COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DENNIS J. HERMAN (220163)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)
dherman@csgrr.com
dpfefferbaum@csgrr.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JERRY TWINDE, On Behalf of Himself and All Others Similarly Situated, <br><br>                          Plaintiff, <br><br>         vs. <br><br> THRESHOLD PHARMACEUTICALS, INC., et al., <br><br>                          Defendants. | No. 4:07-cv-04972-CW <br><br> <u>CLASS ACTION</u> <br><br> CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br> <u>DEMAND FOR JURY TRIAL</u> |
| RAYNOLD L. GILBERT, On Behalf of Himself and All Others Similarly Situated, <br><br>                          Plaintiff, <br><br>         vs. <br><br> THRESHOLD PHARMACEUTICALS, INC., et al., <br><br>                          Defendants. | No. 4:07-cv-04971-CW <br><br> <u>CLASS ACTION</u> |

1

**TABLE OF CONTENTS**

2

Page

3    I.     INTRODUCTION ............................................................................1

4    II.    JURISDICTION AND VENUE ......................................................5

5    III.   THE PARTIES................................................................................6

6    IV.    SOURCES OF ALLEGATIONS ....................................................7

7    V.     BACKGROUND TO THE CLASS PERIOD ................................8

8           A.    Symptomatic BPH and Urinary Problems ...........................10

9           B.    Lonidamine (TH-070)...........................................................11

10          C.    Market Opportunity for TH-070 ..........................................12

11          D.    Threshold Could Not Complete Clinical Trials of TH-070 Without
                  Additional Funding ..............................................................13

12
            E.    Threshold Generates Purportedly Positive Results in a Quickly Thrown
13                Together Study of Thirty Patients in Bari, Italy ..................15

14   VI.    THRESHOLD ISSUES MATERIALLY FALSE AND MISLEADING PROXY
            AND REGISTRATION STATEMENTS FOR TWO PUBLIC OFFERINGS IN
15          VIOLATION OF THE 1933 ACT..................................................17

16          A.    Misleading Statements in IPO Prospectus and Registration Statement.................18

17          B.    Misleading Statements in Prospectus and Registration Statement for the
                  Follow-on Offering ...............................................................26
18
            C.    Threshold's Generic Risk Warnings Were Misleading to Investors ....................31
19
20   VII.   MATERIALLY FALSE AND MISLEADING STATEMENTS PERTAINING
            TO CLAIMS UNDER THE 1934 ACT...........................................33

21          A.    Selick Falsely Claims Threshold Has "Replicated" Bari Study Data and
                  TH-070 Is a "Home Run" ....................................................33
22
            B.    Threshold Misled Investors by Announcing the Completion of Clinical
23                Trial Enrollment Without Revealing Additional Risks to the Safety and
                  Efficacy of TH-070 ..............................................................35
24
            C.    Misleading Statements in May 10, 2006 Announcement of 1Q06 Financial
25                Results and Highlights ..........................................................39

26          D.    Threshold Reveals Some Toxicity Problems Affecting TH-070, Sending
                  Stock Price Crashing, but Fails to Identify Full Extent of Those Problems
27                and Falsely Claims TH-070 Remains Promising and Efficacious........................40

28

**Page**

E.    Threshold Finally Admits TH-070 Does Not Work and Cancels Its
Clinical Program for the Drug, Again Sending Its Stock Price Plummeting.........46

VIII.    PROXIMATE LOSS CAUSATION/ECONOMIC LOSS ................................................48

A.    Applicability of Presumption of Reliance: Fraud on the Market Doctrine............49

B.    Defendants' False and Misleading Statements Proximately Caused
Economic Loss to Threshold's Investors................................................................50

IX.    GROUP PLEADING ALLEGATIONS ................................................................................51

X.    ADDITIONAL SCIENTER ALLEGATIONS IN SUPPORT OF 1934 ACT
CLAIMS ..............................................................................................................................51

A.    Sofinnova Dumps 75% of Its Shares Just Weeks Before the FDA Is Told
of Significant Liver Toxicity Problems Discovered During TH-070 Trials..........51

B.    Three Arch Management Dumps Their Investments in Threshold
Immediately Following Threshold's Claim that TH-070 Will Be a "Home
Run" and Just Weeks Before Threshold Informs the FDA of Liver
Toxicity Problems .................................................................................................54

C.    Selick's and Swearson's Salaries and Bonuses Were Dependent upon the
Purported Success of TH-070, and Dropped Significantly Just Before the
Company Revealed TH-070 Was Toxic to Patients and Did Not Work ...............56

D.    Unexplained Heavy Trading on May 11, 2006 Suggests that Inside
Information Leaked to the Market .........................................................................57

XI.    CLASS ACTION ALLEGATIONS .....................................................................................57

## I.     INTRODUCTION

1.     This is a securities fraud class action on behalf of all purchasers of the publicly traded common stock of Threshold Pharmaceuticals, Inc. ("Threshold" or the "Company") between February 4, 2005 and July 14, 2006 (the "Class Period"), including those who purchased stock in or traceable to the Company's February 4, 2005 initial public offering ("IPO") or its October 12, 2005 follow-on offering ("Follow-on Offering").   The claims asserted herein are brought against Threshold and two of its current or former officers and directors: Harold E. "Barry" Selick ("Selick"), Threshold's Chief Executive Officer ("CEO") and a member of its Board of Directors, and Janet I. Swearson ("Swearson"), Threshold's Chief Financial Officer ("CFO") during the Class Period.  Plaintiffs assert claims on behalf of the proposed Class for violations of both the Securities Act of 1933, 15 U.S.C. §§77a, *et seq.* ("1933 Act") and the Securities Exchange Act of 1934, 15 U.S.C. §§78a, *et seq.* ("1934 Act").

2.     Threshold is a development-stage drug company.  Threshold's drug candidates rely on a process it describes as "Metabolic Targeting" in which drugs target abnormal glucose metabolism to starve and kill off diseased cells while leaving healthy cells with normal glucose metabolism unharmed.  Threshold claimed this process offered advantages over existing treatments, including fewer side effects and applicability to a wider range of conditions.  Prior to the Class Period, Threshold was developing a drug known as "TH-070" for the treatment of Benign Prostatic Hyperplasia, or "BPH."  BPH is a disease common among middle-aged and elderly men that causes the prostate to enlarge, resulting in urinary problems and related conditions.  Although TH-070 was one of three later-stage drugs being developed at the time of Threshold's IPO, it was, by virtue of the $1.6 billion market for BPH drugs, far and away the most important product to investors.

3.     While BPH can have significant lifestyle impacts, it is not a life threatening disease.  However, to treat the condition Threshold was relying on lonidamine (the active ingredient in TH-070), a drug that had previously been approved in Italy only for seriously ill cancer patients.  Lonidamine was not a drug developed by Threshold.  Rather, it was simply an existing drug that appeared to exhibit certain "Metabolic Targeting" tendencies like the drugs Threshold hoped to one day develop on its own.

4.      By 2004, Threshold had raised over $50 million in private financing yet lacked the necessary funds to complete clinical trials for TH-070 and another drug candidate, glufosfamide. With additional private equity investment drying up, Threshold turned its attention to the public markets and began planning for its IPO.  To assure investors that TH-070 was a viable candidate for the BPH market, Threshold planned a quick study of 60 patients in Bari, Italy treated with lonidamine.  Before the Bari Study was complete, Threshold got the results it wanted, cancelled the second half of the study, and told investors it had statistically significant results demonstrating that TH-070 worked better than existing BPH treatments, including blockbuster drugs Flomax and Proscar.  Threshold also told investors that TH-070 was well tolerated and safe, with no serious side effects.

5.      Threshold repeatedly trumpeted the purportedly positive results of the Bari Study to the market, permitting it to complete both its IPO and the Follow-on Offering and raising more than $100 million in cash the Company needed to survive as a going concern.  Threshold used this money to fund phase 2 and 3 clinical trials of TH-070 and glufosfamide, as well as to pay generous salaries and bonuses and provide potentially lucrative stock options to its senior management, including Selick and Swearson.

6.      Plaintiffs bring claims under the 1933 Act for false and misleading statements contained in the Prospectuses and Registration Statements for the two offerings regarding the safety and efficacy of TH-070 to treat BPH, including statements that the drug showed "statistically significant improvements with no therapy related side effects," had "demonstrate[d] tolerability" in prior clinical trials, had demonstrated the ability to "kill[] prostate cells disproportionately" and worked better at increasing urine flow, reducing prostate size, and improving International Prostate Symptom Scores than either Flomax or Proscar.  In fact, as the Company later admitted, ***TH-070 had no statistically significant benefit to BPH patients, worked no better than a placebo, and caused significant serious side effects in the livers of patients taking the drug***.

7.      Plaintiffs' claims for the false and misleading statements in the Registration Statements and Prospectuses for the two offerings are brought under the 1933 Act only, and are grounded in strict liability and negligence.  Plaintiffs do not assert claims of deliberate misconduct

1    with respect to those false statements.  Plaintiffs do assert claims for deliberate misconduct in

2    violation of Securities and Exchange Commission ("SEC") Rule 10b-5 and the 1934 Act for later

3    false and misleading statements regarding the safety and efficacy of TH-070.

4         8.    On March 1, 2006, in connection with the release of Threshold's 4Q05 financial

5    results, Selick told investors that clinical data from the ongoing phase 2 and 3 clinical trials had

6    "replicated" the results of the Bari Study and that TH-070 would be a "home run" drug.  This, of

7    course, was false because, as later admitted, there *was never any data* replicating the Bari Study or

8    otherwise showing that TH-070 worked better than a placebo or had any positive clinical effect

9    whatsoever.  Shortly after these statements were made, four significant events took place.

10        9.    On March 3, 2006, just two days after Selick pumped the stock, one of Threshold's

11   early investors, Three Arch Partners ("Three Arch"), which included Threshold founder George

12   Tidmarsh ("Tidmarsh") and director Wilfred E. Jaeger ("Jaeger") among its members, suddenly

13   dumped 1 million of its shares on the market for $14.5 million.  Two weeks later, on March 16,

14   2006, another early investor, Sofinnova Ventures, Inc. ("Sofinnova"), a venture capital firm run by

15   Threshold director Michael F. Powell ("Powell") and which counts Selick among its Venture

16   Partners, suddenly liquidated, in one day, 75% of its holdings, amounting to more than 2.5 million

17   shares and netting proceeds in excess of $36.5 million.  On March 31, 2006, Tidmarsh suddenly and

18   unexpectedly resigned from the Company to pursue other interests.

19        10.   Then, on April 10, 2006, Threshold told the Food and Drug Administration ("FDA")

20   – but not the public – that one of the patients in the phase 3 clinical trial of TH-070 had developed

21   elevated liver enzymes that were more than *30 times* normal levels.  Moreover, according to an

22   internal company source, by April 2006, additional *unreported* evidence of liver toxicity in at least

23   two other patients involved in the clinical trials of TH-070 had also arisen.

24        11.   Throughout this period, defendants continued to make positive statements about TH-

25   070 and its prospects for success, including announcements that enrollment in both clinical trials had

26   been completed, advising investors that final results would be available around October 2006, and

27   reiterating the purportedly positive results of the Bari Study.  Even when Threshold announced its

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS - 4:07-cv-04972-CW                                              - 3 -

1  1Q06 financial results on May 10, 2006, it continued to advise investors that TH-070 was on track

2  for success.

3         12.    The very next day, May 11, 2006, Threshold shocked investors by revealing that TH-

4  070 had *caused significant liver problems in at least six patients* being treated in the ongoing

5  clinical trials, and that, as a result, *the FDA had ordered that the drug trials be halted pending*

6  *further investigation of the toxicity issues*.  Although this announcement caused Threshold's stock

7  to collapse, falling from $14 to $3.44 and losing 75% of its value in a single day, defendants sought

8  to stem even further losses by falsely claiming that TH-070 remained promising as a treatment for

9  BPH, and minimizing both the significance of the liver toxicity issues that had arisen and the

10  seriousness of the FDA's response.  Based on these misrepresentations, the market for Threshold

11  stock remained active, and its stock traded at elevated trading volumes for the remainder of the Class

12  Period.  Then, before the market opened on July 17, 2006, Threshold shocked investors again by

13  finally revealing that TH-070 worked no better than a placebo, admitting that the liver toxicity

14  problems were more widespread than previously revealed and involved at least 16 patients in the two

15  clinical studies, and that, as a result, *the TH-070 program was being cancelled, as there was no*

16  *commercial potential for the drug*.[1]  This announcement again caused Threshold's stock price to

17  collapse, dropping from $3.18 to $1.55 and losing an additional 51% of its value in a single day.

18         13.    Defendants' false and misleading statements about the safety and efficacy of TH-070

19  caused Threshold's stock to trade at artificially inflated levels during the Class Period, causing harm

20  to investors who purchased shares in or traceable to the two offerings or in the aftermarket when the

21  stock price dropped in response to the May 11, 2006 and July 17, 2006 disclosures described above:

22

23

24

25

26  [1]     This announcement was made before the market opened on July 17, 2006, which was a
27  Monday.  For this reason, the Class Period ends on July 14, 2006, the last full public trading day
   before that announcement.

28

1
2
3
4
5
6
7
8
9
10
11



12   14.   Since the events complained of herein, Threshold has continued to suffer setbacks.

13  On February 26, 2007, the Company announced that its phase 3 clinical trial for glufosfamide for the

14  treatment of pancreatic cancer had failed, and on October 11, 2007, it announced that studies to

15  evaluate the use of that drug to treat other cancers had also failed.  On July 30, 2007, Threshold's

16  stock fell below $1, and it has remained there since September 6, 2007, placing it in danger of being

17  delisted from NASDAQ (the National Association of Securities Dealers Automated Quotation

18  System).  Its stock presently trades at just $0.47 per share.  The Company's early investors,

19  including Three Arch, Sofinnova and their beneficiaries – Selick, Tidmarsh, Powell, Jaeger and

20  others – were able to recoup much of their investments through Class Period sales of their stock,

21  while Company insiders profited handsomely as a result of the generous salaries and bonuses they

22  were paid out of the public offering proceeds.  Meanwhile, Threshold's public investors, the

23  members of the Class proposed here, have been left holding the bag.

24  **II.    JURISDICTION AND VENUE**

25   15.   The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the

26  1933 Act (15 U.S.C. §§77k, 77l(a)(2) and 77o) and §§10(b) and 20(a) of the 1934 Act (15 U.S.C.

27  §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

28

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act and §27 of the 1934 Act.

17. Venue is proper pursuant to §22 of the 1933 Act and §27 of the 1934 Act. The Company is located in the District, and most of the false and misleading statements were concocted at the Company's office within the District.

## III. THE PARTIES

18. Lead plaintiff Michael Hentosh ("Hentosh") purchased Threshold common stock, including shares purchased in or traceable to Threshold's public stock offerings on February 4, 2005 and October 12, 2005 during the Class Period as described in the attached certification, and was damaged as a result of defendants' false and misleading statements. *See* Ex. A, attached hereto.

19. Named plaintiff Christopher Lee ("Lee") purchased Threshold common stock during the Class Period, including shares purchased in or traceable to Threshold's February 4, 2005 public offering, as described in the attached certification, and was damaged as a result of defendants' false and misleading statements, as described in the initial complaint he filed in No. 07-CV-04972 consolidated herein. *See* Ex. B, attached hereto.

20. Named plaintiff Jerry Twinde ("Twinde") purchased Threshold common stock during the Class Period and was damaged as a result of defendants' false and misleading statements, as described in the initial complaint he filed in No. 07-CV-04972 consolidated herein.

21. Named plaintiff Raynold Gilbert claims to have purchased Threshold common stock during the Class Period and suffered damages as a result of defendants' false and misleading statements, as described in the complaint filed in No. 07-CV-04971 consolidated herein.

22. Hentosh, Lee, Twinde and Gilbert are referred to collectively herein as "plaintiffs."

23. Defendant Threshold Pharmaceuticals, Inc. ("Threshold" or the "Company") is a biotechnology company focused on the discovery, development and commercialization of drugs based on a process it described as "Metabolic Targeting." Threshold was incorporated as a Delaware corporation in 2001. The Company's principal place of business is at 1300 Seaport Boulevard, 5th Floor, Suite 500, Redwood City, California, 94063. The Company's common stock is traded on the NASDAQ under the ticker symbol THLD.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:07-cv-04972-CW                                                                 - 6 -

1       24.     Defendant Harold E. "Barry" Selick ("Selick") is, and at all relevant times has been, Threshold's CEO and a member of its Board of Directors. Selick joined the Company in May 2003. Between June 2002 and July 2007, Selick was a Venture Partner of Sofinnova Ventures, Inc. ("Sofinnova"), a venture capital firm that owned more than 10% of Threshold's publicly issued stock during the Class Period. Selick signed the Registration Statements for Threshold's public stock offerings on February 4, 2005 and October 12, 2005.

25.     Defendant Janet I. Swearson ("Swearson") served as CFO and Vice President, Finance and Administration of Threshold from September 2002 until her resignation in August 2006. She remained a consultant to the Company until the end of 2006. Swearson signed the Registration Statements for Threshold's public stock offerings on February 4, 2005 and October 12, 2005.

26.     Defendants Selick and Swearson are collectively referred to herein as the "Individual Defendants." During the Class Period, Threshold had only four executive officers, including Individual Defendants Selick and Swearson.

## IV.    SOURCES OF ALLEGATIONS

27.     The allegations contained herein are based upon investigation of counsel, including a review of SEC filings issued by Threshold, news articles, securities analyst reports, advisories about the Company, press releases and other public statements issued by the Company or its representatives, media reports about the Company, and the first-hand accounts of confidential witnesses, including:

(a)    Confidential Witness No. 1 ("CW1"), a former executive with the Company who oversaw Threshold's clinical operations, including the phase 2 and 3 clinical trials of TH-070, during 2006;

(b)    Confidential Witness No. 2 ("CW2"), a former clinical research coordinator with one of the companies involved in the phase 2 clinical trial of TH-070 conducted during the Class Period;

(c)    Confidential Witness No. 3 ("CW3"), a receptionist who worked at Threshold during 2006;

1          (d)      Confidential Witness No. 4 ("CW4"), an executive assistant with Threshold

2  during 2006;

3          (e)      Confidential Witness No. 5 ("CW5"), who worked in Threshold's information

4  technology department throughout the Class Period; and

5          (f)      Confidential Witness No. 6 ("CW6"), an administrative assistant in

6  Threshold's clinical department throughout the Class Period.

7  **V.      BACKGROUND TO THE CLASS PERIOD**

8          28.      Threshold is a biotechnology company focused on the discovery, development and

9  commercialization of drugs based on Metabolic Targeting, an approach that targets differences in

10  metabolism between normal and certain diseased cells.  During the Class Period, Threshold claimed

11  to be "building a pipeline of drugs that are designed to selectively target tumor cells so that the drugs

12  are less toxic to healthy tissues than conventional drugs, thereby providing improvements over

13  current therapies."

