LEXSEE


Caution
As of: Mar 07, 2008

**IN RE: BAYER AG SECURITIES LITIGATION**

**03 Civ. 1546 (WHP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2004 U.S. Dist. LEXIS 19593**

**September 30, 2004, Decided
September 30, 2004, Filed**

**SUBSEQUENT HISTORY:** Claim dismissed by In re Bayer AG Sec. Litig., 2005 U.S. Dist. LEXIS 19908 (S.D.N.Y., Sept. 14, 2005)

**DISPOSITION:** Defendants' motion to dismiss granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff securities purchasers sued defendant company and officers, alleging claims under § 10(b) of the Securities Exchange Act of 1934 (SEA), 15 U.S.C.S. § 78i(b), S.E.C. Rule 10b-5, 17 C.F.R. § 240.10b-5, and § 20(a) of the SEA, 15 U.S.C.S. § 78t(a). Defendants moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), 9(b), and § 21D of the SEA, 15 U.S.C.S. § 78u-4.

**OVERVIEW:** The purchasers alleged that three general categories of statements prior to the withdrawal of a certain drug were misleading: statements regarding safety and approval; statements relating commercial potential; and announcements about overall financial performance. As to safety and approval, construing all inferences in the purchasers' favor, by August 2000, defendants viewed adverse event reports as sufficiently serious and frequent to affect future earnings. Thus, defendants were obligated at that time to update pre-withdrawal statements concerning the safety profile. However, no such duty arose before August 2000. Adverse event reports and other documents were not material before an August conference. As to statements about the drug's potential, by August defendants believed the brand was at risk but did not disclose information leading to that conclusion; thus, the purchasers adequately pled the company's forward-looking statements needed to be updated. As to statements about overall financial performance, the purchasers did not allege pre-withdrawal statements concerning financial performance were inconsistent with recognized accounting standards and thus materially misleading.

**OUTCOME:** The motion to dismiss was granted as to two officers, with leave to replead. The motion to dismiss claims of foreign purchasers of stock on foreign exchanges was also granted with leave to replead.

**CORE TERMS:** adverse event, rhabdomyolysis, misleading, patient, materiality, disclose, scienter, withdrawal, gemfibrozil, actionable, stock, dose, pre-withdrawal, omission, motive, misstatement, statins, fraudulent, residents, brand, product liability, investor, warning, annual, matter jurisdiction, pharmaceutical, recklessness, contingency, puffery, marketing

**LexisNexis(R) Headnotes**

Page 1

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*

[HN1]A court may consider documents partially quoted in, or that are integral to, the complaint on a motion to dismiss.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims*

[HN2]On a motion to dismiss, a court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor. A court should not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. In this limited task, the issue is not whether a plaintiff will ultimately prevail on his claim, but whether the plaintiff is entitled to offer evidence in support of allegations in the complaint.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN3]To state a cause of action under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), and S.E.C. Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must plead that the defendant in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Heightened Pleading Requirements*

[HN4]A complaint alleging securities fraud under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), must satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C.S. § 78u–4(b)(2). Under Fed. R. Civ. P. 9(b), the circumstances constituting fraud must be stated with particularity, meaning that such allegations must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. The PSLRA, similarly, requires that the complaint shall specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading. 15 U.S.C.S. § 78u–4(b)(1).

*Securities Law > Liability > Private Securities Litigation > General Overview*
[HN5]See 15 U.S.C.S. § 78u–4(b)(2).

*Criminal Law & Procedure > Scienter > General Overview*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Motive & Opportunity*

[HN6]In the context of the Private Securities Litigation Reform Act, plaintiffs can satisfy the pleading requirements for scienter by alleging facts showing that the defendants had both the motive and opportunity to commit fraud, or by alleging facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. More specifically, the plaintiffs can raise a strong inference of fraudulent intent by pleading that the defendants: (1) benefited in a concrete and personal way from the alleged fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to verify information that they had a duty to monitor.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN7]An omission is actionable under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), if the omitted fact is material--that is, its disclosure is necessary to prevent another statement from being materially misleading. An omitted fact is material if there

Page 2

2004 U.S. Dist. LEXIS 19593, *

is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. Generally, a complaint may not properly be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance. Whether a particular statement or omission is material is a mixed question of law and fact.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN8]The United States Court of Appeals for the Second Circuit has instructed district judges that materiality is a flexible, fact-based determination.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN9]Isolated adverse event reports, lacking statistical significance, do not prove that a drug is unsafe.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN10]A duty to update exists when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN11]In a securities fraud action, it is incumbent on the plaintiffs to allege that their injury was caused by the alleged misstatement or omission. To make this showing, the plaintiffs must demonstrate loss causation, i.e., the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiffs.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*

[HN12]While all inferences must be drawn in favor of the plaintiffs on a motion to dismiss, the court need not accept as true an allegation that is contradicted by documents on which the complaint relies.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN13]Disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by a company in the future.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN14]A duty to update opinions and projections may arise if the original opinions or projections have become misleading as a result of intervening events.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN15]Statements containing simple economic projections, expressions of optimism, and other puffery are insufficient bases for a securities claim.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Materiality > Statements of Opinion*

*Torts > Intentional Torts > Defamation > Defenses > Fair Comment & Opinion*

*Torts > Products Liability > Misrepresentation*

[HN16]Statements of opinion are actionable under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78i(b), if it can be established that the speaker deliberately misrepresented his actual opinion. Thus, plaintiffs who charge that a statement of opinion is materially misleading, must allege with particularity provable facts to demonstrate that the statement of opinion is both objectively and subjectively false.

*Securities Law > Liability > Private Securities Litigation > General Overview*

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN17]To adequately plead scienter, a complaint must allege facts that give rise to a strong inference of fraudulent intent. That inference may be established

Page 3

2004 U.S. Dist. LEXIS 19593, *

either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN18]To allege motive in the securities context, plaintiffs must show that a defendant possessed a concrete incentive for personal gain--not simply the desire to increase a company's profitability--a goal shared by any corporate officer.

*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN19]In the securities context, without motive, the strength of circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater. Plaintiffs can plead conscious misbehavior or recklessness by alleging the defendants' knowledge of facts or access to information contradicting their public statements. Knowledge of adverse event reports, alone, is an insufficient basis for an inference of scienter.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Securities Law > Liability > Private Securities Litigation > General Overview*

[HN20]Even under the Private Securities Litigation Reform Act, a district court, on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor.

*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN21]An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness.

*Copyright Law > Publication > Copyright Act of 1976*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Group Published Information*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN22]Under the group pleading doctrine, plaintiffs may rely on a presumption that statements in press releases, or other group-published information are the collective work of those individuals with direct involvement in the everyday business of the company.

*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN23]Scienter cannot be inferred based solely on defendants' managerial positions.

*Securities Law > Liability > Secondary Liability > Controlling Persons > General Overview*

[HN24]See 15 U.S.C.S. § 78t(a).

*Securities Law > Liability > Secondary Liability > Controlling Persons > General Overview*

[HN25]To establish a § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78t(a), violation, plaintiffs must allege: (1) a primary violation by the controlled person; (2) control over the controlled person; and (3) the controlling person's culpable participation in the fraud.

*Antitrust & Trade Law > Sherman Act > Claims*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Secondary Liability > Controlling Persons > General Overview*

[HN26]The Private Securities Litigation Reform Act provides that in any private action arising under the chapter in which the plaintiff may recover damages only on proof that the defendant acted with a particular state of mind, scienter must be pled with specificity. 15 U.S.C.S. § 78u-4(b)(2). That section indicates that plaintiffs must demonstrate a defendant's culpable state of mind to establish a claim for control person liability.

2004 U.S. Dist. LEXIS 19593, *

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*

[HN27]To determine whether there is jurisdiction over securities transactions that are largely foreign, courts consider two factors: (1) whether the wrongful conduct occurred in the United States (U.S.), and (2) whether the wrongful conduct had a substantial effect in the U.S. or on U.S. citizens. In evaluating those factors, courts apply a conduct test and an effects test, either of which suffices for jurisdiction. To support the exercise of jurisdiction under the conduct test, the plaintiff must allege conduct in the United States of sufficient centrality to the claim of fraud to warrant an exercise of such jurisdiction. This test is satisfied when (1) the defendant's U.S. activities were more than merely preparatory to securities fraud committed elsewhere, and (2) those acts directly caused the claimed losses.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*

[HN28]In the context of a determination of subject matter jurisdiction over securities transactions that are largely foreign, mere commentary about activities occurring in the United States does not satisfy the Second Circuit's stringent conduct test, which focuses on defendants' activities in the United States.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*

[HN29]In the context of a determination of subject matter jurisdiction over securities transactions that are largely foreign, the fraud-on-the-market doctrine cannot be used to satisfy the conduct test.

