Analysis
As of: Mar 07, 2008

LEXSEE

**In re Impax Laboratories, Inc. Securities Litigation**

**NO. C 04-04802 JW**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

**2007 U.S. Dist. LEXIS 52356**

**July 18, 2007, Decided
July 18, 2007, Filed**

**PRIOR HISTORY:** In re Impax Labs., Inc. Sec. Litig., 2007 U.S. Dist. LEXIS 723 (N.D. Cal., Jan. 3, 2007)

**CORE TERMS:** bupropion, scienter, customer, causation, announced, generic, pharmaceutical, announcement, resignation, accounting, omission, press release, Exchange Act, per share, particularity, misleading, departure, timing, stock, strategic, misrepresentation, high-ranking, misstatement, investor, inflated, net sales, securities fraud, facts giving rise, judicial notice, hydrochloride

**COUNSEL:** [*1] For Charles Rosen, On behalf of himself and All others similarly situated, Plaintiff: Azra Z. Mehdi, Patrick J. Coughlin, LEAD ATTORNEYS, Willow E. Radcliffe, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA.; Darren Jay Robbins, William S. Lerach, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA.

For Edward Mihalik, Plaintiff: Robert S. Green, Green Welling LLP, San Francisco, CA.

For Dr. Melvin M Owen, Plaintiff: Azra Z. Mehdi, LEAD ATTORNEY, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA.; Shana E. Scarlett, LEAD ATTORNEY, Hagens Berman Sobol Shapiro LLP, Berkeley, CA.

For IMPAX Laboratories, Inc., Defendant: Dale E. Barnes, Jr., LEAD ATTORNEY, Bingham McCutchen LLP, San Francisco, CA.; Joseph Otto Click, LEAD ATTORNEY, Blank Rome LLP, Washington, DC.; Kerry Brainard, Michael Joseph, Washington, DC.

For Barry R. Edwards, Charles Hsiao, Larry Hsu, Cornel C. Spiegler, David S. Doll, David J. Edwards, Defendants: Joseph Otto Click, LEAD ATTORNEY, Blank Rome LLP, Washington, DC.; Kerry Brainard, Michael Joseph, Washington, DC.

For United Food & Commercial Workers Union Local 655, AFL-CIO, Food Employers Joint Pension Plan, Movant: [*2] Monique Winkler, LEAD ATTORNEY, Azra Z. Mehdi, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA.; Shana E. Scarlett, LEAD ATTORNEY, Hagens Berman Sobol Shapiro LLP, Berkeley, CA.; Tricia Lynn McCormick, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA.

For Haiduk Group, Movant: Elizabeth Pei Lin, Milberg Weiss & Bershad LLP, Los Angeles, CA.

For Thomas Galvin, Jr., Movant: Robert S. Green, Green Welling LLP, San Francisco, CA.

**JUDGES:** JAMES WARE, United States District Judge.

Page 1

2007 U.S. Dist. LEXIS 52356, *2

**OPINION BY:** JAMES WARE

**OPINION**

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS THIRD AMENDED CONSOLIDATED COMPLAINT**

**I. INTRODUCTION**

This is a securities fraud class action brought on behalf of investors who acquired Impax Laboratories, Inc. ("Impax") securities between May 5, 2004 and November 3, 2004 (the "Class Period") against Impax and certain of Impax's senior officers and directors (collectively, "Defendants"). Impax is a specialty pharmaceutical company that develops, sells and markets generic pharmaceuticals, including generic equivalents of drugs Wellbutrin and Zyban. Plaintiffs allege violations of Section 10(b) and 20(a) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"). Presently [*3] before the Court is Defendants' Motion to Dismiss Third Amended Consolidated Complaint. The Court conducted a hearing on June 21, 2007. Based on the papers submitted to date and the oral arguments of counsel, the Court DENIES Defendants' Motion to Dismiss.

**II. BACKGROUND**

Plaintiffs filed this suit on behalf of all persons who purchased Impax securities during the class period. Plaintiffs allege the following:

Plaintiffs [1] purchased Impax securities during the Class Period and suffered losses as a result of Defendants' actions. [2] Individual Defendants Barry R. Edwards, Dr. Charles Hsiao, Dr. Larry Hsu, Cornel C. Spiegler, David S. Doll, and David J. Edwards were directors, officers, or high-ranking employees of Impax during the Class Period. (TAC PP 14-20.)

