MICHAEL L. CHARLSON (Bar No. 122125)
LAURENCE A. WEISS (Bar No. 164638)
ALEXANDER M.R. LYON (Bar No. 211274)
HELLER EHRMAN LLP
275 Middlefield Road
Menlo Park, California  94025-3506
Telephone: (650) 324-7000
Facsimile: (650) 324-0638
Michael.Charlson@hellerehrman.com
Laurence.Weiss@hellerehrman.com
Alexander.Lyon@hellerehrman.com

Attorneys for Defendants
THRESHOLD PHARMACEUTICALS, INC.,
HAROLD E. "BARRY" SELICK
and JANET I. SWEARSON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JERRY TWINDE, On Behalf of Himself and All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        v.<br><br>THRESHOLD PHARMACEUTICALS, INC., HAROLD E. "BARRY" SELICK and JANET I. SWEARSON<br><br>                              Defendants. | Case No.: 4:07-CV-04972-CW<br><br>CLASS ACTION<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| RAYNOLD L. GILBERT, On Behalf of Himself and All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        v.<br><br>THRESHOLD PHARMACEUTICALS, INC., HAROLD E. "BARRY" SELICK and JANET I. SWEARSON<br><br>                              Defendants. | Hearing Date:    June 12, 2008<br>Hearing Time:    2:00 p.m.<br>Place:           Courtroom 2, 4th Floor<br>Judge:           Hon. Claudia Wilken |

## NOTICE OF MOTION AND MOTION TO DISMISS

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on June 12, 2008, at 2:00 p.m., or as soon thereafter as the matter may be heard by the Court, in the Courtroom of the Honorable Claudia Wilken, defendants Threshold Pharmaceuticals, Inc. ("Threshold" or the "Company"), Harold E. "Barry" Selick, and Janet I. Swearson (collectively "Defendants") will and hereby do move the Court, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and provisions of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), for an order dismissing, with prejudice, each and every purported claim for relief asserted in the Consolidated Amended Complaint for Violation of the Federal Securities Laws (the "Complaint" or "AC"). Defendants' motion is brought on grounds that the Complaint's allegations fail to state a claim upon which relief can be granted and/or are not pled with the particularity required by Rule 9(b) and the PSLRA. Additionally, some of the statements on which Plaintiffs predicate their purported claims are not actionable under the safe harbor provisions of the PSLRA and/or the bespeaks caution doctrine. Finally, certain claims or portions thereof are barred by the relevant statutes of limitation.

Defendants' motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of Alexander Lyon in Support thereof, the Request for Judicial Notice, all pleadings and papers filed in this action, oral argument of counsel, and any other matters as may come before the Court.

DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:07-CV-04972-CW

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether Plaintiffs' claims under Sections 11 and 12 of the Securities Act of 1933 (Counts I and II) and Section 10(b) of the Securities Exchange Act of 1934 (Count IV) fail to state a claim for relief because they do not allege a material misstatement or omission.  15 U.S.C. §§ 77k, 77l, 78u-4(b)(1); Fed. R. Civ. P. 9(b) & 12(b)(6).

2.      Whether Plaintiffs' claims under Sections 11 and 12 of the Securities Act of 1933 (Counts I and II) and Section 10(b) of the Securities Exchange Act of 1934 (Count IV) fail to state a claim for relief because the alleged misstatements are rendered inactionable by the PSLRA's "safe harbor" and/or the "bespeaks caution" doctrine.  15 U.S.C. §§ 77z-2(c), 78u-5(c); Fed. R. Civ. P. 9(b) & 12(b)(6).

3.      Whether Plaintiffs' claim under Section 10(b) of the Securities Exchange Act of 1934 (Count IV) fails to state a claim for relief because it does not plead specific facts that give rise to a strong inference that Defendants acted with scienter.  15 U.S.C. § 78u-4(b)(2); Fed. R. Civ. P 9(b) & 12(b)(6).

4.      Whether Plaintiffs' claims under Sections 11 and 12 of the Securities Act of 1933 (Counts I and II) and Section 10(b) of the Securities Exchange Act of 1934 (Count IV), or portions thereof, are barred by the statute of limitations.  28 U.S.C. § 1658(b)(1); 15 U.S.C. § 77m; Fed. R. Civ. P 12(b)(6).

5.      Whether Plaintiffs' "control person" claims under Section 15 of the Securities Act of 1933 (Count III) and Section 20(a) of the Securities Exchange Act of 1934 (Count V) fail to state a claim for relief because the Complaint does not adequately allege primary violations of those Acts.  15 U.S.C. §§ 77o, 78t; Fed. R. Civ. P 12(b)(6).

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................................ 3

      A.    The Defendants ........................................................................................... 3

      B.    The FDA's Drug Approval Process. ........................................................... 5

      C.    Threshold's Development Of TH-070 As A Treatment For BPH. ............. 6

III.  ARGUMENT ........................................................................................................ 8

      A.    Legal and Pleading Standards Applicable to Defendants' Motion. ........... 8

      B.    The Complaint Should Be Dismissed Because It Fails to Allege
            Materially False Statements or Omissions. .............................................. 10

            1.    The Allegedly Misleading Statements About The Bari Study. .......... 11

                  a.    Defendants Disclosed All Relevant Details of the Bari
                        Study. ......................................................................................... 11

                  b.    Plaintiffs' Bari Study Claims Are Time-Barred............................ 12

                  c.    Threshold Never Said the Bari Study Proved Safety
                        and Efficacy................................................................................. 13

                  d.    Threshold Fully Disclosed The Specific Risks Relating
                        to FDA Approval of TH-070........................................................ 14

            2.    The Alleged Concealment of Liver Toxicity. .................................... 16

                  a.    Potential for Liver Toxicity......................................................... 16

                  b.    Liver Toxicity Reports From Later TH-070 Clinical
                        Trials........................................................................................... 17

            3.    Plaintiffs' Misquotations Cannot Support Claims Of Falsity. ........... 19

            4.    Section 10(b) Claims Against The Individual Defendants May
                  Not Be Based On Statements They Did Not Make. ............................ 20

      C.    Plaintiffs' Allegations Do Not Support a Strong Inference of Scienter. .............. 21

            1.    Far From Cogent or Compelling, Plaintiffs' Premise is
                  Nonsensical. ..................................................................................... 21

            2.    Plaintiffs' Other Scienter Allegations Are Also Insufficient. ........... 23

      D.    The Control Person Claims Fail For Lack Of A Primary Violation .................... 24

IV.   CONCLUSION .................................................................................................. 25

DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:07-CV-04972-CW

# TABLE OF AUTHORITIES

Page

## Cases

*Abigail Alliance For Better Access to Developmental Drugs v. von Eschenbach,*
    495 F.3d 695 (D.C. Cir. 2007) ................................................................ 5

*Bell Atl. Corp. v. Twombly,*
    ---U.S.---, 127 S. Ct. 1955 (2007) ............................................... 3, 9, 10

*Berry v. Valence Tech., Inc.,*
    175 F.3d 699 (9th Cir. 1999)................................................................. 12

*Branch v. Tunnell,*
    14 F.3d 449 (9th Cir. 1994)..................................................................... 3

*Collagenex Pharm., Inc. v. Thompson,*
    2003 U.S. Dist. LEXIS 12523 (D.D.C. 2003)........................................ 6

*Cooper v. Pickett,*
    137 F.3d 616 (9th Cir. 1997)................................................................... 3

*DeMarco v. DepoTech Corp.,*
    149 F. Supp. 2d 1212 (S.D. Cal. 2001) ............................................ 3, 17

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005) .............................................................................. 10

*Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.,*
    353 F.3d 1125 (9th Cir. 2004)............................................................... 14

*Glen Holly Entm't, Inc. v. Tektronix, Inc.,*
    352 F.3d 367 (9th Cir. 2003)................................................................. 14

*Gompper v. VISX, Inc.,*
    298 F.3d 893 (9th Cir. 2002)................................................................... 9

*Heywood v. Cell Therapeutics, Inc.,*
    2006 U.S. Dist. LEXIS 28684 (W.D. Wash. 2006) ......................... 6, 24

*In re Apple Computer, Inc. Sec. Litig.,*
    243 F. Supp. 2d 1012 (N.D. Cal. 2002) ............................................... 23

*In re Autodesk, Inc. Sec. Litig.,*
    132 F. Supp. 2d 833 (N.D. Cal. 2000) ........................................... 10, 22

iv

*In re Bayer AG Sec. Litig.,*
    2004 U.S. Dist. LEXIS 19593 (S.D.N.Y. 2004) ................................................................... 18

*In re Calpine Corp. Sec. Litig.,*
    288 F. Supp. 2d 1054 (N.D. Cal. 2003) .............................................................................. 22

*In re Carter-Wallace, Inc., (Carter-Wallace I)*
    150 F.3d 153 (2d Cir. 1998) ................................................................................................. 18

*In re Carter-Wallace, Inc., (Carter-Wallace II)*
    220 F.3d 36 (2d Cir. 2000) ................................................................................................... 18

*In re Daou Sys. Inc. Sec. Litig.,*
    411 F.3d 1006 (9th Cir. 2005) ....................................................................................... 8, 9, 24

*In re DNAP Sec. Litig.,*
    2000 U.S. Dist. LEXIS 13482 (N.D. Cal. 2000) ................................................................ 17

*In re ESS Tech., Inc. Sec. Litig.,*
    2004 U.S. Dist. LEXIS 27203 (N.D. Cal. 2004) ................................................................ 20

*In re Immune Response Secs. Litig.,*
    375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................................................. 21

*In re Impax Labs, Inc. Sec. Litig.,*
    2007 U.S. Dist. LEXIS 52356 (N.D. Cal. 2007) ................................................................ 24

*In re Infonet Servs. Corp. Sec. Litig.,*
    310 F. Supp. 2d 1106 (C.D. Cal. 2003) ................................................................... 13, 14, 16