14          29.      As of November 30, 2004, shortly before its IPO, Threshold had 42 employees and

15  three drug candidates: (i) TH-070 for the treatment of benign prostatic hyperplasia ("BPH"); (ii)

16  glufosfamide for the treatment of pancreatic cancer; and (iii) 2-deoxyglucose ("2-DG") for the

17  treatment of solid tumors.  Though glufosfamide appeared to be closest to FDA approval, having

18  commenced its pivotal phase 3 trial in September 2004, TH-070 was the most eagerly anticipated by

19  the investment community due to its targeting of the $1.6 billion market for BPH, as compared with

20  an estimated $400 million market for pancreatic cancer treatment.

21          30.      The active ingredient in TH-070 is lonidamine, a drug not approved for distribution in

22  the United States but which had been approved in Italy to treat solid tumors in seriously ill cancer

23  patients.  Following purportedly successful results of a limited and quickly conducted phase 2 trial of

24  TH-070 among a small group of BPH patients in Italy, Threshold announced its IPO of publicly

25  traded common stock.  Threshold used the results of the study, conducted at Bari University in Bari,

26  Italy (the "Bari Study"), to prime the market for its IPO, which was completed on February 4, 2005,

27  raising $38 million in much-needed capital for the Company.  A subsequent Follow-on Offering

28

1    completed on October 12, 2005, netted an additional $62 million which the Company needed to

2    continue its clinical trials for TH-070 and its other drug candidates.

3        31.    In the Registration Statements and Prospectus for the two offerings and elsewhere,

4    defendants repeatedly claimed that the Bari Study results evidenced great promise for the ultimate

5    success of TH-070. *Infra* §VI. Defendants led the market to believe that, by virtue of its past use to

6    treat cancer patients in Italy, there was little risk of adverse health effects with lonidamine, and the

7    side effects that could be expected were much milder than with existing treatments for BPH,

8    including the widely advertised prescriptions drugs Flomax and Proscar. *Id*. Both of these

9    statements were false.

10        32.    The limited results from the 28-day study of 30 patients in Bari, Italy provided no

11   basis at all claiming TH-070 was safe and effective or for predicting success of the phase 2 and 3

12   clinical trials, including more than 700 patients located throughout the United States and Europe.

13   For example, a well-documented placebo effect had been recognized in prior clinical studies of BPH

14   that Threshold claimed to have analyzed in planning and carrying out the Bari Study – demonstrating

15   that little weight should be given to the results of the non-placebo controlled study.  The Bari Study

16   represented little more than a quick investigation designed to generate results that, if positive, could

17   be leveraged into a stock offering that would provide the funds necessary to figure out whether or

18   not TH-070 had *any* real promise as a potential treatment for BPH.  As CW1 stated, the Bari Study

19   was designed merely to detect "a hint" of a positive response from the drug.  At the end of the Class

20   Period, Threshold admitted that TH-070 did not work any better than a placebo in treating the

21   symptoms of BPH.

22        33.    Neither did lonidamine's past use to treat cancer patients in Italy demonstrate that

23   TH-070 would be safe when administered to the general healthy population suffering from moderate

24   BPH, a common and relatively non-serious, though bothersome, side effect of aging that affects

25   nearly all men by the time they reach 70 years old.  In fact, as defendants later acknowledged on a

26   conference call to discuss the onset of liver problems among patients taking TH-070 in advanced

27   clinical trials, there were repeated instances of elevated liver enzymes found even in blood tests of

28   cancer patients who had taken lonidamine in prior clinical studies of the drug.  Contrary to

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS - 4:07-cv-04972-CW                                          - 9 -

1    Threshold's public statements, the Bari Study was not adequately designed to determine whether or

2    not TH-070 was safe when administered for BPH.  The Bari Study was too short in duration to

3    determine the safety of the drug, and also permitted patients with pre-existing elevated liver

4    functions to participate, thereby masking any potential adverse health impacts of the drug.  Even

5    with these significant limitations, at least one patient in the study (3.8% of the participants)

6    experienced elevated levels of liver enzyme – a fact that was not publicly reported prior to the IPO,

7    and contradicted Threshold's statements that the drug was "well tolerated" with "no therapy-related

8    side effects."

9        **A.    Symptomatic BPH and Urinary Problems**

10       34.    BPH is a condition that affects middle-aged and elderly men by restricting the flow of

11   urine.  As the prostate enlarges, it can partially or completely block the urethra leading to a variety of

12   urinary and bladder symptoms.  Given the enormous patient population and the relative inadequacy

13   of existing drugs, a fast, safe and effective treatment for BPH has tremendous market opportunity.

14       35.    Unlike most organs, the prostate gland continues to grow throughout a man's adult

15   life.  This non-malignant growth or enlargement is called Benign Prostatic Hyperplasia, or BPH.

16   Because the prostate wraps around the urethra, enlargement may impinge the urethra restricting or

17   obstructing urine flow and affecting urine retention.  Urine retention can cause a weakening of the

18   bladder wall resulting in the inability to completely empty the bladder.  Symptoms including

19   difficulty urinating, urinary hesitancy, and frequent urination increased risk of urinary tract

20   infections, urinary retention.  These symptoms are collectively referred to as Lower Urinary Tract

21   Symptoms ("LUTS").  If left untreated, severe BPH can lead to kidney and bladder damage, bladder

22   stones and incontinence.

23       36.    The International Prostate Symptom Score ("IPSS") is a clinically validated seven

24   question, self-administered questionnaire used by medical practitioners to assess LUTS.  Scores

25   from 0 to 7 are considered "mild," scores from 8 to 19 are "moderate" and scores from 20 to 35 are

26   "severe."  Other measurements used to assess the extent of BPH are a patient's maximum urine flow

27   rate (uroflowmetry), the amount of urine left in a bladder after urination is complete (called the "post

28

1   void residual volume"), the size of the prostrate (expressed as prostate volume), and the level of

2   Prostate Specific Antigen ("PSA"), a protein produced by the prostate gland, in the blood.

3         **B.**    **Lonidamine (TH-070)**

4         37.    Defendants claimed that lonidamine – an indazole-3-carboxylic acid – disrupted

5   glycolysis in glandular prostate epithelial cells, the cells that overgrow in BPH.  As a result,

6   Threshold claimed that the targeted cells are unable to generate energy, thereby causing the prostate

7   gland to shrink, relieving symptoms and effectively reversing the aging process of the prostate.

8   Although Threshold claimed that reducing prostate size would relieve symptomatic BPH, the

9   relationship between prostate size and BPH was more complex, such that simply shrinking the

10  prostate would not necessarily relieve or cure BPH, particularly among patients with only mild or

11  moderate symptoms.

12        38.    Lonidamine was approved for use in Italy in the mid-1980 as a monotherapy for the

13  treatment of prostate, brain, breast and lung cancer.  Threshold's preparation of lonidamine was

14  designated TH-070.  In June 2004, Threshold licensed worldwide rights to the use of lonidamine for

15  treatment of BPH from Acraf S.p.a. ("Acraf").  The terms of the license agreement gave Threshold

16  the rights to use Acraf's regulatory documents and pre-clinical and clinical information pertaining to

17  lonidamine in its regulatory filings on TH-070-based products and for obtaining marketing

18  authorizations for such products.

19        39.    The information obtained from Acraf included reports of approximately 80 studies

20  involving lonidamine.  Twenty of those were controlled clinical studies involving over 3,500

21  patients.  The studies were not widely disseminated or easily obtained or understood by the investing

22  public, which relied on defendants' statements summarizing the clinical history of lonidamine.  The

23  Company has admitted that these studies reflect repeated anecdotal evidence which could suggest

24  that lonidamine elevates liver enzymes.  On a May 11, 2006 conference call, following the revelation

25  of serious liver problems among patients taking TH-070 in clinical trials, Threshold's medical

26  director, Alan Colowick ("Colowick"), conceded: "***There are studies in which numerically, in some***

27  ***studies, the liver toxicity was higher numerically***."

28

C.    **Market Opportunity for TH-070**

40.    Prior to and during the Class Period, Threshold represented that there was an enormous market for TH-070, and that it would compete directly with Flomax and other widely prescribed drugs used to treat BPH.  In its February 3, 2005 IPO Registration Statement, for example, the Company stated the following:

*BPH Market Opportunity*

*        *        *

The National Institutes of Health, or NIH, estimates that more than 50% of men in their sixties and approximately 90% of men over seventy have some symptoms of BPH.  Approximately 17 million men in the United States, 27 million men in five major European countries and eight million men in Japan are estimated to suffer from symptoms of the disease and could benefit from a safe and effective treatment for BPH.  Approximately 21% of them have been diagnosed, of which 59% receive medical therapy.  In the United States, 2.0 million men are treated with drugs.  These numbers are expected to increase in the future due to increased awareness and the aging population.

The two major drugs approved to treat BPH, Flomax and Proscar, had combined worldwide revenues of over $1.6 billion in 2003.  Alpha adrenergic receptor blockers, such as Flomax, work by relaxing the smooth muscle in the urethra and bladder and do not change the size of the prostate.  In clinical studies of Flomax for the treatment of BPH symptoms, the average increase in urine flow was approximately 1.8 mL/sec. after four weeks of treatment.  5-alpha reductase inhibitors, such as Proscar and recently approved Avodart, work by blocking production of the hormones that stimulate the growth of new prostate cells but do not immediately kill existing cells.  Consequently, this class of drugs has a slow onset, typically requiring daily treatment for many months before improving patient symptoms.  In clinical studies of Avodart, the average increase in urine flow was approximately 1.6 mL/sec. and the average decrease in prostate size was approximately 8% after four weeks of treatment.

TH-070 offers the potential to treat symptomatic BPH via a novel mechanism, by reducing the prostate size through Metabolic Targeting. By directly inhibiting glycolysis in prostate cells, we expect TH-070 to reduce the size of the prostate more rapidly than current medical treatments, without the attendant side effects, which include decreased libido, impotence and cardiovascular effects.

41.    Threshold stated in the IPO Registration Statement that TH-070 would compete directly with other BPH drugs on the market:

*Competition for our BPH Product Candidate*

Our TH-070 product candidate for the treatment of symptomatic BPH will compete with alpha adrenergic receptor blockers, including Flomax ® , co-marketed by Boehringer Ingelheim and Abbott Laboratories, and Cardura ® , marketed by Pfizer, and with 5-alpha reductase inhibitors, including Proscar ® , marketed by Merck, Avodart ® , marketed by GlaxoSmithKline, and Xatral ® , marketed by the

sanofi-aventis Group. . . .   The leading BPH drugs are Flomax, which had worldwide 2003 sales of approximately $1 billion, and Proscar, which had worldwide 2003 sales of approximately $600 million.

42.    Based on these and similar statements, the market recognized that the investment thesis for Threshold was based upon the success of TH-070.  In initiating coverage on the Company with a buy rating and a $17 price target on September 20, 2005, Fortis Bank recognized that TH-070 was the Company's "most significant potential revenue driver," while repeating the Company's claims that the Bari Study had "showed promising efficacy in men with symptomatic BPH" with a "benign side effect profile."  A day later, Baird/U.S. Equity Research issued a similar report with an outperform rating and $17 price target, again noting the purported "significant improvement" in BPH symptoms in the Bari Study and the "particularly large market" for TH-070.  Other analysts followed with similar reports.

**D.    Threshold Could Not Complete Clinical Trials of TH-070 Without Additional Funding**

43.    Prior to the Class Period, the Company had no marketable products and was not generating any revenue.  Furthermore, the Company was experiencing escalating costs attributable to the high cost of clinical trials, its primary expenditure.  According to Threshold's February 4, 2005 prospectus and Registration Statement:

> We expect our net losses to increase primarily due to our anticipated clinical trial activities.  Clinical trials are costly, and as we continue to advance our product candidates through development, we expect our research and development expenses to increase significantly, especially as we continue our pivotal Phase 3 clinical trial of glufosfamide and begin a registrational program for TH-070 for the treatment of symptomatic BPH in the first half of 2005.  Compared to Phase 1 and Phase 2 clinical trials, Phase 3 clinical trials typically involve a greater number of patients, may be conducted at multiple sites and in several countries, are conducted over a longer period of time and require greater quantities of drug product.

44.    Primarily due to its rising research and development ("R&D") expenses, Threshold's operating expenses and net losses for calendar years 2001 to 2004 had grown at an exponential rate:

| ($000s) | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|
| Research and Development | $35 | $2,179 | $6,252 | $16,327 |
| General and administrative | $201 | $306 | $2,057 | $7,649 |
| Total Operating Expenses | $236 | $2,485 | $8,309 | $23,976 |
| Net Losses | ($236) | ($2,458) | ($8,303) | ($23,566) |

45.    R&D expenses continued to rise during the Class Period as a result of the clinical trials associated with TH-070 and glufosfamide:

| THLD R&D EXPENSE ($000s) | 2004 | 2005 | 2006 |
|---|---|---|---|
| TH-070 | $3,269 | $13,842 | $15,647 |
| Glufosfamide | $7,522 | $12,009 | $17,018 |
| Other | $5,536 | $10,140 | $13,602 |
| Total R&D Expense | $16,327 | $35,991 | $46,267 |

46.    As a result, Threshold was burning through an increasing amount of cash each year in its attempt to develop a viable and profitable drug candidate, as reflected in its annual cash flow statements:

| ($000s) | 2004 | 2005 | 2006 | Cumulative (10/17/01 – 12/31/06) |
|---|---|---|---|---|
| Net Cash Used in Operating Activities | ($10,800) | ($29,879) | ($46,424) | ($96,282) |

47.    By the end of 2004, Threshold had $28.6 million in cash and equivalents on hand, and had been burning cash at a rate of $2.1 million per month. Moreover, the Company was projecting a cash burn of $32 to $38 million for 2005 – an increased burn rate of $2.6 to $3.2 million per month. With no anticipated income from operating activities and expenses expected to increase as a result of the clinical trials of glufosfamide and TH-070, the Company plainly required an additional infusion of cash to remain in business.

48.    From its inception in 2001 through 2004, Threshold had relied on private placements to generate funding. In 2001 and 2002, Threshold raised $9 million through the sale of Series A convertible preferred stock. In November 2003, it raised an additional $40.9 million through the sale of Series B convertible preferred stock. In November 2004, the Company entered into a development agreement with MediBIC Co., Ltd. for which it received an upfront payment of $4.75 million in December 2004 to support the development of glufosfamide in the Asian countries

1    covered by the agreement.[2]  Having already raised more than $50 million of private equity,

2    Threshold's ability to tap the private markets for additional funding was limited.  Threshold thus set

3    its sights on the public markets, and began planning for its IPO.

    E.    **Threshold Generates Purportedly Positive Results in a Quickly**
4          **Thrown Together Study of Thirty Patients in Bari, Italy**

5    49.    To attract public investors, Threshold needed a drug candidate with a huge market

6    potential.  TH-070, targeted at the reported $1.6 billion market for the treatment of BPH, was the

7    Company's only candidate to fill this need.  By comparison, its only other drug candidate

8    undergoing clinical trials at the time was glufosfamide, which was targeted at the much smaller $400

9    million market for the treatment of pancreatic cancer.  In addition, TH-070 relied upon an existing

10   drug – lonidamine – that exhibited Metabolic Targeting properties, as opposed to an entirely new

11   compound that would have to be developed from scratch through costly and uncertain internal R&D

12   efforts.

13   50.    Although Threshold had $40.8 million in cash on hand at the outset of 2004 as a

14   result of its private sale of Series B stock, the Company lacked the capital necessary to mount a full

15   scale phase 2 or 3 study necessary to secure FDA approval for TH-070 while also pursuing approval

16   for glufosfamide and its other drug candidates.  Threshold, therefore, devised a plan to fund a very

17   limited, small scale study on foreign soil, hoping to achieve positive results it could then leverage

18   into a successful IPO to obtain the funding it needed.

19   51.    In January 2004, Threshold initiated a phase 2 clinical trial managed by PPD

20   Development, L.P. and PPD Global Limited (collectively, "PPD"), at the University of Bari on the

21   Adriatic coast of Italy.  Threshold told potential investors the Bari Study was "designed to evaluate

22   the safety and efficacy of TH-070 in patients with symptomatic BPH."  Although PPD was

23   responsible for managing the clinical trials, it had regular communications with the two Threshold

24   project managers overseeing the clinical trials, who reported to CW1.  According to CW5, data from

25

26   _____

27   [2]    This was a related party transaction: Selick's wife was Chief Operating Officer and a director
     of Anexus Pharmaceuticals, Inc., which is a subsidiary of MediBIC Co. Ltd.

28

1    the clinical trials was kept in-house on the Company's server in Word, Excel and Adobe Acrobat

2    documents.  Additional databases were also maintained by PPD.

3          52.    Despite its significant drawbacks, the Bari Study became Threshold's primary support

4    for further testing of TH-070 – and for both the IPO and the Follow-on Offering.  The study was

5    described as a "proof of concept" study that was the first to examine the use of lonidamine in the

6    treatment of symptomatic BPH.  As CW1 explained, the main purpose of the Bari Study was merely

7    to determine if there was a "hint" of a response to the drug before proceeding to phase 3 trials.