**COUNSEL:** [*1] For Plaintiffs: Melvyn I. Weiss, Esq., Michael C. Spencer, Esq., Milberg Weiss Bershad & Schulman LLP, New York, NY.

For Bayer AG, Bayer Corp., David Ebsworth, Manfried Schneider, Werner Wenning, and Wolfgang Plischke, Defendants: Roger J. Hawke, Esq., Andrew W. Stern, Esq., Daniel A. McLaughlin, Esq., Walter C. Carlson, Esq., James W. Ducayet, Esq., Sidley Austin Brown & Wood LLP, New York, NY.

**JUDGES:** WILLIAM H. PAULEY III, U.S.D.J.

**OPINION BY:** WILLIAM H. PAULEY III

**OPINION**

*MEMORANDUM AND ORDER*

WILLIAM H. PAULEY III, District Judge:

This case concerns the introduction and eventual withdrawal of Baycol, a cholesterol-lowering drug known generically as cervastatin. The proposed plaintiff class consists of all persons, including foreign residents, who purchased securities of Bayer AG and its subsidiary in the United States, Bayer Corp. (collectively, "Bayer" or the "Company") from March 6, 1998 to February 21, 2003 (the "Class Period"). Alan Hevesi, Comptroller of the State of New York, is lead plaintiff in his capacity as administrative head of the New York State and Local Retirement Systems and as sole trustee of the New York State Common Retirement Fund. (Consolidated Amended Complaint [*2] (the "Complaint" or "Compl.") at 1.) The Complaint alleges that Bayer and certain of its officers made material misstatements and omissions about Baycol's safety and commercial viability. Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) (2000), and SEC Rule 10b-5 (2000), promulgated thereunder 17 C.F.R. § 240.10b-5 (2000). [1] Additionally, Plaintiffs assert "control person" claims against the individual defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) (2000).

  1 Plaintiffs voluntarily withdrew their claims under sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77o (2000). (Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss ("Pls. Mem.") at 8.)

Defendants move to dismiss the Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and Section 21D [*3] of the Exchange Act, 15 U.S.C. §§ 78u-4 (2000). Defendants also contend that this Court lacks subject matter jurisdiction over the claims of foreign residents. For the following reasons, defendants' motion is granted in part and denied in part.

*BACKGROUND*

The following facts are gleaned from the Complaint and documents incorporated by reference in the pleading.

2

2  It is well established that [HN1]a court may consider documents partially quoted in, or that are integral to, the complaint on a motion to dismiss. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808-09 (2d Cir. 1996)* (full text of documents partially quoted in complaint may be considered on motion to dismiss); *Cortec Indus. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991)* (courts permitted to consider documents that are "integral" to plaintiff's claims); *In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003)* (same).

[*4] Bayer is an international healthcare and chemicals company with executive offices in Germany and the United States. (Compl. P 21.) Bayer AG's shares are listed on the Frankfurt Stock Exchange and other stock exchanges in Europe and Asia. (Compl. PP 21, 144, 193.) Bayer's common stock trades indirectly on the New York Stock Exchange in the form of American depository receipts. (Compl. P 144.)

The individual defendants were executive officers at Bayer during the relevant period. From 1995 through December 1999, David Ebsworth was President of Bayer Corp.'s Pharmaceutical Division; thereafter, he headed Bayer AG's Pharmaceuticals Business Group. (Compl. P 23.) When Ebsworth resigned on January 9, 2002, Wolfgang Plischke assumed leadership of the Pharmaceuticals Business Group. (Compl. PP 23, 26.) Previously, Plischke had been Executive Vice President and then President of Bayer Corp.'s Pharmaceutical Division. (Compl. P 26.) Manfried Schneider was Chairman of Bayer AG's Management Board until April 2002 when Werner Wenning, the Company's Chief Financial Officer, succeeded him. (Compl. PP 24-25.)

Baycol is among a class of drugs known as "statins" that are prescribed to lower cholesterol [*5] and triglyceride levels. (Compl. P 28.) Statins first obtained approval by the Food and Drug Administration ("FDA") in 1987. (Compl. P 28.) In April 1997, Bayer began to market cerivastatin in Europe under the brand name Lipobay. (Compl. P 31.) The FDA approved cerivastatin for use in the United States under the name Baycol in June 1997. (Compl. P 33.)

From the time of its FDA approval, plaintiffs claim that defendants materially misled investors by failing to disclose safety problems associated with Baycol. (Compl. P 3.) According to the Complaint, on June 27, 1997, Ebsworth learned of adverse interactions between Baycol and several other drugs from Bayer's marketing partner, SmithKline Beecham. (Compl. P 34.) Specifically, the Complaint relies on a letter from SmithKline Beecham to Bayer expressing serious concerns over possible drug interactions with Baycol and warning that "simple and safe no longer appears to be a viable promotional platform." (Compl. P 34.) The SmithKline Beecham letter anticipated that Bayer would be required to warn of these drug interactions, detracting from Baycol's marketability. (Affidavit of Roger J. Hawke, dated January 15, 2004 ("Hawke Aff.") Ex. E. [*6] )

On February 18, 1998, Bayer launched Baycol in the United States. (Compl. P 36.) Bayer's joint press release announcing its new drug described Baycol as a "competitively priced . . . safe and effective alternative that . . . helps achieve target cholesterol levels at good value." (Compl. P 36.) While Bayer cautioned that Baycol should not be prescribed to patients with conditions predisposing them to "rhabdomyolysis (acute serious muscle disease)" or "myopathy (a disorder of muscle tissues or muscle)," Ebsworth assured the public that Baycol "has no drug to drug interactions with commonly used drugs.' (Hawke Aff. Ex. F.)

On May 4, 1998, Bayer issued a newsletter reporting on the annual stockholders' meeting and the first quarter of 1998. (Compl. P 41.) That newsletter reprinted Schneider's April 30th forecast that the initial success of Baycol would fuel the Company's primary growth that year. (Compl. P 41.) On May 28, 1998, a post-marketing report prepared by Bayer revealed that four patients in the United States developed rhabdomyolysis while taking 0.3 mg prescribed doses of Baycol. (Compl. P 43.) Nevertheless, Bayer executives continued to advocate aggressive marketing for Baycol. [*7] (Compl. PP 44, 46.) At a marketing meeting in September 1998, Ebsworth asserted:

> We do not know where the legal boundary is until we hit it . . . The area is grayer than we treat it, e.g. we can pick the better study for detail aid. It is the role of marketing to find ways to sell our product . . . It is the role of Marketing to challenge Regulatory systematically - and the role of

Page 6

2004 U.S. Dist. LEXIS 19593, *7

Regulatory to prevent stupid mistakes.

(Compl. P 46.)

On October 30, 1998, Bayer predicted that the FDA would approve higher doses of Baycol by year's end. (Compl. P 48.) In that regard, the Company described a 0.4 mg dose as having "an excellent safety and tolerability profile." (Compl. P 48.)

While "touting" Baycol's cholesterol reducing benefits, Bayer began to receive "adverse event reports" concerning the onset of rhabdomyolysis in patients taking the drug with gemfibrozil. (Compl. P 57.) Adverse event reports are voluntary reports submitted by healthcare providers or patients to drug makers and the FDA when an individual suffers an "adverse drug experience." *See* 21 C.F.R. § 314.80. Federal regulations define an "adverse drug experience" as "any adverse [*8] event associated with the use of a drug in humans whether or not considered drug related. *See* 21 C.F.R. § 314.80(a). The FDA compiles all adverse event reports and makes the data publicly available. *See* 21 C.F.R. § 314.80(c).

The FDA offers a series of caveats regarding the unreliability of adverse event reports: (1) because the reports are submitted voluntarily, they contain information that "has not been scientifically or otherwise verified"; (2) the reported condition may result not from the drug but from "the underlying disease for which the drug was given," other medications being taken, or even "by chance"; and (3) "accumulated case reports cannot be used to calculate incidence or estimates of drug risk." (Hawke Aff. Ex. X.)