Non-party Teva Pharmaceuticals Industries, Ltd. ("Teva") is a global pharmaceutical company and one of the world's largest generic drug companies. (TAC P 70.) Part of Teva's strategy is to reach the market with generic versions of branded pharmaceuticals as quickly as possible; it develops alliances with partners to acquire rights to generic products, or otherwise shares development costs or litigation risks. Id.

In June 2001, Impax and [*4] a Teva subsidiary entered into a Strategic Alliance Agreement ("SAA"). (TAC PP 3, 69.) Under the SAA, Teva received exclusive U.S. prescription-marketing rights for six of Impax's products, including bupropion products; Impax shared in Teva's profits from sales of the products. (TAC P 71.) Non-party Andrx Corporation ("Andrx") was also a signatory to the SAA. (TAC P 73.)

On March 22, 2004, Impax announced that the Food and Drug Administration ("FDA") had granted final marketing approval to its Abbreviated New Drug Application ("ANDA") for bupropion 150 mg controlled release tablets. (TAC P 170.) Impax immediately began shipping 100 mg and 150 mg doses of bupropion to Teva to sell to the market. Id. As a result, on May 5, 2004, Impax reported its first profitable quarter, 1Q04, with revenues of $ 38.8 million, $ 26.6 million of which was attributable to Impax's share of bupropion revenues. (TAC P 80.) Similarly, Impax reported on August 4, 2004 that its 2Q04 revenues were $ 30.8 million, of which $ 8.1 million was attributable to Impax's share of bupropion revenues. (TAC P 280.)

On November 3, 2004, Impax announced that its 3Q04 results would be delayed to review customer credits on bupropion [*5] given by its strategic partner:

IMPAX Laboratories, Inc. . . . today announced that the Company has postponed its release of 2004 third quarter financial results to Tuesday,

November 9, 2004 in order to allow its independent auditors more time to complete their review of the Company's third quarter financial statements, including the timing of certain customer credits on bupropion products marketed by a strategic partner. Results were originally scheduled to be announced on Thursday, November 4, 2004.

(TAC P 135.) Impax's stock price declined from $ 13.00 on November 3, 2004 to $ 10.07 on November 4, 2004, a one-day decline of 23 percent on a volume of 6.77 million shares. (TAC P 140.) The November 3 announcement did not explicitly notify investors that Impax would be forced to restate the 1Q04 and 2Q04 financial results. (TAC P 141.) On November 9, 2004, Impax released its 3Q04 results and restated its 1Q04 and 2Q04 results. (TAC P 144.) It lowered its 1Q04 results by $ 4.3 million and its 2Q04 results by $ 281,000, reducing earnings by $ 0.07 per share. Id. Impax's stock increased in value over the following two days, from $ 11.85 on November 9, 2004 to $ 13.30 on November 11. 2004. [*6] (TAC 148.)

1 The named Plaintiffs are United Food & Commercial Workers Union Local 655, AFL-CIO, Food Employers Joint Pension Plan; and Dr. Melvin M. Owen. (TAC PP 11-12.)

2 (Third Amended Consolidated Complaint for Violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 PP 11-12, hereafter, "TAC," Docket Item No. 112.) Defendant Impax is a small pharmaceuticals company that develops, sells, and markets generic pharmaceuticals, including variations of bupropion hydrochloride ("bupropion"), the generic version of Wellburrin (an anti-depressant) and Zyban (a smoking cessation agent). (TAC P 3.)

Plaintiffs' Third Amended Consolidated Complaint alleges two causes of action against Impax: (1) Claim 1, for violation of Section 10(b) of the Exchange Act and Rule 10b-5, by issuing false or misleading statements about Impax's reserves, revenues, and income, and (2) Claim 2, for violation of Section 20(a) of the Exchange Act, for control person liability. Presently before the Court is Defendants' Motion to Dismiss the Third Amended Complaint.

## III. STANDARDS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against a defendant for failure to state [*7] a claim upon which relief can be granted against that defendant. Dismissal may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990); Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-534 (9th Cir. 1984). For purposes of evaluating a motion to dismiss, the court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). Any existing ambiguities must be resolved in favor of the pleading. Walling v. Beverly Enters., 476 F.2d 393, 396 (9th Cir. 1973).

However, mere conclusions couched in factual allegations are not sufficient to state a cause of action. Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986); see also McGlinchy v. Shell Chem. Co., 845 F.2d 802, 810 (9th Cir. 1988). The complaint must plead "enough facts to state a claim for relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S.    , 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). Courts may dismiss a case without leave to amend if [*8] the plaintiff is unable to cure the defect by amendment. Lopez v. Smith, 203 F.3d 1122, 1129 (9th Cir. 2000).