*In re Intrabiotics Pharms., Inc.,*
    2006 U.S. Dist. LEXIS 56427 (N.D. Cal. 2006) .......................................................... 17, 19

*In re Medimmune, Inc. Sec. Litig.,*
    873 F. Supp. 953 (D. Md. 1995) ......................................................................................... 16

*In re NextCard, Inc. Sec. Litig.,*
    2006 U.S. Dist. LEXIS 16156 (N.D. Cal. 2006) ................................................................ 20

*In re Quarterdeck Office Sys., Inc. Sec. Litig.,*
    1992 U.S. Dist. LEXIS 21411 (C.D. Cal. 1992) ................................................................ 19

*In re Read-Rite Corp. Sec. Litig.,*
    115 F. Supp. 2d 1181 (N.D. Cal. 2000) .............................................................................. 24

*In re SciClone Pharms. Sec. Litig.,*
    1995 U.S. Dist. LEXIS 22054 (N.D. Cal. 1995) ................................................................ 12

*In re Silicon Graphics, Inc. Sec. Litig.,*
    183 F.3d 970 (9th Cir. 1999) ..................................................................................... 9, 20, 21

v

*In re Splash Tech. Holdings Secs. Litig.,*
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) .............................................................. 10

*In re Stac Elect. Sec. Litig.,*
    89 F.3d 1399 (9th Cir. 1996)................................................................................ 9

*In re Syncor Int'l Corp. Sec. Litig.,*
    327 F. Supp. 2d 1149 (C.D. Cal. 2004)............................................................. 21

*In re Worlds of Wonder Sec. Litig.,*
    35 F.3d 1407 (9th Cir. 1994)....................................................... 11, 14, 15, 21, 22

*Lipton v. Pathogenesis Corp.,*
    284 F.3d 1027 (9th Cir. 2002)........................................................................... 24

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,*
    416 F.3d 940 (9th Cir. 2005)............................................................................. 14

*Miller v. Pfizer Inc.,*
    196 F. Supp. 2d 1095 (D. Kan. 2002) ............................................................. 5, 6

*Miller v. Thane Int'l, Inc.,*
    508 F.3d 910 (9th Cir. 2007).............................................................................. 8

*Noble Asset Mgmt. v. Allos Therapeutics, Inc.,*
    2005 U.S. Dist. LEXIS 24452 (D. Col. 2005) ................................................. 14

*Oppenheim Pramerica Asset Mgt. S.A.R.L. v. Encysive Pharm., Inc.,*
    2007 U.S. Dist. LEXIS 69121 (S.D. Tex. 2007) .............................................. 21

*Oran v. Stafford,*
    226 F.3d 275 (3d Cir. 2000)............................................................................... 18

*Padnes v. Scios Nova Inc.,*
    1996 U.S. Dist. LEXIS 22858 (N.D. Cal. 1996) .............................................. 16

*Papasan v. Allain,*
    478 U.S. 265 (1986) .......................................................................................... 10

*Parrino v. FHP, Inc.,*
    146 F.3d 699 (9th Cir. 1998)............................................................................... 3

*Pegasus Holdings v. Veterinary Ctrs. of America,*
    38 F. Supp. 2d 1158 (C.D. Cal. 1998)............................................................... 21

*Plevy v. Haggerty,*
    38 F. Supp. 2d 816 (C.D. Cal. 1998)................................................................. 14

*Ronconi v. Larkin,*
    253 F.3d 423 (9th Cir. 2001).............................................................................. 24

vi

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*,
    902 F.2d 222 (3d Cir. 1990) ............................................................................... 5

*SEC v. Todd*,
    2006 U.S. Dist. LEXIS 41182 (S.D. Cal. 2006) ............................................... 17

*Shore v. Costello*,
    1992 U.S. Dist. LEXIS 21784 (N.D. Cal. 1992) .............................................. 20

*Shuster v. Symmetricom, Inc.*,
    1997 U.S. Dist. LEXIS 14007 (N.D. Cal. 1997) .............................................. 17

*Smith v. Network Equip. Tech.*,
    1990 U.S. Dist. LEXIS 18391 (N.D. Cal. 1990) .............................................. 21

*Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) ............................................................................ 20

*Steiner v. Hale*,
    868 F. Supp. 284 (S.D. Cal. 1994) ................................................................... 13

*Stoneridge Invest. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. ---, 128 S. Ct. 761 (2008) .................................................................... 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    ---U.S.---, 127 S. Ct. 2499 (2007) ...................................................... 3, 9, 21, 23

## Statutes

15 U.S.C. §§ 77k, *l*(a)(2) ......................................................................................... 8
            § 77m ................................................................................................. 14
            § 77z-2(b)(2)(D) ............................................................................... 14
            § 78j(b) .............................................................................................. 8
            § 78p ................................................................................................. 22
            § 78u-4(b)(1), (2) .......................................................................... 9, 23
            § 78u-5(b)(2)(D) .............................................................................. 14
            § 78u-5(c) ......................................................................................... 14

21 U.S.C. § 355 ................................................................................................... 5, 6

21 U.S.C. § 1658 ................................................................................................... 13

## Rules

17 C.F.R. § 229.403 ............................................................................................. 22
         § 240.10b-5 ....................................................................................... 8
         § 240.16a-1(a)(2) ............................................................................. 22
         § 240.16a-3(a) .................................................................................. 22

vii

21 C.F.R. § 310 ................................................................................................................ 5

§ 312 ............................................................................................................. 5

§ 312(e) ................................................................................................. 23, 24

§ 312.20(c) ................................................................................................... 5

§ 312.21 ........................................................................................................ 5

§ 312.22 ........................................................................................................ 5

§ 312.32(a) ................................................................................................. 18

§ 312.32(b)-(d) .......................................................................................... 19

§ 312.32(e) ................................................................................................. 18

§ 314 ........................................................................................................ 5, 6

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Threshold Pharmaceuticals, Inc. ("Threshold" or the "Company"), its CEO Harold E. "Barry" Selick, and its former CFO Janet I. Swearson, move for an order dismissing Lead Plaintiffs' Consolidated Amended Class Action Complaint.

## I.    INTRODUCTION

Threshold is a start-up pharmaceutical company, focused on an innovative but unproven approach for treating certain diseased cells such as cancer cells. Scientists had observed that some tumor cells metabolize glucose faster than normal cells. With a technology it called "Metabolic Targeting," Threshold's plan was to exploit this difference to target drug delivery to diseased cells, which was hoped would result in more effective treatment with fewer side effects. One of Threshold's early attempts to employ this new idea was a drug known as TH-070, an apparently promising treatment for a benign prostate condition. The drug failed in clinical development after extensive testing and the expenditure of tens of millions of dollars when a handful of study patients experienced adverse liver reactions and when review of clinical trial data revealed that the treatment was less effective than had been hoped.

Plaintiffs say that the failure of TH-070 was in reality a massive securities fraud. Never mind that investors in Threshold's two public offerings (and those in the aftermarket) were provided registration statements literally brimming over with risk disclosures, including specific disclosures of the most basic risk attendant to any investment in a start-up drug company – that the proposed drug ultimately might not prove safe or effective and gain commercial marketing approval from the U.S. Food and Drug Administration ("FDA"). Plaintiffs' fraud-by-hindsight allegations attempt to craft a story that, from even before Threshold became a public company, Defendants (a) misrepresented whether an early-phase study of TH-070, the so-called "Bari Study," demonstrated the drug's safety and efficacy, and (b) somehow knew that TH-070 caused adverse liver-related side effects. But the Bari Study was never portrayed as Plaintiffs assert; the allegations about liver toxicity are sheer fantasy unsupported by any facts; and much of what Plaintiffs suggest was hidden from investors was in fact present in the very documents that Plaintiffs selectively quote.

1

The Bari Study was the subject of detailed disclosures in both complained-of registration statements and elsewhere.  There could be no confusion that Bari was a limited proof-of-concept study that was never intended or portrayed as a definitive safety and efficacy clinical trial.  Plaintiffs' contrary contention turns the FDA approval process on its head, positing that the safety and efficacy of a new drug is known at the outset.  The entire point of the years-long, multi-million-dollar process for securing FDA approval is to develop clinical data sufficient to *demonstrate* safety and efficacy.  No investor could reasonably have believed TH-070's safety and efficacy was "proved" by the Bari Study, which was disclosed to be a *precursor* to future clinical trials.

Plaintiffs' Bari Study allegations are, however, more fundamentally flawed.  There could have been no confusion about the Bari Study because Threshold made the investigator's report of the study publicly available, including through a May 2005 press release with an internet hyperlink to the full report.  Any investor could have done precisely what securities analysts did (and separately reported) – read the report and see what the study was and was not.  Indeed, nearly all of Plaintiffs' criticisms of the Bari study are lifted – some *verbatim* – from the report itself.  Thus, any material omission from the registration statement for Threshold's initial public offering ("IPO") (and there was none) was revealed no later than May 2005; investors thereafter could not have been misled.  And because the study was made public more than two years before Plaintiffs' lawsuit, claims based on supposed misstatements about the Bari Study are time-barred.

Plaintiffs' other focus – liver toxicity – fares no better.  The suggestion that TH-070 was known before 2006 to have adverse liver-related side effects is unsupported by facts alleged in the Complaint.  And Plaintiffs' contrary assertions ignore that:

- lonidamine, the active compound in TH-070, had been extensively studied and approved by FDA analog agencies in three European countries for treatment of cancer;
- liver toxicity in humans was not noted as a problem in the numerous studies of lonidamine prior to the TH-070 clinical trials; and
- the FDA, having been provided the various prior studies of lonidamine, allowed Threshold to proceed with its Investigational New Drug application ("IND") and its Phase 2 and Phase 3 clinical trials.