8          53.    The study was "open-label," meaning that both the researchers and the subjects were

9    aware of the treatment being administered, and there was no placebo arm.  As the principal

10   investigators of the study later acknowledged:

11         ***The drawback of this design is the placebo effect that may elicit misleading results***,
          if not properly corrected for, especially considering the small number of patients and
12         the absence of a blind run-in period. [3]

13         54.    Men between the ages of 50 and 80 years were eligible for inclusion if they met

14   certain criteria.  Fifty percent of the patients were described as "severely symptomatic" and already

15   taking alpha-blockers.  The average IPSS score for patients entering the phase 2 study was 19.5,

16   meaning that the study was skewed towards patients with severe symptomatic BPH.  As a result, the

17   patient population was ***not*** representative of the potential TH-070 market for patients with mild to

18   moderate symptoms, who represented 60%-75% of all symptomatic BPH patients.  This was the

19   market segment with the greatest potential growth, as it involved conditions that were more likely to

20   be viewed as a nuisance condition, such that the problems would either be unreported or left

21   untreated in view of the risks of side effects with existing treatments.  Hence, the very advantage that

22   TH-070 was purported to offer over Flomax and Proscar was not capable of being tested, at all, in

23

24

_____

25   [3]    Clinical Evidence Supporting the Role of Lonidamine for the Treatment of BPH.  Pasquale
     Ditonno, MD*, Michele Battaglia, MD*, Oscar Selvaggio, MD*, Lucio Garofalo, MD*, Vito
26   Lorusso, MD†, Francesco Paolo Selvaggi, MD* *UO Urologia I°, University of Bari, Bari, Italy,
     †UO Oncologia Medica, IRCSS Ospedale Oncologico, Bari, Italy. VOL. 7 SUPPL. 7   2005
27   REVIEWS IN UROLOGY    S27

28

1   the Bari Study.  The Bari Study, therefore, did not and could not prove that TH-070 had any

2   advantage over existing treatments.

3           55.     The Bari Study was originally designed to treat 60 patients, split into two groups of

4   30 patients each.  The first group would receive a daily dose of 150 mg once a day for 28 days, while

5   the second would receive 150 mg three times a day, five days a week, for four weeks.  Between

6   March and August 2004, 30 patients at the Bari University Hospital were recruited for the low dose

7   arm of the study.  Four dropouts were registered, leaving only 26 patients who completed the first

8   arm of the study.

9           56.     Within six months after the Bari Study began, Threshold got the results it wanted and

10  cancelled the remainder of the study.  Even before the required six-month follow-up period for the

11  30 low dose patients was complete, Threshold announced that TH-070 had achieved significant

12  "positive" results after 28 days of dosing, including a purported 11.2% average decrease in prostate

13  volume, a 17.8% decrease in PSA levels, a 7.3 average reduction in IPSS scores, a 3.2 ml/sec

14  increase in maximum urine flow rate, and a 61% decline in post-void urine volume.  Threshold also

15  claimed that the TH-070 was "well tolerated" with no significant side effects.

16          57.     Threshold told investors that, based on the purportedly significant results achieved by

17  the low-dose (150 mg once daily) patients, it had elected not to enroll the second 30 patient group for

18  the higher-dose study (450 mg for five times per week).  In canceling the higher-dose arm,

19  Threshold conserved its rapidly dwindling capital, which it needed not only to fund further studies of

20  TH-070 but also to pay the expense of its ongoing phase 2 and 3 trials of glufosfamide.

21          58.     With the purportedly positive results of the Bari Study in hand, Threshold turned to

22  the capital markets.

23  **VI.     THRESHOLD ISSUES MATERIALLY FALSE AND MISLEADING
            PROXY AND REGISTRATION STATEMENTS FOR TWO PUBLIC
24          OFFERINGS IN VIOLATION OF THE 1933 ACT**

25          59.     Plaintiffs bring claims for violation of §§11, 12(a)(2) and 15 of the 1933 Act.  These

26  claims are grounded in strict liability and negligence only.  Plaintiffs do not assert claims of fraud or

27  intentional misconduct with respect to these claims.

28

60. During the Class Period, Threshold earned nearly $100 million from two public stock offerings: (i) its February 4, 2005 IPO; and (ii) an October 12, 2005 Follow-on Offering. Registration Statements and Prospectuses issued for both offerings misled the investing public about the reliability of the Bari Study and its results, the safety and efficacy of TH-070, and the specific risks to the ongoing phase 2 and 3 trials for the drug.

**A.    Misleading Statements in IPO Prospectus and Registration Statement**

61. On February 4, 2005, Threshold commenced its IPO of 5.3 million shares of common stock at $7 per share. All of the shares were offered by Threshold and traded on the NASDAQ under the THLD symbol. Upon completion of the offering, Threshold earned net proceeds of $38 million.

62. As part of the IPO, Threshold's officers, directors, majority shareholders and other persons owning pre-IPO shares in the Company signed lock-up agreements preventing the public sale of such shares for up to 180 days after the date of the offering. As a result, all of the shares of Threshold that were purchased on the public market during that period were shares that are directly traceable to the Company's IPO.

63. Threshold's February 4, 2005 Prospectus stated the following information about TH-070:

**TH-070**

TH-070, our lead product candidate for the treatment of symptomatic BPH, is being evaluated in a Phase 2 trial in Italy. The primary objective of this trial is to determine the safety and tolerability of TH-070 in patients with BPH. In addition, patients are being evaluated for efficacy as measured by changes in specific variables that have been used in clinical trials of currently marketed BPH drugs to support their FDA approval. The primary endpoint specified in the protocol for our trial is a comparison of prostate size between baseline and day 28 of treatment. We have completed enrollment and are evaluating interim data. We observed statistically significant improvements in all variables measured by day 28. In the study, TH-070 was well tolerated with no therapy-related side effects. The safety and efficacy of TH-070 for the treatment of symptomatic BPH will need to be demonstrated in subsequent trials. Based on these interim Phase 2 results, we are designing a registrational program for TH-070 to treat symptomatic BPH. Our registrational program will include multiple multi-center, randomized, double-blinded, placebo-controlled studies, including at least one dose-comparison study. We expect to commence two clinical trials in the first half of 2005, one of which we believe will be a Phase 3 trial. There can be no assurance that regulatory agencies will consider this Phase 3 trial pivotal. Our registrational program will include additional trials.

TH-070 is an orally administered small molecule that has been reported to inhibit the enzyme that catalyzes the first step in glycolysis. **We initially selected TH-070 to treat BPH based on** our understanding that prostate cells rely predominantly on glycolysis for energy production as well as **published animal data and human clinical data demonstrating tolerability**.

TH-070 offers the potential to treat symptomatic BPH via a novel mechanism, by reducing the prostate size through Metabolic Targeting. By directly inhibiting glycolysis in prostate cells, we expect TH-070 to reduce the size of the prostate more rapidly than current medical treatments, without the attendant side effects, which include decreased libido, impotence and cardiovascular effects.

\*     \*     \*

*Metabolic Targeting For BPH*

We are also using Metabolic Targeting to develop a new class of drugs for BPH that may offer an improvement over current treatments. BPH is an overgrowth of prostate cells that results in a tumor that can restrict urine flow and cause a number of debilitating symptoms. Like hypoxic cancer cells, prostate cells in BPH tissue depend on glycolysis for energy production. These cells divert citrate, a molecule required for energy production by the citric acid cycle, into the seminal fluid to support the sperm, and therefore these cells cannot produce energy from the citric acid cycle. This process is mediated by the accumulation of high levels of zinc, which blocks citrate metabolism and disables the citric acid cycle in these prostate cells. These cells are therefore highly dependent on glycolysis for energy production. We are focused on developing new BPH therapies by targeting the metabolism of glucose by prostate cells. **Preclinical studies and our interim Phase 2 data suggest that our product candidate TH-070 inhibits glycolysis and kills prostate cells disproportionately since normal cells can rely on the citric acid cycle for energy production**. Current therapies either address BPH symptoms without addressing the underlying condition, or block growth of new prostate cells without reducing prostate size. We believe our product candidate treats both the symptoms of BPH and underlying condition as well as reduces prostate size.

\*     \*     \*

**TH-070**

TH-070, our lead product candidate for the treatment of symptomatic BPH, is an orally administered small molecule that has been reported to inhibit glycolysis by inactivating hexokinase, the enzyme that catalyzes the first step in glycolysis. As described above, hypoxic tumor cells and certain prostate cells depend on glycolysis for their energy production. By inhibiting glycolysis, TH-070 kills prostate cells, reducing the size of the prostate, and therefore may provide an effective treatment for symptomatic BPH. **We have completed enrollment and are evaluating interim clinical data from a Phase 2 trial of TH-070 for the treatment of symptomatic BPH**. We plan to initiate a registrational program for this indication in the first half of 2005. **We initially selected TH-070 to treat BPH based on** our understanding that prostate cells rely predominantly on glycolysis for energy production as well as **published animal data and human clinical data demonstrating tolerability**.

\*     \*     \*

The two major drugs approved to treat BPH, Flomax and Proscar, had combined worldwide revenues of over $1.6 billion in 2003. Alpha adrenergic receptor blockers, such as Flomax, work by relaxing the smooth muscle in the urethra and bladder and do not change the size of the prostate. *In clinical studies of Flomax for the treatment of BPH symptoms, the average increase in urine flow was approximately 1.8 mL/sec. after four weeks of treatment*. 5-alpha reductase inhibitors, such as Proscar and recently approved Avodart, work by blocking production of the hormones that stimulate the growth of new prostate cells but do not immediately kill existing cells. Consequently, this class of drugs has a slow onset, typically requiring daily treatment for many months before improving patient symptoms. *In clinical studies of Avodart, the average increase in urine flow was approximately 1.6 mL/sec. and the average decrease in prostate size was approximately 8% after four weeks of treatment*.

TH-070 offers the potential to treat symptomatic BPH via a novel mechanism, by reducing the prostate size through Metabolic Targeting. By directly inhibiting glycolysis in prostate cells, we expect TH-070 to reduce the size of the prostate more rapidly than current medical treatments, without the attendant side effects, which include decreased libido, impotence and cardiovascular effects.

*Prior Clinical Trials and Preclinical Studies*

Studies have shown that, at the highest doses studied, multiple TH-070 doses can shrink the rat prostate by over 40%, and a single oral dose of a TH-070 analog can reduce the size of the rat prostate by up to 24%. Prostate shrinkage occurs at dosages that cause no observable adverse clinical effect on the animals and can be seen within ten days of dosing.

Ongoing Clinical Program

*In January 2004, we initiated a Phase 2 clinical trial managed by PPD Development, L.P. and PPD Global Limited, at the University of Bari, Italy, to evaluate the safety and efficacy of TH-070 in patients with symptomatic BPH. This trial is an open-label, two-arm study designed to enroll a total of 60 patients in two 30-patient dosing schedules of TH-070, 150 mg once a day and 150 mg three times a day. These doses and dosing schedules were based on animal efficacy data as well as human safety data. Based on promising interim data from the low-dose group of patients in this study, we elected not to enroll the high-dose group and instead plan to initiate a registrational program for TH-070 to treat symptomatic BPH in the first half of 2005.*

In our Phase 2 trial, patients are being evaluated at several dates for specific efficacy variables, including prostate size, maximum urine flow rate, prostate specific antigen levels, or PSA, and an assessment of each patient's BPH symptoms called the International Prostate Symptom Score, or IPSS. IPSS is a clinically validated seven question, self-administered questionnaire to assess lower urinary tract symptoms. These efficacy variables include those that have been used as endpoints in previous clinical trials that led to FDA approval of currently marketed BPH drugs. The primary endpoint specified in the protocol for our trial is a comparison of prostate size between baseline and day 28 of treatment.

*In the trial we observed improvements in all variables measured by day 14 of treatment, and further improvements by day 28*. All pvalues were less than 0.005, except for day 14 PSA levels. A p-value is a statistical term that indicates the probability that a desired result is random. The smaller the p-value, the lower the

likelihood that the desired result was random.  **A p-value of 0.05 or less is considered statistically significant**.  These interim results are shown in the table below.

| | Changes from Baseline | | | |
|---|---|---|---|---|
| | Prostate Size | Maximum Urine Flow Rate | IPSS (units) | PSA |
| Day 14 | -6.5% | +3.1 mL/sec | not determined | -1.5% |
| Day 28 | -11.1% | +3.2 mL/sec | -7.3 | -17.8 |

*In particular, at day 28 of treatment the average decrease in prostate size was 5.9 cc (–11.2%), the average increase in maximum urine flow rate was 3.2 mL/sec. (an increase from 9.4 mL/sec to 12.6 mL/sec), and the average decrease in PSA levels was 0.7 ng/mL (–17.8%). TH- 070 was well tolerated with no therapy-related side effects*.  These observations are based on interim data, and we continue to follow all patients enrolled and treated in the trial and will do so for a period of six months from first treatment.  The purpose of looking at longer-term data is to determine whether the improvements are sustained after the treatment regimen has been completed, as well as to confirm the absence of latent adverse effects.

We expect to publish results of this trial in the second quarter of 2005. Based on the interim results, we intend to initiate a registrational program of TH-070 for the treatment of symptomatic BPH in the first half of 2005.  Our registrational program will include multiple multicenter, randomized, double-blinded, placebo-controlled studies, including at least one dose-comparison study.  Although our final trial design is not complete, in future clinical trials we expect to measure the same variables we are measuring in our current Phase 2 trial.  We expect to commence two clinical trials in the first half of 2005, one of which we believe will be a Phase 3 trial.  There can be no assurance that regulatory authorities will consider this Phase 3 trial pivotal. Our registrational program will include additional trials.

64.    Taken as a whole, the statements about TH-070 in Threshold's IPO Registration Statement were materially misleading to investors because they emphasized the purportedly positive results of the Bari Study while minimizing or failing to accurately or completely disclose the specific risks associated with TH-070, including that the results of the Bari Study were unreliable indicators of either the efficacy or safety of the drug.

65.    In particular, the Registration Statement misled investors as to the following facts:

(a)    That the small size of the Bari Study – only 30 patients completed dosing – together with the lack of a blind run-in period or a placebo control created a heightened risk that the results were misleading;

(b)    That lack of correction for the small size, lack of placebo control, and no blind run-in period rendered the statistical results with p values under 0.05 neither reliable or meaningful;

1     (c)  That the sample size of the Bari Study was too small to draw any meaningful

2 conclusions about the efficacy or safety of the drug, rendering the statements that the results of the

3 study were "promising" speculative;

4     (d)  That due to the known and uncorrected placebo effect, there was a significant

5 risk that the results were "misleading" such that the purported improvements in prostate size, flow

6 rate, IPSS scores, or PSA levels could not reliably be linked to the action of the drug rather than an

7 uncorrected placebo effect;

8     (e)  That the results presented for the Bari Study were not comparable with the

9 results presented for the prior clinical studies of Flomax and Proscar because, unlike the Bari Study,

10 both of those studies involved the use of placebos and the reported results were corrected for the

11 placebo effect;

12     (f)  That, contrary to the statements in the Registration Statement, the Bari Study

13 was not designed to demonstrate the safety and efficacy of TH-070.  To the contrary, the safety of

14 TH-070 was assumed based on its prior use in treating cancer patients in Europe, while trends in

15 prior animal and human studies indicating that the drug might cause abnormal liver functions were

16 overloaded or disregarded.  Moreover, the inclusion of patients with elevated liver functions at the

17 start of the study, as well as the cancellation of the high-dose arm of the study, in which patients

18 would have received three times the dosage of the patients for whom results were reported, further

19 reduced the Bari Study's ability to demonstrate the safety or efficacy of TH-070; and

20     (g)  That, contrary to the statement that "TH- 070 was well tolerated with no

21 therapy-related side effects," at least one participant in the Bari Study – representing 3.8% of the

22 participants in the tiny study – had developed a three-fold elevation of alanine transaminase ("ALT")

23 levels – a possible sign of liver malfunction – and significant increases in the mean serum follicle-

24 stimulating hormone ("FSH") and luteinizing hormone ("LH") levels, as well as decreases in free

25 testosterone.

26    66.  At the time the Registration Statement was published, Threshold already had received

27 interim data from the Bari Study.  Presumably, defendants discussed the test results and their

28 implications and limitations with Dr. Ditonno and his colleagues who had conducted the study.

1   When the study results were published in June 2005, months after the Registration Statement became

2   effective, Dr. Ditonno warned that the Bari Study was a "proof of concept" study in which, however,

3   a placebo arm was not used.  ***"The drawback in this design is the placebo effect that may elicit***

4   ***misleading results, if not properly corrected for, especially considering the small number of***

5   ***patients and the absence of a blind run-in period."***[4]  This specific known risk was not disclosed.

6           67.     Prior to the time the Bari Study was conducted, prior clinical studies had recognized

7   there was a significant placebo effect among patients being treated for BPH.[5]  Moreover, the clinical

8   studies of Flomax and Proscar – which Threshold claimed to have used as a model in designing its

9   own studies – used placebos and specifically recognized that the placebo effect alone had reduced

10  IPSS scores by 4 points, which should have caused defendants to question the claimed 7-point

11  improvement in that score demonstrated by the Bari Study.  By contrast, the Bari Study deliberately

12  ***excluded*** a placebo arm.  As Threshold later admitted when it abandoned efforts to secure FDA

13  approval for and commercialize the drug, TH-070 did ***not*** work better than a placebo.  "The

14  experience with lonidamine," a scholarly article later concluded, "underscores the importance of

15  randomized, placebo-controlled studies."[6]

16          68.     In addition to lacking a placebo control, the Bari Study was not designed to determine

17  whether TH-070 was safe.  Rather, the design of the Bari Study was, according to Dr. Ditonno,

18  "[b]ased on the extensive literature available on the safety of LND [the active ingredient in TH-070]

19  in an oncology setting . . . ."  In other words, the Bari Study simply ***assumed*** the drug was safe.

20

21

---

22  [4]     P. Ditonno, *et al.*, *Clinical Evidence Supporting the Role of Lonidamine for the Treatment of*
23  *BPH*, Vol 7, Supp. 7 Rev. in Urology at S27 (2005).

24  [5]     *See, e.g.,* Hansen, B.J. *et al.*, *Placebo effects in the pharmacological treatment of*
    *uncomplicated benign prostatic hyperplasia*, Scandanavian J. Urology Nephrology, (1996); Nickel,
25  JC, *Placebo therapy of benign prostatic hyperplasia: a 25-month study*, Br. J. Urol. (1998); Moyad,
    MA, *The placebo effect and randomized trials: analysis of conventional medicine*, Urology Clinical
26  N. Am. 125 (2002).

27  [6]     Herbert Lepor, MD, *The Role of Gonadotropin – Releasing Hormone Antagonists for the*
    *Treatment of Benign Prostatic Hyperplasia*, 8(4) Rev. in Urology at 183 (2006).