Nevertheless, as adverse event reports continued to accumulate, the FDA ordered changes in Baycol's labeling. (Compl. P 52.) In January 1999, the *Physician's Desk Reference* was revised to note that "rare cases of rhabdomyolysis . . . have been reported with cerivastatin and other drugs in this class." (Compl. P 52.) Bayer framed that caution by observing that a causal relationship between Baycol [*9] and rhabdomyolysis "cannot be readily determined." (Compl. P 52.)

In March 1999, Bayer issued its 1998 annual report in which it acknowledged that Baycol had "not yet fulfilled [its] expectations in the United States." (Compl. P 54.) However, Bayer also reported that it anticipated "greater success" for Baycol in the United States with the FDA's approval of a higher dosage. (Compl. P 54.) At the Bayer annual stockholders' meeting, Schneider characterized Baycol as a potential "blockbuster" drug. (Compl. P 58.)

Reports of rhabdomyolysis continued to emerge. By April 23, 1999, Bayer's safety department had received fifty-one adverse event reports of Baycol-related rhabdomyolysis in the United States and abroad. (Compl. P 57.) Concurrently, a study by Rikshospitalet University Hospital in Germany (the "Rikshospitalet study") suggested that higher doses of Baycol were likely to cause significant cell death. (Compl. P 62.) Despite that, the study concluded that Baycol "had a good tolerability and safety profile" and that a 0.4 mg dose of Baycol had "clinical utility . . . without treatment-limiting adverse events." (Hawke Aff. Ex. U.)

In May 1999, the FDA authorized a 0.4 mg dosage. [*10] (Compl. PP 39, 63.) Following that approval, Bayer launched an aggressive marketing campaign lauding Baycol's "powerful new strength" and predicting that it would become "the most-used dosage." (Compl. PP 63, 64.) Research analysts focused on the stronger dosage as the "catalyst for improved Baycol sales." (Compl. P 67.)

In October 1999, Bayer's senior drug safety officer in the United States reported by email that the incidence of myopathy among patients taking Baycol in tandem with gemfibrozil had increased "about 60 %." (Compl. P 70; Hawke Aff. Ex. Y.) The email also mentioned three new rhabdomyolysis cases in the United States involving patients taking the 0.4 mg dosage of Baycol with gemfibrozil. (Compl. P 70; Hawke Aff. Ex. Y.) Pending receipt of adverse event data for rival statins, the drug safety officer reached no conclusion concerning the safety of Baycol relative to its competitors. (Hawke Aff. Ex. Y.)

On October 25, 1999, the FDA informed Bayer that a promotional "Sales Aid" for Baycol was "false, lacking in fair balance, or otherwise misleading." (Compl. P 71; Hawke Aft. Ex. Z.) The FDA observed that "Bayer presents the most important risk information (risk of myopathy, [*11] rhabdomyolysis, etc.) with much less emphasis, in the middle of the Sales Aid." (Hawke Aff. Ex. Z.) Bayer responded by amending the Baycol safety label to proscribe its use with gemfibrozil in December 1999. (Compl. P 76.)

By the end of 1999, adverse event reports were

Page 7

2004 U.S. Dist. LEXIS 5953, *11

inundating Bayer. (Compl. P 77.) An internal memorandum for senior Bayer executives dated December 30, 1999 reported that "in the past two months, 60 U.S. cases of rhabdomyolysis have been received in Safety Assurance. . . . The steadily increasing numbers of spontaneous reports of rhabdomyolysis associated with Baycol, along with additional telephone activity, have overwhelmed the available Safety Assurance resources in terms of processing [serious adverse event reports]." (Compl. P 77.)

In early 2000, Bayer began its quest for approval of a 0.8 mg dose of Baycol. (Compl. P 80.) Plaintiffs assert that to reach that goal, defendants conspired to withhold information from the FDA. (Compl. PP 84, 94.) Plaintiffs concede, however, that they cannot identify how Bayer misled government regulators. (Hearing Transcript, dated April 29, 2004 ("Tr.") at 46.)

On March 10, 2000, Dr. Steve Niemcryk, an epidemiologist in Bayer's [*12] Safety Surveillance group, notified Bayer's Scientific Relations department that adverse event reports disclosed that the risk of rhabdomyolysis with Baycol was between five and 67 times greater than with other statins (e.g., Mevacor, Lipitor, Zocor and Lipostat). (Compl. P 81.) Moreover, Niemcryk concluded that patients taking Baycol in combination with gemfibrozil were "at a remarkable disadvantage" when compared with patients using other statins in the same regimen. (Hawke Aff. Ex. EE.) Niemcryk cautioned that his findings needed to be evaluated with care because adverse event reports are of questionable reliability and risk estimates should not be extrapolated from them. (Hawke Aff. Ex. EE.)

On May 12, 2000, Bayer issued a newsletter reporting on the annual stockholders' meeting and the first quarter of 2000. (Compl. P 90.) Bayer reported a doubling of Baycol sales and anticipated that Baycol and another drug would spur robust growth in the Pharmaceuticals Business Group. (Compl. PP 90-91.)

In July 2000, the FDA approved an 0.8 mg Baycol dose, which Bayer described as a "highly effective and safe treatment." (Compl. P 95.) On August 1, 2000, Bayer promoted the stronger dose in [*13] a letter to medical professionals claiming that Baycol had a "proven safety profile." (Compl. P 98.) Bayer reiterated its caution against combined use of Baycol and gemfibrozil due to the risk of rhabdomyolysis. (Compl. P 98.)

On August 2, 2000, senior members of Bayer's Global Drug Safety team and consultants met with Plischke to discuss the accumulation of adverse event reports. (Compl. P 99.) A consensus emerged that the data concerning Baycol's dangers "was putting the brand at risk." (Compl. P 99.) When that conclusion was communicated to Ebsworth, he dismissed the reservations of the safety experts and instructed his marketing team "to promote the hell out of this product." (Compl. P 99.)

By autumn 2000, Bayer had received 482 adverse event reports of rhabdomyolysis among Baycol users. (Compl. P 105.) Several Bayer employees noted that 'spontaneous reports of deaths in the U.S. . . . were overwhelmingly associated with use of the 0.8 mg dose," though only one of those deaths had occurred in conjunction with gemfibrozil. (Compl. P 119.) In October 2000, Takeda Chemical Industries, Ltd. ("Takeda"), the largest pharmaceutical concern in Japan and a joint venturer with Bayer, expressed [*14] alarm about the possible connection between Baycol and rhabdomyolysis based on a research report posted in the World Health Organization's database. (Compl. P 106.) Although the Complaint cites statistics from that study, the report's author questioned their reliability:

> We do not think that our data show that the frequency of adverse reactions really differs between different statins. One factor favoring a higher number of ADR [adverse drug report] reports for cerivastatin is the factor that this drug is new on the market, and effects of new drugs, including ADRs, are more carefully observed by doctors.

(Hawke Aff. Ex. OO.)

On March 15, 2001, Bayer issued its 2000 annual report which commented enthusiastically on Baycol's "great success" and reported that annual sales surpassed 500 million Euros. (Compl. P 116.) Days after that upbeat report, Bayer officials concluded that "current labeling was inadequate to discourage a starting dose of 0.8 mg." (Compl. P 119.) Minutes of an internal meeting discuss "spontaneous reports of deaths in the U.S. (12 since the beginning of the year) . . . overwhelmingly associated with use of the 0.8 mg dose . . . [and] a total of [*15] 231 deaths from all sources" in the database. (Compl. P 119.)

Page 8

In April 2001, the FDA required Bayer to amend its warning labels again to emphasize the risk of taking Baycol with gemfibrozil. (Compl. P 120.) In response, Bayer reiterated its earlier warning by notifying doctors of the dangers of prescribing Baycol and gemfibrozil together. (Compl. PP 98, 120.)

On May 21, 2001, Bayer issued a newsletter reporting on the annual stockholders' meeting and the first quarter of 2001. (Compl. P 123.) It recapitulated Schneider's presentation at the meeting where he observed that "Baycol did particularly well, doubling its market share in the United States and recording more than 80 percent higher sales in total." (Compl. P 123.)