Claims brought under Section 10(b) of the Exchange Act and Rule 10b-5 must meet the particularity requirements of Federal Rule of Civil Procedure 9(b). In re Daou Sys., Inc. Sec. Litig., 411 F.3d 1006, 1014 (9th Cir. 2005). Rule 9(b) requires that "[i]n all averments of

Page 3

2007 U.S. Dist. LEXIS 52356, *8

fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

Moreover, claims brought under Section 10(b) and Rule 10b-5 must also meet the stringent pleading standards of the Private Securities Litigation Reform Act of 1995. To plead a violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must allege (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005). The PSLRA amends the Exchange Act to require that a private securities fraud litigation complaint "plead with particularity both falsity and scienter." In re Daou, 411 F.3d at 1014. [*9] Specifically, a complaint alleging securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1085 (9th Cir. 2002).

## IV. DISCUSSION

Defendants move to dismiss on the grounds that Plaintiffs have failed to adequately allege loss causation and scienter. The Court considers each issue in turn.

### A. Loss Causation

Defendants contend that Plaintiffs' two new relevant allegations, which concern Impax's August 4, 2004 press release announcing 2Q04 results and a November 4, 2004 Teva conference call, do not remedy the deficiencies the Court previously found in Plaintiffs' loss causation allegations. (Defendants' Notice of Motion and Motion to Dismiss Third Amended Consolidated Complaint and Memorandum of Points and Authorities in Support Thereof at 8, hereafter, "Motion," Docket Item No. 115.)

To plead loss causation adequately, a plaintiff must allege a causal connection between [*10] the defendant's material misrepresentation and the plaintiff's loss; that is, the "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." 15 U.S.C. § 78u-4(b)(4); Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005); Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2nd Cir. 2005). The plaintiff "must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss." Lentell, 396 F.3d at 173 (quoting Suez Equity Investors, L.P. v. Toronto Dominion Bank, 250 F.3d 87, 95 (2nd Cir. 2001) (emphasis in original).) If a plaintiff alleges a fraud on the market, a mere allegation of an inflated purchase price does not constitute or proximately cause a relevant economic loss, because:

> [A]t the moment that the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value. Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, [*11] say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the market place, an initially inflated purchase price might mean a later loss. But this is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, or other events, which taken separately or together account for some or all of that lower price.

Id. at 342-43.

The Ninth Circuit considered loss causation under the *Dura* framework in the case of In re Daou Systems, Inc., 411 F.3d 1006, 1014 (9th Cir. 2005). The court held that the Daou complaint adequately pled loss causation by alleging that "the drop in Daou's stock price was causally related to Daou's financial misstatements reflecting its practice of prematurely recognizing revenue before it was earned." Id. at 1026. The complaint alleged that the defendants' belated revelation of the company's true financial condition "led to a 'dramatic, negative

Page 4

effect on [*2] the market, causing Daou's stock to decline to $ 3.25 per share, a staggering 90% drop from the Class Period high of $ 34.375 and *a $ 17 per share drop from early August 1998*.'" Id. (emphasis in original.) Lastly, the complaint alleged that "Daou's stock price has never recovered and the Company has never been able to match the artificially inflated revenues reported during the Class Period." Id. The Daou court found these allegations sufficient to plead loss causation.

In this case, whether Plaintiffs have adequately pled loss causation is grounded on two events that allegedly occurred in 2004. Specifically, Plaintiffs attempt to link Impax's May 5, 2004 announcement of 1Q04 results to the losses they allegedly suffered on two instances: the August 4, 2004 "partial revelation" of 2Q04 reduced sales and the November 3, 2004 "full revelation" concerning the 1Q04 and 2Q04 results. Plaintiffs' theory of loss causation is as follows:

In May 2004, Impax made at least three material misstatements or omissions.

First, Impax stated in a press release that its 1Q04 revenues were a record $ 38.8 million, up more than 240% from 1Q03. (TAC 80, PP 183.) This was false and misleading because Defendants' [*13] recognition of revenues on bupropion sales was premature and improper; they lacked sufficient information to recognize revenue on bupropion sales because they did not know the terms and conditions of Teva's sales to its customers. (TAC P 84.) Moreover, Impax decreased its reserves, failing to accrue any reserves for sales of bupropion. (TAC P 125.)