In short, Plaintiffs allege no facts (because there are none) that anyone knew or suspected TH-070 would have adverse side effects of the sort first detected in the Spring of 2006.

2

Under pleading standards recently explicated by the United States Supreme Court, the Complaint falls far short. Stripped of their unsupported innuendo, misquotations and irrelevant surplusage, Plaintiffs' claims lack any semblance of plausibility or cogency. For example, while Plaintiffs do not allege that Threshold misled the FDA, they never explain why, if the Bari Study was so incompetent and TH-070's toxicity so apparent, the FDA allowed the Company's clinical trials to proceed. Plaintiffs never explain why, if Threshold was so aware that TH-070 would never work, it spent tens of millions of dollars on supposedly hopeless clinical trials. And Plaintiffs never explain why Dr. Selick and Ms. Swearson, supposedly aware that TH-070 would never gain FDA approval, held onto every single share of their Threshold stock through the class period and beyond.

Far from the "plausible" fact pleading required under *Bell Atl. Corp. v. Twombly*, ---U.S.---, 127 S. Ct. 1955, 1974 (2007), Plaintiffs' theory requires one to assume not only that Defendants were fraudsters, but that they were also willing to endanger human life. Nothing supports this. And it is all the more fantastic because Defendants were apparently so inept with their fraud that they somehow neglected to enrich themselves, while using the money raised from the Threshold stock offerings for precisely the purpose stated in the registration statements – the (supposedly doomed) clinical trials. The Complaint lacks allegations of every accepted touchstone for pleading scienter under the PSLRA and comes nowhere close to presenting the "cogent and compelling" inferences required to state a securities fraud claim. See *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, ---U.S.---, 127 S. Ct. 2499, 2510, 2513 (2007). It must be dismissed.

## II.    FACTUAL BACKGROUND[1]

### A.    The Defendants

Plaintiffs bring their claims against Threshold and two of its officers. Threshold was founded in 2001 and is focused on the development of drugs using Metabolic Targeting. AC ¶ 23. Threshold told investors in the registration statement for its IPO that investing in Threshold was

---

[1] This section is drawn from the Complaint's allegations, documents referenced in it and facts that the Court may properly consider in deciding this motion. *See Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994); *DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1217 (S.D. Cal. 2001). Where a complaint references only excerpts of a document, the Court may consider the entire text, *Cooper v. Pickett*, 137 F.3d 616, 623 (9th Cir. 1997), and documents upon which the complaint necessarily relies, though not explicitly referenced in the complaint, are also appropriately considered by the Court. *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998).

3

very risky in part because Metabolic Targeting was "an unproven approach to therapeutic intervention" that had not produced an FDA-approved drug. IPO R.S. at 10; 10/05 R.S. at 9.[2] Among the conditions to which Threshold sought to apply Metabolic Targeting was benign prostatic hyperplasia ("BPH"), sometimes referred to as enlarged prostate. AC ¶ 2. The condition affects some 52 million men in the United States, Europe and Japan, presenting a large potential market. AC ¶ 40. Threshold's lead drug candidate for BPH was TH-070, which the Company was investigating at the time of its February 2005 IPO. AC ¶¶ 29, 63. Threshold raised $38 million in its IPO, *id.* ¶ 61, and another $62 million in a follow-on offering in October 2005. *Id.* ¶ 75. Plaintiffs allege that these funds were used to conduct the studies needed to secure FDA approval of TH-070 and its other drug candidates. *Id.* ¶ 50.

Harold E. "Barry" Selick is Threshold's Chief Executive Officer and a director. AC ¶¶ 1, 24. He was also a "venture partner" at Sofinnova Ventures, Inc., an early Threshold investor. *Id.* ¶ 9. Plaintiffs allege that Dr. Selick signed registration statements for Threshold's two stock offerings, *id.* ¶ 24, that he spoke during two conference calls with investors, *id.* ¶¶ 71, 87, and that he was quoted in two Company press releases, *id.* ¶¶ 100, 117. While Plaintiffs allege that he received salary, bonus and stock options from the Company, *id.* ¶¶ 5, 145-146, Dr. Selick is not alleged to have sold any Threshold stock during the class period.

Finally, Defendant Janet I. Swearson is Threshold's former Chief Financial Officer and Vice President – Finance and Administration. *Id.* ¶¶ 2, 25. Plaintiffs allege that she also signed the two registration statements. *Id.* ¶ 24. Apart from these facts, details about her salary and other compensation, *id.* ¶¶ 5, 145-146, and that on a conference call with investors she made a statement about Threshold's expenses that Plaintiffs do not challenge, *id.* ¶ 86, Plaintiffs make literally no

---

[2] The exhibits to the concurrently filed Declaration of Alexander Lyon ("Lyon Dec.") are arranged chronologically. The exhibits most frequently cited in this Memorandum are abbreviated as follows: "IPO R.S." (Ex. A) refers to the registration statement for Threshold's February 2005 IPO; "5/19/05 P.R." (Ex. C) refers to a May 19, 2005 Threshold press release; "Bari Study" (Ex. D) refers to the published results of Threshold's early trial of TH-070 in Bari, Italy; "Fortis" (Ex. F) refers to an analyst report issued by Fortis Bank on September 20, 2005; "10/05 R.S." (Ex. G) refers to the registration statement for Threshold's October 2005 follow-on offering; "3/1/06 Tr." (Ex. I) refers to the transcript of a March 1, 2006, investor conference call; "5/11/06 P.R." (Ex. K) refers to a May 11, 2006 Threshold press release; "5/11/06 Tr." (Ex. M) refers to the transcript of a May 11, 2006, investor conference call; and "7/17/06 P.R" (Ex. N) refers to a July 17, 2006 Threshold press release.

DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:07-CV-04972-CW

other substantive allegations about Ms. Swearson.  Like Dr. Selick, Ms. Swearson is not alleged to have sold any Threshold stock during the class period.

**B.    The FDA's Drug Approval Process**

Of course, Threshold could not just begin selling TH-070, or even testing it on patients. Before any drug may be sold in the United States, the manufacturer must demonstrate to experts at the FDA that the drug is safe and effective for its intended use.  21 U.S.C. § 355; *see also Miller v. Pfizer Inc.*, 196 F. Supp. 2d 1095, 1101 (D. Kan. 2002).  A proposed new drug cannot be presumed safe and effective.  Instead, the FDA has a highly regulated, time-consuming and expensive process that a drug company must follow to demonstrate safety and efficacy.  *See generally Abigail Alliance For Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 697 (D.C. Cir. 2007); *see also* 21 C.F.R. Parts 310, 312 & 314 *et seq.*  At each stage, the FDA is involved, reviewing the scientific data and the proposed protocols to ensure that human trials of a proposed new drug are handled safely and that the trials actually yield meaningful data.

The process begins with an IND.  *Miller*, 196 F. Supp. 2d at 1101.  The IND application is itself a huge submission, including detailed specifications of the proposed new drug, all relevant previous scientific research, and a proposed protocol for conducting human clinical trials.  *See* 21 C.F.R. § 312.21-312.22.  It is often an iterative process, with the FDA commenting on the application, and the sponsor modifying the proposed protocol to accommodate the FDA's views. *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 226 (3d Cir. 1990) (detailing stages of FDA review).  A new drug sponsor may not start clinical trials in the United States without giving the FDA 30 days to review and comment on the IND.  21 C.F.R. § 312.20(c).

Clinical investigations are generally divided into three phases.  21 C.F.R. §§ 312.21, 312.22. In the first two, studies are conducted to obtain preliminary evidence of a drug's efficacy and safety.  *Id.*  Phase 3 studies are permitted only after evidence from earlier phases suggests a drug's effectiveness and are intended to gather additional information about effectiveness and safety sufficient to permit the FDA to evaluate the drug for commercial approval.  *Id.*

Only after the clinical trials and other studies specified in the IND appear successful may a drug company submit a New Drug Application ("NDA") asking that the drug be approved for sale.

5

*Miller*, 196 F. Supp. 2d at 1101-02 (citing 21 C.F.R. § 314). A successful NDA must be supported by "full reports of investigations…[showing] whether or not such drug is safe for use, and whether such drug is effective in use." 21 U.S.C. § 355(b)(1)(A). The studies, data submissions, and analysis required to secure FDA approval routinely take years and cost millions of dollars. *See Collagenex Pharm., Inc. v. Thompson*, 2003 U.S. Dist. LEXIS 12523, at *3 (D.D.C. 2003). The outcome for any particular drug candidate is anything but certain.

Because clinical trials are expensive, it is common for drug companies, particularly new companies like Threshold, to raise public funds to conduct the trials. *E.g.*, *Heywood v. Cell Therapeutics, Inc.*, 2006 U.S. Dist. LEXIS 28684, at *4-*5 (W.D. Wash. 2006) ("developmental stage" pharmaceutical company initiated public offering to finance operations during clinical trials).

**C.    Threshold's Development Of TH-070 As A Treatment For BPH**

At the time of its IPO, Threshold was conducting a Phase 2 clinical trial of TH-070 in Bari, Italy. IPO R.S. at 3. Threshold told investors that TH-070 offered the "potential to treat symptomatic BPH," *id.* at 3, 48; however, it warned that "[t]he safety and efficacy of TH-070 for the treatment of symptomatic BPH will need to be demonstrated in subsequent trials." *Id.* at 3.

***TH-070***: The active agent in TH-070 is lonidamine. AC ¶ 37. Lonidamine had been extensively studied and was approved as a treatment for cancer in three European countries in the mid-1980's. *Id.* ¶¶ 38-39, 69, 103. By the time of the Bari Study, it had been used to treat cancer for nearly two decades and had been the subject of at least 80 studies involving thousands of patients. AC ¶¶ 39, 51. Known side effects of the drug revealed in these myriad studies were specifically disclosed in Threshold's registrations statements. *See* IPO R.S. at 10; 10/05 R.S. at 9. Liver toxicity was not among them.