28

1    69.    As support for the contention that there was "extensive" literature available on the

2    safety of the drug, Dr. Ditonno cited a single article, written in 1991, when lonidamine was still a

3    relatively new drug.[7]  That article merely surveyed the results of prior clinical trials, most completed

4    in the mid-1980s among advanced cancer patients undergoing chemotherapy or other concurrent

5    treatments.  Although the article claimed without citation that hepatic and/or renal toxicity were rare,

6    it repeatedly recognized the "peculiar aspects of lonidamine's clinical toxicity" profile and warned

7    that: "Clinical experience has provided some interesting data, but *there is incomplete information*

8    *regarding pharmacokinetics in humans*."

9    70.    In contrast to the single study relied upon to assume the safety of TH-070, other pre-

10    clinical and clinical studies of the drug had indicated that liver dysfunction was not unexpected.  A

11    1996 dog study completed *after* the survey article relied on to assume safety in the Bari Study found

12    significant liver malfunction occurred at high intravenous doses and suspicious lesions, and

13    unpredictable toxicity occurred even after oral dosing, providing additional evidence of potential

14    liver toxicity.[8]  In addition, other studies had exhibited trends demonstrating liver problems among

15    patients being treated with lonidamine.  For example, according to a May 22, 2006 report from

16    Baird/U.S. Equity Research:

17          In a detailed look at older scientific literature, we found variations in
18          pharmacokinetics in both animal experiments and cancer trials, although with cancer
             patients, it is difficult to determine how much of the variation is due to the patients'
19          underlying conditions. More troubling, though, is a relatively old (1996) study in
             dogs that showed both unpredictable pharmacokinetics and histologic lesions in the
20          liver after a 30-day course of oral lonidamine. THLD is conducting pharmacokinetic
             experiments in humans and dogs to further elucidate the PK profile of TH-070, and
21          we expect results in 2H, 2006.

22    71.    Defendants admitted that they had been aware of these trends, but attempted to

23    dismiss them in a May 11, 2006 conference call as "anecdotally potentially reported" problems or on

24    grounds that no prior study had yet found statistically significant evidence of liver problems:

25    [7]    G. Robustelli della Cuna & P. Pedrazzoli, *Toxicity and Clinical Tolerance of Lonidamine*, 18
26    No. 2 Supp. 4 Seminars in Oncology; (1991); *see also* Ditonno *et. al.*, *supra note* 3 at fn. 14.

27    [8]    G.S. Price, *et al.*, *Pharacokinetics and toxicity of oral and intravenous lonidamine in dogs*,
       38(2) Cancer Chemotheraphy & Pharmacology (1996).

28

1    Barry Selick  - Threshold Pharmaceuticals - CEO

2    . . . In the literature are approximately 80 published studies, around 20 of which are controlled clinical trials.  In those controlled clinical trials, greater than 3500 patients are reported, and in those studies, there is not any evidence of statistically significant differences in liver toxicity between those patients who received Londiamine versus those who did not.

3

4

5    Steve Harr  - Morgan Stanley - Analyst

6    But there are trends, correct?

7    Alan Colowick  - Threshold Pharmaceuticals - CMO

8    **There are studies in which numerically, in some studies, the liver toxicity was higher numerically**, but certainly nothing unlike some of the other side effects, which clearly demonstrate statistical significance. Nothing that came through in any of the studies in that regard.

9

10

11    72.    The fact that liver problems had not yet been found at statistically significant levels did not mean, however, that the drug was safe.  Lonidamine had previously been prescribed solely in one country, Italy, for the treatment of life-threatening conditions.  There was no assurance that lonidamine would be safe when taken by relatively healthy patients who were not suffering from cancer or related conditions that could mask adverse effects of long-term use of lonidamine, potentially altering the risk-reward profile of the drug.  Adding to this risk was the fact that the Bari Study was designed such that patients who already had elevated liver enzymes up to 2.5 times normal levels were eligible to participate, such that adverse liver effects during the short-term (28-day) study might go undetected if elevated liver enzymes were wrongly attributed to pre-existing conditions rather than effect of the drug, particularly during the early stages of toxicity.

12

13

14

15

16

17

18

19

20

21    73.    Contrary to the Registration Statements' claims that the Bari Study had been **designed** to determine whether TH-070 was safe, in fact, it contained **no** design controls whatsoever to identify the propensity of the drug to cause liver problems.  As Colowick, Threshold's medical director, later admitted on the Company's May 11, 2006 conference call:

22

23

24    Quite frankly, we didn't specify – prespecify a level of liver toxicity, which was *a priori* caused an event to be specified as an SAE [(significant adverse event)].  This was something that was in the judgment of the investigator.  For all three of the patients, at some point now during their course, they've been hospitalized, which automatically qualifies them as having an SAE.

25

26

27

28

74.     Although the Bari Study was published in June 2005, it was little noticed by the market and did not correct or counterbalance the false information in the Prospectus and Registration Statement.  The study itself was incomplete (by virtue of the cancellation of the high-dose arm), and downplayed the health risks of the drug by claiming that there was "extensive" evidence demonstrating that lonidamine was safe.  The study further downplayed the risks arising from the lack of a placebo by claiming that the magnitude of the drug response reduced the risk of a misleading placebo effect.  Further, the description of the Bari Study in the Registration Statements for Threshold's two public offerings in 2005 was incomplete.  Without specialized knowledge or expertise in both BPH and the conduct of clinical trials, it was not possible for investors to understand the significance of the differences between the selective statements in the Registration Statements for those offerings and the article describing the Bari Study results.  Moreover, by the time the Bari Study was published, Threshold had completed its IPO, and its phase 2 and 3 trials for TH-070 were underway.  The market, therefore, viewed the publication of the Bari Study as old news.  As a result of all of these factors, the information in the Bari Study was not transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance the misleading impression created by the one-sided representations in Threshold's Registration Statements.

**B.     Misleading Statements in Prospectus and Registration Statement for the Follow-on Offering**

75.     On October 12, 2005, Threshold commenced a Follow-on Offering of 6.25 million shares of its common stock at a price of $10.46 per share.  The offering generated net proceeds of $62 million to Threshold.

76.     The October 12, 2005 Prospectus for the Follow-on Offering reiterated the positive statements about TH-070 found in the IPO Registration Statement, while similarly omitting detailed or specific warnings of the safety and efficacy risks, causing investors to be misled by the statements contained therein.  The Registration Statement stated the following with respect to TH-070:

**TH-070**

TH-070, our lead product candidate for the treatment of symptomatic BPH, is an orally administered small molecule that has been reported to inhibit glycolysis by

inactivating hexokinase, the enzyme that catalyzes the first step in glycolysis. By targeting the metabolism of glucose and other processes that are essential for prostate cell viability, *TH-070 kills prostate cells, reducing the size of the prostate,* and therefore may provide an effective treatment for symptomatic BPH. *We have completed a Phase 2 trial in Italy of TH-070 in 30 men with symptomatic BPH. In this study, TH-070 appeared to be generally well tolerated when administered at a dose of 150 mg orally every day for 28 days.* The drug appears to be active in treating BPH. Using baseline values as a control, statistically significant changes in all efficacy endpoints were observed. *Based on these data demonstrating tolerability and important clinical activity,* an investigational new drug application, or IND, was submitted to the FDA in the second quarter of 2005. We initiated two multi-center, placebo controlled, double blind, randomized clinical studies: a Phase 2 dose ranging study in the U.S. initiated in June 2005 and a Phase 3 study in Europe initiated in August 2005. We expect to have results from both of these studies by the end of 2006, and that further efficacy and safety clinical trials will be necessary to achieve marketing approval.

*        *        *

**TH-070**

*BPH Market Opportunity*

In 2004, it is estimated that worldwide sales of drugs used to treat BPH were at least $2.8 billion. The National Institutes of Health, or NIH, estimate that more than 50% of men in their sixties and approximately 90% of men over seventy have some symptoms of BPH. Approximately 18 million men in the United States, 28 million men in five major European countries and eight million men in Japan are estimated to suffer from symptoms of the disease and could benefit from a treatment for BPH that is more effective and has fewer side effects. Approximately 24% of them have been diagnosed, of which approximately two-thirds receive medical therapy. In the United States, approximately two million men are treated with drugs for BPH. These numbers are expected to increase in the future due to increased awareness and the aging population.

As a man ages, it is common for his prostate to enlarge. This enlargement process begins as early as age 25 but does not cause problems until later in life, when the prostate presses against the urethra and symptoms of BPH become evident. Because the prostate surrounds the urethra, BPH can restrict the flow of urine, resulting in urine retention, which can cause weakening of the bladder wall and the inability to empty the bladder completely. The most common symptoms of BPH include a weak and interrupted urine stream, urgency, leaking and frequent urination. Severe BPH an result in urinary tract infections, kidney and bladder damage, bladder stones and incontinence.

*Current Therapies for BPH*

Current therapies for BPH either address its symptoms but not the underlying condition, or block growth of new prostate cells without reducing prostate size. There are two classes of drugs to treat BPH. The first, alpha adrenergic receptor blockers, such as Flomax, work by relaxing the smooth muscle in the urethra and bladder without addressing the underlying condition of the enlarged prostate. *In clinical studies of Flomax for the treatment of BPH symptoms, the average increase in urine flow was approximately 1.8 mL/sec. after four weeks of treatment.* Drugs in the second category, 5-alpha reductase inhibitors, such as Proscar and Avodart, work

by blocking production of the hormones that stimulate the growth of new prostate cells but do not immediately kill existing cells. Consequently, this class of drugs has a slow onset, typically requiring daily treatment for many months before improving patient symptoms. *In clinical studies of Avodart, the average increase in urine flow was approximately 1.6 mL/sec. and the average decrease in prostate size was approximately 8% after four weeks of treatment.* Drugs in both classes can have significant side effects, including decreased libido, impotence, abnormal ejaculation, rhinitis and cardiovascular effects such as dizziness, fainting and lightheadedness. Many patients ultimately fail existing medical therapy, leading to 350,000 surgical procedures annually in the United States, despite the risks of serious surgical complications including impotence and incontinence. We believe our product candidate treats both the symptoms of BPH and underlying condition as well as reduces prostate size.

*Advantages of TH-070*

TH-070, our lead product candidate for the treatment of symptomatic BPH works by a novel mechanism. It is an orally administered small molecule that has been reported to inhibit glycolysis by inactivating hexokinase, the enzyme that catalyzes the first step in glycolysis. As described above, hypoxic tumor cells and certain prostate cells depend on glycolysis for their energy production. By targeting the metabolism of glucose and other processes that are essential for prostate cell viability, *TH-070 kills prostate cells, reducing the size of the prostate,* and therefore may provide an effective treatment for symptomatic BPH. *We expect TH-070 to reduce the size of the prostate more rapidly than current medical treatments and to improve symptoms, without the attendant side effects of other drugs,* which include decreased libido, impotence, abnormal ejaculation, rhinitis and cardiovascular effects such as dizziness, fainting and lightheadedness. *We initially selected TH-070 to treat BPH based on* our understanding that prostate cells rely predominantly on glycolysis for energy production as well as *published animal and human clinical data demonstrating tolerability.*

*Prior Clinical Trials*

We have completed a Phase 2 clinical trial at the University of Bari, Italy, *to evaluate the safety and efficacy of TH-070* in patients with symptomatic BPH. This trial was an open-label, two-arm study designed to enroll a total of 60 patients in two 30-patient dosing schedules of TH-070, 150 mg once a day and 150 mg three times a day. *Based on promising interim data from the low-dose group of patients in this study*, we elected not to enroll the high-dose group.

In this Phase 2 trial, patients were evaluated at several timepoints for safety and specific efficacy variables, including prostate size, maximum urine flow rate, prostate specific antigen levels, or PSA, and an assessment of each patient's BPH symptoms called the International Prostate Symptom Score, or IPSS. IPSS is a clinically validated seven question, self-administered questionnaire to assess lower urinary tract symptoms. These efficacy variables include those that have been used as endpoints in previous clinical trials that led to FDA approval of currently marketed BPH drugs. The primary endpoint for our trial was a comparison of prostate size, as measured by volume, between baseline and day 28 of treatment.

*In the trial we observed improvements in all variables that were measured by day 14 of treatment, and further improvements by day 28. All p-values were less than 0.005, except for day 14 PSA levels. A p-value is a statistical term that indicates the probability that a desired result is random. The smaller the p-value,*

*the lower the likelihood that the desired result was random. Generally, a p-value of 0.05 or less is considered statistically significant. Additionally, after six months of follow-up after the last dose of active drug, all efficacy endpoints remained improved and statistically different than baseline, other than prostate volume. These final results are shown in the table below:*

Change from Baseline in Efficacy Endpoints

| Endpoint | I-PSS (units) | | Maximum Urine Flow Rate (mL/sec) | | Prostate Volume (cc) | | PSA (ng/mL) | |
|---|---|---|---|---|---|---|---|---|
| Visit | N | Mean (SD) | N | Mean (SD) | N | Mean (SD) | N | Mean (SD) |
| Day 14 | - | - | 28 | 3.1** (5.1) | 30 | -6.5% (10.9) | 28 | -1.5% (33.9) |
| Day 28 | 29 | -7.3** (3.5) | 29 | 3.2** (5.2) | 29 | -11.2%** (15.2) | 29 | -17.8%** (25.2) |
| Day 200 | - | - | 25 | 4.2** (5.1) | 26 | -4.3% (18.4) | 26 | -14.8%* (27.8) |

\* p<0.05 versus baseline
\*\* p<0.005 versus baseline
Note: missing observations carried forward for Day 14 and Day 28 endpoints.

In particular, at day 28 of treatment the average decrease in prostate size was 5.9 cc (-11.2%), the average increase in maximum urine flow rate was 3.2 mL/sec. (an increase from 9.4 mL/sec to 12.6 mL/sec), and the average decrease in PSA levels was 0.7 ng/mL (-17.8%). **TH-070 was well tolerated with no drug-related adverse events reported by the investigator.**

*Ongoing Clinical Program*

We have initiated two separate multi-center, randomized, placebo controlled, double blinded clinical studies. The first of these was accepted by the FDA as our IND opening clinical study and is being conducted in approximately 30 centers in the U.S. This Phase 2 study was initiated in June 2005 and will randomize approximately 200 men with symptomatic BPH to one of five cohorts in a parallel fashion: placebo or one of four doses of TH-070 (5, 25, 50, or 150 mg) to be taken orally once per day for 28 days. The primary objective of this study is to assess the safety of TH-070 and to define the dose response relationship with respect to several measures of efficacy after 28 days of dosing. Standard endpoints and definitions will be used, including prostate size, maximum urine flow rate, PSA, and an assessment of each patient's BPH symptoms as measured by the IPSS score. Safety will be assessed using standard safety reporting. Subjects will be followed for three months after they receive their last dose of study drug to assess the durability of response across efficacy variables and long-term safety. At the completion of this study, we expect to be able to understand the dose response relationship of TH-070 in men with symptomatic BPH. This study is not designed to demonstrate statistically significant differences in efficacy as compared to placebo. We expect to have results from this trial by the end of 2006.

We also initiated a Phase 3 study in August 2005 that is being conducted in approximately 60 centers in Europe. This study will randomize approximately 480 men with symptomatic BPH to one of three cohorts in a parallel fashion: placebo or one of two doses of TH-070 (50 or 150 mg) to be taken orally once per day for

twelve weeks. This study design is similar to those that have been used for pivotal studies for alpha blockers. The primary objective of this study is to assess the safety of TH-070 and to assess its efficacy as assessed by IPSS of either dose of TH-070 compared to placebo. Secondary endpoints of efficacy include prostate size, maximum urine flow rate, and PSA. Safety will be assessed using standard safety reporting. Subjects will be followed for one month after they receive their last dose of study drug to assess safety. At the completion of this study, we expect to be able to determine whether the administration of either dose of TH-070 daily for twelve weeks is associated with statistically and clinically meaningful differences compared to placebo and if TH-070 is well tolerated in this setting. We expect to have results from this trial by the end of 2006.

77.     As with the statements in the IPO Registration Statement, the statements about TH-070 in Threshold's Follow-on Offering Registration Statement were materially misleading to investors because they emphasized the purportedly positive results of the Bari Study, while minimizing or failing to accurately or completely disclose the specific risks associated with TH-070, including that the results of the Bari Study were unreliable indicators of either the efficacy or safety of the drug.

78.     In particular, the Follow-on Offering Registration Statement misled investors as to the following facts:

(a)     That the small size of the Bari Study – only 30 patients completed dosing and only 24 completed the study – together with the lack of a blind run-in period or a placebo control created a heightened risk that the results were misleading;

(b)     That only 28 patients had completed the Bari Study, not 30 as reported in the Registration Statement;

(c)     That lack of correction for the small size, lack of placebo control, and no blind run-in period rendered the statistical results with p values under 0.05 neither reliable or meaningful;

(d)     That the sample size of the Bari Study was too small to draw any meaningful conclusions about the efficacy or safety of the drug, rendering the statements that the results of the study were "promising" speculative;

(e)     That due to the known and uncorrected placebo effect, there was a significant risk that the results were "misleading" such that the purported improvements in prostate size, flow rate, IPSS scores, or PSA levels could not reliably be linked to the action of the drug rather than an uncorrected placebo effect;

1          (f)     That the results presented for the Bari Study were not comparable with the

2    results presented for the prior clinical studies of Flomax and Proscar because, unlike the Bari Study,

3    both of those studies involved the use of placebos and the reported results were corrected for the

4    placebo effect;

5          (g)     That, contrary to the statements in the Registration Statement, the Bari Study

6    was not designed to demonstrate the safety and efficacy of TH-070.  To the contrary, the safety of

7    TH-070 was assumed based on its prior use in treating cancer patients in Europe, while trends in

8    prior animal and human studies indicating that the drug might cause abnormal liver functions were

9    overlooked or disregarded.  Moreover, the inclusion of patients with elevated liver functions at the

10    start of the study, as well as the cancellation of the high-dose arm of the study, in which patients

11    would have received three times the dosage of the patients for whom results were reported, further

12    reduced the Bari Study's ability to demonstrate the safety or efficacy of TH-070;

13          (h)     That, contrary to the statements that "TH-070 kills prostate cells, reducing the

14    size of the prostate," in fact, there was no clinical evidence that TH-070 had any effect whatsoever in

15    reducing the size of the prostate, and in fact, worked no better than a placebo in achieving this effect;

16    and

17          (i)     That, contrary to the statement that "TH-070 was well tolerated with no drug-

18    related adverse events reported by the investigator," the investigator had reported that at least one

19    participant in the Bari Study – representing 3.8% of the participants who completed the tiny study –

20    had developed a three-fold elevation of ALT levels – a possible sign of liver malfunction – and

21    significant increases in the mean serum FSH and LH levels and decreases in free testosterone.