By August 2001, the FDA had "evidence" that patients using Baycol developed rhabdomyolysis at significantly higher rates than patients using other statins. (Compl. P 127.) Armed with that information, the FDA pressured Bayer to withdraw Baycol. (Compl. P 127.)

On August 8, 2001, Bayer withdrew Baycol from the market. (Compl. P 128.) The withdrawal was effective worldwide. (Compl. PP 128, 139.) In orchestrated press releases that day, Bayer and the FDA announced [*16] Baycol's voluntary withdrawal. (Compl. PP 128-29.) The Company explained that "the reason for this voluntary action lies in increasing reports of side effects involving muscular weakness (rhabdomyolysis), especially in patients who have been treated concurrently with the active substance gemfibrozil despite a contraindication and warnings contained in the product information." (Compl. P 128.) The FDA attributed the withdrawal to "reports of sometimes fatal rhabdomyolysis" and noted that it had "received reports of 31 U.S. deaths due to severe rhabdomyolysis associated with use of Baycol, 12 of which involved concomitant gemfibrozil use." (Compl. P 129.)

In response to the withdrawal announcement, Bayer's stock price dropped seventeen percent. (Compl. P 130.) Responding to that precipitous decline in its stock price, defendants attempted to reassure the investing public. On August 13, 2001, Schneider stated that the Company's top priority was to withdraw the product quickly in the interest of patient safety. (Compl. P 133.) On August 16, 2001, Bayer described various product liability litigation concerning Baycol as "unfounded" and concluded that there was no need to establish reserves [*17] for potential losses. (Compl. P 134.) On August 17, 2001, Ebsworth defended the Company's actions by asserting that Bayer "took voluntary action as soon as an accumulation of anomalous findings became apparent." (Compl. P 135.) At a news conference on August 23, 2001, Schneider maintained that there was no evidence that Baycol had caused any of the reported deaths. (Compl. P 138.)

Four months later, Bayer conceded in an SEC filing that if the product liability plaintiffs were successful, the damages would be material to Bayer's results of operations and cash flows. (Compl. P 144.) Bayer's SEC filing noted "rhabdomyolysis has been reported more frequently in patients taking [Baycol] than other statins," and that "approximately one hundred patients . . . taking [Baycol] . . . have died." (Compl. P 144.) After the withdrawal of Baycol, "more than 277 lawsuits, many of them putative class actions, had been initiated in the United States against Bayer." (Compl. P 144.)

Plaintiffs allege that defendants' pre-withdrawal statements about Baycol's safety were materially misleading because they failed to disclose: (1) the adverse event reports; (2) SmithKline Beecham's warning of adverse [*18] drug interactions with Baycol; (3) evidence indicating that Baycol caused rhabdomyolysis at higher rates than other statins; and (4) the internal concerns over Baycol's safety as well as the adequacy of its warning. (Compl. PP 50, 96-97.) The Complaint further asserts that earnings reports and statements concerning Baycol's growth were materially misleading because of safety concerns and the lack of reserves for potential losses associated with Baycol, as required by Generally Accepted Accounting Principles ("GAAP") and International Accounting Standards ("IAS"). (Compl. PP 42, 51-53, 58-59, 66, 182.)

Plaintiffs also allege that defendants' assurances, in the wake of Baycol's withdrawal, misled the investing public. Specifically, plaintiffs point to defendants' statements regarding Bayer's concern with patient safety, their characterization of the products liability suits as unfounded and Bayer's failure to set aside reserves for loss contingencies, given what the Company knew. (Compl. PP 133, 137, 138, 142.)

Finally, plaintiffs allege that several press releases, SEC registration statements and annual reports, which Bayer issued both before and after the withdrawal, failed to take [*19] into account reserves for loss contingencies associated with Baycol, and did not disclose defendants' knowledge of the risks posed by the drug. (Compl. PP 87,

Page 9

92, 108, 110, 117, 121-24, 143-47, 150-55, 158, 160, 168, 179.)

*DISCUSSION*

I. *Motion to Dismiss Standard*

[HN2]On a motion to dismiss, a court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor. *Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998)*. A court should not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. In this limited task, the issue is not whether a plaintiff will ultimately prevail on his claim, but whether the plaintiff is entitled to offer evidence in support of allegations in the complaint. *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll., 128 F.3d 59, 62 (2d Cir. 1997)*.

II. *Section 10(b) and Rule 10b-5*

[HN3]To state a cause of action under Section 10(b) [*20] and Rule 10b-5 promulgated thereunder, a plaintiff must plead that the defendant "in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff.'" *Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir. 2003)* (quoting *Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000)*; *accord In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 555-56 (S.D.N.Y. 2004)*.

[HN4]A complaint alleging securities fraud under Section 10(b) also must satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2). *Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001)*. Under Rule 9(b), the circumstances constituting fraud must be stated with particularity, meaning that such allegations must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where [*21] and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000)* (internal quotations omitted). The PSLRA, similarly, requires that

"the complaint shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

Additionally, the PSLRA's scienter provision provides that [HN5]"the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

[HN6]Plaintiffs can satisfy the pleading requirements for scienter by alleging facts showing that defendants had both the motive and opportunity to commit fraud, or by alleging facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *Kalnit, 264 F.3d at 138* (defining recklessness as "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent [*22] that the danger was either known to the defendant or so obvious that the defendant must have been aware of it"). More specifically, plaintiffs can raise a strong inference of fraudulent intent by pleading that the defendants: (1) benefited in a "concrete and personal way" from the alleged fraud; (2) engaged in "deliberately illegal" behavior; (3) "knew facts or had access to information suggesting that their public statements were not accurate"; or (4) failed to verify information that they had a duty to monitor. *See Novak, 216 F.3d at 311*.

III. *Statements Prior to the Withdrawal of Baycol*

Plaintiffs allege that three general categories of statements prior to the withdrawal of Baycol were misleading: statements regarding the safety and approval of Baycol; statements relating to Baycol's commercial potential; and announcements about Bayer's overall financial performance. Defendants argue that the Complaint fails to allege facts demonstrating those statements were materially misleading, or were made with the requisite scienter.

A. *Statements Concerning Baycol's Safety and Approval*

The Complaint asserts that defendants' pre-August 2001 statements regarding [*23] Baycol's safety profile and regulatory approval were rendered materially inaccurate by defendants' failure to disclose adequate information about the drug's health risks. (*See* Compl. PP 36, 48, 64, 72, 95, 98.)

2004 U.S. Dist. LEXIS 19593, *23

[HN7]An omission is actionable under Section 10(b) if the omitted fact is material - that is, its disclosure is necessary to prevent another statement from being materially misleading. *See Glazer v. Formica Corp., 964 F.2d 149, 156 (2d Cir. 1991); Kronfeld v. Trans World Airlines, Inc., 832 F.2d 726, 735 (2d Cir. 1987).* An omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976).* Generally, "a complaint may not properly be dismissed pursuant to Rule 12(b)(6) . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance. [*24] " *Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).* Whether a particular statement or omission is material is a mixed question of law and fact. *See TSC, 426 U.S. at 450.*

Defendants contend that they were under no duty to disclose the adverse event reports about Baycol because the Second Circuit has held that such reports do not provide reliable information that a drug is unsafe. *See In re Carter-Wallace, Inc. Sec. Litig., 150 F.3d 153 (2d Cir. 1998)* ("*Carter-Wallace I*"); *In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36 (2d Cir. 2000)* ("*Carter-Wallace II*")

The *Carter-Wallace* cases involved securities fraud claims against a drug manufacturer for alleged misstatements about the safety of its epilepsy drug, Felbatol. *See Carter-Wallace I, 150 F.3d at 154-55.* There, the drug manufacturer received numerous adverse event reports, including ten reports of deaths among Felbatol users stemming from aplastic anemia, a potentially fatal bone-marrow condition. *See Carter-Wallace I, 150 F.3d at 154-55.* Ultimately, those reports led Carter-Wallace to recommend that doctors cease [*25] the use of Felbatol with their patients. *See Carter-Wallace I, 150 F.3d at 155.* That direction to health care professionals precipitated a rapid decline in the price of the company's stock. *See Carter-Wallace I, 150 F.3d at 155.* The Second Circuit concluded that the drug manufacturer's assurances about safety "did not become materially misleading until [it] had information that Felbatol had caused a statistically significant number of aplastic-anemia deaths and therefore had reason to believe that the commercial viability of Felbatol was threatened." See *Carter-Wallace I, 150 F.3d at 157; see also Carter-Wallace II, 220 F.3d at 42* ("The early medical reports may have indicated a potential problem, but until a connection between Felbatol and any illness could be made, we would not expect Carter-Wallace to abandon its product on what, at the time, would have been speculation.") As a result, the Second Circuit held that the drug manufacturer had no duty under Section 10(b) to disclose the Felbatol-related deaths before it withdrew the drug. *See Carter-Wallace I, 150 F.3d at 157.*