Second, Impax's President, Defendant Larry Hsu, stated in the same press release, "The launch of our generic Wellbutrin SR represents IMPAX's single largest product opportunity to date. According to NDCHealth, U.S. sales of Wellbutrin SR 100 mg and 150 mg, marketed by GlaxoSmithKline (NYSE:GSK), were approximately $ 1.4 billion in the twelve months ended February 29, 2004 . . ." (TAC P 154.) Defendants' "product opportunity" statement was false and misleading because it suggested that Impax had a much larger market share of the market for generic bupropion drugs than was actually the case. (TAC P 158.) In particular, (1) Impax's initial shipments of bupropion had already "filled the pipeline" of customer demand (thus ensuring that future orders would be dramatically reduced); (2) Impax was aware that price protection credits had been issued [*14] to consumers; and (3) Teva had informed Impax that it should stop building bupropion inventory. (TAC PP 101-03, 158, 170-75.)

Third, Impax's May 10, 2004 Report on Form 10-Q stated:

> The rebates, chargebacks, returns and other credits decreased for the three months ended March 31, 2004 to approximately 14% of product sales as compared to approximately 22% for the comparable period in 2003. This decrease was mainly due to Bupropion Hydrochloride 100mg and 150 mg Controlled Release Tablets, Loratadine, and Pseudoephedrine Sulfate (5 mg/120 mg) 12-hour Extended Release Tablets which are exempt from rebates, chargebacks and other credits as per the agreements with Schering-Plough, Wyeth, and Novartis . . .

(TAC P 192.) This statement was false and misleading because the terms of the SAA gave Teva the ability to allow for returns and credits, and Teva did in fact do so.[3] (TAC P 197.)

The reality of the situation was

partially revealed to the market in August 2004. 4 On August 4, 2004, Impax announced that its financial results for 2Q04 were well-below investor expectations (actual earnings per share ("EPS") of $ 0.01 per share, compared to analyst expectations of $ 0.03 per share). The press [*15] release also stated:

> Total revenues for the second quarter of 2004 were $ 30.8 million, more than double total revenues of $ 14.1 million in the prior year's second quarter. . . .The sequential quarter decline was due to timing of bupropion shipments and pipeline filling, particularly as related to the launch of Bupropion Hydrochloride in the first quarter. During the 2004 second quarter, IMPAX's revenues from sales of Bupropion Hydrochloride products, through our strategic alliance agreements with Teva and Andrx, were approximately $ 8.1 million, compared with $ 23.9 million in the first quarter. . .

(TAC P 280.) In response, the market closed down from $ 13.97 to $ 12.00 on an increased trading volume of 7.1 million shares. (TAC P 134.) The reality of the situation was fully revealed to the market on November 3, 2004, when Impax ultimately revealed that its 3Q04 results would be delayed to review customer credits on bupropion products:

> IMPAX Laboratories, Inc . . . today announced that the Company has postponed its release of 2004 third quarter financial results to Tuesday, November 9, 2004 in order to allow its independent auditors more time to complete their review of the Company's [*16] third quarter financial statements, including the timing of certain customer credits on bupropion products marketed by a strategic partner. Results were originally scheduled to be announced on Thursday, November 4, 2004.

(TAC P 135.)

Of the November 3, 2004 press release, the Court previously held:

> Impax's November 3 announcement concerned only the release of 3Q04 results. The November 3 announcement did not indicate that the 1Q04 or 2Q04 financial statements or revenues would be altered. However, Plaintiffs' Second Amended Complaint only alleges material misstatements or omissions with respect to Impax's 1Q04 and 2Q04 financial results. Since Impax's November 3 press release does not address these financial results, the Court finds that it did not disclose a previously made misstatement or omission.

(Order Granting Defendants' Motion to Dismiss Second Amended Consolidated Complaint with Leave to Amend at 7, Docket Item No. 110.)

3  That is, the SAA provided, "Teva shall have the sole and exclusive right to determine all terms

Page 6

and conditions of sale of the Products to its customers." (TAC P 197.)

4  Additionally, Plaintiffs allege that in reality, the bupropion products were not exempt from [*17] credits, as Defendant Spiegler explained in a November 9, 2004 conference call:

> The September, 2004, financial report indicated two major sales credits issued by Teva in September of 2004, which was our share of this credit for an aggregate of about $ 3.5 million . . . . As a result of all our discussions with Teva it was determined that these credits related to March 2004 sales

. . .

(TAC PP 196.)