***The Bari Study***: The Bari Study of TH-070, which began in 2004, was "the first study on the use of lonidamine in the treatment of symptomatic BPH." Bari Study at 532; Fortis at 11-12. As the Complaint states, and as Threshold disclosed in its IPO registration statement, the trial was designed to be an open-label (*i.e.*, no placebo) study of 30 patients in each of two dosing arms. AC ¶ 52, IPO R.S. at 48. After receiving "promising interim data" from the first patient group, the second group was not enrolled. AC ¶¶ 56-57; IPO R.S. at 48. At the time of its IPO, Threshold

6

anticipated that a report of the Bari trial would be published within a few months.  AC ¶ 63.

***Bari Study Results Are Published And Reported By Threshold***:  This in fact happened: the investigator's report on the Bari Study was published in May 2005, about three months after the IPO.  Threshold announced the report's publication, and summarized it, in a press release dated May 19, 2005.  5/19/05 P.R.; *see* AC ¶ 74 (alleging June 2005 publication).  The online version of the press release included a hyperlink to a website where the study report was available.  5/19/05 P.R.  The report detailed the findings, noting, among other things, that the trial was a "proof of concept" study without a placebo arm.  AC ¶ 66; Bari Study at 532.  Based on the study's results, the investigator concluded that TH-070 "*may be* a safe and effective new therapeutic alternative for the treatment of BPH in patients at high risk of disease progression." *Id*. at 533 (emphasis added).  The investigator further reported that TH-070 "was well tolerated, with no significant therapy-related side effects" and "no significant changes in serum chemistry except for 1 patient who had a transient 3-fold elevation" of certain liver enzymes.  *Id*. at 531; AC ¶ 78(i).

***Phase 2 And Phase 3 Trials***:  In Summer 2005, Threshold initiated two new clinical trials of TH-070.  AC ¶ 76.  Both trials, a Phase 2 study in the United States and a Phase 3 study in Europe, were designed to evaluate TH-070's safety and efficacy.  *Id*.  Both were randomized, placebo-controlled, blinded studies.  *Id*.  The registration statement for Threshold's follow-on offering included detailed descriptions of these studies.  *Id*.  The main goal of the Phase 2 study was to assess the safety of TH-070 and to measure efficacy at different dosages over 28 days of dosing; it was "not designed to demonstrate statistically significant differences in efficacy as compared to placebo." *Id*.  In contrast, the Phase 3 study was "to assess the safety of TH-070 and to assess its efficacy … compared to placebo." *Id*.  Threshold told investors that "[a]t the completion of this [Phase 3] study, we expect to be able to determine whether [certain dosing of TH-070] is associated with statistically and clinically meaningful differences compared to placebo and if TH-070 is well tolerated in this setting." *Id*.  Threshold disclosed that it expected results from the trials "by the end of 2006." *Id*.  It added, "[w]e expect that further efficacy and safety clinical trials will be necessary to achieve marketing approval." *Id*.  The studies proceeded into 2006.

***The FDA Partial Clinical Hold***:  On May 11, 2006, Threshold announced that the FDA had

7

placed a "partial clinical hold" on its TH-070 program in response to reports of abnormal liver enzyme levels in six patients.  AC ¶ 102.  The Company explained that the abnormalities included three "serious adverse events" ("SAEs") reported from the Phase 3 trial in Europe and three additional observations in other trials.  5/11/06 P.R.; AC ¶ 102.  Following the FDA's action, Threshold decided to stop dosing subjects (which had been completed in the Phase 2 study anyway) and to review the available data.  5/11/06 Tr. at 3-4; AC ¶ 102.

  ***July 17, 2006 Announcement***:  On July 17, 2006, Threshold announced that its data review showed that the Phase 2 and Phase 3 trials had not achieved their primary efficacy endpoints. 7/17/06 P.R.; AC ¶ 117.  Based on the safety and efficacy results of the trials, the Company announced that it would discontinue development of TH-070 for BPH.  7/17/06 P.R.; AC ¶ 117.

## III. ARGUMENT

###  A. Legal And Pleading Standards Applicable To Defendants' Motion

  Plaintiffs assert claims under Sections 11 and 12(a)(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*(a)(2), and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5.  Each claim requires Plaintiffs to allege a material misstatement or omission.  *In re Daou Sys. Inc. Sec. Litig.*, 411 F.3d 1006, 1014, 1027 (9th Cir. 2005); *Miller v. Thane Int'l, Inc.*, 508 F.3d 910, 916 (9th Cir. 2007).  Section 10(b) claims also require plaintiff to plead each defendant's scienter.  *Daou,* 411 F.3d at 1014-15.

  The Supreme Court recently underscored that a complaint must be dismissed unless it contains enough *facts* to state a claim for relief that is "plausible on its face."  *Bell,* 127 S. Ct. at 1974.  Merely pleading "labels and conclusions, [or] a formulaic recitation of the elements of the cause of action" is insufficient, even under Rule 8.  *Id.* at 1964-65.  Rather, a complaint must contain factual allegations that "raise a right to relief above the speculative level."  *Id*.  Thus, where a complaint alleges conduct that is equally consistent with both culpability and innocence, the fact that the plaintiff declares it "culpable" is irrelevant and will not suffice to avoid dismissal.  *Id.* at 1964-66, 1970-73.

  Plaintiffs' claims must also comply with the heightened pleading standards of the PSLRA and Rule 9(b).  Under the PSLRA, Plaintiffs' Section 10(b) claim "must specify each statement

1  alleged to have been misleading [and] the reason or reasons why the statement is misleading….”

2  15 U.S.C. § 78u-4(b)(1). In addition, where (as here) the complaint premises its Section 11 and 12

3  claims on the same conduct as its Section 10(b) claim, the Section 11 and 12 claims must also be

4  pled with particularity. *Daou,* 411 F.3d at 1027-28; *In re Stac Elect. Sec. Litig.*, 89 F.3d 1399,

5  1404-05 (9th Cir. 1996). Plaintiffs’ effort to plead around this rule, *see* AC ¶ 59, is unavailing.

6  *Stac*, 89 F.3d at 1405 n.2 (“nominal efforts” to couch pleading in negligence “are unconvincing

7  where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis

8  for the claims levied in the prospectus.”). The basis for all of Plaintiffs’ claims is that TH-070 was

9  represented to be safe and effective when Defendants knew the opposite to be true – that is, that the

10 representations were fraudulent. AC ¶¶ 66, 71, 88-89, 97 101, 108-09, 115-16.

11      In addition to pleading with particularity why the complained-of statements were false when

12 made, Plaintiffs’ 10(b) claims must “state with particularity facts giving rise to a strong inference

13 that the defendants acted” with scienter. 15 U.S.C. § 78u-4(b)(2); *Daou*, 411 F.3d at 1014-15. In

14 the Ninth Circuit, scienter means “deliberately reckless or conscious misconduct.” *In re Silicon*

15 *Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999) (en banc).

16      In its decision last term in *Tellabs,* the Supreme Court explained that in deciding a motion to

17 dismiss, “a court must consider plausible nonculpable explanations for the defendant’s conduct, as

18 well as inferences favoring the plaintiff.” *Tellabs,* 127 S. Ct. at 2510; *see also Gompper v. VISX,*

19 *Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) (When evaluating scienter, the court “must consider all

20 reasonable inferences to be drawn from the allegations, including inferences unfavorable to the

21 plaintiffs.”). The inferences urged by plaintiff must be “cogent” and “at least as compelling as any

22 opposing inference one could draw from the facts alleged.” *Tellabs,* 127 S. Ct. at 2504-05.

23      These pleading standards, and recent Supreme Court pronouncements, reflect a fundamental

24 concern about the societal and monetary costs associated with unwarranted litigation. *Bell*, 127 S.

25 Ct. at 1966-67; *see also Stoneridge Invest. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. ---,

26 128 S. Ct. 761, 772 (2008) (“allow[ing] plaintiffs with weak claims to extort settlements from

27 innocent companies” could raise cost of doing business, and “shift securities offerings away from

28 domestic capital markets.”); *Tellabs*, 127 S. Ct. at 2504 (securities fraud actions “can be employed

9

abusively to impose substantial costs on companies and individuals whose conduct conforms to the law"); *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 347 (2005) (concern with "permit[ing] a plaintiff 'with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value…."").

In evaluating the Complaint's sufficiency, the Court need not accept legal conclusions asserted as "facts." *Bell Atlantic*, 127 S. Ct. at 1965 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Moreover, the Court may consider not only the Complaint's allegations, but also "other sources courts ordinarily examine when ruling on 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 127 S. Ct. at 2509.

## B. The Complaint Should Be Dismissed Because It Fails To Allege Materially False Statements Or Omissions

To the extent the basis for Plaintiffs' claims can be discerned,[3] it appears to be (1) that supposed deficiencies in the design or implementation of the Bari Study provided no basis for Defendants to make any optimistic statements about the prospects of TH-070, and (2) that Defendants concealed evidence of liver toxicity. *See* AC ¶¶ 64-65, 77-78, 82, 92, 94-95, 102-07, 111. On examination, however, the Complaint reveals no actual material misstatements or omissions about TH-070. *First*, all material facts about the Bari Study that Plaintiffs claim were omitted were in fact disclosed. In addition, Threshold's public statements accurately reflected that TH-070 was *at the beginning* of the FDA's drug approval process; as such, no investor could reasonably have believed that TH-070 had already been proven safe or effective. To the extent Threshold suggested TH-070 was promising, that optimism was qualified with detailed disclosure of specific risks to the drug's development and commercialization, something courts of this Circuit

---

[3] Plaintiffs' pleading approach – repetitively quoting lengthy excerpts of unclear relevance from Threshold's public disclosures (replete with unexplained highlighting), and then vaguely asserting that "[t]aken as a whole" the statements are misleading for multiple reasons – violates Rule 8. Numerous courts faced with labyrinthine securities complaints such as this, which "[leave] it up to defendants and the court to try to figure out exactly what the misleading statements are, and to match the statements with the reasons they are false or misleading," have so held. *E.g., In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 841-842 (N.D. Cal. 2000) (rejecting complaint with lengthy quotations from press releases and analyst reports); *In re Splash Tech. Holdings Secs. Litig.*, 160 F. Supp. 2d 1059, 1075 (N.D. Cal. 2001) (court and defendants had no obligation to painstakingly compare lengthy quoted passages to lists of possible reasons the passages were false).