22    **C.**    **Threshold's Generic Risk Warnings Were Misleading to Investors**

23        79.     Although the Registration Statements for both the IPO and the Follow-on Offering

24    warned that success of the ongoing TH-070 clinical trials was not guaranteed, they failed to provide

25    specific or detailed warnings of the risks then facing those trials.  Instead, they relied on mere

26    boilerplate warnings typical of those found in SEC filings of other companies in the pharmaceutical

27    industry.  Taken together with the numerous statements regarding the "promising" results of the Bari

28    Study and the unqualified statements that TH-070 "works" by reducing the size of the prostate and is

"well tolerated" without "adverse" effects due to its long-term use to treat cancer patients, these warnings understated the risks to the Company and, therefore, misled investors.

80.     The only specific warnings in the IPO Proxy and Registration Statements relating to the safety or efficacy of TH-070 were the following:

> While we believe that interim results of our Phase 2 trial for TH-070 suggest it may effectively treat symptomatic BPH, there can be no assurance that our registrational program will confirm our interim results, will show that beneficial results of TH-070 will be sustained beyond 28 days, or will lead to regulatory approval. Moreover, regulatory agencies may require additional preclinical and clinical studies to support approval of TH-070 for the treatment of symptomatic BPH. The clinical trials we plan to commence in 2005 for TH-070 may not be pivotal trials, and our registrational program will include additional trials.

*       *       *

> Glufosfamide is known to cause reversible toxicity to the bone marrow and kidneys, as well as nausea and vomiting. TH-070, which we are developing to treat patients with BPH, has been investigated as a male contraceptive and is known to cause reversible effects on fertility in animals. In human clinical trials at doses significantly higher than the dose of TH-070 we contemplate investigating for BPH, muscle and testicular pain have been observed. These side effects or others that could be identified in the course of our clinical trials or that may otherwise be associated with our product candidates may outweigh the benefits of our product candidates and prevent regulatory approval or limit their market acceptance if they are approved.

81.     Similarly, the only specific warnings in the Proxy and Registration Statements for the Follow-on Offering relating to the safety or efficacy of TH-070 were the following:

> There can be no assurance that our ongoing clinical trials for symptomatic BPH will confirm results from our Phase 2 trial in Italy, will show that beneficial results of TH-070 will be sustained beyond 28 days, or will lead to regulatory approval. We initiated a Phase 2 trial in the United States in June 2005 and a Phase 3 trial in several European countries in August 2005 for this indication; however, we expect regulatory agencies will require additional clinical trials and may require additional preclinical studies to support approval of TH-070 for the treatment of symptomatic BPH.

*       *       *

> Glufosfamide is known to cause reversible toxicity to the bone marrow and kidneys, as well as nausea and vomiting. TH-070, which we are developing to treat patients with BPH, has been investigated by others as a male contraceptive because of its effects on spermatogenesis, fertility and shrinkage of testes in animals. As a consequence, these may be significant side effects that may or may not be reversible in patients treated with TH-070 for BPH. Clinical studies to investigate these side effects can be lengthy and expensive, and may be required prior to additional Phase 3 efficacy studies for TH-070. Furthermore, in clinical trials involving cancer patients at doses significantly higher than the doses of TH-070 currently being investigated for BPH, muscle and testicular pain have been observed. These side effects or others that could be identified in the course of our clinical trials or that may otherwise be

1    associated with our product candidates may outweigh the benefits of our product
     candidates. Side effects may prevent or delay regulatory approval or limit market
2    acceptance if our products are approved.

3        82.    Nowhere did these or any other warnings in the Registration Statements alert

4    investors of the significant placebo effect present in clinical studies for BPH or the major escalation

5    in risk due to the lack of placebo, blind run-in period, and small size inherent in the Bari Study.  This

6    major escalation in risk of failure of TH-070 constituted a significant increase in the magnitude of

7    risk over the generalized risk of failure in all advanced clinical trials as suggested in Threshold's

8    generic risk warnings.  Nor did these or any other warnings in the Registration Statements alert

9    investors that past clinical studies of lonidamine had detected trends indicative of potentially serious

10   liver problems arising from use of the drug, or that at least one participant in the Bari Study had

11   experienced elevated liver functions during treatment.

12   **VII.    MATERIALLY FALSE AND MISLEADING STATEMENTS
             PERTAINING TO CLAIMS UNDER THE 1934 ACT**
13
        83.    Throughout 2005 and into 2006, Threshold repeatedly trumpeted the positive results
14
     of the Bari Study, including in press releases issued on 5/19/05, 6/28/05, 8/8/05, 3/20/06 and 4/5/06,
15
     announcing the completion of enrollment and other milestones in the ongoing phase 2 and 3 trials of
16
     TH-070 and in its 3/1/06 press release and conference call discussing Threshold's 4Q05 financial
17
     results.  At no time did the Company disclose the additional concealed risks regarding the safety and
18
     efficacy of the drug, as described above.
19
        **A.    Selick Falsely Claims Threshold Has "Replicated" Bari Study Data
20            and TH-070 Is a "Home Run"**

21       84.    On March 1, 2006, in connection with the release of its 4Q05 financial results,

22   Threshold announced without fanfare that it would conduct three additional studies of TH-070 in

23   2006, including, according to a Fortis Bank report:

24       a pharmacokinetic study, intended to better understand the drug's absorption,
         distribution, metabolism, and excretion (ADME); a spermatogenesis study, intended
25       to better understand the affect of hexokinase inhibition on spermatogenesis; and a
         study that will enroll men who are scheduled to undergo radical prostatectomy,
26       intended to provide information on how TH-070 affects prostate tissue (specimens
         from these pts will be examined post-surgery). We believe all three studies will
27       provide a better assessment of TH-070's phamacologic and pharmacodynamic
         properties. . . .

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS - 4:07-cv-04972-CW                                          - 33 -

85. No reason was given for the decision to conduct additional pharmacokinetic or other studies while the phase 2 and 3 trials were ongoing. Threshold did, however, tell investors that both the phase 2 and phase 3 TH-070 trials were on schedule to report results by the end of 2006.

86. Threshold's 4Q05 results included a net loss of $0.44 per share, significantly lower than the market's expectation of a $0.34 per share loss. Although the wider loss was reported to have resulted from a $4 million increase in R&D costs over the market's $10 million expectation, no detailed explanation of what had caused the 40% cost overrun was provided. When asked by analysts on the March 1, 2006 conference call to explain the reason for the update, Swearson vaguely responded that the increase "was primarily due to the clinical trials because we had started the Phase 2 and Phase 3 for BPH."

87. In announcing the results, Threshold did not warn investors of **any** potential issues with respect to the safety or the efficacy of TH-070. To the contrary, on a March 1, 2006 conference call with investors, on which Swearson and other Threshold executives, including Colowick, also appeared and spoke, *Selick told investors that Threshold already had data from the ongoing clinical trials and could confidently predict that the drug would be a "home run"*:

> Here are just some of our 2005 accomplishments. First with respect to TH-070 and BPH. We initiated two placebo-controlled multi-center studies this past summer of 200 patient Phase II dose response study in the US, and a 480-patient Phase III efficacy study in Europe. We remain on track to have results from both of these studies by year-end. These studies followed positive Phase II results that were published in the May 2005 edition of reviews in urology. *These data is replicated in our currently ongoing study* suggest that TH-070 may address both goals of therapy for the treatment of BPH that is rapid system improvement as measured by the International Prostate Symptoms Score as well as treatment of the underlying disease.
>
> *        *        *
>
> . . .And as for TH-070 for the treatment of BPH, over the past year, we spoken with patients whose symptoms range from the inconvenience of having to insist on isle seats when they travel on plane to those who wake up literally every hour during the night after their bladders, and then have to rush to the bathroom. *The ongoing studies replicate what we've already demonstrated in our single center Phase II study and TH-070 lonidamine is going to be truly a home run for patients*.

88. Selick's statements on the March 1, 2006 conference call were materially false and misleading to investors because, as Threshold admitted on June 11, 2006, *TH-070 did not work any better than a placebo in treating BPH*. *See infra* ¶117. Contrary to Selick's statements, the Bari

Study (*i.e.*, "single center Phase II study" referred to by Selick) had **not** demonstrated any statistically significant benefit to BPH patients from taking TH-070, nor had the purportedly positive results from that study been "replicated" in the ongoing clinical trials of the drug. Far from being the "home run for patients" that Selick claimed he already knew it was, TH-070 was an unmitigated failure.

89. In making these statements, Selick was deliberately reckless to the truth or falsity of the statements he was making about TH-070. If, as he told investors on the conference call, he had data from the ongoing clinical trials, he knew that TH-070 was not efficacious for the treatment of BPH because, as Threshold later admitted, that data showed that TH-070 did not work any better than a placebo for the treatment of BPH. If, on the other hand, Selick did **not** have any data from the ongoing clinical trials of TH-070, then he was deliberately reckless in stating that the results of the Bari Study had been replicated by the ongoing clinical trials, because there was no foundation for that statement.

90. Further evidence of Selick's scienter is found in Sofinnova's March 16, 2006 sale of 2.562 million shares – 75% of its holdings – at a price of $14.25 per share, obtaining $36.5 million in gross proceeds. Selick was one of Sofinnova's Venture Partners, while Threshold director Powell – the brother of Threshold's investor relations representative and senior director of corporate communications, Denise Powell – was president of Sofinnova's Board of Directors. As a result, both Selick and Powell profited from this sale. *See infra* ¶¶130-137.

**B.  Threshold Misled Investors by Announcing the Completion of Clinical Trial Enrollment Without Revealing Additional Risks to the Safety and Efficacy of TH-070**

91. By March 2006, investors were eagerly anticipating an announcement that Threshold had completed of enrollment in the ongoing clinical trials, because this would mean that the expected near-term catalyst to Threshold's stock price – the release of data from those trials – was near at hand.

92. On March 20, 2006, Threshold  announced that it had completed enrollment in the phase 2 TH-070 trial, claimed it would complete enrollment in the phase 3 trial by April 2006, and

said it would have results from both trials available around the beginning of the 4Q06 (*i.e.*, by October 2006):

> REDWOOD CITY, Calif., March 20 /PRNewswire-FirstCall/ -- Threshold Pharmaceuticals, Inc. (NASDAQ:THLD), today ***announced that the Company has completed enrollment in the Phase 2 study evaluating TH-070*** for the potential treatment of benign prostatic hyperplasia (BPH). The Phase 2 study, being conducted in the United States, is investigating the dose response of TH-070 in patients with BPH.
>
> ***"We are pleased to have reached this milestone. We anticipate that we will have top line results around the beginning of the fourth quarter this year,"*** said Alan Colowick, M.D., chief medical officer at Threshold. "We look forward to the continued development of TH-070 and to the potential benefit that TH-070 may provide to men suffering from the symptoms of BPH."
>
> \*      \*      \*
>
> ***Threshold previously announced the results from a Phase 2 single center study conducted in 2004 at the University of Bari, Italy.*** That trial met its primary endpoint, a mean reduction in prostate volume measured by Trans-Rectal Ultrasound (TRUS) at day 28 compared to baseline (-11.2%, p<0.001), and all other day 28 endpoints. Six months after cessation of treatment, BPH symptoms (as measured by IPSS) in patients remained significantly improved compared to baseline as were maximum urine flow, post-void urine volume, and PSA (Prostate Specific Antigen). Detailed results of the trial were published in the quarterly journal of Reviews in Urology in May, 2005.

93.    On April 3, 2006, Threshold unexpectedly announced that Tidmarsh, the founder and President of the Company, had resigned from its Board of Directors effective March 31, 2006. No specific reason was given for the sudden resignation, other than that Tidmarsh wanted to "focus on [his] new endeavors." Tidmarsh's resignation came just one month after Three Arch Partners, a venture capital firm which counted Tidmarsh and Threshold director Jaeger among its members, had dumped 1 million of its shares – 29% of its holdings – for $14.5 million. *See infra* ¶¶138-143.

94.    On April 5, 2006, Threshold announced that the phase 3 trial of TH-070 had completed enrollment, and reiterated that it would have results from that and the phase 2 trials by the beginning of the fourth quarter. Once again, the Company repeated the positive results of the Bari Study without revealing any of the specific risks to efficacy or safety concealed by that study, or warning of any current concerns with the efficacy or toxicity of the drug:

> REDWOOD CITY, Calif., April 5 /PRNewswire-FirstCall/ -- Threshold Pharmaceuticals, Inc. (NASDAQ:THLD), today ***announced that the Company has completed enrollment in its Phase 3 clinical trial*** evaluating TH-070 for the potential treatment of benign prostatic hyperplasia (BPH). The Phase 3 trial, being

conducted in Europe and Canada, is investigating the safety and efficacy of TH-070 in patients with BPH.

> *"Now that enrollment has been completed in both the Phase 2 and Phase 3 TH-070 trials, we plan to have top line results from these trials around the beginning of the fourth quarter of this year,"* said Alan Colowick, M.D., chief medical officer at Threshold. *"Rapid enrollment into both of these trials reflects the enthusiasm and support of the clinical investigators and their staff who are dedicated to finding improved treatment options for their patients with BPH."*

*    *    *

> *Threshold previously announced the results from a Phase 2 single center clinical trial conducted in 2004 at the University of Bari, Italy.* That trial met its primary endpoint, a mean reduction in prostate volume measured by Trans-Rectal Ultrasound (TRUS) at day 28 compared to baseline (-11.2%, p<0.001), and all other day 28 endpoints. Six months after cessation of treatment, BPH symptoms (as measured by IPSS) in patients remained significantly improved compared to baseline as were maximum urine flow, post- void urine volume, and PSA (Prostate Specific Antigen). Detailed results of the trial were published in the quarterly journal of Reviews in Urology in May, 2005.

95. The statements in the March 20, 2006 and April 5, 2006 press releases were materially false and misleading to investors because they announced seemingly positive news about the ongoing clinical trials of TH-070 without revealing the hidden risks to approval of the drug – *i.e.*, that the drug was prone to causing liver toxicity in patients and it did not work any better than a placebo in treating BPH. Further, as with the prior statements in the public offering documents, the press releases misled the public by reiterating the positive results of the Bari Study *without* revealing either the limitations of that study or any results of the ongoing clinical trials revealing toxicity issues and lack of efficacy of the drug.

96. The press releases were also misleading to investors because final clinical results were likely to be delayed and would not be as meaningful as the market expected in light of the known toxicity and efficacy issues that had already arisen in the clinical trials. As a result, it was misleading for Threshold medical director Colowick to trumpet the purported achievement of a purported milestone in the drug's development, reiterate the drug's purported benefit to BPH patients, or claim that there was enthusiastic support for the drug *without* warning of the heightened risks to TH-070's success.

97. At the time these statements were made, defendants knew about or recklessly disregarded evidence that TH-070 had significant toxicity and efficacy problems that made it

1  unlikely that the drug would fulfill its claimed promise as a significant new treatment for BPH.  By

2  March 1, 2006, Selick claimed to have already had data from the ongoing clinical trials which, as

3  later revealed, showed that TH-070 did not work any better than a placebo in treating BPH.

4  Moreover, less than a week after announcing completion of the phase 3 trials, Threshold

5  "voluntarily" told the FDA that liver toxicity issues had arisen in that trial.  It is certain that

6  defendants knew about these issues at the time of the April 5, 2006 announcement, and – given

7  Selick's statement that trial data was in hand by March 2006 – highly likely they knew about it just

8  three weeks earlier when completion of the phase 2 trials was announced.  Moreover, as recounted

9  by CW6, by April 2006, at least three liver toxicity issues were already being investigated internally

10  at Threshold.

11        98.    At the very least, the toxicity issues that had arisen with the drug alerted defendants

12  that clinical trials were likely to be delayed or that additional clinical trials would have to be

13  conducted, such that final results from the clinical trials would not come as quickly after completion

14  of enrollment or be as meaningful as the market expected.  Indeed, Threshold's quiet announcement

15  of additional TH-070 trials on March 1, 2006, strongly suggests defendants' recognition that

16  additional pharmokinetic studies would be required in light of emerging toxicity and efficacy issues

17  with the drug.  The suspicious and sudden sales of shares by Three Arch and Sofinnova on March 3

18  and 16, 2006, and Tidmarsh's unexplained resignation on March 31, 2006 lend further support to a

19  strong inference that defendants knew about or deliberately disregarded the undisclosed risks to the

20  TH-070 clinical program at the time both of these statements were made.

21        99.    On April 10, 2006, less than a week after reporting the completion of enrollment in

22  ongoing clinical trials, Threshold contacted the FDA to alert the agency that one of the patients in its

23  phase 3 trial of TH-070 had developed elevated levels of the liver transamine ALT that were ***thirty***

24  ***times higher*** than normal.  Threshold later claimed that it had voluntarily raised the issue with the

25  FDA, even though it had no obligation to do so because the sick patient was in the European trial not

26  under the FDA's jurisdiction.  Although that action demonstrated that Threshold recognized the

27  seriousness of the patient's condition, ***no public announcement*** of either the incident or Threshold's

28  or the FDA's response was made.  Moreover, as reported by CW6, ***by April 2006, all three of the***

*liver toxicity events which would later scuttle the TH-070 program had been identified internally and were being discussed by employees of Threshold's clinical department*. Neither the FDA nor the public was advised of these additional incidents of liver toxicity, or alerted of the risks those events posed to the ongoing clinical trials.