In affirming the district [*26] court, the Second Circuit held that "drug companies need not disclose isolated reports of illnesses . . . until [they] . . . provide statistically significant evidence that the ill effects may be caused by - rather than randomly associated with - use of the drugs and are sufficiently serious and frequent to affect future earnings." *Carter-Wallace I, 150 F.3d at 157.*

Similarly, the Third Circuit has held that a drug manufacturer's failure to disclose adverse event reports does not give rise to a securities fraud claim. *Oran v. Stafford, 226 F.3d 275 (3d Cir. 2000).* The Third Circuit explained that such reports do not demonstrate a medically conclusive link between a drug and its reported side effects. *See Oran, 226 F.3d at 284* ("Because the link between the . . . drugs and heart-valve disorders was never definitively established during the relevant period even after the withdrawal data is taken into account, [defendant's] failure to disclose this data cannot render its statements about the inconclusiveness of the relationship materially misleading.").

The *Carter-Wallace* and *Oran* decisions recognize that adverse event reports [*27] are random and may not establish a nexus between a drug and the reported illness. *See 21 C.F.R. § 314.80(a).* FDA regulations buttress this conclusion by providing that "[a] report or information submitted by an applicant . . . does not necessarily reflect a conclusion by the applicant or FDA that the report or information constitutes an admission that the drug caused or contributed to an adverse effect.'" *Carter-Wallace II, 220 F.3d at 40-41* (citing 21 C.F.R. § 314.80(k)); *see also In re Alliance Pharm. Sec. Litig., 279 F. Supp. 2d 171, 189 (S.D.N.Y. 2003)* ("Not every adverse effect in a clinical trial is automatically material, and . . . causation, as well as statistical significance, is key.")

Page 11

2004 U.S. Dist. LEXIS 19593, *27

The *Carter-Wallace* decisions do not hold that adverse event reports are always immaterial. Indeed, [HN8]the Second Circuit has instructed district judges that materiality is a flexible, fact-based determination. *See Ganino, 228 F.3d at 164* (rejecting "a bright-line test for materiality" since it is a fact-specific inquiry); *Glazer v. Formica Corp., 964 F.2d 149, 156 (2d Cir. 1992)* [*28] (same); *see also In re Kidder Peabody Sec. Litig., 10 F. Supp. 2d 398, 410 (S.D.N.Y. 1998)* (declining to hold as a matter of law that misstatements affecting profits by no more than 2.54 % were immaterial). *Carter-Wallace* stands for the proposition that [HN9]isolated adverse event reports, lacking statistical significance, do not prove that a drug is unsafe. *See 150 F.3d at 157.* However, those decisions do not answer the question whether adverse event reports, coupled with other evidence, can put a pharmaceutical company on notice concerning a drug's safety risks. *See In re Corning, Inc. Sec. Litig., 2001 U.S. Dist. LEXIS 12912, Nos. 92 Civ. 345 (TPG), 92 Civ. 1103 (TPG), 2001 WL 986782, at *2 (S.D.N.Y. Aug. 27, 2001)* (refusing to read *Carter-Wallace* as creating a bright-line pleading standard).

In contrast, plaintiffs allege that the confluence of information led Bayer executives to question Baycol's commercial viability. On August 2, 2000, a meeting of Bayer's Global Drug Safety executives was convened to address mounting concerns over Baycol. (Compl. P 99.) The consensus that emerged concerning the adverse event reports was that the potential dangers were [*29] "putting the brand at risk." (Compl. P 99.)

Construing all inferences in plaintiffs' favor, by August 2000, defendants viewed the adverse event reports as "sufficiently serious and frequent to affect future earnings." *Carter-Wallace 1, 150 F.3d at 157.* Thus, defendants were obligated at that time to update their pre-withdrawal statements concerning Baycol's safety profile. *See Kowal v. IBM (In re IBM Corporate Sec. Litig.), 163 F.3d 102, 110 (2d Cir. 1998)* (stating that [HN10]a duty to update exists "when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event."); *see also In re Gulf Oil/Cities Serv. Tender Offer Litig., 725 F. Supp. 712, 745-49 (S.D.N.Y. 1989)* (material misstatements and omissions adequately alleged where defendants expressed strong interest in consummating a merger but failed to disclose subsequent "change of heart"). When the consensus emerged, Bayer crossed the Rubicon. Given the August 2000 consensus that the brand was at risk, Takeda's alarm two months later over the study in the WHO database was material. (Hawke Aff. Ex. OO.) *See TSC, 426 U.S. at 450.*

While defendants [*30] were under a duty to disclose the adverse event data after August 2000, no such duty arose prior to that time. The adverse event reports and other documents were not material before the August 2000 safety conference. For example, the June 1997 SmithKline Beecham letter did not render defendants' pre-withdrawal statements materially misleading. (Compl. P 34.) [HN11]In a securities fraud action, it is incumbent on plaintiffs to allege that their injury was caused by the alleged misstatement or omission. *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 196 (2d Cir. 1993).* To make this showing, plaintiffs must demonstrate loss causation, i.e., the "causal link between the alleged misconduct and [the] economic harm ultimately suffered by plaintiff." *Emergent Capital, 343 F.3d at 197; see also Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 186 (2d Cir. 2601)* ("The damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission."). Bayer withdrew Baycol because of accumulating reports of side effects involving rhabdomyolysis, especially when the drug was used in tandem [*31] with gemfibrozil. (Compl. P 127-28.) In contrast, the SmithKline Beecham letter warned of interactions between Baycol and erythromycin, cyclosorin, and itaconazole. Because the SmithKline Beecham warning is not the alleged cause for the withdrawal of Baycol, plaintiffs cannot show loss causation between defendants' non-disclosure of that letter and their injury. *See Castellano, 257 F.3d at 186; Emergent Capital, 343 F.3d at 197.*

Plaintiffs also allege that the Rikshospitalet study showed that Baycol was unsafe. (Compl. P 62.) However, that study concluded that Baycol "had a good tolerability and safety profile," a fact the Complaint overlooks. (Hawke Aff. Ex. U.) [HN12]While all inferences must be drawn in favor of plaintiffs on a motion to dismiss, "the court need not accept as true an allegation that is contradicted by documents on which the complaint relies." *Bristol-Myers, 312 F. Supp. 2d at 555.* Because the Rikshospitalet study concluded that Baycol was safe, it was consistent with defendants' statements. Thus, its disclosure would not have significantly altered the "total mix" of information then available to investors. *See TSC*

Page 12

2004 U.S. Dist. LEXIS 19593, *31

426 U.S. at 449; [*32] *see also Oran, 226 F.3d at 284* (disclosure of adverse medical reports would not have altered "total mix" given FDA's conclusion that the relationship between drug and reported illnesses was inconclusive).

Plaintiffs further allege that Baycol promotional materials were misleading given the FDA's October 1999 criticism of them as "lacking in fair balance." (Compl. P 71.) However, the FDA's criticism was not based on an omission; rather, it focused on the placement of warning language within the Baycol promotional literature. (*See* Hawke Aff. Ex. Y, at 3.) The FDA's criticism was directed to emphasis, not to a failure to disclose. *See L Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., 936 F.2d 759, 762-63 (2d Cir. 1991)* (statement in prospectus not materially misleading where other sections in prospectus mentioned fact that plaintiff alleged was concealed).

Nor were Niemcryk's observations material. Although Niemcryk discussed studies indicating that "cerivastatin substantially elevates risk for rhabdomyolysis compared with other statins," he cautioned that those findings were inconclusive. (Hawke Aff. Ex. EE.) As Niemcryk acknowledged, they merely summarized [*33] adverse event reports, which provide "no certainty that the suspected drug caused the reaction." (Hawke Aff. Exs X, EE at 1-2.) Therefore, defendants were not under a duty to disclose that information. *See Carter-Wallace I, 150 F.3d at 157.*

In sum, defendants were under a duty to disclose adverse event reports after August 2000 and their non-disclosure constitutes an actionable omission under Section 10(b). However, prior to August 2000, defendants' statements were not materially misleading since the information they possessed was not material.