In this case, the specific subject of the allegedly fraudulent statements was Impax's 1Q04 and 2Q04 revenues. Fraudulent statements were allegedly made in May 2004 when Impax announced erroneous 1Q04 revenues and made unqualifiedly optimistic statements about the financial opportunity to Impax that bupropion represented. In August 2004, the "truth" became partially apparent to the market. Impax's August 4, 2004 announcement that its 2Q04 financials results were well below investors' expectations and that timing of product shipments and pipeline filling had proved problematic, made it known to the market that Impax's entry into the bupropion market would not be as facile as the company's May 2004 statements indicated. This announcement was accompanied by a significant same-day price decline. [*18] *In light of the August 2004 disclosure*, which explicitly pertained to Impax's 1Q04 and 2Q04 results, the Court now finds it reasonable to infer that the market understood the company's November 3, 2004 announcement to potentially implicate 1Q04 and 2Q04 customer credits and revenues as well. See Wagner v. Barrick Gold Corp., No. 03 Civ. 4302, 2006 U.S. Dist. LEXIS 3854, at *10-12 (S.D.N.Y. Jan. 31, 2006). As alleged, the November 3, 2004 announcement caused another significant same-day price decline. The Court finds that Plaintiffs have adequately alleged a causal connection between Defendants' misrepresentations as to 1Q04 and 2Q04 revenues and Plaintiffs alleged loss.

The Court finds that Plaintiffs have adequately alleged loss causation. [5]

5  Since the Court finds that Plaintiffs have adequately alleged loss causation based on the August and November 2004 press releases, the Court does not consider the relevance of Plaintiffs' allegations concerning Teva's November 4, 2004 conference call concerning the timing of the credits issued to Teva's customers on bupropion sales. (See TAC P 142.)

## B. Scienter

The parties dispute whether Plaintiffs have adequately alleged scienter.

The Supreme Court [*19] has defined "scienter" as a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 n.12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976). In the Ninth Circuit, recklessness (as a form of intentional conduct) has long sufficed to establish scienter for § 10(b) purposes. Nelson v. Serwold, 576 F.2d 1332, 1337 (9th Cir. 1978).

Congress enacted the PSLRA to "deter opportunistic private plaintiffs from filing abusive securities fraud claims, in part, by raising the pleading standards for private securities fraud plaintiffs." In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 973 (9th Cir. 1999). Post-PSLRA, a plaintiff must allege with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2). At minimum, a plaintiff must plead particular facts giving rise to a strong inference of deliberate recklessness. In re Silicon Graphics, 183 F.3d at 979. In determining whether a plaintiff has adequately pled scienter, a court must consider whether the totality of the plaintiff's allegations, although individually lacking, gives rise to the "strong inference" required by the PSLRA. Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1230 (9th Cir. 2004).

Congress [*20] did not further define the "strong inference" requirement. The Supreme Court has recently clarified the requirement. To determine whether a plaintiff has alleged facts giving rise to a "strong inference" of scienter, a court must consider both (1) plausible nonculpable explanations for the defendant's conduct; and (2) inferences favoring the plaintiffs. Tellabs, Inc. v. Makor Issues & Rights, Ltd., No. 06-484,

Page 7

2007 U.S. Dist. LEXIS 52356, *20

127 S. Ct. 2499, 168 L. Ed. 2d 179, 2007 U.S. LEXIS 8270 at *10-11 (U.S. June 21, 2007). Evidence of scienter must be more than merely "reasonable" or "permissible" - it must be "cogent" and "at least as compelling as any opposing inference one could draw from the facts alleged." [6] 127 S. Ct. 2499, 2007 U.S. LEXIS 8270 at *10-11, 30.

6 This is because [a]n inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct." Id.

Plaintiffs have alleged a number of facts, which they contend - in their totality - are sufficient to plead scienter with particularity. The Court summarizes each set of allegations below, and then considers their sufficiency.

**1. GAAP Allegations**

Plaintiffs allege the following:

Defendants prematurely and improperly recognized revenue on bupropion products, "despite [*21] knowing that the terms and conditions of sale to Teva's customers allowed for price adjustments and therefore, prices were not fixed and determinable." (TAC P 91.) First, Teva publicly stated in its Form 20-F, filed immediately prior to the Class Period, that its practice was to allow for different types of credits and returns from its customers, including shelf-stock adjustments, chargebacks, and volume rebates. (TAC PP 95-100.) Defendants Doll and B. Edwards were previously employed by Teva's marketing department. (TAC PP 14(a), 18(b), 99.) Moreover, Defendants Doll, B. Edwards, and Spiegler were in regular contact with Teva's management. (TAC PP 161-65.) Second, Defendant B. Edwards was specifically informed by Teva's Executive Vice President in 1Q04 that Teva had issued credits to Walgreens concerning bupropion. (TAC PP 01-03.)