10

have long held to defeat claims under Sections 11, 12, and 10(b).  *See, e.g., In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407 (9th Cir. 1994).  *Second*, Threshold never withheld any material information regarding the risk of, or incidents involving, liver toxicity.

### 1.    The Allegedly Misleading Statements About The Bari Study

According to Plaintiffs, Defendants' alleged optimistic statements about TH-070's prospects were not justified based on the Bari Study.  Plaintiffs complain that the study was too small, *see* AC ¶¶ 65(a)-(c), 78(a)-(d), that it lacked a placebo control, *id*. at ¶¶ 65(a)-(b), (d)-(e), 78(a), (c), (e)-(f), and that it was not adequately designed to assess TH-070's safety or efficacy, *id* at ¶¶  65(f), 78(g)-(h).  But these assertions are insufficient to allege securities fraud because (1) Defendants disclosed all relevant details about the Bari Study, including precisely the points Plaintiffs complain of; (2) Defendants did so more than two years before Plaintiffs' claims, rendering them time-barred; (3) Plaintiffs mischaracterize Defendants' statements; and (4) Defendants informed investors of the many risks surrounding TH-070 and Threshold with disclosures that negate Plaintiffs' claims under both the "bespeaks caution" doctrine and the PSLRA's safe harbor.

### a.    Defendants Disclosed All Relevant Details Of The Bari Study

To begin, Threshold disclosed in great detail both the scope and results of the Bari Study, including the very elements Plaintiffs say were hidden.  *See* IPO R.S. at 48-49.  *First*, the IPO prospectus itself revealed that the Bari Study was "open-label"[4] – *i.e.*, that the treatment was not concealed from either the doctor or patient and that no placebo was used – that it involved only 30 patients, that a planned second group of 30 more patients was not enrolled based on "promising interim data," and that the Company had decided "to initiate a registrational program for TH-070 to treat symptomatic BPH in the first half of 2005."  *See* IPO R.S. at 48-49.  The IPO registration statement also made clear the preliminary nature of the Bari Study by noting that "[t]he safety and efficacy of TH-070 for the treatment of symptomatic BPH will need to be demonstrated in subsequent trials," *id.* at 3, and more generally that "[s]uccess in preclinical testing and early

---

[4] "Open-label" is defined as "being or relating to a clinical trial in which the treatment given to each subject is not concealed from either the experimenters or the subject."  Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/open%20label (last visited March 6, 2008).

11

clinical trials does not ensure that later clinical trials will be successful," *id.* at 8.

Further, Threshold announced the results of the Bari Study in May 2005 (as it had told IPO investors it would), providing investors a hyperlink and URL to a website that had posted the investigator's report itself.  5/19/05 P.R. at 2.  Among other things, that report stated:

- "This is a 'proof of concept' study in which, however, a placebo arm was not used." Bari Study at 532; *compare* AC ¶¶ 52, 66.

- "the placebo effect … may elicit misleading results, if not properly corrected for, especially considering the small number of patients and absence of a blind run-in period."  *Id.*; *compare* AC ¶¶ 53, 66.

- "50% of the patients were severely symptomatic."  *Id.*; *compare* AC ¶ 54.

Details regarding the scope and results of the Bari Study were reiterated in the registration statement for Threshold's follow-on offering.  *See* 10/05 R.S. at 46-47.

Thus, the only thing actually "omitted" from Threshold's disclosures about the Bari Study was Plaintiffs' disparaging characterization of it, which is inactionable because the underlying facts were disclosed.  *In re SciClone Pharmaceuticals Sec. Litig.*, 1995 U.S. Dist. LEXIS 22054, at *27-*28 (N.D. Cal. 1995) (defendants not required to characterize results of clinical trial where disclosures provided adequate information for investors to form conclusions).

### b.    Plaintiffs' Bari Study Claims Are Time-Barred

Even if one could conjure some omission from the IPO Registration Statement concerning the Bari Study, any claims based on that supposed omission are time-barred because Threshold actually disclosed the full Bari Study no later than May 19, 2005.  As a result of the many disclosures in the IPO prospectus, in the 5/19/05 press release, and in the investigator's report on the Bari Study that was hyperlinked to that press release, the market knew the facts.  *Berry v. Valence Tech., Inc.*, 175 F.3d 699, 703 n.4 (9th Cir. 1999).[5]  Because Plaintiffs' original complaint

---

[5] Plaintiffs' conclusory allegation that the report on the Bari Study "was little noticed by the market," AC ¶ 74, is belied by an analyst report cited in the Complaint that clearly demonstrates the market's awareness and evaluation of the facts reported:

> We caution that the [Bari] trial did not include a placebo run-in (the ongoing trials do include such a run-in), and that the sample size was limited (30 patients at day 28; 25 at day 200). However, as a preliminary proof of concept study, we believe it yielded encouraging data.

Fortis at 12.  In any event, their assertion is irrelevant as Plaintiffs assert a fraud-on-the-market case.  *See* AC ¶¶ 120-27.

12

was filed more than two years after these disclosures, on July 5, 2007, Plaintiffs' claims based on the supposed omissions about the Bari Study come too late as a matter of law and must be dismissed. *See* 28 U.S.C. § 1658(b)(1) (Section 10(b) claim must be brought within two years of discovery); 15 U.S.C. § 77m (Section 11 and 12(a)(2) claims must be brought within one year of discovery); *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1106, 1120-21 (C.D. Cal. 2003) (dismissing Section 11, 12(a)(2) and 10(b) claims on limitations grounds).

          **c.**        **Threshold Never Said The Bari Study Proved Safety and Efficacy**

To read the Complaint, one would think Threshold had raised money by telling investors that the Bari Study proved TH-070's safety and efficacy, and that FDA approval and commercial success were imminent. This is simply untrue, as even a cursory review of Threshold's registration statements and other disclosures make clear. In fact, Threshold said just the opposite, repeatedly explaining that TH-070 was in the early stages of the process and that there remained much clinical work to do – statements that deflate Plaintiffs' claim. *See Steiner v. Hale*, 868 F. Supp. 284, 288 (S.D. Cal. 1994) (dismissing claim against drug company where plaintiffs identified no "confident or unqualified statements that the drug would in fact be successful").

Threshold specifically and repeatedly warned that "the safety and efficacy of TH-070 for the treatment of symptomatic BPH will need to be demonstrated in subsequent trials" and that the Company "expect[ed] that further efficacy and safety clinical trials will be necessary to achieve marketing approval." IPO R.S. at 3; 10/05 R.S. at 2, 48. Indeed, after the full report of the Bari Study was released in May 2005, Threshold said that larger, blinded, placebo-controlled clinical trials were needed "to understand the dose response relationship of TH-070 in men with symptomatic BPH" and "to be able to determine whether the administration [of TH-070] is associated with statistically and clinically meaningful differences compared to placebo and if TH-070 is well tolerated…." 10/05 R.S. at 47-48. Threshold provided detailed descriptions of these planned studies, projecting results by year-end 2006. *Id.* No investor with these disclosures could have believed that TH-070's safety and efficacy for the treatment of BPH had already been proven, based on the Bari Study or otherwise.

13

### d. Threshold Fully Disclosed The Specific Risks Relating To FDA Approval Of TH-070

Even if Defendants' statements concerning TH-070's prospects could be characterized as optimistic, they are inactionable as a matter of law under the "bespeaks caution" doctrine and, with respect to statements made after the IPO prospectus, the PSLRA safe harbor provision.[6]

The bespeaks caution doctrine allows a court to "rule as a matter of law that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 948 (9th Cir. 2005) (quoting *Stac,* 89 F.3d at 1408). The doctrine applies when "optimistic projections coupled with cautionary language…affect[] the reasonableness of reliance on and the materiality of those projections." *Id.* (quoting *Worlds of Wonder,* 35 F.3d at 1414). In other words, where a company divulges "abundant and specific disclosures regarding the risks [it faces], as opposed to terse, generic statements, the investing public is on notice of these risks and cannot be heard to complain that the risks were masked as mere contingencies." *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 832 (C.D. Cal. 1998). Dismissal on the pleadings under the bespeaks caution doctrine is granted upon a showing of "sufficient cautionary language or risk disclosure [such] that reasonable minds could not disagree that the challenged statements were not misleading." *Id.* (quoting *Stac,* 89 F.3d at 1409) (internal quotation marks omitted).

The PSLRA safe harbor, 15 U.S.C. §§ 77z-2(c), 78u-5(c), provides that forward-looking statements are not actionable if they are accompanied by meaningful cautionary language. *Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v.  Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004). Statements pertaining to the prospects for FDA approval are forward-looking and subject to the safe harbor. *Noble Asset Mgmt. v. Allos Therapeutics, Inc.*, 2005 U.S. Dist. LEXIS 24452, at *26 (D. Col. 2005).

This case is the quintessential example of one that must be dismissed under the bespeaks

---

[6] The PSLRA's safe harbor provision does not apply to statements made in connection with an initial public offering, 15 U.S.C. §§ 77z-2(b)(2)(D), 78u-5(b)(2)(D); however the "bespeaks caution" doctrine does apply to Threshold's IPO prospectus. *Infonet*, 310 F. Supp. 2d  at 1091-92 & 1104 n.20.  To the extent any of Defendants' challenged statements consisted of generalized statements of optimism or "puffing," they are not actionable because they are not material. *Glen Holly Entm't, Inc. v. Tektronix, Inc.,* 352 F.3d 367, 379 (9th Cir. 2003).