### C.    Misleading Statements in May 10, 2006 Announcement of 1Q06 Financial Results and Highlights

100.    On May 10, 2006, Threshold announced its results for 1Q06 ended March 31, 2006. Again, Threshold made no announcement of the liver toxicity issues that had arisen in the ongoing trials of TH-070, nor did it warn of any efficacy issues that had arisen in those trials. Instead, the press release again trumpeted the completion of enrollment in the phase 2 and 3 trials as significant highlights of the quarter, and again claimed that the anticipated results from those trials would be reported within approximately five months – *i.e.*, by the beginning of 4Q06:

> The net loss for the first quarter of 2006 was $13.8 million compared to $7.5 million for the first quarter of 2005. Research and development expenses were $11.4 million for the first quarter of 2006 versus $5.3 million for the first quarter of 2005. The increase in research and development expenses primarily reflects increased costs of advancing the Company's product pipeline, including Phase 2 and Phase 3 multi-center clinical trials of TH-070 for the treatment of benign prostatic hyperplasia (BPH), an ongoing Phase 3 trial of glufosfamide for the second-line treatment of patients with pancreatic cancer and a Phase 2 trial of glufosfamide in combination with gemcitabine for the first-line treatment of pancreatic cancer. General and administrative expenses were $3.8 million for the first quarter of 2006 versus $2.6 million for the same quarter last year. The increase in general and administrative expenses primarily reflects increased costs associated with being a public company and stock compensation expense recognized under FAS 123(R).

>                    *      *      *

> "We continued to achieve our clinical milestones with the completion of enrollment in both the Phase 2 and Phase 3 trials of TH-070 in BPH, and we expect to report the results of these trials around the beginning of the fourth quarter," said Barry Selick, Threshold's chief executive officer. . . .

>                    *      *      *

> The Company anticipates the following clinical milestones in 2006:

> --    Report results from ongoing Phase 2 and Phase 3 trials of TH-070 in BPH around the beginning of the fourth quarter of 2006;

101.    The foregoing statements in the May 10, 2006 press release were materially false and misleading to investors because the release failed to warn investors that liver problems had already

1    arisen in the ongoing clinical trials of TH-070.  Given that defendants alerted the FDA *the following*

2    *day* that there were liver toxicity issues in *six patients* being treated in *two separate studies* being

3    conducted in both the United States *and* Europe, they clearly knew or were deliberately reckless to

4    the fact that, at the time this press release was issued, Threshold had *not* "achieved its clinical

5    milestones" with respect to TH-070, nor would it "continue" to do so, nor was it likely that the

6    studies would be completed and final results reported by 4Q06.  Further, to the extent the increased

7    costs of the TH-070 trials resulted from additional expenditures relating to liver toxicity indications,

8    the statements regarding the reasons for the increased costs were misleading, because they were not

9    due to ordinary costs incurred in "advancing the product pipeline" through clinical trials, but instead

10   represented extraordinary costs that were likely to plug that product pipeline for the foreseeable

11   future, or clog it up for good.

12         **D.**     **Threshold Reveals Some Toxicity Problems Affecting TH-070,**
                  **Sending Stock Price Crashing, but Fails to Identify Full Extent of**

13                     **Those Problems and Falsely Claims TH-070 Remains Promising and**
                  **Efficacious**

14

15         102.    On May 11, 2006, Threshold *shocked investors* by issuing the following press

16   release, announcing that the *TH-070 program had been placed on "Partial Clinical Hold" by the*

17   *FDA* due to *abnormal liver test results reported in six patients* in the ongoing phase 2 and 3 trials:

18         REDWOOD CITY, Calif., May 11, 2006 /PRNewswire-FirstCall --
Threshold Pharmaceuticals, Inc. (Nasdaq: THLD), today announced changes in the
status of its TH-070 clinical development program for BPH (Benign Prostatic

19   Hyperplasia).

20           As a result of abnormalities observed in liver enzyme levels in 6 subjects in
ongoing clinical trials, the FDA (U.S. Food and Drug Administration) has placed the

21   U.S. TH-070 program on partial clinical hold and has requested that the Company
provide additional information related to the drug's acceptable dose and duration of

22   treatment in BPH patients. These abnormalities include 3 serious adverse events
observed at 3 months of dosing in the phase 3 European/Canadian clinical trial and 3
additional observations of elevated liver enzymes that occurred in other ongoing

23   clinical trials.

24           The Company is amending the phase 3 European/Canadian trial to
discontinue dosing. 567 patients have been enrolled in this study, virtually all whom

25   have completed 28 days of dosing. Data from these patients combined with that from
the 216 U.S. phase 2 patients will be evaluated and will inform the Company's next

26   steps for this program and its response to the FDA.

27           A partial clinical hold is a delay or suspension of part of the clinical work

28   being performed under the Company's IND (Investigational New Drug) Application.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Under the partial clinical hold the current phase 2 trial will continue to completion. The human pharmacokinetic (PK) trial, already underway, will continue. The radical prostatectomy trial, planned to start this year, has been withdrawn by the Company and will not be initiated as was planned. A formal letter from the FDA detailing the partial hold issues is expected to be received in the next 30 days and no further clinical trials will be initiated until a complete response has been submitted and these issues are resolved. It is possible that, as the ongoing trials conclude, additional safety issues may be observed.

103.    The sudden and unexpected news caused Threshold's stock to collapse, falling $10.56 or 75.4% in a single day.  Anticipating that drastic market reaction, the Company sought to stem further losses by falsely reassuring the market that TH-070 was safe and effective, and that the Company already had plans to reinitiate clinical trials under a modified dosing regimen:

Lonidamine (TH-070) was originally approved for the treatment of cancer in 3 European countries in the mid-1980's. Published randomized clinical trials of Londiamine in approximately 3500 cancer patients did not reveal statistically significant elevations in liver function tests. In the Company's previous single center phase 2 TH-070 trial, one patient had transient elevated liver enzymes.

The Company plans to collect and analyze all the data, including the 28-day treatment data from approximately 750 patients who are participating in the phase 2 U.S. trial and the phase 3 trial being conducted in Europe and Canada. Threshold expects these results to be available in the third quarter of 2006. The Company hopes to commence additional clinical trials evaluating the use of TH-070, which might include intermittent therapy, subject to the evaluation of all relevant data and agreement with regulatory agencies.

104.    During a conference call held later the same day, Threshold's senior officers, including Colowick, similarly sought to reassure the market that the FDA action did not mean the end of TH-070:

During the call, the FDA expressed their concern about the liver toxicity and in a subsequent follow-up call the same day notified Threshold that we were being placed on partial clinical hold, reiterating again that they understood that no patients were currently receiving active dose except for an additional cohort on a clinical pharmacology study which they agreed could continue.  But this was done as a regulatory policy to prevent further clinical trials from being initiated until we resolved the partial clinical hold. We had a discussion with them about what that meant; we have not received the formal letter from the FDA. *However, we think we have a reasonable sense of what those issues are and the issues are primarily related around determining what is a safe both dose and duration of the drug to move forward. We believe and I think the FDA agrees that that plan would look something like a shorter-duration certainly than has been used in the current European study*.  We agreed that, once we received that letter, we would respond with a complete response to the partial clinical hold with a dataset that would include the data from the ongoing clinical programs as well as completed -- previous completed studies, both clinical and nonclinical.

1    105.    Threshold said that three patients had been classified as having experienced a

2    "significant adverse event" or "SAE" due to elevated liver enzymes.  However, Colowick attempted

3    to minimize these events, first by claiming that the results from one of those patients, whose liver

4    enzymes were elevated by ***30 times over normal levels***, occurred because the patient had abused

5    alcohol during treatment.  Next, Colowick told investors in the May 11, 2006 conference call that,

6    although the other two patients experienced elevated liver enzymes that were around ***ten times***

7    ***normal*** levels, Threshold ***did not agree*** that ***any*** of the events should be classified as SAEs:

8         I think the magnitude of the elevation of the liver enzymes, even in the absence of
          significant clinical symptoms, were concerning enough to the investigators that they
9         classified these as SAEs and we, quite frankly, weren't in agreement with that."
          Finally, Colowick downplayed the risk by advising investors that there were three
10        additional patients with liver problems who were discussed with the FDA, but
          claimed that these patients had "clearly, not nearly the same degree of elevation of
11        enzymes that we observed in the patients who were reported as SAEs.

12   106.    The statements on the May 11, 2006 conference call regarding the continued viability

13   of TH-070 to treat BPH were materially false and misleading to investors because: (a) the liver

14   toxicity problems with the drug were much more significant than revealed on that call; and (b) the

15   drug did not work any better than a placebo in treating BPH.  Threshold's attempt, through its

16   medical director, Colowick, to portray the clinical hold as simply being imposed out of the FDA's

17   desire to be consistent in its "regulatory policy," and his suggestion that the Company had "a

18   reasonable sense of what those issues [of concern to the FDA] are" and that the "FDA agrees" based

19   on discussions with Threshold, that a shorter duration or intermittent dosing schedule could work

20   were also misleading to investors, as was Threshold's efforts to downplay the significance of the

21   liver toxicity issues by explaining away one event as the result of alcohol abuse by the patient and

22   attempting to minimize the other two events by suggesting they were the result of an overly

23   aggressive stance by the investigators.  The misleading nature of these statements was heightened by

24   defendants' failure to disclose, either on the conference call or in any of its prior statements going all

25   the way back to the IPO, the specific toxicity and efficacy risks associated with the drug, as

26   previously alleged.

27

28

107.    The statements were also misleading because the data revealed that the problems were even more severe than investors had been told.  Threshold later admitted that there were many more adverse events than had been disclosed on May 11, 2006:

> You will recall that on May 11, we said that as the ongoing trials concluded, additional safety issues may well be observed.  ***In total, we have observed 16 subjects across all of the TH-070 studies who have elevated transaminases, including two in patients who received placebo. Of the 16, 6 were classified as serious adverse events***.

108.    By May 11, 2006, or earlier, defendants knew or recklessly disregarded that there was no basis to support their claims that TH-070 still had promise as a treatment for BPH, because the data they had from the clinical trials demonstrated that the drug was neither safe nor efficacious for the treatment of that condition.  While some of this data was disclosed to investors in the press release and on the conference call, other data critical to understanding the significance and magnitude of TH-070's problems was deliberately concealed.

109.    Threshold admitted on the conference call that it had first alerted the FDA of potential liver toxicity issues on April 10, 2006 – more than a month ***before*** any public announcement about those problems was made.  It is reasonable to infer that Threshold had known about the liver problems and investigated and discussed them internally prior to April 10, 2006, before going to the FDA with their concerns.  In fact, Threshold's medical director, Colowick, admitted on the May 11, 2006 conference call that the Company had internal data from all the clinical trials available before April 10, 2006:

> We had a discussion with the FDA about this specific case on April 10, as well as the other data that we had available to us at that time across all of our studies.  We discussed with them the plans for the study for which this patient was enrolled, which was the European Phase III study which is not filed to the IND and therefore not under their jurisdiction, but we wanted to discuss it with them at any rate.  We updated them on the progress of the Phase II U.S. study and I think it's notable to say that, at that time, patients were still receiving active study drug on that study.  The FDA felt comfortable with our plan at that time, allowed us to continue the planned clinical program and move forward.

110.    CW1 said that the liver issue discussed in April 2006 affected a patient participating in the phase 3 trial at a clinical site in Poland.  Following the incident, a team of Threshold employees responsible for looking at SAEs involving TH-070 investigated the incident and communicated with the FDA.  CW1 said that the team included Colowick, a urologist from Seattle

1  (likely Michael Brawer), and other employees, including a physician, statistician, a product

2  development executive, and several members of the pre-clinical department.  In connection with its

3  investigation of the three SAEs, CW1 said the team conducted a detailed statistical analysis of the

4  data from the clinical studies.

5        111.    According to CW6, *__all three SAEs were being discussed internally by members of__*

6  *__Threshold's clinical department in April 2006, before the SAEs were disclosed to the FDA or the__*

7  *__public__*.  Although, as an administrative assistant, CW6 was not privy to the details of the SAEs, s/he

8  stated that s/he learned about the SAEs from one of the other employees in the department, who s/he

9  recalled was a clinical research associate who would have had personal knowledge of the events.

10  CW6 said that the SAEs s/he learned about in April 2006 were the same SAEs that later caused the

11  FDA to place a clinical hold on the TH-070 trial.  In a small company like Threshold, it is reasonable

12  to infer that if an administrative assistant in the clinical department knew about the SAEs affecting

13  Threshold's most significant ongoing drug trial by April 2006, so, too, did higher-ranking

14  employees, including Selick, Swearson and Colowick.  Indeed, CW4 revealed that there were

15  numerous closed door meetings involving Selick, Swearson and Thresholds Board of Directors

16  following the announcements of the liver toxicity issues.

17        112.    According to a May 12, 2006 report from a CIBC World Markets ("CIBC") analyst,

18  the patient with 30x normal liver enzymes had received 150 mg of the drug, whereas *__the two__*

19  *__patients with 10x elevations had received just 50 mg doses__*.  The CIBC report, which claimed to be

20  based upon "conversations with [Threshold's] management," stated:

21        Liver abnormalities were observed at both 50mg and 150mg in the European phase
       III trial at three months, *__and at similar or possibly lower doses in the U.S. phase II__*
22      *__trial at 28 days. In addition, they occurred within five days at extremely high doses__*
       *__in a recent pharmacokinetic study__*.
23

24        113.    As soon as the clinical trials were placed on clinical hold, CW1 said Threshold

25  advised the clinical sites to immediately stop administering TH-070 to patients in the study.  CW2,

26  the research coordinator at one of those sites, said that there were a massive amount of paperwork

27  involved in suspending those trials, and repeated visits by both Threshold and FDA representatives

28  to assure that the study was closed and no one was being given TH-070.  CW5 said that Selick

1  informed employees of the action in a company-wide meeting the day before the clinical hold was

2  announced.  Threshold was immediately inundated with calls from angry shareholders, but –

3  according to CW3 – Selick and Swearson refused to take the calls.

4       114.    The lack of a clear dose-response relationship between the dose of the drug and the

5  incidence of liver problems, as well as the results of the "recent pharmokinetic study" referenced by

6  management in their private communications with CIBC, would also have alerted Threshold and its

7  management that the safety profile of TH-070 was too uncertain to provide ***any*** basis to claim that

8  approval for treatment of BPH was still viable using an intermittent dosing schedule, or on any other

9  basis.

10      115.    Threshold's recognition of a liver toxicity problem prior to April 10, 2006

11  demonstrates that defendants were at least deliberately reckless in reiterating the positive results of

12  the Bari Study or advising investors that results from the ongoing phase 2 and 3 clinical trials would

13  be available by 4Q06, as they did in the  March 1, March 20, April 5 and May 10, 2006 press

14  releases, or in claiming, in the May 11, 2006 conference call and press release, that TH-070 was still

15  a viable drug candidate for the treatment of BPH.  Additional circumstantial evidence supporting a

16  strong inference of scienter is provided by the following facts previously alleged:

17          (a)    The sudden decision by Threshold on March 1, 2006 to conduct additional

18  pharmacokinetic studies of TH-070, and the unexplained 40% increase in the Company's R&D

19  expenses for the TH-070 trials during 4Q05;

20          (b)    The sudden sales by Three Arch and Sofinnova, entities with strong ties to

21  Selick, Tidmarsh, Powell and Jaeger, of a combined total of 3.5 million shares on March 3 and 16,

22  2006 for $14.5 and $36.5 million respectively;

23          (c)    The sudden and unexpected resignation of Threshold founder and chairman

24  George Tidmarsh on March 31, 2006;

25          (d)    Threshold's decision to both raise the Polish patient's elevated ALT levels

26  with the FDA on April 10, 2006 and withhold that information from the public while continuing

27  thereafter to publish positive statements about the Bari Study and the ongoing phase 2 and 3 trials of

28  TH-070 or raise additional toxicity issues that had arisen with either the FDA or the public; and

1          (e)      Threshold's announcement on May 11, 2006 of the FDA clinical hold, just

2 one day after again making positive statements about the Bari Study and the ongoing trials in its

3 1Q06 earnings release published on May 10, 2006.

4        116.     Wholly apart from the safety problems with the drug, Threshold admitted on July 17

5 that the data collected by May 11, 2006 showed that ***TH-070 also did not work any better than a***

6 ***placebo in treating BPH***.  In light of the limitations of the Bari Study and their access to clinical

7 data in connection with the then ongoing investigation into the liver toxicity issues, as described

8 above, defendants were either aware that their statements regarding the future of the TH-070 clinical

9 program were false at the time they were made, or deliberately reckless in making those statements

10 in the absence of any data to support them.

11
12
    **E.**      **Threshold Finally Admits TH-070 Does Not Work and Cancels Its**
            **Clinical Program for the Drug, Again Sending Its Stock Price**
            **Plummeting**

13        117.     On July 17, 2006, when Threshold finally announced that TH-070 did not work, it

14 told investors that the clinical program would be cancelled, eliminating any chance that the

15 Company would capture any part of the billion-dollar market for BPH treatment.  The press release

16 titled, "*Phase 2 and Phase 3 Clinical Trials of TH-070 in Benign Prostatic Hyperplasia (BPH) Do*

17 *Not Meet Primary Endpoint*," stated:

18
19
20
21
22
      REDWOOD CITY, Calif., July 17, 2006 /PRNewswire-FirstCall – Threshold
Pharmaceuticals, Inc. (Nasdaq: THLD), today announced that its Phase 2 and Phase
3 trials of TH-070 did not meet their primary endpoints of symptomatic improvement
as measured by IPSS (International Prostate Symptom Score).  The Phase 2 trial did
not generate a statistically significant dose response relationship and the Phase 3 trial
did not achieve a statistically significant difference in IPSS between TH-070 and
placebo.  Based on the safety and efficacy results of these trials, Threshold plans to
discontinue development of TH-070 for BPH.

23
24
25
26
      "We are of course disappointed by these results.  Although we will continue
to analyze the data from these trials, we do not expect that this efficacy data,
combined with the liver effects that we reported earlier, will support a path for
development of TH-070 for BPH.  Therefore we believe it is in the best interest of
the company and our shareholders to discontinue the TH-070 BPH program at this
time," said Barry Selick,  Threshold's chief executive officer.  "We will continue to
seek additional product candidates with which to broaden our portfolio and look
forward to the results from our ongoing Phase 2 and Phase 3 trials of Glufosfamide
for the treatment of pancreatic cancer by year-end."