B. *Statements Relating to Baycol's Commercial Potential*

Plaintiffs assert that defendants' pre-withdrawal statements regarding Baycol's positive effect on the Company's growth were materially misleading because they did not include information about the drug's potential health risks. (Compl. PP 41, 53-54, 58, 65, 74, 85-86, 90, 103, 109, 116, 122-23.)

Defendants' statements describing Baycol's strong sales record are not actionable since they are merely recitations of historical fact and are not alleged to be inaccurate. (Compl. PP 65, 103, 109, 116, 122-23.) *See In re Sofamor Group, Inc., 123 F.3d 394, 401 (6th Cir. 1992)* [*34] [HN13]("Disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future."); *In re Duane Reade Inc. Sec. Litig., 2003 U.S. Dist. LEXIS 21319, No. 02 Civ. 6478 (NRB), 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003)* (same).

Defendants' statements predicting strong growth for Baycol in 1998 and 1999 are also not actionable because plaintiffs do not allege facts that would undermine the veracity of those announcements. (Compl. PP 41, 58.) The only potentially contradictory information - the adverse event reports - did not provide reliable evidence that Baycol drug was unsafe. *See Carter-Wallace I, 150 F.3d at 157.*

However, defendants were under a duty to update their pre-withdrawal statements that Baycol would "produce a sustained increase in [Bayer's] operating margin" and provide "strong potential for future growth." (Compl. PP 53-54, 74, 85-86, 90.) By August 2000, defendants believed the brand was at risk but failed to disclose the information that led them to that conclusion. (Compl. P 99.) Thus, plaintiffs have adequately alleged that Bayer's forward-looking statements needed to be updated. *In re Time Warner, Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993)* [*35] [HN14]("[A] duty to update opinions and projections may arise if the original opinions or projections have become misleading as a result of intervening events.")

C. *Announcements Concerning Bayer's Overall Financial Prospects*

The Complaint also alleges that defendants' statements regarding the Company's financial performance during the pre-withdrawal Class Period were materially misleading because they did not take into account reserves for loss contingencies associated with the drug. (Compl. PP 45, 51, 108, 121.)

GAAP and IAS require financial statements to accrue for loss contingencies if: (1) there is information available before the statements are issued indicating a probability that a liability has been incurred, and (2) the amount of the loss can reasonably be estimated. *See* FASB Statement No. 5, P 3. Defendants contend that their failure to accrue for such loss contingencies was immaterial because plaintiffs have not alleged facts

Page 13

2004 U.S. Dist. LEXIS 19593, *35

showing that it was more likely than not that a liability had been incurred during that time, or that the amount of the potential loss could reasonably be estimated. The adverse event reports did not by themselves establish a causal connection [*36] between Baycol and rhabdomyolysis. *See* 21 C.F.R. §§ 314.80(c), 314.80(k); *Carter-Wallace I*, 150 F.3d at 157. However, defendants were aware of problems with Baycol by August 2000. (Compl. P 99.) Therefore, plaintiffs have sufficiently alleged that by August 2000 defendants possessed information making it more likely than not that a loss contingency would arise.

However, plaintiffs do not allege that the amount of the loss could reasonably be estimated, as required by GAAP. *See Goldstein v. MCI Worldcom*, 340 F.3d 238, 248-49 (5th Cir. 2003) ("Loss contingency 'shall be accrued by a change to income' if . . . the amount of the loss can be reasonably estimated.") (citing to FASB Statement No. 5); *Schick v. Ernst & Young*, 808 F. Supp. 1097, 1103 n.4 (S.D.N.Y. 1992) (same). Accordingly, plaintiffs have not alleged that defendants' pre-withdrawal statements concerning Bayer's financial performance were inconsistent with recognized accounting standards and thus materially misleading.

IV. *Statements After the Withdrawal of Baycol*

When Baycol was withdrawn, defendants reassured [*37] the markets by stating that Bayer's top priority was patient safety, and that Bayer acted as soon as the danger became apparent. (Compl. PP 133-36, 148-49, 152.) Defendants also characterized the product liability litigation as "groundless." (Compl. PP 134, 138, 141, 154.)

Defendants' claims that Bayer acted in the interests of patient safety are not actionable because they constitute "puffery," i.e., "exaggerated or general statements that make no specific claims on which [plaintiffs] can rely." *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 528 n.14 (S.D.N.Y. 2003); *see Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) ("Broad general statements are precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable."). Those statements contain no representations as to specific facts. Accordingly, they were not the type of fact-based statements on which investors could reasonably rely. *See Novak*, 216 F.3d at 315 [HN15]("Statements containing simple economic projections, expressions of optimism, and other puffery are insufficient" bases for a securities claim); *Bristol-Myers*, 312 F. Supp. 2d at 559 [*38] (statement that new drug was "one of the most important advances in cancer medicine" constituted non-actionable puffery; *In re Symbol Techs. Class Action Litig.*, 950 F. Supp. 1237, 1243-44 (E.D.N.Y. 1997) ("Actionable statements must contain, or at least suggest, definite positive projections' or statements of fact.").

In contrast, Ebsworth's statement that Bayer took action as soon as it had an "anomalous accumulation" of negative data about Baycol was specific and fact-based. It specified the time when Bayer knew it should have withdrawn Baycol, as well as the quantum of data that alerted Bayer to problems with Baycol. (Compl. P 135.) That statement is neither puffery nor opinion. *See Newman v. Rothschild*, 662 F. Supp. 957, 959 (S.D.N.Y. 1987) (defense of puffery not available when alleged misstatement concerns specific facts); *see also*, *Rosen v. Textron, Inc.*, 321 F. Supp. 2d 308, 320 (D.R.I. 2004) (statement regarding amount of contract and delivery dates too specific for defense of puffery to apply). It was material because the timing of an "anomalous accumulation" of adverse event report data could impact the Company's litigation [*39] exposure, and be important to reasonable investors. *See TSC*, 426 U.S. at 449; *Oran*, 226 F.3d at 286 (information bearing on company's potential liability could be viewed as material by a reasonable investor). Ebsworth's statement is thus actionable under Section 10(b).

Defendants' statements concerning the merits of the product liability suits are statements of opinion. *See Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 2004 WL 307296, at *7 (S.D.N.Y. 2004) ("[A] material misstatement of opinion is by its nature a false statement, not about the objective world, but about the defendant's own belief."). [HN16]Statements of opinion are actionable under Section 10(b) if it can be established that the speaker deliberately misrepresented his actual opinion. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095-96, 115 L. Ed. 2d 929, 111 S. Ct. 2749 (1991); *Podany*, 318 F. Supp. 2d 146, 2004 WL 307296, at *6. Thus, "plaintiffs who charge that a statement of opinion . . . is materially misleading, must 'allege with particularity' provable facts' to demonstrate that the statement of opinion is both [*40] objectively and subjectively false." *Bond Opportunity Fund v. Unilab Corp.*, 2003 U.S. Dist. LEXIS 7838, No. 99 Civ. 11074

Page 14

2004 U.S. Dist. LEXIS 19593, *40

(JSM), 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003) (citation omitted).

By August 2000, certain Bayer executives believed the Baycol brand was at risk. That belief undermined defendants' post-withdrawal assertions that the product liability litigation was "groundless." (Compl. P 138.) *See DeMarco v. Robertson Stephens Inc., 318 F. Supp. 2d 110, 2004 WL 51232, at *4 (S.D.N.Y. 2004)* (finding a strong inference that an analyst report recommending investments contradicted the analyst's true opinion where the same analyst privately issued far less favorable assessment of the same investments). Therefore, this Court cannot conclude that defendants' assertions concerning the merits of product liability litigation are not actionable as a matter of law.

Finally, plaintiffs allege that defendants' statements regarding litigation reserves were materially misleading. Defendants maintained that there was no need to establish any litigation reserve because the lawsuits were groundless. (Compl. PP 134, 141.) Plaintiffs sufficiently pled a material misstatement [*41] in light of the conclusion reached at the August 2000 meeting. (Compl. P 99.) *See Shapiro v. UJB Fin. Corp., 964 F.2d 272, 282 (3d Cir. 1992)* (statements about the adequacy of loan loss reserves potentially actionable if defendants possessed information undermining that claim).