Defendants also knew that Teva's monthly reports containing the details of bupropion sales did not include a column for reserves or returns until October 2004.

(TAC P 121.) Defendants Spiegler and Doll were explicitly informed by Teva that Teva was not accruing reserves specific to bupropion, because Teva had established a 4 percent reserve for returns [*22] in computing Teva's aggregate net sales. [7] (TAC P 381.)

7 This was possible because Teva's revenues were sufficiently large that "it is possible that Teva could not have accrued any reserves on bupropion sales *at all* and might still have been in compliance with GAAP." (TAC P 112.)

The SAA formed by Impax and Teva provided, in pertinent part, as follows: [8]

Teva was granted the "sole and exclusive right" to determine the terms and conditions of sale of the Products to its customers. (SAA § 11.4.) Within thirty days following each calendar quarter, Teva was required to provide to Impax "in a mutually acceptable format . . . the Net Sales and Profit for each Product." (SAA § 11.3.) "Net Sales" were defined as:

[T]he gross amount invoiced for each of the Products sold by Teva or Teva's Affiliates on an arms-length basis in each country in the Territory, less the sum of: (a) trade, quantity and/or cash discounts, allowances, rebates, retroactive price adjustments, free goods, bad debts, cash incentive payments (e.g. slotting allowance), and chargebacks; (b) **credits or refunds for rejected, outdated or returned Product;** (c) any tax, duty or other government charge upon or related to the sale, [*23] delivery or use of that Product; (d) cost of short dated Product, which is destroyed by Teva or its Affiliates; (e) three percent (3%) as a contribution towards selling, administrative and other expenses of Teva; and (f) other specifically identifiable amounts included in the Product's gross sales that will have been or ultimately will be credited and are substantially similar to those listed above; **in each case determined in accordance with U.S.**

Page 8

### GAAP.

(SAA § 1.4.26.) (emphasis added). Lastly, "Profits" were defined as "an amount equal to Net Sales less the applicable Manufacturing Costs." (SAA § 1.4.33.)

8  Defendants have requested that the Court take judicial notice of the SAA. (Defendants' Request for Judicial Notice in Support of Defendants' Motion to Dismiss the Third Amended Consolidated Complaint Ex. A, hereinafter, "SAA," Docket Item No. 116.) Pursuant to Federal Rule of Evidence 201, the Court grants Defendants' request. The remainder of Defendants' requests for judicial notice are denied.

After considering the SAA and the allegations of the Third Amended Complaint, Plaintiffs' expert concluded as follows:

Both Defendants' (1) recognition of 100% of bupropion revenues and (2) failure [*24] to accrue any reserves for those revenues, were improper under GAAP. (TAC Ex. C P 39.) More particularly, he concluded that prior to recognizing revenues from products sold under the SAA, Impax's management should have obtained a sufficient understanding of Teva's marketing and sales policies, internal controls, and accounting policies and procedures related to sales under the SAA--particularly since there were several conditions present that increased the risk of improper revenue recognition. (TAC Ex. C P 16.) Lastly, he opines that Defendants could not properly have delegated their GAAP responsibilities to Teva through the SAA. (TAC Ex. C P 151.)

GAAP requires that revenue is only recognized when, *inter alia*, the seller's price to the buyer is fixed and determinable. See Securities and Exchange Commission Staff Accounting Bulletin 101, available at http://www.sec.gov/interps/account/sab101.htm.  9 Violations of GAAP standards can provide evidence of scienter; when "significant" violations are described, they provide "powerful indirect" evidence of scienter. Daou, 411 F.3d at 1016 (internal citations omitted). Moreover, expert accounting analysis may be one type of allegation that contributes [*25] to a strong inference that defendants knew of alleged accounting improprieties. Oracle, 380 F.3d at 1233-34.

9  The Court takes judicial notice of the SEC's website pursuant to Federal Rule of Evidence 201.

The Court previously directed Plaintiffs to, ". . . plead facts which give rise to a strong inference that Defendants knew or were deliberately reckless in not knowing that Teva was not accounting for customer credits as seemingly required by the SAA." (See Order Granting Defendants' Motion to Dismiss with Leave to Amend at 7, hereinafter, "2006 Order," Docket Item No. 74.) Plaintiffs have now adequately alleged that Defendants knew that credits were necessary to induce sales of bupropion for a number of reasons, and that Teva was in fact issuing such credits. (TAC PP 89, 162-63, 171.) Plaintiffs have further alleged that Defendants willfully recognized 100 percent of bupropion revenues without accruing any reserves. (TAC PP 91-125.)