14

caution doctrine and the PSLRA safe harbor because Threshold repeatedly disclosed the very risks

that Plaintiffs suggest were hidden.  *See, e.g., id.* at *23-27 (statements allegedly exaggerating

chances of FDA approval not actionable where disclosures put investors on notice that approval

was uncertain).  Defendants urge the Court to review Threshold's registration statements to see the

extensive risk disclosures included in those documents.  IPO R.S. at 8-25; 10/05 R.S. at 7-25.  A

small sample of the risk disclosures includes:

- "While we believe that interim results of our Phase 2 trial for TH-070 suggest it may effectively treat symptomatic BPH, there can be no assurance that our registrational program will confirm our interim results, will show that beneficial results of TH-070 will be sustained beyond 28 days, or will lead to regulatory approval."  IPO R.S. at 8; *see also* IPO R.S. at 9-10.

- "There can be no assurance that our ongoing clinical trials for symptomatic BPH will confirm results from our Phase 2 trial in Italy, will show that beneficial results of TH-070 will be sustained beyond 28 days, or will lead to regulatory approval." 10/05 R.S. at 7; *see also* 10/05 R.S. at 8.

- "TH-070…has been investigated by others as a male contraceptive because of its effects on spermatogenesis, fertility and shrinkage of testes in animals.  As a consequence, these may be significant side effects that may or may not be reversible in patients treated with TH-070 for BPH.  Clinical studies to investigate these side effects can be lengthy and expensive, and may be required prior to additional Phase 3 efficacy studies for TH-070.  Furthermore, in clinical trials involving cancer patients at doses significantly higher than the doses of TH-070 currently being investigated for BPH, muscle and testicular pain have been observed.  These side effects or others that could be identified in the course of our clinical trials or that may otherwise be associated with our product candidates may outweigh the benefits of our product candidates.  Side effects may prevent or delay regulatory approval or limit market acceptance if our products are approved."  10/05 R.S. at 9; *see also* IPO R.S. at 10.

- "All of our product candidates are based on Metabolic Targeting, a therapeutic approach that targets fundamental differences in energy metabolism between normal and certain diseased cells.  We have not, nor to our knowledge has any other company received regulatory approval for a drug based on this approach.  There can be no assurance that our approach will lead to the development of approvable or marketable drugs."  10/05 R.S. at 9; *see also* IPO R.S. at 10.

Threshold's other public disclosures, including the press releases and conference calls cited by

Plaintiffs, all included a PSLRA safe harbor disclosure with reference to more extensive disclosures

in the Company's SEC filings – precisely as the safe harbor contemplates.  *See*, *e.g.*, 5/19/05 P.R. at

2-3; 3/1/06 Tr. at 2-3; 5/11/06 P.R. at 2; 5/11/06 Tr. at 2-3.

        These disclosures negate Plaintiffs' suggestion that Defendants misled investors as to the

substantial risks associated with TH-070's development, and investment in Threshold.  As a matter

of law, they render Defendants' statements non-actionable.  *See Worlds of Wonder,* 35 F.3d at

15

1415-21 (prospectus not misleading where it identified the very risks that ultimately undermined

the business); *Infonet Servs.*, 310 F. Supp. 2d at 1091-92 (cautionary language in prospectus meant

investors "could not have been caught off guard" by disappointing number of customers).

### 2.    The Alleged Concealment Of Liver Toxicity

Plaintiffs' accusation that Defendants concealed liver toxicity issues relating to TH-070

throughout the class period fares no better than their contentions about the Bari Study.  Their

allegations reduce to two propositions:  that Threshold should have recognized and disclosed

anecdotal information about liver problems that were not – and are not alleged to have been –

regarded as significant by anyone; and that Threshold was required to disclose reports from its

clinical investigators of significant adverse events ("SAEs") in its ongoing clinical trials before

concluding that the reports indicated something meaningful about TH-070.  As a matter of law,

neither proposition gives rise to a securities claim.

### a.    Potential For Liver Toxicity

Plaintiffs cite a few passing references amidst the mountain of prior research on lonidamine

that mention liver effects, *see* AC ¶¶ 33, 39, 65(f), 69, 70, 72 78(g), 82, and claim that those reports

should have been specifically disclosed by Threshold.  For instance, Plaintiffs say Defendants

overlooked supposed "trends in prior animal and human studies indicating that the drug *might* cause

abnormal liver functions," AC ¶ 65(f) (emphasis added), "reported instances of elevated liver

enzymes in cancer patients who had taken lonidamine," AC ¶ 33, and studies reflecting anecdotal

evidence that plaintiffs say "*could* suggest that lonidamine elevates liver enzymes," AC ¶ 39

(emphasis added).  Plaintiffs also complain that Threshold failed to attribute significance to a

patient in the Bari Study who showed a "*possible* sign of liver malfunction."  AC ¶ 65(g), 78(i)

(emphasis added).[7]  The crux of Plaintiffs' claim appears to be that Defendants (together,

apparently, with all of the many other scientists at Threshold, the facilities around the world that

_____

[7] Plaintiffs criticize the Bari Study because it was not designed to investigate a possible relationship between lonidamine and liver toxicity, and for including in the study patients with already-elevated liver enzymes.  AC ¶¶ 72-73.  But Plaintiffs cannot plead falsity by hindsight second-guessing of the design of Defendants' clinical trials.  *In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp 953, 966 (D. Md. 1995); *Padnes v. Scios Nova Inc.*, 1996 U.S. Dist. LEXIS 22858, at *16 (N.D. Cal. 1996) ("[W]here a company accurately reports the results of a scientific study, it is under no obligation to second-guess the methodology of that study.").

DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:07-CV-04972-CW

1  conducted the prior research, the FDA and others) failed to interpret prior research on lonidamine

2  as reflecting a significant risk of liver toxicity.

3      Plaintiffs' criticism rings hollow because Plaintiffs *admit* that the pre-existing scientific data

4  had, in fact, *not* shown any statistically significant correlation between lonidamine and liver

5  toxicity.  *See* AC ¶¶ 71-72.  Their admission is no surprise:  even the prior studies Plaintiffs cite do

6  not support an inference that liver toxicity was a concern.  For example, Plaintiffs concede that the

7  1991 article they cite merely notes "incomplete information regarding [the] pharmacokinetics [of

8  lonidamine] in humans,"[8] even as it reports that hepatitic *(i.e.,* liver) toxicity as a result of the drug

9  was "rare."  AC ¶ 69.  And while Plaintiffs say a 1996 dog study "found significant liver

10  malfunction occurred at high intravenous doses" of lonidamine, AC ¶ 70, other animal studies

11  involving TH-070 "caused no observable adverse clinical effect on the animals,"  IPO R.S. at 48, a

12  finding Plaintiffs do not dispute.  In any case, Plaintiffs' quibbling over the interpretation of

13  scientific data is insufficient to allege fraud.  *DeMarco,* 149 F. Supp. 2d at 1225 (rejecting claim

14  that defendants' analysis did not accurately capture toxicity).

15      The securities laws simply do not require disclosure of every scintilla of information, such

16  as the few prior references to liver effects and lonidamine, when the universal conclusion was that

17  liver toxicity was not an issue.  *In re Intrabiotics Pharms., Inc.,* 2006 U.S. Dist. LEXIS 56427, at

18  *39-*40 (N.D. Cal. 2006).  "[C]ompanies are not obligated to disclose every potential problem a

19  product may have."  *Shuster v. Symmetricom, Inc.*, 1997 U.S. Dist. LEXIS 14007, at *16 (N.D. Cal.

20  1997).  Indeed, the overdisclosure of insignificant information would hardly aid investors in their

21  evaluation of the total mix of information available.  *In re DNAP Sec. Litig.*, 2000 U.S. Dist. LEXIS

22  13482, at *6-*7 (N.D. Cal. 2000).  On the contrary, "[a]n excess of disclosure can have the same

23  net effect as a dearth of it – the shareholder misses the relevant information."  *SEC v. Todd*, 2006

24  U.S. Dist. LEXIS 41182, at *12 (S.D. Cal. 2006).

25          **b.    Liver Toxicity Reports From Later TH-070 Clinical Trials**

26      On May 11, 2006, Threshold announced that the FDA had placed a partial clinical hold on

27

28      [8] "Pharmacokinetics" refers to "[t]he process by which a drug is absorbed, distributed, metabolized, and eliminated by the body."  The American Heritage Dictionary of the English Language 1316 (4th ed. 2000).

17

the U.S. portion of its TH-070 clinical development program "[a]s a result of abnormalities observed in liver enzyme levels in 6 subjects in ongoing clinical trials," including three SAEs. 5/11/06 P.R.; AC ¶ 102.  Plaintiffs allege that Threshold was aware of all three SAEs in or before April 2006, that it reported one of them to the FDA on April 10, 2006, and that Defendants' failure to disclose the SAEs publicly before May 11, 2006 was fraudulent.  AC ¶¶ 99-101, 111.  These allegations do not state a claim.