27
28
      Study Details and Results

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS - 4:07-cv-04972-CW                                          - 46 -

The Phase 2 randomized, placebo controlled, double-blind trial (TH-CR-203) enrolled men with moderate to severe BPH. After a two-week placebo run-in period, 216 patients were randomized to receive placebo or one of four doses of TH-070 (5mg, 25mg, 50mg, 150mg) daily for one month and to be followed off therapy for three months. The primary objectives of this study were to determine the dose-response relationship of TH-070 with respect to symptomatic improvement (as measured by IPSS) and to evaluate other efficacy endpoints and the safety at the different doses.

The Phase 3 randomized, placebo controlled, double-blind trial (TH-CR-202) also enrolled men with moderate to severe BPH. After a two-week placebo run-in period, 567 patients were randomized to receive placebo or one of two doses of TH-070 (50mg or 150mg) daily for three months and to be followed off therapy for one additional month. The primary objective was to evaluate the efficacy of TH-070 compared to placebo as measured by IPSS. Dosing in this trial was prematurely discontinued at the same time that the Company announced the partial clinical hold in the U.S. TH-070 program due to adverse events relating to elevated liver enzymes.

The interim analysis of the Phase 2 data did not demonstrate a clear dose response in IPSS at one month of treatment. The mean IPSS change from baseline as measured following placebo run-in to one month of treatment ranged from -2.1 to -2.5 across the five dose groups, including the placebo control.

The interim analysis of the Phase 3 data did not demonstrate a statistically significant difference in IPSS between either of the two drug dose groups (50mg and 150mg) and placebo. The mean IPSS change from baseline as measured following the placebo run-in to one month of treatment ranged from -1.9 to -2.9 and to three months of treatment ranged from -4.4 to -5.5. There was no statistically significant difference in any of the secondary endpoints with the exception of change in prostate specific antigen (PSA) which did show statistical significance at certain time points. Primary endpoint results are summarized below.

The interim safety results from the Phase 2 and Phase 3 trials include seven cases of myalgia and four cases of testicular pain. Across all TH-070 clinical trials, there were 15 patients who had elevations in liver enzymes (as defined by elevations greater than three times the upper limit of normal), two of whom were in the placebo group. Six of the patients with elevated liver enzymes were deemed to have experienced serious adverse events.

Phase 2 U.S. Clinical Trial (interim data)

| Endpoint=IPSS (change from baseline | Placebo | 5mg | 25mg | 50mg | 150mg |
|---|---|---|---|---|---|
| | Mean (SD) n=40 | Mean (SD) n=44 | Mean (SD) n=43 | Mean (SD) n=38 | Mean (SD) n=40 |
| 1 month treatment | -2.1 (4.5) | -2.3 (6.1) | -2.5 (5.2) | -2.2 (4.4) | -2.3 (5.7) |

Phase 3 European/Canadian Clinical Trial (interim data)

| Endpoint=IPSS (change from baseline) | Placebo Mean (SD) | 50mg Mean (SD) | 150mg Mean (SD) |
|---|---|---|---|

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:07-cv-04972-CW
- 47 -

| | | | |
|---|---|---|---|
| 1 month treatment | -2.6 (4.8) n=179 | -1.9 (4.7) n=186 | -2.9 (5.6) n-172 |
| 3 month treatment | -5.5 (5.7) n=104 | -4.8 (5.5) n=106 | -4.4 (5.8) n=108 |

These developments in the TH-070 program will cause changes to the Company's plans and budgets, and therefore to the financial guidance previously provided by the Company. These changes will be provided in the Company's quarterly earnings press release on August 9, 2006.

118.    On a conference call later that same day, Colowick admitted:

As for the clinical trials themselves, as you can see from the data summary in our press release, it is clear that we did not hit our primary endpoint in either study. With the exception of a reduction in PSA levels, we did not hit the secondary endpoints either. When we evaluate endpoints, such as IPSS, maximum year-end flow rate or postvoid residual volume, it turns out the improvements in these endpoints are less than what was observed in the previous Phase II study and not significantly different from the placebo values. And while the 8 to 9% mean decrease in prostate volume in both the current studies is comparable to the mean reduction of 11% seen in the first Phase II study, a similar decrease in prostate volume was noted in the placebo arms of the current studies.

119.    On this news, Threshold's stock price fell $1.63, an additional loss of 51.3% in value on a trading volume of 12.9 million shares, causing further injury to investors who had purchased shares in reliance on defendants' false and misleading statements regarding TH-070.

## VIII.  PROXIMATE LOSS CAUSATION/ECONOMIC LOSS

120.    Plaintiffs' claims for securities fraud are asserted under the fraud on the market theory of reliance. The market price of Threshold's securities, including common stock regularly traded on the NASDAQ market, was artificially inflated by the materially false statements and material omissions which defendants made in Threshold's Registration Statements for its February 4, 2005 IPO and its October 10, 2005 secondary offering, in its March 1, 2006 press release and conference call, in its May 10, 2006 press release, and in its May 11, 2006 press release and conference call as previously alleged. These materially false statements and material omissions inflated the price of Threshold's stock, causing injury to investors when that inflation was eliminated through two disclosures, the first occurring on May 11, 2006, when defendants announced the suspension of clinical trials due to elevated liver enzymes in patients receiving TH-070, and the second occurring

1    on July 17, 2006, when defendants announced the end of the clinical trials because interim data

2    demonstrated TH-070's lack of efficacy.

3         **A.    Applicability of Presumption of Reliance: Fraud on the Market
              Doctrine**

4

5         121.    At all relevant times, the market for Threshold's common stock was an efficient

     market for the following reasons, among others:

6

7              (a)    Threshold's stock met the requirements for listing, and was listed and actively

     traded on the NASDAQ market, a highly efficient and automated market;

8

9              (b)    As a regulated issuer, Threshold filed periodic public Reports with the SEC

10   and NASDAQ;

11             (c)    Threshold regularly communicated with public investors via established

12   market communication mechanisms, including through regular disseminations of press releases on

13   the national circuits of major newswire services, publications on its website and other internet sites,

14   and through other wide-ranging public disclosures, such as through conference calls,

15   communications with the financial press and other similar reporting services; and

16             (d)    Threshold was followed by securities analysts employed by major brokerage

17   firms, including, but not limited to, CIBC World Markets, Rodman & Renshaw and Willliam Blair

18   & Company who wrote reports which were distributed to the sales force and certain customers of

19   their respective brokerage firms.  Each of these reports was publicly available and entered the public

20   marketplace.

21        122.    As a result of the foregoing, the market for Threshold's common stock digested

22   current information regarding Threshold from all publicly available sources and reflected such

23   information in Threshold's stock price.  Under these circumstances, all purchasers of Threshold's

24   common stock during the Class Period suffered similar injury through their purchase of Threshold's

25   common stock at artificially inflated prices and its subsequent decline in value, and a presumption of

26   reliance applies.

27

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS - 4:07-cv-04972-CW                                              - 49 -

**B.    Defendants' False and Misleading Statements Proximately Caused Economic Loss to Threshold's Investors**

123.    On February 4, 2005, the first day of the Class Period, Threshold held its IPO, pursuant to its S1/A filed on February 3, 2005, of 5.3 million shares at a price of $7 per share.  On the first day of trading, Threshold's common stock closed at $7.14 on a trading volume of 2.2 million shares.  On October 12, 2005, Threshold held a secondary offering of 6.3 million shares at a price of $10.46 per share.  Threshold closed on October 12, 2005 at $10.01 on trading volume of 1.4 million shares.

124.    During the Class Period, Threshold's stock traded at inflated prices because of material misstatements and omissions made by defendants in the Registration Statements and subsequent press releases and conference calls regarding both the safety and efficacy of lonidamine for the treatment of BPH.

125.    The inflation in Threshold's securities prices was partially eliminated when the market learned on May 11, 2006 that, contrary to defendants' statements about the safety of lonidamine, the FDA placed a hold on the US  phase 2 and European phase 3 trials due to three serious adverse events involving elevated liver enzymes in lonidamine patients.  On this news, the share price of Threshold fell from $14 on May 11, 2005 to $3.44 on May 12, 2005, a one-day decline of $10.56 or 75.4% of its value on extraordinary trading volume of 33.5 million shares.  In contrast, the NASDAQ Biotechnology Index (^NBI) fell $9.24 or 1.2% the same day.

126.    The remaining inflation in Threshold's securities was eliminated when the market learned on July 17, 2006 that TH-070 was not an effective treatment for BPH, that there were additional three serious adverse events of elevated liver enzymes and at least 16 total adverse events, and that Threshold would cease their clinical trials of lonidamine for BPH.  On this news, Threshold's stock price fell from $3.18 to $1.55, a one-day drop of $1.63 or 51.3% of its value on unusually high trading volume of 12.9 million shares.  In contrast, the NASDAQ Biotechnology Index fell $6.41 or less than 1% the same day.

127.    The foregoing allegations describe plaintiffs' general theory of damages, demonstrate that plaintiffs' damages were caused by defendants' material misstatements and omissions as well as

1  the scheme to defraud as alleged herein, and negate any inference that plaintiffs' losses were the

2  result of general market conditions or other factors wholly unrelated to the false and misleading

3  information complained of herein.  Upon further investigation and expert analysis, plaintiffs may

4  assert that there were additional inflationary or corrective events that caused or contributed to the

5  damages they incurred.

6  **IX.    GROUP PLEADING ALLEGATIONS**

7        128.    The Individual Defendants, because of their positions with the Company, possessed

8  the power and authority to control the contents of Threshold's quarterly reports, press releases and

9  presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*,

10  the market.  Each defendant was provided with copies of the Company's reports and press releases

11  alleged herein to be misleading prior to or shortly after their issuance and had the ability and

12  opportunity to prevent their issuance or cause them to be corrected. Because of their positions and

13  access to material non-public information available to them but not to the public, each of these

14  defendants knew that the adverse facts specified herein had not been disclosed to and were being

15  concealed from the public, and that the positive representations which were being made were then

16  materially false and misleading.  The Individual Defendants are liable for the false statements

17  pleaded herein, as those statements were each "group-published" information, the result of the

18  collective actions of the Individual Defendants.

19  **X.    ADDITIONAL SCIENTER ALLEGATIONS IN SUPPORT OF 1934 ACT
          CLAIMS**

20

21        129.    Plaintiffs make the following allegations in further support of their claims under the

22  1934 Act.  Because scienter is not a required element of the 1933 Act, plaintiffs do not make the

    allegations herein in support of those claims.
23

24        A.    **Sofinnova Dumps 75% of Its Shares Just Weeks Before the FDA Is
                Told of Significant Liver Toxicity Problems Discovered During TH-
                070 Trials**
25

26        130.    Sofinnova is a venture capital firm that invests in early-stage companies in the life

27  sciences and information technology industries. Members of Sofinnova sit on the boards of the

28  companies in which the firm holds a stake and are actively involved in the management of the

1   corporations in which they invest.  Some of the members of Sofinnova are also directly invested in

2   the early stage corporations in which the firm invests.

3       131.    Sofinnova invests and operates through various related entities and affiliates,

4   including Sofinnova Venture Partners V, L.P., Sofinnova Management V 2005, L.L.C., Sofinnova

5   Management V, L.L.C., Sofinnova Venture Affiliates V, L.P., Sofinnova Venture Principals V, L.P.

6   and Sofinnova Ventures, Inc.  Acting through these entities, Sofinnova was a significant early-stage

7   investor in Threshold, amassing a 13.4% stake in the Company through participation in its pre-IPO

8   private stock offerings, accumulating 2.25 million shares of Series A and 3.03 million shares of

9   Series B preferred stock.  Upon the completion of Threshold's IPO, Sofinnova's Series A and B

10  shares were automatically converted into 3.4 million shares of Threshold common stock.  Like other

11  pre-public investors, Sofinnova was prohibited by the terms of the IPO lock-up agreement from

12  selling those shares for 180 days after the IPO.  As a result of the issuance of additional common

13  stock through the IPO and Follow-on Offering, Sofinnova's 3.4 million common shares in Threshold

14  were diluted by the initial and secondary offerings to a 9.3% stake by October 2005.  By the time of

15  the Follow-on Offering, when Threshold's stock was being offered at $10.46 per share, Sofinnova's

16  stake in the Company was worth in excess of $35.9 million.

17      132.    Threshold director Powell is the general partner at Sofinnova, and has served as its

18  managing director since 1997.  He is also directly invested in Threshold, through the ownership of

19  893,201 shares in his own name.  Powell's sister, Denise Powell, the head of investor relations at

20  Threshold, was granted options to purchase 95,540 shares of Threshold stock between 2005 and

21  2006.

22      133.    Selick was one of Sofinnova's "Venture Partners," receiving compensation of

23  $236,083 in 2003 and 2004.  Selick also held a "carried interest" in one of the companies in which

24  Sofinnova had investments, presumably Threshold.[9]   A "carried interest" indicates a capital

25  investment, either cash or stock, which has been pooled with other investors.  Under common

26

27  [9]      So far as plaintiffs have been able to ascertain, Selick owned no contemporaneous interest in
    any other company in which Sofinnova had invested during or prior to the Class Period.

28

1    venture capital arrangements, the amount of capital invested in this fashion is typically

2    disproportionate to the investors' percentage ownership in the pooled fund.  A typical arrangement

3    would involve a carried interest contribution of 1% of a fund's capital which provides a right to a

4    disproportionate return upon the disposition of the invested assets, frequently as much as 20% of the

5    total return obtained on the investment.

6        134.    On March 16, 2006, after Threshold's stock price had climbed to $14.25 per share,

7    Sofinnova suddenly sold 2.562 million shares, amounting to 75% of its holdings in the Company.[10]

8    Sofinnova obtained $14.25 per share for its stock, generating gross proceeds of $36.5 million.

9    Sofinnova's sales represented 89% of the trading volume on March 16, 2006, causing a 4% decline

10    in Threshold's stock price.  After reaching an intraday high of $14.55, Threshold's stock closed at

11    $13.80, then dropped to $13.60 the following day.

12        135.    The sales by Sofinnova, an entity controlled by Powell and in which Selick had

13    significant financial interests, are suspicious in both timing and amount.  As previously alleged,

14    Sofinnova's sales occurred just two weeks after Selick had primed the market with his statement that

15    the positive results in the Bari Study had been "replicated" in the ongoing clinical trials, and just

16    three weeks before Threshold went to the FDA to report liver toxicity issues that had arisen in one of

17    those trials.  Moreover, the sales, representing 75% of its equity investment in the Company, were

18    the first ever sales of any Threshold shares by Sofinnova.

19        136.    Sofinnova's sale also amounted to a sudden liquidation of 7.5% of **all** the publicly

20    traded shares in the Company.  The liquidation of that amount of stock in a single day is highly

21    unusual, as large blocks of stock are typically liquidated over a period of days, weeks or even

22    months to avoid triggering a negative price reaction.  That Sofinnova elected to sell more than 2.5

23    million shares on a single day, in a company which had an average daily trading volume of just

24

25

26 [10]     Sofinnova's sales were accomplished through three entities it owns and controls, each of

27 whom, like the parent company, is headquartered at 140 Geary Street in San Francisco.  Sofinnova Venture Partners V, L.P. sold 2,444,114 shares; Sofinnova Venture Affiliates V, L.P. sold 80,411 shares, and Sofinnova Venture Principals V, L.P. sold 37,475 shares.

28

1    126,087 shares to that point, suggests it was privy to negative non-public information about the

2    Company at the time of that sale.

3        137.    The Sofinnova's sales also provide further support for a strong inference of scienter

4    against Selick, who, by virtue of his ownership of a carried interest in Sofinnova's venture fund,

5    reaped substantial profits as a result of the sale.  For example, under the typical venture capital

6    arrangements described above, Selick would have stood to share in 20% of the proceeds of that sale,

7    an amount in excess of $7.3 million, providing him with a strong pecuniary motivation to mislead

8    investors by proclaiming TH-070 to be a "home run" drug in the absence of any data to support that

9    statement.

10    **B.    Three Arch Management Dumps Their Investments in Threshold
          Immediately Following Threshold's Claim that TH-070 Will Be a
11        "Home Run" and Just Weeks Before Threshold Informs the FDA of
          Liver Toxicity Problems**

12        138.    Like Sofinnova, Three Arch is a venture capital firm that invests in early-stage

13    companies in the healthcare industry.  Three Arch operates through numerous partnership, limited

14    liability and corporate entities.  Acting through these entities, Three Arch  was a significant early-

15    stage investor in Threshold, amassing a 13.4% stake in the Company through participation in its pre-

16    IPO private stock offerings, accumulating 2.25 million shares of Series A and 3.03 million shares of

17    Series B preferred stock.  Upon completion of Threshold's IPO, Three Arch's Series A and B shares

18    were automatically converted into 3.44 million shares of Threshold common stock.  Like other pre-

19    public investors, Three Arch was prohibited by the terms of the IPO lock-up agreement from selling

20    those shares for 180 days after the IPO.  As a result of the issuance of additional common stock

21    through the IPO and Follow-on Offering, Three Arch's 3.44 million common shares in Threshold

22    were diluted to a 9.3% stake by October 2005.  By the time of the Follow-on Offering, when

23    Threshold's stock was being offered a $10.46 per share, Three Arch's stake in the Company was

24    worth in excess of $35.9 million.

25        139.    Threshold founder, director and President Tidmarsh was an "entrepreneur-in-

26    residence" at Three Arch from April to September 2001 prior to joining Threshold.  Upon

27    Tidmarsh's departure to Threshold, Three Arch became a significant early investor in Threshold.  In

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS - 4:07-cv-04972-CW                                                      - 54 -

1  addition, Threshold director Jaeger has been a partner of Three Arch since 1993. As a partner in the

2  entity which owns and controls the 3.44 million shares, Jaeger is considered an indirect owner of the

3  shares and has a significant financial interest in them.

4      140.    On March 3, 2006, just two days after Selick announced that TH-070 would be a

5  "home run" and that the US phase 2 and European phase 3 clinical trials were replicating the Bari

6  Study, Three Arch dumped 1 million of its 3.44 million shares of Threshold stock – 29% of its

7  holdings – at $14.50, for $14.5 million. Three Arch's sale represented 60% of the trading volume on

8  March 3, 2006.

9      141.    The sale by Three Arch, a firm controlled by Jaeger and with close ties to Threshold

10  President Tidmarsh, is suspicious in both timing and amount. As previously alleged, Three Arch's

11  sales occurred just two days after Selick had primed the market with his statement that the positive

12  results in the Bari Study had been "replicated" in the ongoing clinical trials, and just five weeks

13  before Threshold went to the FDA to report liver toxicity issues that had arisen in one of those trials.