V. *Scienter*

Having alleged that defendants misled investors, [3] plaintiffs must adequately plead scienter. [HN17]To do so, the Complaint must "allege facts that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, 25 F.3d 1124, 1128 (2d Cir. 1994)*. That inference may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields, 25 F.3d at 1128* (citation omitted).

3 Defendants' failure to update pre-withdrawal statements that Baycol was safe after August 2000 (Compl. PP 36, 48, 64, 72, 95, 9); pre-withdrawal statements regarding Baycol's commercial potential (Compl. PP 54, 74, 85-86, 90); post-withdrawal assertions that the product liability litigation was groundless (Compl. PP 134, 138, 141, 154); and Ebsworth's August 17,

2001 statement that the Company "took voluntary action as soon as an accumulation of anomalous findings became apparent" (Compl. P 135).

[*42] To the extent plaintiffs' allegations of scienter are based on motive and opportunity, they are insufficient. Plaintiffs allege that Ebsworth had the motive to engage in fraud because the Company was under pressure to bring a "blockbuster" drug to market and thus needed Baycol to be a commercial success. (Compl. P 80.) Plaintiffs assert, therefore, that Ebsworth had an incentive to turn a blind eye to safety considerations. (Compl. PP 3, 46-47, 89, 99.) However, [HN18]to allege motive in the securities context, plaintiffs must show that a defendant possessed a concrete incentive for personal gain - not simply the desire to increase a company's profitability - a goal shared by any corporate officer. *See Chill v. GE, 101 F.3d 263, 268 (2d Cir. 1996)* ("The motive to maintain the appearance of corporate profitability . . . will naturally involve benefit to a corporation, but does not entail concrete benefits" sufficient for scienter); *see also San Leandro, 75 F.3d at 814* (holding that a company's goal of maintaining a healthy investment rating was not a sufficient motive for fraud); *Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995)* [*43] (maintaining high stock price in order to increase executive compensation is insufficient to allege motive); *cf. Novak, 216 F.3d at 307-08* (holding that motive was sufficiently pled where defendants allegedly misrepresented corporate performance to inflate stock price while selling their own shares). As plaintiffs identify no tangible personal benefits to defendants, their allegations regarding motive do not meet that threshold.

[HN19]Without motive, the strength of circumstantial allegations of conscious misbehavior or recklessness "must be correspondingly greater." *Beck v. Mfrs. Hanover Trust Co., 820 F.2d 46, 50 (2d Cir. 1987)*. Plaintiffs can plead conscious misbehavior or recklessness by "alleging defendants' knowledge of facts or access to information contradicting their public statements." *Novak, 216 F.3d at 308*. Under *Carter-Wallace II*, knowledge of adverse event reports, alone, is an insufficient basis for an inference of scienter. *See Carter-Wallace II, 220 F.3d at 41* ("Carter-Wallace's actual awareness of adverse reports while [it] touted Felbatol's safety does not, on its own, constitute 'strong circumstantial [*44] evidence of conscious misbehavior or recklessness.'"). Here, however, plaintiffs have alleged

Page 15

2004 U.S. Dist. LEXIS 19593, *44

other facts evidencing defendants' culpable state of mind. The August 2000 safety meeting was a turning point. Various Bayer executives including Plischke agreed that the confluence of information about the adverse effects of Baycol was "putting the brand at risk." (Compl. P 99.) This troubling conclusion was communicated to Ebsworth. (Compl. P 99.) Thus, the Complaint alleges that for more than one year, Plischke and Ebsworth knew of data that Bayer executives believed was significant enough to threaten Baycol's viability. That knowledge renders defendants' post-August 2000 silence actionable. *See Chiarella v. United States, 445 U.S. 222, 230, 63 L. Ed. 2d 348, 100 S. Ct. 1108 (1980)* (silence may be actionable as a material omission if there is a duty to speak). It also belies Ebsworth's August 2001 assertion that Bayer took action as soon as an "accumulation of anomalous findings became apparent." While other interpretations may be plausible, plaintiffs are entitled to all reasonable inferences at the pleading stage. *See In re Initial Pub. Offering Sec. Litig. ("IPO"), 241 F. Supp. 2d 281, 332 (S.D.N.Y. 2003)* [*45] [HN20] ("Even under the PSLPA, the district court, on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor."). Because the Complaint alleges that Ebsworth ignored Bayer executives' conclusion regarding the adverse event report data, plaintiffs have adequately pled facts evidencing conscious misbehavior. *See Chill, 101 F.3d at 269* [HN21]("An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness."). Defendants' motion to dismiss plaintiffs' 10b-5 claim is therefore denied as to Ebsworth.

Plaintiffs have also pled scienter as to Plischke. Because defendants' pre-withdrawal statements about Baycol's safety and commercial potential were contained in press releases and shareholder newsletters, they can be imputed to the other individual defendants under the "group pleading" doctrine. *See In re Softx-Ex Corp. Sec. Litig., 210 F. Supp. 2d 276, 283 (S.D.N.Y. 2000)* [HN22]("Under the group pleading doctrine, Plaintiffs may rely on a presumption that statements in . . . press releases, or other group-published information are the collective work [*46] of those individuals with direct involvement in the everyday business of the company."). Plaintiffs must still establish scienter as to each defendant. *See Steed Fin. LDC v. Nomura Sec. Int'l, Inc., 2004 U.S. Dist. LEXIS 18580, No. 00 Civ. 8058 (NRB), 2004 WL 2072536, at *5 (S.D.N.Y. Sept. 14, 2004).*

Plischke was among the executives who concluded in August 2000 that the dangers associated with Baycol were "putting the brand at risk." (Compl. P 135.) Thus, plaintiffs have adequately alleged scienter as to Plischke given his access to information that contradicted Bayer's pre-withdrawal statements. *See Novak, 216 F.3d at 308; Chill, 101 F.3d at 269.* Defendants' motion to dismiss the 10b-5 claim against Plischke is therefore denied.

Plaintiffs do not plead sufficient allegations of scienter as to Wenning or Schneider. Plaintiffs fail to allege that either of them knew of the conclusion by other Bayer executives that the Baycol brand was at risk. *See In re Health Mgmt. Sys. Sec. Litig., 1998 U.S. Dist. LEXIS 8061, No. Civ. 1865 (HB), 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998)* (stating that [HN23]scienter cannot be inferred based solely on defendants' managerial positions); [*47] *Glickman v. Alexander & Alexander Servs., 1996 U.S. Dist. LEXIS 2325, No. 93 Civ. 7594 (LAP), 1996 WL 88570, at *14 (S.D.N.Y. Feb. 29, 1996)* (same). Accordingly, defendants' motion to dismiss plaintiffs' 10b-5 is granted as to Wenning and Schneider.

VI. *Control Person Liability*

Section 20(a) of the Exchange Act provides that [HN24]"every person who . . . controls any person liable [for a § 10(b) violation] . . . shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). [HN25]To establish a Section 20(a) violation, plaintiffs must allege: (1) a primary violation by the controlled person; (2) control over the controlled person; and (3) the controlling person's culpable participation in the fraud. *See SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996); Ellison v. Am. Image Motor Co., Inc., 36 F. Supp. 2d 628, 637 (S.D.N.Y. 1999).*

Plaintiffs have satisfied their pleading burden under Section 20(a) as to Ebsworth and Plischke. The Complaint alleges that Bayer, through Ebsworth and Plischke, violated Section 10(b) and thus committed a "primary violation." [*48] *See Solv-Ex, 210 F. Supp. 2d at 285.* Plaintiffs sufficiently allege that Ebsworth and Plischke culpably participated in the alleged fraud because the Complaint adequately pleads scienter for both of them. *Compare IPO, 241 F. Supp. 2d at 395-96* (holding that claims under Section 20(a) are subject only to the pleading standards of Rule 8(a)). *with Burstyn v. Worldwide Xceed Group, Inc., 2002 U.S. Dist. LEXIS 18555, No. 01 Civ. 1125 (GEL), 2002 WL 31191741, at*

Page 16

*7 (S.D.N.Y. Sept. 30, 2002) (concluding that heightened pleading requirements of PSLRA apply to Section 20(a) claims). Defendants do not dispute that the individual defendants are controlling persons within the meaning of Section 20(a), nor could they. *See In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999) (describing "controlling persons" as those who, *inter alia*, "held high-level management positions in which they were involved in the day-to-day operations of [the company]" and "allegedly participated directly in disseminating the false and misleading financial statements").