These allegations give rise to potentially opposing inferences. On one hand, they support an inference that Defendants significantly violated GAAP by recognizing revenues improperly, which is one form of "powerful indirect" evidence of scienter. On the other [*26] hand, the allegations also support an inference that Impax simply relied on Teva's contractual commitment to report sales as directed by the terms of the SAA. On balance, however, the Court finds that Plaintiffs' new allegations give rise to a strong, cogent inference that Defendants knew, or were deliberately reckless in not knowing, that Teva was not accounting for customer credits in the manner required by the SAA.

These allegations weigh in favor of finding that Plaintiffs have adequately alleged scienter.

### 2. Resignations of Impax's CFO and CEO

As supporting evidence of scienter, Plaintiffs allege the departure of Impax's CFO and CEO:

Approximately one month after Impax released the details of its restatement, it announced that its CFO, Individual Defendant Spiegler, would retire from Impax in early 2005. (TAC P 400.) On

Page 9

2007 U.S. Dist. LEXIS 52356, *26

August 15, 2006, Impax announced that Individual Defendant B. Edwards was resigning as CEO and a member of Impax's board of directors, effective October 1, 2006. (TAC P 404.)

Proximate resignations or replacements of high-ranking officers or directors do not alone support scienter. However, particularly when such "corporate reshuffling" occurs in tandem with financial [*27] restatements, these changes "add one more piece to the scienter puzzle." In re Adaptive Broadband Sec. Litig., No. C 01-1092 SC, 2002 U.S. Dist. LEXIS 5887, at *42-43 (N.D. Cal. Apr. 2, 2002); see also In re McKesson HBOC Sec. Litig., 126 F. Supp. 2d 1248, 1274 (N.D. Cal. 2000).

These allegations, too, give rise to potentially opposing inferences. On one hand, Impax did not publicly fire or comment unfavorably on the departures of either its former CFO or CEO. Moreover, the resignation of Individual Defendant B. Edwards came one and a half years after the events alleged in the Third Amended Complaint. B. Edwards' resignation was not proximate in time to the financial restatements--and Plaintiffs have not alleged facts clearly tying the two together. 10 Accordingly, the Court finds that there are many plausible explanations for his resignation unrelated to culpability for the alleged Section 10(b) violations; B. Edwards' resignation, then, does not weigh in favor of a finding of scienter.

10 Plaintiffs allege, "No reason was given for defendant B. Edwards's (sic) resignation, but the massive scale of the fraud at Impax, its enormous consequences for the Company, B. Edwards' knowledge [*28] of the bupropion credits granted to Teva's customers, and B. Edwards (sic) insider sales totaling $ 2.6 million were likely factors in his departure from the Company." (TAC P 404.) However, these allegations are mere unsupported speculation.

On the other hand, Individual Defendant Spiegler's retirement was announced in close proximity to the news of Impax's financial restatements. The Court considers the totality of the allegations against Spiegler in tandem with his proximate departure from Impax. For instance, Plaintiffs have alleged, "According to the November 2, 2004 SLC Minutes, the SLC agreed that due to Spiegler's interference with the ongoing investigation, by, for example, suggesting that employees who were being interviewed by the SLC ask the SLC 'to put all requests in writing,' 'it would be preferable for Spiegler to have no supervisory role or other involvement with respect to Impax employees' communications with the SLC and its independent counsel." (TAC P 403.) As alleged, the Court finds that Spiegler's departure provides minimal, non-dispositive supporting evidence of scienter.

**3. Focus on Bupropion as Principal Source of Company Revenues**

As further evidence of scienter, [*29] Plaintiffs allege that Defendants were a small core of managers who were "fully focused" on bupropion sales:

In its 2003 Form 10-K report, Impax identified itself as a "small company" with 453 employees as of February 27, 2004. (TAC P 45.) As of February 27, 2004, it only had six executive officers, five of which are named as Individual Defendants in this action. Id. Prior to Impax's rollout of bupropion, the company had operated with negative cash flow for each of the eighteen quarters since its inception. (TAC P 75.) Its 2003 cash flow, at [19,223,000), was a 26 percent deterioration over its 2002 cash flow. Id. Bupropion was the product that garnered Impax a strategic alliance with Teva, a global pharmaceutical company with 2003 net sales of $ 3.3 billion. (TAC PP 70, 74.) In 1Q04, Impax's first profitable quarter, bupropion accounted for 61 percent of Impax's revenues. (TAC P 69.)