Negative clinical results such as SAEs are not material, and therefore need not be disclosed, unless and until those adverse events reach a statistically significant level sufficient to threaten a drug's commercial prospects.  *In re Carter-Wallace, Inc., (Carter-Wallace I)* 150 F.3d 153, 157 (2d Cir. 1998); *see also In re Carter-Wallace, Inc., (Carter-Wallace II)* 220 F.3d 36, 38, 40-41 (2d Cir. 2000) (no obligation to disclose more than 50 SAEs because their existence did not prove problems with the drug); *Oran v. Stafford,* 226 F.3d 275, 284 (3d Cir. 2000) (no obligation to disclose heart valve problems in 20 patients before scientifically significant link to drug was found); *In re Bayer AG Sec. Litig.,* 2004 U.S. Dist. LEXIS 19593, at *29-*30 (S.D.N.Y. 2004) (no duty to disclose until some scientific consensus had formed about side effects).  This is because the FDA broadly defines what constitutes an SAE to encompass many incidents – for example any hospitalization, incapacity or death of a clinical trial participant – whatever their cause.  *See* 21 C.F.R. § 312.32(a).  In other words, people who participate in clinical trials, many of whom are ill to begin with, can experience adverse effects or even die for reasons wholly unrelated to the new drug.  *See* 21 C.F.R. § 312.32(e) (report of an adverse event to the FDA does not reflect a conclusion that it was caused by the drug). When an SAE occurs, it must be investigation specifically to determine *whether* the SAE resulted from the drug being tested.  And it takes some time to determine whether the drug caused the event and whether the event is likely to recur.[9]  Mandating disclosure before that determination would be illogical and counterproductive to investors.  *Carter-Wallace I,* 150 F.3d at 155 (no duty to disclose while "justifiably … accumulating more evidence regarding the possible adverse side effects in

---

[9]  Indeed, in a blinded, placebo-controlled study of the sort Threshold was conducting on TH-070 in Spring 2006, it takes time and an appropriate process (so as not to destroy the blinded nature of the study as to other patients) even to determine whether the person experiencing the adverse event was actually receiving the therapeutic agent.

order to dissect … the incoming reports") (internal citation and quotation marks omitted).

Plaintiffs allege only that (i) SAEs occurred, (ii) Defendants were "discussing" and "investigating" them, and (iii) they were reported to the FDA. AC ¶¶ 99, 109. But Threshold was required to investigate all SAEs and to report to the FDA any that might possibly relate to TH-070. 21 C.F.R. § 312.32(b)-(d). Thus, the fact that SAEs occurred and were reported cannot suffice. Without factual allegations indicating that, at the time of complained-of statements, there was a known, scientifically established correlation between liver toxicity findings and TH-070, Plaintiffs' SAE allegations go nowhere. *Intrabiotics,* 2006 U.S. Dist. LEXIS 56427, at *34 (no claim stated based on undisclosed SAEs without alleging a scientifically established connection to the drug).[10]

### 3.    Plaintiffs' Misquotations Cannot Support Claims Of Falsity

Plaintiffs' claims of falsity also fail to the extent they rely upon misquotations of statements made by Dr. Selick and by Dr. Alan Colowick, Threshold's former Chief Medical Officer, on investor conference calls. The misquotations are demonstrable; and the *actual* statements reveal no falsity at all.

Plaintiffs assert that during a March 1, 2006 conference call, Dr. Selick stated that "These data [from the Bari Study] is replicated in our currently ongoing study suggest that TH-070 may address both goals of therapy for the treatment of BPH…" AC ¶ 87. Not so. What Dr. Selick actually said was "These data, *if* replicated in our currently ongoing studies, suggest that…" 3/1/06 Tr. at 4-5 (emphasis added). Plaintiffs further allege that, during the same call, Dr. Selick said "The ongoing studies replicate what we've already demonstrated in our single center Phase II study and TH-070 lonidamine is going to be truly a home run for patients." AC ¶ 87. What Dr. Selick actually said here was "*If* the ongoing studies replicate what we've already demonstrated in our single center Phase II study, *then* TH-070 *in my opinion* is going to be truly a home run for

_____

[10] Plaintiffs make a somewhat related claim that Defendants' May 11, 2006 announcement regarding the FDA's partial clinical hold was incomplete because it failed to reveal the true extent of the observed liver toxicity findings. AC ¶¶ 102-107. This claim fails, however, because the Complaint does not identify any additional detail about liver toxicity that was not disclosed, much less information that investors would have considered material. Plaintiffs seek to infer falsity from the fact that the Company's stock fell from its May 11, 2006 level on July 17, 2006, when the Company announced its plans to discontinue the TH-070 program. But a stock price drop alone does not establish that Defendants' statements were false. *In re Quarterdeck Office Sys., Inc. Sec. Litig.,* 1992 U.S. Dist. LEXIS 21411 (C.D. Cal. 1992).

patients." 3/1/06 Tr. at 10-11 (emphasis added). Thus, with both misquotations, Plaintiffs take conditional statements about what might happen in the future and transmogrify them into assertions of current fact.[11]

Plaintiffs also misquote Dr. Colowick, and then rely on that misquotation as their sole basis to contend that Threshold misleadingly attempted "to downplay the significance of the liver toxicity issues" during its May 11, 2006 conference call. AC ¶ 105, 106. Plaintiffs assert that Dr. Colowick, in discussing the study investigators' decision to classify a patient event as an SAE, stated that "we, quite frankly, weren't in agreement with that." AC ¶ 105. Dr. Colowick actually stated "we, quite frankly, *were* in agreement with that." 5/11/06 Tr. at 16 (emphasis added). Again, the misquotation is groundless and cannot support a claim of falsity.

### 4. Section 10(b) Claims Against The Individual Defendants May Not Be Based On Statements They Did Not Make

Plaintiffs cannot base a Section 10(b) claim against Dr. Selick or Ms. Swearson on statements these individuals are not alleged to have made. Plaintiffs do not identify a single supposedly misleading statement made by Ms. Swearson, so the Section 10(b) claim against her must be dismissed except to the extent it is based on alleged falsity in Threshold's registration statements. *E.g.*, *In re ESS Tech., Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 27203, at *38-*39 (N.D. Cal. 2004) (plaintiffs must "state, with particularity, facts indicating that the individual defendant was directly involved in the preparation of the allegedly misleading statements").

Plaintiffs rely on the tired "group pleading" doctrine as the basis for their 10(b) claims. AC ¶ 128. But as court after court has concluded, the doctrine is no longer viable given the PSLRA's requirement that Plaintiffs plead *each* defendants' alleged conduct and state of mind. *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 364-65 (5th Cir. 2004); *see also In re NextCard, Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 16156, at *11-*12 (N.D. Cal. 2006) (group

---

[11] These misquotations taint paragraph after paragraph in the Complaint in which Plaintiffs assert – based on nothing more than their own misquotations – that Dr. Selick and others had, by March 1, 2006, already seen data from the Phase 2 and Phase 3 clinical trials that called the safety and efficacy of TH-070 into question. *E.g.*, AC ¶ 88, 89, 95, 96, 97. Apart from the misquotation, Plaintiffs allege no facts from which to infer that the Company had "unblinded" the trials by this time. Because the Court may take judicial notice of what Dr. Selick actually said, *Silicon Graphics*, 183 F.3d at 986, it need not accept Plaintiffs' erroneous pleading. *Shore v. Costello*, 1992 U.S. Dist. LEXIS 21784, at *6-*7 (N.D. Cal. 1992).

20

pleading "appears to be totally inconsistent with the particularity requirements of the PSLRA"); *In re Syncor Int'l Corp. Sec. Litig.*, 327 F. Supp. 2d 1149, 1171-72 (C.D. Cal. 2004) (conflicts with the Ninth Circuit's interpretation of scienter under the PSLRA); *In re Immune Response Secs. Litig.*, 375 F. Supp. 2d 983, 1029-31 (S.D. Cal. 2005) (inconsistent with the spirit of the PSLRA).[12]

### C.    Plaintiffs' Allegations Do Not Support A Strong Inference Of Scienter

To state a Section 10(b) claim, Plaintiff must allege with particularity facts that would give rise to a "strong inference" that the Defendants engaged in conscious or deliberately reckless misconduct. *Silicon Graphics*, 183 F.3d at 974. A "strong" inference is one that a reasonable person would find cogent and at least as compelling as any opposing inference one could draw from the facts alleged. *Tellabs*, 127 S. Ct. at 2404-05. The Complaint, which alleges *none* of the accepted indicia of scienter, falls far short of this high standard.

### 1.    Far From Cogent Or Compelling, Plaintiffs' Premise Is Nonsensical

Plaintiffs' theory appears to be that Defendants used the Bari Study to create the appearance of early positive results for TH-070 so that Threshold could raise money from public investors to sponsor more studies of TH-070, all the while knowing that the drug would turn out to be unsafe and ineffective. *See* AC ¶¶ 43-58. The theory verges on the absurd, and the factual allegations underlying it do not support a cogent and compelling inference of scienter.

Plaintiffs do not dispute that Threshold used its stock-offerings proceeds for precisely the purpose it said it would – to conduct clinical trials of TH-070 and its other drug candidates. Defendants' conduct thus negates an inference of scienter because it shows that Defendants believed TH-070 had promise. *Worlds of Wonder,* 35 F.3d at 1425 (continued spending on research and development of new products negated scienter); *Oppenheim Pramerica Asset Mgt. S.A.R.L. v. Encysive Pharm., Inc.,* 2007 U.S. Dist. LEXIS 69121 (S.D. Tex. 2007) (use of offering

---

[12] Even if group pleading were still generally permissible, it could not support Plaintiffs' claims against Ms. Swearson because to invoke the doctrine, a plaintiff must plead facts showing that the person, by reason of his or her role within the company, would logically have been part of the decisionmaking concerning a complained-of disclosure – *i.e.,* was part of the "group." *E.g., Pegasus Holdings v. Veterinary Ctrs. of America,* 38 F. Supp. 2d 1158, 1166 (C.D. Cal. 1998); *Smith v. Network Equip. Tech.,* 1990 U.S. Dist. LEXIS 18391, at *13-*15 (N.D. Cal. 1990). The Complaint is devoid of facts suggesting why Ms. Swearson, as CFO, would have been involved in evaluating clinical trial data or disclosures about it. Notably, the Complaint contains no allegations directed to Threshold's accounting or reported financial results.

21

1  proceeds to develop drug negated scienter).  It is implausible, not cogent and compelling, to posit

2  that Defendants would expend time and money on clinical trials of a drug they knew would fail.