14  Moreover, the sale representing 29% of its equity investment in the Company was the first ever sales

15  of any Threshold shares by Three Arch.

16      142.    Three Arch's sale also amounted to a sudden liquidation of 2.7% of all the publicly

17  traded shares in the Company. The liquidation of that amount of stock in a single day is highly

18  unusual, as large blocks of stock are typically liquidated over a period of days, weeks or even

19  months to avoid triggering a negative price reaction. That Three Arch elected to sell one million

20  shares on a single day suggests it was privy to negative non-public information about the Company

21  at the time of that sale.

22      143.    The sudden resignation of Tidmarsh on March 31, 2006 adds to the suspicious nature

23  and timing of the Three Arch's sale. Tidmarsh, the company founder and president, suddenly

24  resigned less than a month after the Three Arch's sale and did not provide the market with any

25  meaningful reason for his departure, suggesting only that he wanted to focus on "new endeavors."

26

27

28

1

2

**C.    Selick's and Swearson's Salaries and Bonuses Were Dependent upon the Purported Success of TH-070, and Dropped Significantly Just Before the Company Revealed TH-070 Was Toxic to Patients and Did Not Work**

3

4

144.    According to Threshold's annual Proxy Statements, management salaries and bonuses

5

were determined by the compensation committee of the Board of Directors based on the

6

achievement of specific short-term corporate goals as well as longer-term strategic objectives,

7

including the "progress of the Company's research and development programs and corporate

8

development activities . . . and the Company's success in securing capital sufficient to enable it to

9

continue research and development activities."

10

145.    In March 2005, Selick was awarded a bonus of $374,614 – 127% of his 2004 base

11

salary of $295,833 – and was given a 35% raise for 2005 to $400,000.  At the same time, Swearson

12

received a bonus of $141,375 – 65% of her base salary of $217,083 – and a raise to $245,000.

13

According to the compensation committee report, Selick's bonus and raise resulted from the

14

"enrollment and data analysis for the Company's Phase 2 trial of TH-070 for the treatment of

15

symptomatic BPH; and preparation for our initial public offering of common stock resulting in net

16

proceeds of approximately $38 million in February 2005."

17

146.    Given the completion of the $62 million Follow-on Offering – nearly double the size

18

of the IPO – and the purported "replication" of the Bari Study results in the ongoing TH-070 clinical

19

trials which had nearly completed enrollment by March 2006 when new compensation awards were

20

determined, it would appear that Selick's and Swearson's compensation, and that of other members

21

of Threshold's management, would have kept pace for FY05.  However, the compensation

22

committee trimmed Selick's bonus to $120,000 and Swearson's to $98,500, representing a respective

23

68% and 30% drop in their prior-year bonuses.  Both executives' total compensation (salary and

24

bonus) also dropped for 2005.

25

147.    Significantly, the executive compensation committee made no disclosures concerning

26

the dramatic drop in bonuses awarded to the Individual Defendants.  Instead, the executive

27

committee cited achievements of very similar corporate objectives in FY2006 which they cited in

28

FY2005, namely the initiation of the US phase 2 and European phase 3 clinical studies of TH-070

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS - 4:07-cv-04972-CW                                                        - 56 -

1   and the completion of the IPO and Follow-on Offering raising $100 million.  Thus, the reduction in

2   Individual Defendants' compensation in 2006 further supports the inference that, by March 2006 or

3   earlier, Threshold knew or recklessly disregarded data demonstrating that the risks to TH-070's

4   success were much greater than previously reported to the public, and that there was substantial

5   doubt whether the drug would prove to be safe or efficacious.

6        **D.    Unexplained Heavy Trading on May 11, 2006 Suggests that Inside
               Information Leaked to the Market**

7        148.    The public was not informed until after trading hours on Thursday, May 11, 2006,

8   that the FDA had placed a hold on Threshold's TH-070 clinical trials.  Thus, the May 11, 2006

9   closing price of $14 did not reflect this information.  Up until that point, Threshold had only made

10  positive public comments on the progress of TH-070.

11       149.    Trading was unusually heavy on May 11, 2006 at a volume of 1.2 million shares as

12  compared with an average daily trading volume of 172,404 shares up to that point.  The May 11,

13  2006 surge in trading activity, at almost seven times the average volume, suggests that inside

14  information may have been leaked to the market, allowing some investors to bail out their shares at

15  $14 while leaving the less fortunate to bear the brunt of the collapse.

16  **XI.    CLASS ACTION ALLEGATIONS**

17       150.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and

18  (b)(3) on behalf of a class, consisting of all persons who purchased the Company's publicly traded

19  securities on the open market or in a registered stock offering during the Class Period, and who were

20  damaged thereby (the "Class").  Excluded from the Class are defendants, the Company's officers

21  and directors, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any

22  entity in which defendants have or had a controlling interest or of which the Company is a parent or

23  subsidiary.

24       151.    The members of the Class are located in geographically diverse areas and are so

25

26  numerous that joinder of all members is impracticable.  The disposition of their claims in a class

27  action will provide substantial benefits to the parties and the Court.  Following the completion of the

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS - 4:07-cv-04972-CW                                                    - 57 -

1    Follow-on Offering, Threshold had approximately 37.3 million shares of its common stock

2    outstanding and active options trading.

3            152.    Common questions of law or fact exist as to all members of the Class and

4    predominate over any questions affecting solely individual members of the Class.   Among the

5    questions of law or fact common to the Class are:

6                    (a)    Whether the 1933 Act was violated by defendants;

7                    (b)    Whether the 1934 Act was violated by defendants;

8                    (c)    Whether defendants omitted and/or misrepresented material facts;

9                    (d)    Whether defendants' statements omitted material facts necessary to make the

10   statements made, in light of the circumstances under which they were made, not misleading;

11

12                   (e)    Whether defendants knew or deliberately disregarded that their statements

13   were false and misleading;

14                   (f)    Whether the prices of Threshold's publicly traded securities were artificially

15   inflated; and

16

17                   (g)    The extent of damages sustained by the Class members and the appropriate

18   measure of damages.

19           153.    Plaintiffs' claims are typical of the claims of the members of the Class as plaintiffs

20   and members of the Class sustained damages arising out of defendants' wrongful conduct in

21   violation of federal laws as complained of herein.

22           154.    Plaintiffs will fairly and adequately protect the interests of the members of the Class

23   and have retained counsel competent and experienced in class action and securities litigation.

24   Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

25           155.    A class action is superior to all other available methods for the fair and efficient

26   adjudication of this controversy since joinder of all members of the Class is impracticable.

27   Furthermore, because the damages suffered by individual Class members may be relatively small,

28

the expense and burden of individual litigation make it impossible for the Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of Section 11 of the 1933 Act
### Against All Defendants

156.    Plaintiffs incorporate ¶¶1-82, 102, 117-128 and 150-155 by reference herein.

157.    This Count is brought by plaintiffs pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, and is asserted against all defendants.  For purposes of this Count, plaintiffs do not claim that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent.

158.    The Registration Statements for the IPO and the Follow-on Offering were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading and omitted to state material facts required to be stated therein.

159.    Defendant Threshold is the issuer of the common stock purchased by plaintiffs and the Class.  As such, Threshold is strictly liable for the materially inaccurate statements contained in the Registration Statements and the Prospectuses and the failure of the Registration Statements and Prospectuses to be complete and accurate.

160.    The Individual Defendants each signed the Registration Statements either personally or through an attorney-in-fact and/or caused their issuance.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statements.  They had a duty to ensure that such statements were true and accurate, that there were no omissions of material facts that would make the statements misleading and that the documents contained all facts required to be stated therein.  In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statements, and also should have known

1  of the omissions of material facts necessary to make the statements made therein not misleading. As

2  such, the Individual Defendants are liable to plaintiffs and the Class.

3      161.    By reasons of the conduct herein alleged, each defendant violated §11 of the 1933

4  Act.

5      162.    Plaintiffs acquired Threshold common stock in reliance on the Registration

6  Statements and without knowledge of the untruths and/or omissions alleged herein. Plaintiffs

7  sustained damages when the price of Threshold common stock declined substantially due to material

8  misstatements in the Registration Statements and Prospectuses.

9      163.    This action was brought within one year after the discovery of the untrue statements

10  and omissions and within three years of the date of the IPO and the Follow-on Offering.

11                              **COUNT II**

12              **For Violation of Section 12(a)(2) of the 1933 Act**
                          **Against All Defendants**
13

14      164.    Plaintiffs incorporate ¶¶1-82, 102, 117-128 and 150-163 by reference herein.

15      165.    This Count is brought by plaintiffs pursuant to §12(a)(2) of the 1933 Act, 15 U.S.C.

16  §77l(a)(2), on behalf of all purchasers of Threshold common stock in the IPO and Follow-on

17  Offering, and is asserted against all defendants. For purposes of this Count, plaintiffs affirmatively

18  state that they do not claim that defendants committed intentional or reckless misconduct or that

19  defendants acted with scienter or fraudulent intent.

20      166.    Defendants were sellers and offerors and/or solicitors of purchasers of the Threshold

21  common stock offered pursuant to the IPO and Follow-on Offering Prospectuses. Defendants

22  issued, caused to issue, and/or signed the Registration Statements in connection with the IPO and the

23  Follow-on Offering. The Registration Statements contained Prospectuses that were used to induce

24  investors, such as plaintiffs and the other members of the Class, to purchase Threshold common

25  stock.

26      167.    The Prospectuses contained untrue statements of material facts, omitted to state other

27  facts necessary to make the statements made not misleading, and omitted material facts required to

28

1  be stated therein.  The Individual Defendants' actions of solicitation included participating in the

2  preparation of the false and misleading Prospectuses.

3      168.    As set forth more specifically above, the Prospectuses contained untrue statements of

4  material facts and omitted to state material facts necessary in order to make the statements, in light

5  of circumstances in which they were made, not misleading.

6      169.    Plaintiffs and the other Class members did not know, nor could they have known, of

7  the untruths or omissions contained in the Prospectuses.

8      170.    Defendants were obligated to make a reasonable and diligent investigation of the

9  statements contained in the Prospectuses to ensure that such statements were true and that there was

10 no omission of material facts required to be stated in order to make the statements contained therein

11 not misleading.  None of defendants made a reasonable investigation or possessed reasonable

12 grounds for the belief that the statements contained in the Prospectuses were accurate and complete

13 in all material respects.  Had they done so, these defendants could have known of the material

14 misstatements and omissions alleged herein.

15     171.    This claim was brought within one year after discovery of the untrue statements and

16 omissions in the Prospectuses and within three years after Threshold common stock was sold to the

17 Class in connection with the IPO and the Follow-on Offering.

18     172.    By reason of the misconduct alleged herein, defendants violated §12(a)(2) of the 1933

19 Act and are liable to plaintiffs and the Class members who purchased or acquired Threshold

20 common stock in the IPO and/or the Follow-on Offering pursuant to the Prospectuses, each of whom

21 has been damaged as a result of such violation.

22                                **COUNT III**

23                    **For Violation of Section 15 of the 1933 Act**
                              **Against All Defendants**
24
       173.    Plaintiffs incorporate ¶¶1-82, 102, 117-128 and 150-172 by reference herein.
25
       174.    For purposes of this Count, plaintiffs affirmatively state that they do not claim that
26
   defendants committed intentional or reckless misconduct or that defendants acted with scienter or
27
   fraudulent intent.
28

1    175.    Throughout the Class Period, the Individual Defendants acted as controlling persons

2    of Threshold within the meaning of §15 of the 1933 Act, 15 U.S.C. §77o.  By reason of their stock

3    ownership, senior management positions and/or directorships at the Company, as alleged above,

4    these defendants, individually and acting pursuant to a common plan, had the power to influence and

5    exercised or failed to exercise that power in a manner that caused Threshold to engage in the conduct

6    complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to

7    §15 of the 1933 Act.

8    176.    In addition, throughout the Class Period, Threshold, by virtue of its power over the

9    hiring, retention and oversight of its employees, as exercised through its Board of Directors and

10    other agents, acted as a controlling person of the Individual Defendants and other members of

11    Company management within the meaning of §15 of the 1933 Act, 15 U.S.C. §77o.  Threshold had

12    the power to influence the conduct of these employees, and exercised or failed to exercise that power

13    in a manner that caused the Individual Defendants to engage in the conduct complained of herein in

14    violation of the 1933 Act.  By reason of such conduct, Threshold is liable pursuant to §15 of the

15    1933 Act.

16                                **COUNT IV**

17                **For Violation of Section 10(b) of the 1934 Act and Rule 10b-5**
                                  **Against All Defendants**
18
       177.    Plaintiffs incorporate all prior allegations of this Complaint by reference herein.
19
       178.    During the Class Period, defendants disseminated or approved the false statements
20
     specified above, which they knew or deliberately disregarded were misleading in that they contained
21
     misrepresentations and failed to disclose material facts necessary in order to make the statements
22
     made, in light of the circumstances under which they were made, not misleading.
23
       179.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:
24
            (a)    Employed devices, schemes and artifices to defraud;
25
            (b)    Made untrue statements of material facts or omitted to state material facts
26
     necessary in order to make the statements made, in light of the circumstances under which they were
27
     made, not misleading; or
28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS - 4:07-cv-04972-CW                                              - 62 -

1        (c)    Engaged in acts, practices and a course of business that operated as a fraud or

2 deceit upon plaintiffs and others similarly situated in connection with their purchases of Threshold

3 common stock during the Class Period.

4        180.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of

5 the market, they paid artificially inflated prices for Threshold common stock.  Plaintiffs and the

6 Class would not have purchased Threshold common stock at the prices they paid, or at all, if they

7 had been aware that the market prices had been artificially and falsely inflated by defendants'

8 misleading statements.

9        181.    As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and

10 the other members of the Class suffered damages in connection with their purchases of Threshold

11 common stock during the Class Period.

12                                     **COUNT V**

13              **For Violation of Section 20(a) of the 1934 Act**

                          **Against All Defendants**
14

15        182.    Plaintiffs incorporate all prior allegations of their Complaint by reference herein.

16        183.    The Individual Defendants acted as controlling persons of Threshold within the

17 meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company and their

18 ownership of Threshold common stock, the Individual Defendants had the power and authority to

19 cause Threshold to engage in the wrongful conduct complained of herein.  Threshold controlled the

20 Individual Defendants and all of its employees.  By reason of such conduct, the Individual

21 Defendants and Threshold are liable pursuant to §20(a) of the 1934 Act.

22        184.    In addition, throughout the Class Period, Threshold, by virtue of its power over the

23 hiring, retention and oversight of its employees, as exercised through its Board of Directors and

24 other agents, acted as a controlling person of the Individual Defendants and other members of

25 Company management, including Colowick, within the meaning of §20(a) of the 1934 Act.

26 Threshold had the power to influence the conduct of these employees, and exercised or failed to

27 exercise that power in a manner that caused the Individual Defendants and Colowick to engage in

28

1  the conduct complained of herein in violation of §10(b) of the 1934 Act.  By reason of such conduct,

2  Threshold is liable pursuant to §20(a) of the 1934 Act.

3                          **PRAYER FOR RELIEF**

4         WHEREFORE, plaintiffs pray for relief and judgment as follows:

5         A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

6         B.      Awarding plaintiffs and the members of the Class damages, interest and costs;

7         C.      With respect to Count II, ordering rescission or rescissory damages for purchasers of

8  Threshold common stock in the IPO and Follow-on Offering;

9         D.      Awarding plaintiffs reasonable costs and attorneys' fees; and

10        E.      Awarding such equitable/injunctive or other relief as the Court may deem just and

11 proper.

12                          **JURY TRIAL DEMAND**

13        Plaintiffs demand a jury trial on all claims.

14 DATED:  January 15, 2008                   COUGHLIN STOIA GELLER
                                                RUDMAN & ROBBINS LLP
15                                            DENNIS J. HERMAN
                                              DANIEL J. PFEFFERBAUM
16

17                                                    /s/ Dennis J. Herman
18                                              DENNIS J. HERMAN

19                                            100 Pine Street, Suite 2600
                                              San Francisco, CA  94111
20                                            Telephone:  415/288-4545
                                              415/288-4534 (fax)
21
                                              Lead Counsel for Plaintiffs
22
   T:\CasesSF\Threshold\CPT00048275.doc
23

24

25

26

27

28

   CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
   SECURITIES LAWS - 4:07-cv-04972-CW                                              - 64 -

1    <u>CERTIFICATE OF SERVICE</u>

2         I hereby certify that on January 15, 2008, I electronically filed the foregoing with the Clerk

3    of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4    addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5    mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6    participants indicated on the attached Manual Notice List.

7         I further certify that I caused this document to be forwarded to the following designated

8    Internet site at:  http://securities.csgrr.com/.

9         I certify under penalty of perjury under the laws of the United States of America that the

10   foregoing is true and correct.  Executed on January 15, 2008.

11
                                          /s/ Dennis J. Herman
12                                        DENNIS J. HERMAN

13
                                         COUGHLIN STOIA GELLER
14                                          RUDMAN & ROBBINS LLP
                                         100 Pine Street, 26th Floor
15                                       San Francisco, CA  94111
                                         Telephone:  415/288-4545
16                                       415/288-4534 (fax)

17
                                         E-mail:  Dennish@csgrr.com
18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 4:07-cv-04972-CW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Kevin Anthony Burke**
  kburke@hewm.com

- **Michael L. Charlson**
  michael.charlson@hellerehrman.com,larissa.soboleva@hellerehrman.com,jennifer.cygnor@hellerehrman.

- **Marc S. Henzel**
  mhenzel182@aol.com

- **Dennis J. Herman**
  dennish@csgrr.com,jdecena@csgrr.com,moniquew@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.con

- **Alexander M.R. Lyon**
  alexander.lyon@hellerehrman.com,yfs@hellerehrman.com

- **Daniel Jacob Pfefferbaum**
  DPfefferbaum@csgrr.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Samuel H. Rudman**
  srudman@csgrr.com

- **Evan J. Smith**
  esmith@brodsky-smith.com

- **Laurence Andrew Weiss**
  lweiss@hewm.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Mary K. Blasy**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101