While there is a divergence of opinion as to whether the "culpable participation" [*49] element must be pled with particularity, this Court holds that it does. [HN26]The PSLPA provides that "in any private action arising under this chapter in which the plaintiff may recover damages only on proof that the defendant acted with a particular state of mind," scienter must be pled with specificity. 15 U.S.C. § 78u-4(b)(2). That section indicates that plaintiffs must demonstrate a defendant's culpable state of mind to establish a claim for control person liability. *See Mishkin v. Ageloff,* 1998 U.S. Dist. LEXIS 14890, 97 Civ. 2690 (LAP), 1998 WL 651065, at *24 (S.D.N.Y. Sept. 23, 1998) ("In order to prevail under section 20(a), a plaintiff must come forward with proof that a defendant acted with a particular state of mind.'") (quoting 15 U.S.C. § 78u-4(b)(2)); *see also Burstyn,* 2002 U.S. Dist. LEXIS 18555, 2002 WL 31191741, at *7 ("Since culpable participation is an element, the PSLRA's heightened pleading requirements apply, and plaintiffs must plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct. [*50] ") (internal quotations and citation omitted). *But see In re Vivendi Universal, S.A. Sec. Litig.,* 2003 U.S. Dist. LEXIS 19431, No. 02 Civ. 5571 (HB), 2003 WL 22489764, at *22 (S.D.N.Y. Nov. 3, 2003); *IPO,* 241 F. Supp. 2d at 395-96. Accordingly, since plaintiffs have failed to allege culpable participation by Wenning and Schneider with the requisite specificity, the motion to dismiss the Section 20(a) claim against them is granted.

VII. *Subject Matter Jurisdiction Over Foreign Residents*

Defendants claim that this Court lacks subject matter jurisdiction over foreign residents who acquired Bayer securities on foreign exchanges because defendants' conduct in the United States was merely incidental to the alleged fraud.

[HN27]To determine whether there is jurisdiction over securities transactions that are largely foreign, courts consider two factors: (1) whether the wrongful conduct occurred in the United States, and (2) whether the wrongful conduct had a substantial effect in the United States or on U.S. citizens. *See Europe & Overseas Commodity Traders', S.A. v. Banque Paribas London ("EOC Traders"),* 147 F.3d 118, 125 (2d Cir. 1998). In evaluating those factors, courts apply [*51] a "conduct test" and an "effects test," either of which suffices for jurisdiction. *See SEC v. Berger,* 322 F.3d 187, 193, 195 (2d Cir. 2003). To support the exercise of jurisdiction under the conduct test, the plaintiff must allege conduct in the United States "of sufficient centrality to the claim of fraud to warrant an exercise of such jurisdiction." *Nikko Asset Mgmt. Co. Ltd. v. UBS AG,* 303 F. Supp. 2d 456, 464 (S.D.N.Y. 2004). This test is satisfied when (1) defendant's U.S. activities were more than "merely preparatory" to securities fraud committed elsewhere, and (2) those acts "directly caused" the claimed losses. *Berger,* 322 F.3d at 193.

Plaintiffs do not dispute that there is no jurisdiction under the effects test. *4* (Pls. Mem. at 57-65.) Defendants argue that plaintiffs cannot satisfy the conduct test because the alleged conduct in the United States was insignificant compared to the foreign conduct and because plaintiffs have not alleged reliance.

  4 Subject matter jurisdiction exists under the effects test if a defendant's foreign conduct had a substantial impact within the United States. *See Alfadda v. Fenn,* 935 F.2d 475, 478 (2d Cir. 1991).

[*52] The Complaint does not specify what conduct occurred in the United States. Plaintiffs nevertheless maintain that there was sufficient conduct in the United States for jurisdiction over foreign residents because defendants considered the success of Baycol in this country important for Bayer, and alleged misstatements pertained to defendants' U.S.-based conduct. (Pls. Mem. at 59-61.) However, [HN28]mere commentary about activities occurring in the United States does not satisfy this Circuit's stringent conduct test, which focuses on defendants *activities* in the United States. *Bersch v. Drexel Firestone, Inc.,* 519 F.2d at 987; *Interbrew S.A. v. Edperbrascan Corp.,* 23 F. Supp. 2d 425, 431 (S.D.N.Y.

Page 17

1998); *see also Tri-Star Farms, Ltd. v. Marconi, 225 F. Supp. 2d 567, 578 (W.D. Pa. 2002)* ("Simply making fraudulent statements about what is happening in the United States does not make those statements 'United States conduct' for purposes of the conduct test.").

Plaintiffs also contend that jurisdiction exists because defendants learned of Baycol's dangers from information collected in the United States. (Pls. Mem. at 60.) That argument is [*53] insufficient for subject matter jurisdiction. *See Nikko, 303 F. Supp. 2d at 464* (conduct test not satisfied where defendant UBS learned in the United States during Enron-related transactions that Enron's financials were false, which UBS Japan then failed to disclose to foreign plaintiff in a subsequent transaction).

Plaintiffs also allege that defendants misled the FDA to secure approval for higher doses of Baycol in the United States. As previously noted, the Complaint fails to specify what information Bayer withheld from the FDA, or how it misled government regulators. Even so, such actions cannot support subject matter jurisdiction over foreign residents. *See EOC Traders, 147 F.3d at 127-31* (holding there was no jurisdiction even though defendants solicited plaintiff's representative to buy fraudulent securities, and accepted his order for them, while the representative was in the United States); *Fidenas AG v. Compagnie Int'l, 606 F.2d 5, 8-10 (2d Cir. 1979)* (no jurisdiction where defendant's United States office was aware of alleged fraud and bogus securities were sold to United States residents); *Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 985, 987 n.24 (2d Cir. 1975)* [*54] (no jurisdiction despite substantial New York-based activities in preparation for the alleged transaction because the "United States activities [were] merely preparatory . . . and [were] relatively small in comparison to those abroad"); *Interbrew, 23 F. Supp. 2d at 432* (no jurisdiction even though transaction at issue involved company with substantial operations in the United States); *CL-Alexanders Laing & Cruickshank v. Goldfield, 709 F. Supp. 472, 479 n.3 (S.D.N.Y. 1989)* ("Plaintiff has not found, nor has this Court, any case where subject matter jurisdiction was held proper under the 'conduct' test merely because fraudulent statements were prepared in the United States.").

Similarly, the Complaint's allegations that defendants filed misleading forms with the SEC are insufficient because of the absence of any allegation that those filings were a substantial or contributing cause of the foreign residents' decision to purchase Bayer stock. *See Itoba, Ltd. v. Lep Group, PLC, 54 F.3d 118, 122 (2d Cir. 1995); In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1, 10 (D.D.C. 2000)* ("The complaint contains no allegations of [*55] specific reliance on those fraudulent acts which occurred in the United States.") (citing *In re Gaming Lottery Sec. Litig., 58 F. Supp. 2d 62, 73 (S.D.N.Y. 1999)*). Although plaintiffs rely in part on the "fraud on the market" doctrine to show causation and reliance, [HN29]that doctrine cannot be used to satisfy the conduct test. *See In re Baan, 103 F. Supp. 2d at 10*; *see also Basic, Inc. v. Levinson, 485 U.S. 224, 241, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988)* (explaining that fraud on the market doctrine creates a rebuttable presumption that defendants' fraud caused plaintiffs' loss because "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business").

This Court therefore lacks subject matter jurisdiction over the claims of foreign residents in the proposed class under the conduct test.

*CONCLUSION*

For the foregoing reasons, defendants' motion to dismiss is denied as to Bayer, Ebsworth and Plischke. Defendants' motion to dismiss is granted as to Wenning and Schneider with leave to replead. Finally, the defendants' motion to dismiss the claims [*56] of foreign purchasers of Bayer stock on foreign exchanges is granted with leave to replead.

Dated: September 30, 2004

New York, New York

SO ORDERED:

WILLIAM H. PAULEY III

U.S.D.J.

Page 18