Facts critical to a business' core operations or an important transaction are so apparent that their knowledge may be attributed to the company and its key officers. In re Read-Rite Corp. Sec. Litig., 335 F.3d 843, 848 (9th Cir. 2003). However, post-PSLRA, allegation of these facts serves to establish, [*30] at most, a "reasonable inference" of a company's or key officer's knowledge. Id. That is, these allegations are not independently adequate to satisfy the scienter requirement, but may be considered as one aspect of a scienter analysis. Indeed, following the PSLRA, the

Page 10

2007 U.S. Dist. LEXIS 52356, *30

Ninth Circuit has rejected as "patently incredible" the argument, when made by high-ranking individual defendants, that they were unaware of major business events likely to have a significant impact on the company's financial condition. See No. 84 Employer-Teamster v. America West Holding Corp, 320 F.3d 920, 943 (9th Cir. 2003).

To summarize the above-described allegations: at relevant times, Impax was a small company with low revenues and few high-ranking members of management. Bupropion was the single largest of Impax's products, accounting for more than half of the company's revenues. On one hand, these allegations bolster an inference of scienter – specifically, that Defendants were aware of Impax's financial picture with respect to bupropion. This primary inference in turn supports the secondary inference, discussed *supra*, that Defendants were aware that Impax was significantly violating GAAP by improperly and prematurely [*31] recognizing revenues. On the other hand, for the same reasons previously discussed, the primary inference could also support an inference that though Defendants were aware of the financial aspects of bupropion sales and the SAA, they simply relied on Teva's contractual commitment to report sales as directed by the SAA. On balance, and for the reasons previously explained, the Court finds that Plaintiffs' allegations support a strong, cogent inference of scienter. Although Plaintiffs' allegations with respect to bupropion as the principal source of company revenues are not independently adequate to satisfy the scienter the requirement, the Court simply considers them in its analysis of whether the totality of Plaintiffs' allegations give rise to a strong inference of scienter.

In total, Plaintiffs have alleged (1) that Defendants significantly violated GAAP by improperly and prematurely recognizing revenues; (2) the proximate departure of one high-ranking official within the company; and (3) the company's focus on bupropion as its principal source of revenue. For the reasons explained *supra*, these allegations collectively support a strong inference - at least as compelling as any opposing [*32] inference of non-fraudulent intent - that Defendants' actions were taken with at least deliberate recklessness. The Court finds that Plaintiffs have adequately alleged scienter. [11]

11 Plaintiffs also cite (1) material weaknesses in Defendants' internal controls; and (2) Defendants'

stock sales, "unusual in timing and amount" as further evidence of alleged scienter. (Opposition at 24-25.) The Court previously found both types of allegations insufficient to establish scienter. (2006 Order at 11-14.) In light of its current finding that Plaintiffs have adequately alleged scienter, the Court need not reconsider the relevance of these particular allegations to scienter. This is because Plaintiff's only need state one set of facts giving rise to a strong inference of deliberate recklessness. If they have done so, it is irrelevant whether another different set of facts might have accomplished the same thing. See, e.g. In re Cylink Secs. Litig., 178 F. Supp. 2d 1077, 1083 (N.D. Cal. 2001).

### C. Control Person Liability

To allege a Section 20(a) violation adequately, a plaintiff must state (1) a primary violation of federal securities law and (2) that the defendant exercised actual power and control [*33] over the primary violator. Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000). To establish a prima facie case, a plaintiff need not show the defendant's participation or exercise of power. Moreover, a defendant is entitled to a good faith defense if he or she can show no scienter and an effective lack of participation. Id.

Defendants do not separately contend that Plaintiffs' Section 20(a) claim should be dismissed. The Court has now found that Plaintiffs have adequately alleged a primary violation of Section 10(b) of the Exchange Act and Rule 10b-5. Morever, Plaintiffs have alleged that Defendants exercised actual power and control over the primary violators. (TAC P 468.)

The Court finds that Plaintiffs have adequately alleged control person liability.

### V. CONCLUSION

The Court DENIES Defendants' Motion to Dismiss. Defendants shall file an Answer in accordance with Fed. R. Civ. P. 12(a)(4)(A). The parties shall appear for a Case Management Conference on **September 24, 2007 at 10 AM.** Pursuant to the Civil Local Rules of the Court, the parties shall file a joint case management statement ten (10) days before the date of the conference.

Dated: July 18, 2007

Page 11

JAMES WARE