3         Plaintiffs' theory is rendered even less plausible by the fact that Defendants never tried –

4  even according to the Complaint – to capitalize on the supposed fraud.  The Complaint does not

5  allege that Dr. Selick or Ms. Swearson sold even one share of their stock.  *See Worlds of Wonder*,

6  35 F.3d at 1425 (insiders' continued stock holding showed their belief in the company's future).

7         Plaintiffs contend that Dr. Selick benefited, not by selling his own stock, but rather through

8  the sale of stock by a venture investor in Threshold with which he was affiliated.  Plaintiffs allege

9  that Dr. Selick had a "carried interest" in a Sofinnova company and "presume" that company to be

10 Threshold.  AC ¶ 133.  This is yet another instance of Plaintiff alleging "facts" that are

11 demonstrably incorrect.  Plaintiffs all but admit they have no basis for the allegation, *see id.* n.9,

12 because Plaintiffs know that if Dr. Selick had held a beneficial interest in Threshold through an

13 affiliation with Sofinnova, it would have been disclosed in Threshold's registration statements (*see*

14 SEC Form S-1, Item 11(m); 17 C.F.R. § 229.403); and no such affiliation was disclosed.  IPO R.S.

15 at 75-78; 10/05 R.S. at 78-81.  They also know that if Dr. Selick stood to benefit from Sofinnova's

16 sale of Threshold stock, that fact would have had to be disclosed in the SEC Form 3 disclosing Dr.

17 Selick's beneficial ownership of Threshold stock and the SEC Form 4 relating to Sofinnova's

18 holdings, including its sale.  15 U.S.C. § 78(p); 17 C.F.R. §§ 240.16a-1(a)(2), 240.16a-3(a).  This

19 also did not happen.  *See* Lyon Dec. Exs. B, J (2/3/05 SEC Form 3 re Dr. Selick's beneficial

20 ownership and 3/20/06 SEC Form 4 re Sofinnova March 2006 sale disclosing beneficial ownership

21 of persons other than Dr. Selick).  Plaintiffs' "presumption" has no basis in fact, and certainly is

22 insufficient to create an inference of anything, much less a cogent and compelling one.[13]

23        Ultimately, the only plausible inference to be drawn from the alleged facts is that Threshold

24 identified a promising drug candidate that could help a large patient population, embarked down the

25 path of clinical development, but had to withdraw the drug when clinical trials failed to confirm the

26 _____

27 [13] Plaintiffs also allege that Dr. Selick and Ms. Swearson received salary and bonus, and that this compensation was adjusted from time to time.  *See* AC ¶¶ 145-47.  Allegations like these – of facts so general that they could be said of essentially every executive at every company – are

28 insufficient to support an inference of scienter.  *In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1087 (N.D. Cal. 2003); *Autodesk*, 132 F. Supp. 2d at 844.

initially promising results. Against this logical and coherent story, which is supported by all the facts (including those in the Complaint), Plaintiffs' theory that Defendants raised and expended millions of dollars on a concept that they knew would never work, while failing to cash in on the ruse, is nonsensical. At a minimum, it is neither cogent nor as compelling as the non-culpable inference that can be drawn from the same facts. As a result, the Complaint must be dismissed. *Tellabs*, 127 S. Ct. at 2510, 2513.

### 2. Plaintiffs' Other Scienter Allegations Are Also Insufficient

Plaintiffs put forward various other assertions that they say imply scienter. They are wrong. Under the PSLRA, the inquiry is whether Plaintiffs plead particularized facts giving rise to a strong inference that "the defendant" – that is, a particular person – acted with the requisite state of mind. 15 U.S.C. § 78u-4(b)(2). Allegations about other people's conduct – that is, scienter by imputation – is insufficient. *See In re Apple Computer, Inc. Sec. Litig.,* 243 F. Supp. 2d 1012, 1023, 1028 (N.D. Cal. 2002) (noting Ninth Circuit's rejection of "collective scienter").[14] In any case, Plaintiffs' allegations about non-defendants' conduct and knowledge are generally benign, and are certainly insufficient to support a cogent and compelling theory of wrongdoing.

- ***Alleged Knowledge Of Clinical Trial Data***: AC ¶ 66, 89, 95, 97-98, 109, 111. Apart from misquoting Dr. Selick, *see infra* Part III(B)(3), Plaintiffs offer only rank speculation that someone at Threshold had early access to clinical trial data.[15] This is inadequate: the heightened pleading standard in a failed-drug case requires a plaintiff to explain *what* data defendants received, *who* reviewed it and *how* it showed that public statements were false. *Steiner*, 868 F. Supp. at 287; *see also Intrabiotics,* 2006 U.S. Dist. LEXIS 56427 at *29-31 (allegations that defendants reviewed Case Report Forms ("CRFs") insufficient where contents of CRFs not alleged); *Cell Therapeutics,* 2006 U.S. Dist. LEXIS 28684, at *17 (failure to allege when the CRFs were reviewed, how many were examined and in what context).

- ***Communications With The FDA***: AC ¶ 10, 97, 99. Plaintiffs say they have pled scienter because "in April 2006," Threshold discussed reports of SAEs with the FDA but did not disclose this publicly. For the reasons discussed above, a sponsor's report of an SAE to the FDA does not, as a matter of law, "reflect a conclusion by the sponsor or FDA…that the drug caused or contributed to an adverse experience." 21 C.F.R. §

---

[14] With respect to a corporate entity such as Threshold, this means that *specific* information must be attributed to *specific* individuals responsible for the Company's statements. *See Apple,* 243 F. Supp. 2d at 1023. Plaintiffs' general assertions that "defendants," "Threshold," or "employees of Threshold's clinical department" were aware of "liver toxicity issues," "liver toxicity events" or "liver toxicity problems," AC ¶¶ 97, 99, 101, 109, are insufficient.

[15] The suggestion that Threshold would have had such access is inconsistent with the allegations that the trials post-Bari were blinded, controlled studies. *See* AC ¶¶ 76, 87.

23

312(e); *see also infra* Part III(B)(2)(b).[16]

- **_Stock Sales By Sofinnova And Three Arch_**: AC ¶¶ 130-43. Stock sales in early March 2006 by two of Threshold's venture investors, Sofinnova and Three Arch, do not support an inference of scienter against Defendants. First, Three Arch retained 2.44 million shares or 71% of its investment, and Sofinnova retained 878,200 shares or 25% of its investment. *See id.* at ¶ 140; Lyon Dec. Ex. J (Form 4). Second, there was nothing surprising about the venture investors' sales because Threshold repeatedly disclosed that the large pre-IPO investors might sell substantial portions of their investments after the expiration of their lock-up agreements. IPO R.S. at 24-25; 10/05 R.S. at 24-25; *see Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (stock sales must be unusual in timing or amount to support inference of scienter).

- **_Tidmarsh's Resignation From The Board_**: AC ¶¶ 98, 139-43. The resignation of Threshold founder George Tidmarsh from the board of directors in March 2006 suggests nothing suspicious. Dr. Tidmarsh had resigned as Threshold's President seven months earlier, and gave precisely the same reason for both resignations – to pursue new endeavors. *See* Lyon Dec. Ex. E (8/18/05 Press Release); 10/05 R.S. at 78. "The resignation of a high level executive, by itself, surely cannot be taken to strongly imply the requisite scienter…." *In re Read-Rite Corp. Sec. Litig.*, 115 F. Supp. 2d 1181, 1184 (N.D. Cal. 2000); *In re Impax Labs, Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 52356, (N.D. Cal. 2007).

- **_Announcement Of Additional Clinical Trials_**: AC ¶¶ 84-86, 98, 115(a). Threshold's March 2006 announcement that it planned additional clinical trials of TH-070 does not support an inference that Defendants knew TH-070 was unsafe or ineffective. Threshold repeatedly told investors that its TH-070 program would include additional trials. *See* IPO R.S. at 3, 8, 49; 10/05 R.S. at 7, 9, 47-48. Far from suggesting scienter, the announcement is further support for the competing, non-culpable inference that the Company was diligently pursuing its drug development program.

While the flaws with these so-called scienter allegations differ – some are misleading, others innocent, and still others simply vague – they fail to meet the standard mandated by *Tellabs*. Plaintiffs' Section 10(b) claim must be dismissed.

### D.    The Control Person Claims Fail For Lack Of A Primary Violation

Plaintiffs "control person" claims under Section 15(a) of the Securities Act and Section 20(a) of the Exchange Act both require a primary violation of the respective Acts. Because they fail to plead a primary violation of either Act, the control person claims fail as well. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 (9th Cir. 2002); *Daou,* 411 F.3d at 1029-30.

---

[16]  Plaintiffs use innuendo rather than specific pleading to suggest nefarious conduct when none is indicated by the facts actually alleged. *See* AC ¶¶ 10, 99. "In April 2006" is a 30-day period of time, with the latter part of the month pre-dating the actual disclosure by only a few days. Plaintiffs' insinuations in the Complaint that Threshold knew of three SAEs by the early part of April, *see id.* ¶¶ 97, 109, is entirely without support. Plaintiffs' "CW 6," an administrative assistant who Plaintiffs concede was in no position to have personal knowledge about the SAEs, *id.* ¶ 111, does not offer the needed support. *See Vertex*, 357 F. Supp. 2d at 353 (rejecting anonymous witness allegations where witness claimed no personal knowledge); *Cell Therapeutics*, 2006 U.S. Dist. LEXIS 28684, at *18 (rejecting anonymous witness allegations that lacked specificity).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiffs' Complaint must be dismissed.

Dated:  March 7, 2008                    HELLER EHRMAN LLP


By /s/ _____
          Michael L. Charlson

Attorneys for Defendants
THRESHOLD PHARMACEUTICALS, INC.,
HAROLD E. "BARRY" SELICK
and JANET I. SWEARSON