1   COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
2   DENNIS J. HERMAN (220163)
    DANIEL J. PFEFFERBAUM (248631)
3   100 Pine Street, Suite 2600
    San Francisco, CA  94111
4   Telephone:  415/288-4545
    415/288-4534 (fax)
5   dherman@csgrr.com
    dpfefferbaum@csgrr.com
6
    Lead Counsel for Plaintiffs
7
                        UNITED STATES DISTRICT COURT
8
                        NORTHERN DISTRICT OF CALIFORNIA
9
                                OAKLAND DIVISION
10
11  JERRY TWINDE, On Behalf of Himself and  )   No. 4:07-cv-04972-CW
    All Others Similarly Situated,           )
12                                           )   CLASS ACTION
                            Plaintiff,       )
                                             )
13         vs.                               )
                                             )
14  THRESHOLD PHARMACEUTICALS, INC.,         )
    et al.,                                  )
15                                           )
                            Defendants.      )
16  _____   )
    RAYNOLD L. GILBERT, On Behalf of         )   No. 4:07-cv-04971-CW
17  Himself and All Others Similarly Situated, )
                                             )   CLASS ACTION
18                          Plaintiff,       )
                                             )
19         vs.                               )
                                             )   DATE:          June 12, 2008
20  THRESHOLD PHARMACEUTICALS, INC.,         )   TIME:          2:00 p.m.
    et al.,                                  )   COURTROOM:     Hon. Claudia Wilken
21                                           )
                            Defendants.      )
22  _____   )
23
24         PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
25
26
27
28

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................1

II.   SUMMARY OF ALLEGATIONS ........................................................4

III.  ARGUMENT .....................................................................................6

    A.    Defendants Initially Violated the Securities Act by Negligently Publishing Materially False and Misleading Information About TH-070 in the Registration Statements for Threshold's Initial Public Offering and Prospectus/Follow-On Offering ................................................................6

        1.    The Prospectuses and Registration Statements Misled Investors About the Reliability and Significance of the Bari Study Results ..............8

            a.    Defendants Did Not Disclose "All Relevant Details" of the Bari Study .................................................................................9

            b.    The Publication of the Bari Study Report Did Not Reveal the Truth to the Market ................................................................11

            c.    Plaintiffs' Claims Are Not Time-Barred........................................14

        2.    The Risk Warnings in the Registration Statements Were Neither Meaningful Nor Complete ..........................................................15

            a.    Neither the Safe Harbor Nor the Bespeaks Caution Doctrine Supports Dismissal of the Complaint ............................16

            b.    Threshold Was Required to Disclose the Specific Risk of Liver Toxicity Associated with TH-070 ........................................18

    B.    Defendants Committed Fraud by Deliberately Concealing Known Liver Toxicity Problems After They Arose and Making Baseless Claims About the Efficacy of TH-070 in the Ongoing Clinical Trials ................................21

        1.    Defendants' Denial that Selick Falsely Claimed TH-070 Was a "Home Run" Because Phase 2 Data Had Been "Replicated" in the Clinical Trials Provides No Ground to Dismiss the Complaint................23

        2.    Threshold Misled Investors by Making Positive Announcements About the Clinical Trials Without Disclosing the Negative Liver Toxicity Problems that Had Arisen............................................................24

        3.    When the FDA Hold Was Announced, Defendants Made Baseless Claims About the Continued Prospects for TH-070 ................................28

    C.    Defendants' Exorbitant Bonuses and Rich Compensation Packages, Together with Stock Sales by Related Parties, Lends Additional Support for a Strong Inference of Scienter ........................................................30

1

2                                                                                                         **Page**

3          D.       The Individual Defendants "Made" the Misleading Statements Giving
                    Rise to Plaintiffs' Claims ..........................................................................................33

4

5          E.       Defendants Concede that They Are Control Persons Within the Meaning
                    of §15 of the Securities Act and §20(a) of the Exchange Act .............................34

6    IV.    CONCLUSION.............................................................................................................35

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

Page

3

*Asher v. Baxter Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004) ..........................................................................16

4

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)........................................................................................18

5

6

*Bell Atlantic Corp. v. Twombly*,
    127 S. Ct. 1955 (2007)....................................................................................22

7

*Cahill v. Liberty Mut. Ins. Co.*,
    80 F.3d 336 (9th Cir. 1996) ..............................................................................6

8

9

*City Nominees, Ltd. v. Macromedia, Inc.*,
    No. 98-16058, 2000 U.S. App. LEXIS 8201
    (9th Cir. Apr. 21, 2000) ..................................................................................15

10

11

*Commc'ns Workers of Am. Plan for Employees' Pensions
    & Death Benefits v. CSK Auto Corp.*,
    No. CV06-1503-PHX-DGC (Lead), 2007 U.S. Dist. LEXIS 72424
    (D. Ariz. Sept. 27, 2007)................................................................................22

12

13

*Danis v. USN Commc'ns Inc.*,
    73 F. Supp. 2d 923 (N.D. Ill. 1999) ...............................................................30

14

*Eminence Capital, LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ........................................................................35

15

16

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)..........................................................................................6

17

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ...............................................................16, 18, 25

18

19

*Fla. State Bd. of Admim. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) ..........................................................................33

20

*Gargiulo v. Demartino*,
    527 F. Supp. 2d 384 (E.D. Pa. 2007) ...............................................15, 16, 19

21

22

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ..........................................................................33

23

*Herman & MacLean v. Huddleston*,
    459 U.S. 375, 381-82 (1983) ........................................................................6, 7

24

25

*Hollinger v. Titan Capital Corp.*,
    914 F.2d 1564 (9th Cir. 1990) ........................................................................34

26

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ........................................................................34

27

28

1

2                                                                                    **Page**

3
4   *In re Amgen, Inc. Sec. Litig.,*
        No. CV 07-2536 PSG (PLAx), 2008 U.S. Dist. LEXIS 24611
5       (C.D. Cal. Feb. 1, 2008).................................................................................13, 25

6   *In re Amylin Pharm., Inc. Sec. Litig.,*
        No. 01cv1455 BTM(NLS), 2003 U.S. Dist. LEXIS 7667
7       (S.D. Cal. May 1, 2003)..........................................................................11, 17, 19

8   *In re Amylin Pharm., Inc. Sec. Litig.,*
        No. 01cv1455 BTM(NLS), 2002 U.S. Dist. LEXIS 19481
9       (S.D. Cal. Oct. 10, 2002) .............................................................21, 27, 30, 33

10  *In re Bank of Boston Corp. Sec. Litig.,*
        762 F. Supp. 1525 (D. Mass. 1991) ....................................................................11

11  *In re Bayer AG Sec. Litig.,*
        No. 03 Civ. 1546 (WHP), 2004 U.S. Dist. LEXIS 19593
12      (S.D.N.Y. Sept. 30, 2004)...................................................................................25

13  *In re Carter-Wallace, Inc. Sec. Litig.,*
        150 F.3d 153 (2d Cir. 1988)................................................................................25
14
    *In re Carter-Wallace Sec. Litig.,*
15      220 F.3d 36 (2d Cir. 2000)..................................................................................26

16  *In re Daou Sys., Inc. Sec. Litig.,*
        411 F.3d 1006 (9th Cir. 2005) .................................................................... *passim*
17
    *In re Entropin, Inc., Sec. Litig.,*
18      487 F. Supp. 2d 1141 (C.D. Cal. 2007) .......................................................30, 33

19  *In re GlenFed, Inc. Sec. Litig.,*
        60 F.3d 591 (9th Cir. 1995) ................................................................................34
20
    *In re Immune Response Sec. Litig.,*
21      375 F. Supp.  2d 983 (S.D. Cal. 2005)....................................................... *passim*

22  *In re Impax Labs.,*
        No. C 04-04802 JW, 2007 U.S. Dist. LEXIS 52356
23      (N.D. Cal. July 18, 2007).............................................................................28, 31

24  *In re Intrabiotics Pharm., Inc. Sec. Litig.,*
        No. C 04-02675 JSW, 2006 U.S. Dist. LEXIS 56427
25      (N.D. Cal. Aug. 1, 2006)......................................................................................19

26  *In re Intrabiotics Pharm., Inc. Sec. Litig.,*
        No. C 04-02675 JWS, 2006 U.S. Dist. LEXIS 15753
27      (N.D. Cal. Jan. 23, 2006) .....................................................................................7

28

1

2                                                                                          **Page**

3    *In re JDS Uniphase Corp. Sec. Litig.*,
         No. C 02-1486 CW, 2005 U.S. Dist. LEXIS 20831
4        (N.D. Cal. Jan. 6, 2005) ...................................................................................7

5    *In re Livent, Inc. Sec. Litig.*,
         148 F. Supp. 2d 331 (S.D.N.Y. 2001)...........................................................14
6
     *In re Medimmune, Inc., Sec. Litig.*,
7        873 F. Supp. 953 (D. Md. 1995) ....................................................................10

8    *In re NPS Pharm., Inc. Sec. Litig.*,
         No. 2:06-cv-00570, 2007 U.S. Dist. LEXIS 48713
9        (D. Utah July 3, 2007)............................................................................ *passim*

10   *In re Oak Tech. Sec. Litig.*,
         No. 96-20552 SW, 1997 U.S. Dist. LEXIS 18503
11       (N.D. Cal. Aug. 1, 1997)................................................................................26

12   *In re PETsMART, Inc. Sec. Litig.*,
         61 F. Supp. 2d 982 (D. Ariz. 1999) ...............................................................33
13
     *In re Portal Software, Inc. Sec. Litig.*,
14       No. C-03-5138 VRW, 2006 U.S. Dist. LEXIS 61589
         (N.D. Cal. Aug. 17, 2006).................................................................................7
15
     *In re Regeneron Pharm., Inc. Sec. Litig.*,
16       No. 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350
         (S.D.N.Y. Feb. 3, 2005)..................................................................................17
17
     *In re Silicon Graphics, Inc. Sec. Litig.*,
18       183 F.3d 970 (9th Cir. 1999) ...................................................................21, 32

19   *In re SmarTalk Teleservices, Inc. Sec. Litig.*,
         124 F. Supp. 2d 527 (S.D. Ohio 2000) .........................................................34
20
     *In re Stac Elecs. Sec. Litig.*,
21       89 F.3d 1399 (9th Cir. 1996) ............................................................................7

22   *In re  Stratosphere Corp. Sec. Litig.*,
         1 F. Supp. 2d 1096 (D. Nev. 1998).................................................................34
23
     *In re Vantive Corp. Sec. Litig.*,
24       283 F.3d 1079 (9th Cir. 2002) ........................................................................21

25   *In re Viropharma, Inc., Sec. Litig.*,
         No. 02-1627, 2003 U.S. Dist LEXIS 5623
26       (E.D. Pa. Apr. 7, 2003) ....................................................................................3

27   *In re Worlds of Wonder Sec. Litig.*,
         35 F.3d 1407 (9th Cir. 1994) ..........................................................................33

28

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS -      - v -
4:07-cv-04972-CW

**Page**

*Kaplan v. Rose*,
    49 F.3d 1363 (9th Cir. 1994) ................................................................ *passim*

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) ........................................................2, 3

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
    403 F.3d 1050 (9th Cir. 2005) ....................................................16

*Miller v. Thane Int'l, Inc.*,
    No. 05-56043, 2008 U.S. App. LEXIS 5687
    (9th Cir. Mar. 18, 2008) .............................................................12

*Miss. Pub. Employees' Retirement Sys. v. Boston Scientific Corp.*,
    No. 07-1794, 2008 U.S. App. LEXIS 8140
    (1st Cir. Apr. 16, 2008) ..............................................................22

*Nathenson v. Zonagen, Inc.*,
    267 F.3d 400 (5th Cir. 2001) ................................................23, 27

*No. 84 Employer-Teamster Joint Council Pension Trust Fund
    v. America West Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ......................................................27

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ....................................................32

*Oppenheim Pramerica Asset Mgmt. S.a.r.l. v. Encysive Pharm.*,
    No. H-06-3022, 2007 U.S. Dist. LEXIS 69121
    (S.D. Tex. Sept. 18, 2007) ..........................................................33

*Oran v. Stafford*,
    226 F.3d 275 (3rd Cir. 2000) ......................................................25

*Padnes v. Scios Nova Inc.*,
    No. C 95-1693 MHP, 1996 U.S. Dist. LEXIS 22858
    (N.D. Cal. Sept. 18, 1996) ..........................................................10

*Pegasus Holdings v. Veterinary Ctrs. of Am., Inc.*,
    38 F. Supp. 2d 1158 (C.D. Cal. 1998) ........................................34

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) ................................................ *passim*

*SEC v. Seaboard Corp.*,
    677 F.2d 1301 (9th Cir. 1982) ....................................................14

*Sloman v. Presstek, Inc.*,
    No. 06-cv-377-JD, 2007 U.S. Dist. LEXIS 69475
    (D.N.H. Sept. 18, 2007) ..............................................................22

**Page**

*TSC Indus., Inc. v. Northway, Inc.*,
        426 U.S. 438 (1976)................................................................................18, 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
        127 S. Ct. 2499 (2007)..................................................................... *passim*

*Tello v. Dean Witter Reynolds, Inc.*,
        410 F.3d 1275 (11th Cir. 2004) ...................................................................15

*Vess v. Ciba-Geigy Corp. U.S.A.*,
        317 F.3d 1097 (9th Cir. 2003) .......................................................................7

*Warshaw v. Xoma Corp.*,
        74 F.3d 955 (9th Cir. 1996) .........................................................................17

*Wool v. Tandem Computers, Inc.*,
        818 F. 2d 1433 (9th Cir. 1987) ....................................................................21

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
        §77k.................................................................................................................2
        §77k(a)...........................................................................................................6
        §77*l*(a)(2) .................................................................................................2, 6
        §77*o*.................................................................................................2, 21, 34
        §78*o*.................................................................................................2, 21, 34

Federal Rules of Civil Procedure
        Rule 9(b) .....................................................................................................7, 8
        Rule 12(b)(6)..........................................................................................2, 6, 15

17 C.F.R.
        §240.10b-5 .......................................................................................................2

I.      INTRODUCTION

This case involves materially false and misleading statements about TH-070, a drug being developed by defendant Threshold Pharmaceuticals, Inc. ("Threshold" or the "Company") for the treatment of benign prostatic hyperplasia ("BPH"), a bothersome condition affecting the lower urinary tract of middle-aged and elderly men. ¶¶2-3, 28-42.[1] Plaintiffs allege that defendants initially negligently overstated TH-070's prospects for success by: (i) making overly optimistic statements about past clinical trials; (ii) making unfounded claims about the safety of the drug to treat BPH; and (iii) understating or failing to disclose material risks to ongoing clinical trials. *E.g.*, ¶¶64-74; 77-82. Plaintiffs further allege that, when the risks to the drug's approval began to manifest themselves, defendants committed fraud by continuing to make positive statements regarding the conduct of the ongoing trials, while deliberately concealing the negative conditions they knew had arisen. ¶¶94-101. Even when the drug's safety concerns were belatedly revealed by an announcement that the FDA had placed the trials on clinical hold, plaintiffs allege that defendants continued to downplay those risks while making unfounded claims about the Company's ability to revive the trials and gain FDA approval for the drug. ¶¶102-16.

Unable to find a cogent reason to dismiss the claims that plaintiffs ***did*** plead, defendants mischaracterize plaintiffs' allegations so as to urge the Court to dismiss claims that simply have not been pled. Throughout their brief, defendants accuse plaintiffs of pleading a claim of "fraud by hindsight" based on the purported contention that defendants unequivocally knew from the beginning of the Class Period that TH-070 was neither safe nor effective for the treatment of BPH, yet deliberately put hundreds of patients at risk of potentially deadly side effects by proceeding with clinical trials of the drug as part of an evil scheme to defraud the Company's investors.

Plaintiffs do not allege that defendants deliberately set about to harm their patients or steal from their investors. To the contrary, plaintiffs allege that defendants were guilty of nothing more than simple negligence at the outset of the Class Period, when they made overly optimistic

---

[1]      All paragraph ("¶") references refer to the Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint"), filed January 15, 2008.

1    statements about the safety and efficacy of the drug in the registration statements and prospectuses

2    for two public offerings, while omitting or understating the risks that rendered FDA approval

3    significantly less likely than investors had been led to believe.  Plaintiffs' claims arising from these

4    misstatements arise only under §§11, 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C.

5    §§77k, 77*l*(a)(2), 77*o* ("Securities Act"), and are not grounded in fraud.  ¶¶6-7, 59.

6         It was not until later in the Class Period when those hidden risks began to manifest

7    themselves, that defendants, out of desperation or greed or a little of both, compounded their earlier

8    negligence with outright fraud in proclaiming that the clinical trials remained firmly on the road to

9    success, while failing to alert investors of the problems that had already arisen from those still-

10   concealed risks.  These claims, commencing with CEO Harold E. "Barry" Selick's March 1, 2006

11   statement to investors that TH-070 was "going to be truly a home run" because the prior clinical data

12   had been "replicated" in the ongoing trials, ***do*** involve fraud, and are therefore brought under

13   §§10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) ("Exchange Act"), and

14   Rule 10(b)(5) promulgated by the SEC (17 C.F.R. §240.10b-5).

15        Defendants' motion fails to distinguish between these two aspects of plaintiffs' claims,

16   suggesting that the Complaint must plead actual knowledge at the time of the IPO that TH-070 was

17   both unsafe and ineffective in order to survive.  In painting the entire case with such a broad brush,

18   defendants incorrectly conflate plaintiffs' fraud- and non-fraud claims, ignoring that, as defendants'

19   knowledge of the problems with TH-070 grew during the Class Period, statements which were

20   negligently false at the outset became fraudulent when repeated later on.  By failing to consider the

21   timing of these statements or the context in which they were made, and treating individual

22   allegations in isolation, defendants violated the Supreme Court's reminder that the Complaint be

23   construed holistically.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 127 S. Ct. 2499, 2511 (2007).

24        Defendants' primary attack on the Complaint is factual.  These arguments provide no ground

25   for granting a motion under Fed. R. Civ. P. 12(b)(6).  *E.g., Lee v. City of Los Angeles*, 250 F.3d 668,

26   688-90 (9th Cir. 2001); *see also In re NPS Pharm., Inc. Sec. Litig.*, No. 2:06-cv-00570, 2007 U.S.

27   Dist. LEXIS 48713, at *10 (D. Utah July 3, 2007) ("The problem with all of [defendant's] claims is

28   that they require the court to weigh evidence.  Therefore, they are inappropriate at the motion to

1   dismiss stage."). Moreover, defendants' contentions are baseless. Defendants incorrectly contend,

2   for example, that plaintiffs have no claim because Threshold publicly reported the results of the

3   phase 2 Bari Study and urged investors to read the full report for themselves. But contrary to the

4   representations in defendants' brief, Threshold never made extensive efforts to publicize the report

5   or to encourage investors to read it, nor did it incorporate or even reference that report in its public

6   stock offering prospectuses and registration statements. Moreover, the report was couched with

7   reassuring statements regarding the efficacy and safety of the drug, which negated its ability to serve

8   as a storm warning even for those investors who happened to read it.

9       Defendants place undue reliance on their contention that Selick never called TH-070 a "home

10  run" or claimed that the Bari trial data had been "replicated" in the phase 3 study. Injecting fact

11  disputes is improper at the motion to dismiss stage. *Lee*, 250 F.3d at 688-90. Moreover, defendants'

12  contention is based entirely on a recently-prepared transcript of an unauthenticated conference call

13  recording which cannot be considered on a motion to dismiss. Opp. to RJN[2] at 1, 3-5; Lyon Decl.,[3]

14  Exs. H, M. Defendants ignore the contemporaneous transcript of that conference call that was

15  independently prepared by Bloomberg and circulated to investors ***during*** the Class Period, and

16  which quotes Selick as saying exactly what the Complaint alleges he did. Herman Decl.[4] Ex. A.

17  Even if the jury were to ultimately credit Selick's contention that he mumbled a few qualifiers into

18  his conference call statements, that alone would not establish that his statements, as qualified, were

19  not misleading to investors. Nor would such a finding say anything at all about the many other

20  statements made on March 1, 2006 or thereafter that told investors the clinical trials were proceeding

21

22

---

23  [2]     "Opp. to RJN" refers to Plaintiffs' Response to Request for Judicial Notice in Support of

24  Defendants' Motion to Dismiss, filed herewith.

25  [3]     "Lyon Decl." refers to the Declaration of Alexander M.R. Lyon in Support of Defendants'
    Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint for Violation of the

26  Federal Securities Laws, filed March 7, 2008.

27  [4]     "Herman Decl." refers to the Declaration of Dennis J. Herman in Support of Plaintiffs' Brief
    in Opposition to Defendants' Motion to Dismiss, filed herewith.

28

1   as planned, even while defendants were scrambling behind the scenes to address the mounting liver

2   toxicity problems that had arisen.

3   **II.    SUMMARY OF ALLEGATIONS**

4          Threshold is a development-stage drug company which had just 42 employees at the time of

5   its IPO.  ¶¶2, 29.  Threshold told investors it was attempting to develop a class of drugs using its

6   theory of "Metabolic Targeting."   ¶2.  During the Class Period,[5] TH-070 was Threshold's lead

7   product candidate.  *Id*.  Unlike the drugs Threshold hoped to one day develop on its own, TH-070

8   was based upon an existing drug, lonidamine, that appeared to exhibit "Metabolic Targeting"

9   properties.  ¶¶2-3, 28.  Previously, lonidamine had only been prescribed overseas, principally in

10  Italy, for the treatment of seriously ill cancer patients. ¶¶3, 30.  Although BPH was a lifestyle disease

11  that affected otherwise healthy individuals, Threshold repeatedly referred to lonidamine's past use to

12  treat cancer patients as evidence that the drug had a "demonstrated safety profile," suggesting that

13  the only serious question was whether TH-070 worked to treat BPH.  ¶31; *see generally* ¶¶34-39.

14         To demonstrate its efficacy for the treatment of BPH, Threshold put together an extremely

15  small and quickly conducted study at Bari University in Bari, Italy.  ¶¶4, 49-58. The purpose of the

16  Bari Study was to detect a "hint" of a positive effect that Threshold could then use to support its IPO

17  and generate the capital needed to fund full scale clinical trials of the drug.  ¶¶49-52.  Absent an

18  infusion of public capital, Threshold could not afford to complete those studies on its own, as its

19  access to the private equity markets was drying up.  ¶¶43-48.  The Bari Study was originally

20  designed to have two arms, a low dose and high dose arm.  ¶55.  After completion of the low dose

21  arm, Threshold had the results it wanted, and cancelled the high dose arm of the study.  ¶56.

22         Threshold claimed that the Bari Study had demonstrated that TH-070 worked far better with

23  fewer side effects than either Proscar or Flomax, bolstering that claim by comparing the Bari Study

24  results to the clinical trials for those two drugs.  ¶¶56, 63, 70.  As a result, Threshold told investors

25  _____

26  [5]     The Class Period runs from February 4, 2005, the date of Threshold's IPO, to July 14, 2006,
27  the last trading date before Threshold revealed that TH-070 did not work and the Company had no
    further plans to develop the drug.  ¶1.

28

1    that TH-070 was strongly positioned to capture a large share of the $2 **billion** market for the

2    treatment of BPH. ¶¶40-42, 63, 70.  The market reacted favorably to this news, and investors poured

3    $100 million into the Company as the result of two public offerings: a February 4, 2005 IPO and an

4    October 12, 2005 Follow-on Offering.  ¶¶61, 75.  Threshold used the funds to conduct two further

5    clinical trials of the drug, one in Europe and another in the United States, as well as to pay rich

6    bonuses to Selick, CFO Janet I. Swearson and other members of management.  ¶¶5, 30, 144-47.

7        Throughout the Class Period, Threshold told investors that the clinical studies were

8    proceeding as expected, and repeatedly trumpeted the Bari Study results as a strong indication of

9    TH-070's efficacy, and the past use of lonidamine as strong evidence that the drug was safe.  ¶¶31,

10   83, 87, 92, 94, 100.  In fact, the Bari Study had significant limitations that were not disclosed to

11   investors, and which rendered its reliability as an indicator of success in further clinical trials highly

12   suspect.  ¶¶4-5, 31-33, 49-58, 82.  This included a significant "placebo effect" that had been

13   identified and corrected for in the past clinical trials of Flomax and Proscar to which the TH-070 trial

14   results were compared, and which was recognized by the Bari Study investigator, who warned that

15   the Bari Study data could be "misleading" as a result.  ¶¶53, 66-67.  Moreover, prior clinical data

16   available to defendants indicated that liver toxicity issues could be associated with the drug – a risk

17   which was also not disclosed to investors.  ¶¶33, 69-72.

18       By March 6, 2006, Threshold had conducted additional pharmacokinetic studies of

19   lonidamine which revealed significant liver toxicity issues associated with the drug.  ¶¶84, 112, 114.

20   Later that month, two venture capital firms who had been among the Company's earliest investors,

21   and who had strong ties to members of its management, quickly liquidated significant amounts of

22   their holdings in the Company.  ¶¶130-43.  By April 10, 2006, liver toxicity issues had arisen in the

23   European clinical trial and been reported to the FDA.  ¶¶99, 109.  By May 10, 2006, additional

24   toxicity issues had arisen in both the European and U.S. trials.  ¶¶102-11.  Throughout this period,

25   defendants continued to make positive statements about TH-070, without revealing either the liver

26   toxicity issues that had arisen or correcting the past misstatements regarding the safety or efficacy of

27   the drug or the reliability of the Bari Study.  ¶¶87, 92, 94, 100.

28

1    On May 11, 2006, Threshold shocked investors by revealing that the FDA had placed the

2    clinical trials on hold due to three "significant adverse events" ("SAEs") in which patients being

3    treated with TH-070 had been hospitalized with elevated liver enzymes.  ¶102.  Threshold's stock

4    dropped $10.56 on this news, *a staggering one day loss of 75% of its value.*  ¶¶103, 125.  Seeking

5    to stem further losses, defendants assured investors that the clinical hold was a temporary setback,

6    that they remained confident of TH-070's efficacy, and that the FDA had indicated that the trials

7    could continue, suggesting that the FDA hold was an overly cautious response designed merely to

8    preserve "consistency" in its regulatory policies.  ¶¶104-09.  On July 17, 2006, Threshold finally

9    revealed that TH-070 did *not* work any better than a placebo and announced that it was canceling

10   further efforts to develop the drug.  ¶117.  On this news, Threshold's stock fell by $1.63, *an*

11   *additional loss of 51% in shareholder value*.  ¶119.

12   **III.    ARGUMENT**

13       In considering a motion brought under Fed. R. Civ. P. 12(b)(6), the Court must presume the

14   truth of all well-pled factual allegations.  *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1013 (9th

15   Cir. 2005).  A court may not weigh the evidence that might be presented at trial, but must simply

16   determine whether the complaint itself is legally sufficient.  *E.g., Cahill v. Liberty Mut. Ins. Co.*, 80

17   F.3d 336, 337-38 (9th Cir. 1996).

18       **A.    Defendants Initially Violated the Securities Act by Negligently**
             **Publishing Materially False and Misleading Information About TH-**
19           **070 in the Registration Statements for Threshold's Initial Public**
             **Offering and Prospectus/Follow-On Offering**

20       The Securities Act imposes liability on persons who issue or sell stock pursuant to

21   registration statements or prospectuses that contain materially false or misleading statements

22   (including misleading omissions), as well as the directors of such issuers and other persons who sign

23   or are responsible for the contents of those filings.  15 U.S.C. §§77k(a), 77*l*(a)(2).  Liability is

24   imposed under the Securities Act without regard to scienter.  *Ernst & Ernst v. Hochfelder*, 425 U.S.

25   185, 200 (1976) ("Congress created express liability regardless of the defendant's fault"); *Herman &*

26   *MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983) ("liability against the issuer of a security is

27

28

1    virtually absolute, even for innocent misstatements"); *Daou*, 411 F.3d at 1027("defendants will be

2    liable for innocent or negligent misrepresentations").[6]

3        To establish a *prima facie* claim under the Securities Act, a plaintiff need only plead a

4    material misstatement or omission in a registration statement (§11) or prospectus (§12(a)(2)).  *Daou*,

5    411 F.3d at 1027.  Neither the PSLRA nor Fed. R. Civ. P. 9(b) apply to claims brought under §§11

6    and 12(a)(2) of the Securities Act.  *E.g., In re Intrabiotics Pharm., Inc. Sec. Litig.*, No. C 04-02675

7    JWS, 2006 U.S. Dist. LEXIS 15753, at *40-*41 (N.D. Cal. Jan. 23, 2006).  Sections 11 and 12(a)(2)

8    therefore "place[] a relatively minimal [pleading] burden on a plaintiff" as compared with §10(b).

9    *Herman & MacLean*, 459 U.S. at 382.

10       Defendants incorrectly contend that plaintiffs' Securities Act claims must nevertheless be

11   pled with particularity under Fed. R. Civ. P. 9(b) because they "sound in fraud."  Motion at 9.[7]

12   Unlike the cases relied upon by defendants, the Complaint here specifically ***disclaims*** allegations of

13   fraud with respect to the Securities Act claims, and incorporates ***only*** the non-fraudulent allegations

14   into those claims.  ¶¶6-7, 59, 156, 164, 173.  Therefore, Fed. R. Civ. P. 9(b) does not apply.  *In re*

15   *JDS Uniphase Corp. Sec. Litig.*, No. C 02-1486 CW, 2005 U.S. Dist. LEXIS 20831, at *33-*35

16   (N.D. Cal. Jan. 6, 2005); *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2006 U.S.

17   Dist. LEXIS 61589, at *7, *12 (N.D. Cal. Aug. 17, 2006); *cf. Daou*, 411 F.3d at 1028-29 (complaint

18   expressly premised on a "fraudulent scheme and course of business" with "wholesale adoption" of

19   fraud allegations into Securities Act claims, and "plaintiffs . . . never rely on such conduct as

20   negligence or mistake in stating their claims"); *In re Stac Elecs. Sec. Litig.,* 89 F.3d 1399, 1405 n.2

21   (9th Cir. 1996) ("the gravamen of the complaint is plainly fraud and no effort is made to show any

22   other basis for the claims levied at the Prospectus").

23       Moreover, where, as here, fraud is not an essential element of a claim, Fed. R. Civ. P. 9(b)

24   only requires "averments of fraud" to be pled with particularity.  *E.g., Vess v. Ciba-Geigy Corp.*

25

26   [6]     Here, as elsewhere, all citations are omitted and emphasis is added unless otherwise noted.

27   [7]     "Motion" refers to Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended
     Complaint for Violation of the Federal Securities Laws, filed March 7, 2008.

28

1   *U.S.A.*, 317 F.3d 1097, 1104-05 (9th Cir. 2003).  Defendants' Motion points to no specific averments

2   that they contend sound in fraud.  Rather, the Motion is based solely on the conclusory assertion that

3   the entire Complaint "sounds in fraud" because the "basis for all of Plaintiffs' claims is that TH-070

4   was represented to be safe and effective when Defendants knew the opposite to be true."  Motion at

5   9.  As set forth above, defendants' argument mischaracterizes the nature of plaintiffs' Securities Act

6   claims, which are premised on defendants' ***negligent*** failure to fully disclose the risks that clinical

7   trials at TH-070 would not be successful.  Hence, there are no "averments of fraud" that are required

8   to be pled, with particularity or otherwise.[8]

9           **1.    The Prospectuses and Registration Statements Misled
                    Investors About the Reliability and Significance of the Bari**
10          **Study Results**

11          The Complaint alleges that the registration statements and prospectuses were misleading

12  because they emphasized the positive results of the Bari Study while understating and omitting the

13  specific risks and uncertainties inherent in the design of that study.  ¶¶59-82.  In particular, plaintiffs

14  allege that:

15      •       Although the designers of the Bari Study had specifically warned that there was a
                "significant" possibility that the study results were "misleading," this warning was
16              not included in the registration statement or prospectus for either the IPO or the
                Follow-on Offering.  ¶¶65(d), 66-67, 78(e), 82.
17

18      •       Contrary to the registration statement and prospectus, the Bari Study was ***not***
                designed to "determine the safety or tolerability of TH-070" or to "evaluate" the
19              efficacy of the drug, but had instead merely ***assumed*** the safety of the drug based on
                limited and undisclosed prior clinical trial data, and had been designed merely to
20              detect whether there was "a hint" of positive action of the drug.  ¶¶63, 65(f), 68-69,
                76, 78(g).
21

22      •       There was no basis to compare the results of the Bari Study to the results of clinical
                trials of Proscar or Flomax, which were placebo-controlled studies in which an
23              unusually strong placebo effect had been recognized.  ¶¶65(e), 78(f).

24  _____

25  [8]        This is not to suggest that plaintiffs' concede the allegations lack particularity.  As set forth
    below, the Complaint plainly identifies the information in the registration statements and
26  prospectuses that is alleged to be misleading, and specifically identifies the reasons why that
    information was false and misleading to investors at the time those filings became effective.  ¶¶64-
27  74, 77-78.  Hence, even if a particularity requirement were imposed, the Complaint plainly satisfies
    Fed. R. Civ. P. 9(b).

28

- • The representation that "TH-070 kills prostate cells, reducing the size of the prostate" was false because TH-070 works no better than a placebo in reducing the size of the prostate. ¶¶78(h), 117.

- • The combination of an exceedingly small sample size, no placebo control, a lack of a blind run in period, the early termination of the study, and a severely symptomatic patient group made it impossible to draw any meaningful conclusions about the results of the Bari Study, or to claim that the results were a "statistically significant" indicator of the safety or efficacy of TH-070 as a treatment for BPH. ¶¶65(a-c, f), 78(a-d, g).

Plaintiffs allege that the combination of all of these factors, when considered in light of the glowingly positive statements by defendants suggesting that TH-070 worked better and with fewer side effects than two blockbuster drugs which had captured the $2 billion market for BPH treatment, misled investors:

> Taken as a whole, the statements about TH-070 in Threshold's IPO Registration Statement were materially misleading to investors because they emphasized the purportedly positive results of the Bari Study while minimizing or failing to accurately or completely disclose the specific risks associated with TH-070, including that the results of the Bari Study were unreliable indicators of either the efficacy or safety of the drug.

¶64; *see also* ¶77.

### a.    Defendants Did Not Disclose "All Relevant Details" of the Bari Study

Ignoring the foregoing specific allegations, defendants oversimplify plaintiffs' claims into complaints that the Bari Study was "too small," "lacked a placebo control," and was "not adequately designed" and then contend that the Complaint should be dismissed because the "precise[] points Plaintiffs complain of" were disclosed.[9]  Motion at 11.  But the information defendants point to as being revealed is ***not*** the same information described above which plaintiffs allege was concealed.

---

[9]    Defendants also mischaracterize the Complaint as contending that Threshold said the Bari Study ***proved*** TH-070's safety and efficacy."  Motion at 13.  Not so.  Plaintiffs' claim is that defendants provided investors with a one-sided presentation about the Bari Study, by repeatedly and strongly touting the purported positive results of that trial while failing to disclose and minimizing the risks of that study.  Hence, the argument in §III.B.1(c) of defendants' Motion is merely a straw man that provides no ground to dismiss the Complaint.

1    Defendants do not dispute that the claim that "TH-070 kills prostate cells" was false. ¶¶77,

2  78(h).  Neither do defendants seriously attempt to dispute the allegation that the registration

3  statements falsely claimed that the "primary objective" of the Bari Study was "to determine the

4  safety and tolerability of TH-070."  ¶¶63, 65(f), 76, 78(g).  In a footnote, defendants contend this is

5  just "second-guessing of the design of Defendants' clinical trials."  Motion at 16 n.7.  Not so.

6  Plaintiffs' claim is that there was no design at all, not merely that the design they implemented was

7  deficient.  ¶¶68-70.  ***Assuming*** the safety and tolerability of a drug is far different than ***testing*** it.[10]

8    Defendants do contend that the Complaint should be dismissed because Threshold's

9  registration statements disclosed that the Bari Study was an "open label" trial in which no placebo

10  was used.  Motion at 11-12.  Plaintiffs do not contend that the lack of a placebo was concealed.  ¶53.

11  Rather, plaintiffs contend that Threshold misled investors by not warning that the clinical trials of

12  Flomax and Proscar, which the registration statement used to demonstrate the purported strong

13  favorable results of the Bari Study, both ***did*** involve the use of placebos, nor did it warn investors

14  that those studies had documented – and corrected results for – a significant placebo effect showing

15  marked improvement in patients who had ***not*** received the drug.  ¶¶65-67, 78, 82-83.  This placebo

16  effect pertained specifically to the treatment of BPH.  *Id*.  As a result, the placebo risk was much

17  greater with respect to TH-070 than the generalized risk present in any study in which a placebo was

18  not used.  *Id*.  The failure to disclose this specific heightened risk, together with the repeated

19  comparisons of the Bari Study to clinical trials in which a placebo effect was noted and corrected for

20  to suggest stronger positive action of TH-070, was misleading.  *Kaplan v. Rose*, 49 F.3d 1363, 1371-

21

22  [10]    Defendants' reliance on *In re Medimmune, Inc., Sec. Litig.*, 873 F. Supp. 953 (D. Md. 1995)

23  and *Padnes v. Scios Nova Inc.*, No. C 95-1693 MHP, 1996 U.S. Dist. LEXIS 22858 (N.D. Cal. Sept.
   18, 1996), is therefore misplaced.  The complaint in *Medimmune* was premised on "design

24  limitations" – not the absence of a design.  873 F. Supp. at 959.  Moreover, *Medimmune* arose only
   under §10(b), and was decided principally on grounds of scienter, an issue that is irrelevant under

25  §11 of the Securities Act.  *Padnes* similarly arises only under §10(b).  Moreover, in *Padnes*, the
   Court noted that defendants were relying on a study published in a peer-reviewed journal, and that

26  plaintiffs had failed to plead facts to show that there was no basis for the conclusions drawn from the
   study, or that there were undisclosed facts seriously undermining the accuracy of the study.  1996

27  U.S. Dist. LEXIS 22858, at *18-*19.  Here, the Bari Study was ***not*** peer reviewed, and plaintiffs
   specifically explain why its conclusions were suspect.  ¶¶32-33, 52-57, 66-74.

28

72 (9th Cir. 1994) (triable issue on falsity existed where registration statement claimed medical device "compared favorably" with competing products, without revealing facts from competing clinical trials tending to undermine that statement); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1019 (S.D. Cal. 2005) ("Plaintiffs' criticism is not that what was said was inaccurate, but that it was incomplete, thus portraying the results of the clinical trial in an unduly optimistic light.").

Defendants are similarly mistaken in contending that the Complaint should be dismissed merely because the registration statement told investors that the Bari Study was "preliminary." *In re Amylin Pharm., Inc. Sec. Litig.*, No. 01cv1455 BTM(NLS), 2003 U.S. Dist. LEXIS 7667, at *20-*23 (S.D. Cal. May 1, 2003) ("*Amylin II*") (vague, boilerplate warnings that FDA approval is not guaranteed and prior results were preliminary were not meaningful to warn investors of specific risks present in trials); *Immune Response*, 375 F. Supp. 2d at 1039 ("While some risks were disclosed in the Prospectus, the overall determination of whether there was adequate disclosure or whether they rendered the allegedly misleading statements immaterial . . . are generally questions that should be left to the trier of fact."); *see also infra* §III.A.2.

### b. The Publication of the Bari Study Report Did Not Reveal the Truth to the Market

Defendants strenuously contend that the Complaint should be dismissed because Threshold purportedly publicized a written report of the Bari Study's principal investigator in May 2005. Defendants are incorrect. The Bari Study report was not published until months ***after*** the IPO prospectus and registration statement became effective. ¶74. As such, it could hardly have corrected anything in those filings. *See In re Bank of Boston Corp. Sec. Litig.*, 762 F. Supp. 1525, 1537-39 (D. Mass. 1991) (later statements cannot retroactively affect falsity of registration statement).

Neither was the publication of the Bari Study report sufficient to prevent the later misstatements in the prospectus and registration statement for the Follow-on offering from misleading investors. ¶74. "Truth on the market" is not a defense to claims arising under the

1   Securities Act.[11]  *Miller v. Thane Int'l, Inc.*, No. 05-56043, 2008 U.S. App. LEXIS 5687, at *19 n.2

2   (9th Cir. Mar. 18, 2008).  The Bari Study report was not attached as an exhibit to, or incorporated by

3   reference into, the prospectus and registration statement for that offering, nor was it listed among the

4   outside sources Threshold told investors to read and consider in the section of the Registration

5   Statement titled:  "Where You Can Find More Information."[12]  *See* Lyon Decl., Ex. G at Table of

6   Contents, 92.  Moreover, Threshold specifically cautioned investors to "rely ***only*** on the information

7   contained in this prospectus.  We have not authorized ***anyone*** to provide you with information that is

8   different."  *Id.* at Table of Contents.  It is no defense to contend that investors should have looked

9   elsewhere to figure out that they were being misled.  *See Miller*, 2008 U.S. App. LEXIS 5687, at *18

10  ("investors are not generally required to look beyond a given document to discover what is true and

11  what is not"); *Kaplan*, 49 F.3d at 1374 (denying summary judgment on grounds that omission of

12  clinical report from registration statement could be deemed material in light of positive statements

13  about efficacy of medical device essential to company's performance).

14          Nor does the "truth on the market" doctrine provide a defense to plaintiffs' Exchange Act

15  claims.  To establish that defense, defendants bear a "heavy burden" of demonstrating that the report

16  was "transmitted to the public with a degree of intensity and credibility sufficient to effectively

17  counterbalance any misleading impression created by the insiders' one-sided representations" in the

18  registration statements.  *E.g., Kaplan*, 49 F.3d at 1377.  This involves an "intensively fact-specific"

19  inquiry that is not susceptible to resolution on the pleadings.  *Provenz v. Miller*, 102 F.3d 1478,

20

21  [11]     "Truth on the market" is the analog of the "fraud on the market" doctrine, as it depends upon
the operation of an efficient stock market to incorporate corrective information into the market price
22  for publicly traded securities.  *Kaplan*, 49 F.3d at 1376.  In a public stock offering, the price is set by
the issuer, not the market.  Moreover, as set forth in the text, investors are entitled to rely upon the
23  completeness of the offering documents, and are not under a duty to seek out contrary company-
specific information.  *Miller*, 2008 U.S. App. LEXIS 5687, at *19-*20 n.2.  For both of these
24  reasons, courts apply the truth on the market doctrine only in the context of claims under the
Exchange Act.  *Id.*; *see also Kaplan*, 49 F.3d at 1371-76 (applying doctrine to §10(b), but not to §11
25  claims).

26  [12]     Indeed, that section told investors that Threshold had attached copies of any "contract,
agreement, ***or other document***" where the description of the document in the registration statement
27  was incomplete.  Lyon Decl., Ex. G at 92.  By ***not*** attaching the Bari Study report, Threshold was, in
essence, telling investors that its description of the investigator's findings was complete.

28

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS -
**4:07-cv-04972-CW**                                                                    - 12 -

1    1492-93 (9th Cir. 1996); *Immune Response*, 375 F. Supp. 2d at 1036-37; *In re Amgen, Inc. Sec.*

2    *Litig.*, No. CV 07-2536 PSG (PLAx), 2008 U.S. Dist. LEXIS 24611, at *25 (C.D. Cal. Feb. 1, 2008);

3    *NPS Pharm.*, 2007 U.S. Dist. LEXIS 48713, at *16.

4        Contrary to defendants' arguments, the Bari Study report was not widely publicized by

5    Threshold.  ¶74.  Threshold did not "announce" the contents Bari Study report, or "hyperlink" it for

6    investors, as defendants claim in their brief.  Motion at 11-12.  To the contrary, the Company merely

7    mentioned that the study "will be" published, and did so at the end of a press release whose principle

8    focus was on boasting about the purportedly positive results of six-month follow-up examinations of

9    the Bari Study patients.[13]  *See* Lyon Decl., Ex. C.  The "hyperlink" defendants tout is merely the web

10   address for a third-party republisher's home page, where users can search through thousands of

11   medical journal articles and read or download them for a fee ($1,250.00 for an annual pass; $20.00

12   for a single report).  *See id.*; *see also* www.medreviews.com.  Under these circumstances, it cannot

13   be said that the Bari Study report was conveyed to the market with sufficient "intensity and

14   credibility" to effectively counteract defendants' misleading statements about its results.  *E.g.*,

15   *Kaplan*, 49 F.3d at 1376-78 (denying summary judgment where 80 clinical reports published during

16   class period purportedly put plaintiffs on notice of the truth); *Amgen*, 2008 U.S. Dist. LEXIS 24611,

17   at *40-*41 ("that the DAHANCA 10 results were posted on its website does not mean the market

18   *knew* of these results")(emphasis in original).

19       Even for those investors who obtained a copy, the Bari Study report did not correct the

20   misleading information in the offering documents.  Rather, like the Company's prospectuses and

21   registration statements, the report downplayed the risks associated with TH-070 by falsely claiming

22

---

23   [13]    The May 19, 2005 press release defendants rely upon in support of this argument was
     primarily focused on conveying to the market the results of six-month follow up lab tests of the Bari

24   Study participants, which purportedly demonstrated "significant sustained improvement in
     symptoms six months off therapy."  Lyon Decl., Ex. C.  Where the past study results were

25   mentioned, the release merely reiterated the previously-reported statistical data *without* warning of
     the limitations of the study, thereby perpetuating the false and misleading nature of Threshold's prior

26   representations about the Bari Study.  *Id.*  It was not until the end of the press release that Threshold
     mentioned that "[d]etailed results of the study *will be* published by MedReviews in the quarterly

27   journal of Reviews in Urology."  *Id.*

28

1   that there was "extensive" evidence demonstrating that the drug was safe, and that the purportedly

2   strong showing of efficacy minimized the risk of a placebo effect with the drug.  ¶74.  "Without

3   specialized knowledge or expertise in both BPH and the conduct of clinical trials," plaintiffs allege,

4   "it was not possible for investors to understand the significance of the differences between the

5   selective statements in the Registration Statements . . . and the article describing the Bari Study

6   results." ¶74.  These specific, fact-based allegations must be taken as true, and do not permit

7   dismissal based on defendants' contrary – and conclusory – characterization of the Bari Study

8   report.[14]  *E.g., Kaplan*, 49 F.3d at 1377-78; *NPS Pharm.*, 2007 U.S. Dist. LEXIS 48713, at *16.

9                   **c.    Plaintiffs' Claims Are Not Time-Barred**

10          Defendants incorrectly contend that plaintiffs' claims are time-barred because the statute of

11   limitations purportedly accrued on May 19, 2005, when Threshold announced that a report of the

12   Bari Study **would be** published by a third party, which they contend placed plaintiffs on inquiry

13   notice of their claims.  Motion at 12.  As just described, the report itself had not yet been published

14   on that date, nor was it hyperlinked to the press release on which defendants base their accrual

15   argument.

16          A plaintiff has inquiry notice when public disclosures "provide the plaintiff with sufficient

17   storm warnings to alert a reasonable person to the probability that there were either misleading

18   statements or significant omissions involved in the sale of the securities."  *In re Livent, Inc. Sec.*

19   *Litig.*, 148 F. Supp. 2d 331, 364-65 (S.D.N.Y. 2001).  In the Ninth Circuit, "the question of notice of

20   fraud is for the trier of fact."  *SEC v. Seaboard Corp.,* 677 F.2d 1301, 1309-10 (9th Cir. 1982); *see*

21   _____

22   [14]     Defendants' reliance on an analyst report from Fortis Bank to demonstrate that the Bari

23   Study report was recognized by the market provides no legitimate defense to this action.  *Provenz*,
     102 F.3d at 1493; *Immune Response*, 375 F. Supp. 2d 1037.  Apart from raising factual issues

24   incapable of resolutions on a motion to dismiss, the Fortis report makes no mention of the BPH-
     specific placebo effect, or of the Bari Study author's specific warning that the results may be

25   "misleading" as a result.  *See* Lyon Decl., Ex. F.  To the contrary, like defendants' own one-sided
     statements about the Bari Study, the Fortis report specifically claims that the Bari Study "data

26   suggest efficacy on-par with, or superior to, marketed drugs" (*i.e.*, Flomax and Proscar), **without**
     mentioning the risks that the data was not comparable to data from prior clinical studies of those

27   drugs.  *Id.* at 12.  That defendants relegate this contention entirely to a footnote plainly demonstrates
     the lack of credence the Court should give it.  *See* Motion at 12 n.5.

28

1  *also Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1283 (11th Cir. 2004) ("Whether a plaintiff

2  had sufficient facts to place him on inquiry notice of a claim for securities fraud . . . is a question of

3  fact, and as such is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6).").

4  Furthermore, on a motion to dismiss, defendants must "irrefutably [demonstrate that] plaintiff

5  discovered or should have discovered the fraudulent conduct."  *City Nominees, Ltd. v. Macromedia,*

6  *Inc.*, No. 98-16058, 2000 U.S. App. LEXIS 8201, at *3 (9th Cir. Apr. 21, 2000); *Gargiulo v.*

7  *Demartino*, 527 F. Supp. 2d 384, 393 (E.D. Pa. 2007) (same).

8       Defendants have not met this burden.  The mere issuance of a press release that contains a

9  brief reference to the fact that the Bari Study investigator would publish a report of his findings in a

10  third-party journal, without more, does not trigger the running of the statute of limitations.[15]  Neither

11  does the report itself trigger the running of the statute because, as described above, it was itself

12  misleading to investors including by providing false assurances that the purportedly strong efficacy

13  results significantly minimized the risks of not having a placebo control.  *See Kaplan*, 49 F.3d at

14  1377-78 (issue of fact whether clinical reports published during class period put investors on notice

15  of the truth allegedly concealed in post-offering public statements); *Gargiulo*, 527 F. Supp. at 394

16  (reassuring statements are sufficient to dissipate storm warnings).

17           **2.    The Risk Warnings in the Registration Statements Were**
                     **Neither Meaningful Nor Complete**
18

19       Taking a slightly different approach, defendants next contend that plaintiffs' claims must be

20  dismissed under either the PSLRA's safe harbor or the analogous "bespeaks caution" doctrine.[16]

21  _____

22  [15]    Of course, the publication of the Bari Study could not have triggered the accrual period for
    the statute of limitations on claims arising from the misleading statements in the Follow-on Offering,
23  because the report was published several months ***prior*** to the effective date of the registration
    statement for that offering.  Hence, defendants' argument cannot be that those claims are time
24  barred, but that it should be rejected under a "truth on the market" theory.  As previously explained,
    that defense is unavailable under the Securities Act, unsupported by the record here and is, in any
25  event, an intensely factual issue that is inappropriate for resolution on the pleadings.  *See, supra,*
    §III.A.1(b).

26  [16]    In a footnote, defendants also assert that "[t]o the extent" any of the alleged
    misrepresentations are "generalized statements of optimism or 'puffing,' they are also inactionable.
27  Motion at 14 n.6.  Because defendants fail to point to any statement that they contend is inactionable
    puffery, they have failed to demonstrate any basis for dismissal on this ground.  Plaintiffs cannot
28

1   Motion at 13-16.  In order to establish this defense, defendants have the burden of proving that there

2   was sufficient cautionary language so that "reasonable minds could not disagree that the challenged

3   statements were not misleading."  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 403 F.3d

4   1050, 1056 (9th Cir. 2005).  Because this defense also involves a fact-intensive inquiry, it too is

5   inappropriate for resolution on a motion to dismiss.  *E.g., Fecht v. Price Co.*, 70 F.3d 1078, 1081-82

6   (9th Cir. 1995); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004).

7                    **a.       Neither the Safe Harbor Nor the Bespeaks Caution
                                Doctrine Supports Dismissal of the Complaint**

8

9            The PSLRA's safe harbor provides protection for statements that are forward-looking.

10  Defendants' Motion fails to identify any such forward-looking statements.  Indeed, the Motion fails

11  to identify ***any*** specific alleged misrepresentation, either by quotation or paragraph reference to the

12  Complaint, that defendants contend is protected by the safe harbor or inactionable under the

13  bespeaks caution doctrine.  Instead, the Motion vaguely refers to "[s]tatements pertaining to the

14  prospects for FDA approval" and "Plaintiffs' suggestion that Defendants misled investors as to the

15  substantial risks associated with TH-070's development."  Motion at 14, 15.

16           Plaintiffs do not allege that the prospectuses failed to warn that the Bari Study results might

17  not be confirmed in subsequent clinical trials – they allege that defendants failed to disclose specific,

18  existing risks that diminished the likelihood that would occur.  Inasmuch as those risks arose from

19  historical and current information omitted from the prospectuses and registration statements, they are

20  neither forward-looking nor protected by the safe harbor or bespeaks caution doctrine.[17]  *E.g.,*

21  *Gargiulo*, 527 F. Supp. 2d at 391-92; *In re Viropharma, Inc., Sec. Litig.*, No. 02-1627, 2003 U.S.

22  Dist LEXIS 5623 (E.D. Pa. Apr. 7, 2003).

23
24  respond to a hypothetical argument, and defendants' attempt to raise this point by innuendo should
    be rejected out of hand.

25  [17]      While the risks may have affected the likelihood of future events occurring, they were each
26  based on current or historical information.  The failure to correct the Bari Study data for the BPH-
    specific placebo effect, or warn investors that such an effect had been documented in the Flomax and
    Proscar studies, related to prior clinical studies.  ¶67.  The Bari Study investigator's warning that
27  "the placebo effect may elicit misleading results" was a reference to historical, not future, data.  ¶66.
    The trends of liver toxicity were evident in past, not future, clinical studies.  ¶¶67-71.
28

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS -
**4:07-cv-04972-CW**                                                           - 16 -

1    Neither were the warnings meaningful.  To the contrary, as explained in the Complaint, the

2    warnings consist of generalized risks attendant to *any* clinical trial – results might not be replicated,

3    unanticipated side effects might crop up, and there is no assurance of ultimate FDA approval.  ¶¶79-

4    82.  Nowhere did these or any other warnings in the registration statements alert investors of the

5    significant placebo effect present in clinical studies for BPH or the major escalation in risk due to the

6    lack of placebo, blind-run in period, and small size inherent in the Bari Study.  This major escalation

7    in risk of failure of TH-070 constituted a significant increase in the magnitude of risk over the

8    generalized risk of failure in all advanced clinical trials as suggested in Threshold's generic risk

9    warnings.  ¶82.  Nor did these or any other warnings in the Registration Statements alert investors

10   that past clinical studies of lonidamine had detected trends indicative of potentially serious liver

11   problems arising from the use of the drug, or that at least one participant in the Bari Study had

12   experienced elevated liver functions during treatment.  *Id.*  These warnings are therefore insufficient

13   to insulate defendants' misrepresentations under either the safe harbor or the bespeaks caution

14   doctrine.[18]  *E.g.*, *Provenz*, 102 F.3d at 1493 (blanket warnings are insufficient); *Warshaw v. Xoma*

15   *Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (optimistic statements about clinical trials actionable despite

16   the presence of risk warnings); *In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03 Civ. 3111 (RWS),

17   2005 U.S. Dist. LEXIS 1350, at *54 (S.D.N.Y. Feb. 3, 2005) (where risk warnings did not refer to

18   any of the specific problems alleged, they were insufficient under the bespeaks caution doctrine);

19   *Amylin II*, 2003 U.S. Dist. LEXIS 7667, at *20-*22 (refusing to dismiss claims based upon ten pages

20   of risk factors such as:  "Results from our clinical trials may not be sufficient to obtain regulatory

21   clearance to market Symlin," "The FDA may also require additional testing for safety and efficacy,"

22   and "data collected from our clinical trials may not be sufficient to support approval.").

23   _____

24   [18]    Even where Threshold's risk warnings were more specific, they were materially incomplete.
     For example, defendants point to Threshold's warning that TH-070 had caused "muscle and
25   testicular pain" at higher doses and that other adverse side effects "could be identified" in subsequent
     clinical trials.  Motion at 15.  However, defendants ignore that this warning failed to alert investors
26   that there were also trends in the prior clinical studies showing a higher number of patients
     experiencing liver toxicity issues when being treated with the drug.  ¶¶70-72.  While defendants
27   contend these incidents of liver toxicity were not statistically significant, that does not excuse their
     failure to disclose this risk.  *See infra* §§III.A.2(b), III.B.2.

28

1
2

**b.    Threshold Was Required to Disclose the Specific Risk of Liver Toxicity Associated with TH-070**

3

There is no dispute that TH-070 was derailed in large part due to severe liver toxicity

4

problems experienced by patients enrolled in the ongoing clinical trials of the drug during the Class

5

Period.  ¶¶102-19.  Nor is there any dispute that earlier clinical trials had repeatedly reported

6

instances of liver toxicity among patients receiving lonidamine (the active ingredient in TH-070).

7

¶¶33, 38-39, 70-71.  Neither do defendants deny that the information regarding these potential liver

8

toxicity trends was available to Threshold prior to its IPO, or contend that this information was

9

disclosed to investors.[19]  *Id.*  Rather, defendants' only argument for dismissal is that the Company

10

was not required to disclose the risk of liver toxicity problems associated with TH-070 because there

11

was no data conclusively demonstrating a "statistically significant correlation between lonidamine

12

and liver toxicity."  Motion at 16-17.

13

Defendants' argument cannot bear scrutiny, either as a general proposition of the law or

14

under defendants' view, no risk would ***ever*** have to be disclosed until it

15

has materialized and been documented.  Of course, by that time, it is no longer a risk – it is a fact.

16

The purpose of a risk disclosure is to warn investors of material risks that ***might*** occur – not just to

17

identify adverse events that are ***certain*** to occur.  It is hornbook law that a risk must be disclosed if it

18

is material.  A risk is material if it would be important to a reasonable investor, such that it alters the

19

total mix of information available to the market.  *E.g., Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32

20

(1988).  The question of materiality involves a delicate balancing and assessment of all the relevant

21

facts considered in context, which is generally inappropriate for resolution on a motion to dismiss.

22

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976); *Fecht*, 70 F.3d at 1080-81.

23

In positing that they had no duty to disclose the risk of liver toxicity complications from TH-

24

070, defendants, in essence, advance a theory that equates "statistical significance" with

25

[19]    Information regarding the potential liver toxicity issues associated with lonidamine was

26

contained in approximately 80 prior clinical studies that had been provided to Threshold by Acraf S.p.a., the drug manufacturer that licensed lonidamine to the Company.  ¶¶38-39.  Threshold medical

27

director Alan Colowick admitted that:  "There are studies in which numerically, in some studies, the liver toxicity was higher numerically."  ¶39.

28

1   "materiality" as a matter of law.  Such a bright line test is inconsistent with the fact-based standard

2   of materiality, and should be rejected.  *Provenz*, 102 F.3d at 1489; *see, e.g., Immune Response*, 375

3   F. Supp. 2d at 1021-22 (defendants claim that they had no duty "to disclose efficacy data that was

4   not considered fatal by scientists" inappropriate for resolution on a motion to dismiss); *Gargiulo*,

5   527 F. Supp. 2d at 391 (rejecting contention that misrepresentations regarding efficacy risks, product

6   design, and progress of FDA application were immaterial "anecdotal product development

7   information" that did not have to be disclosed in registration statement); *Amylin II*, 2003 U.S. Dist.

8   LEXIS 7667, at *28 ("[w]hether the safety issues actually rose to the level of 'major' or 'clinically

9   important' in the context of the studies is an issue of fact" precluding dismissal).

10          Defendants' reliance on *In re Intrabiotics Pharm., Inc. Sec. Litig.*, No. C 04-02675 JSW,

11  2006 U.S. Dist. LEXIS 56427 (N.D. Cal. Aug. 1, 2006), is misplaced because that case addresses the

12  question of at what point a drug company has to alert investors that there **are** safety problems with a

13  drug, **not** the question presented here of whether the company has to reveal, in the first instance, the

14  risk that specific safety issues (*e.g.*, liver toxicity) **might** arise.  Moreover, in *Intrabiotics*, Judge

15  White recognized the laxer pleading standard under the Securities Act and **upheld** plaintiffs' claims

16  under §§11 and 15 arising from negligently false statements in a registration statement about the

17  drug's safety profile.  *Id.* at *40-*41.[20]

18          Here, the need to disclose the potential liver toxicity problems was increased because

19  defendants had repeatedly assured investors that there was "published animal data and human

20  clinical data demonstrating tolerability" and, due to its long use to treat cancer patients in Italy,

21  lonidamine was demonstrably safe.  ¶¶31, 63, 76.  This was false.  In fact, prior clinical studies had

22  reported incidents of liver and kidney toxicity arising in patients treated with lonidamine, had noted

23  that the drug had a "peculiar" toxicity profile that was not yet fully understood, and had warned that

24  "there is incomplete information regarding pharmacokinetics in humans."  ¶69.  Moreover, later

25

26  [20]     In a later decision, Judge White indicated that he was inclined to reconsider his initial
    opinion based on new evidence that caused him to reconsider his conclusion that the claims there
27  were not "grounded in fraud."  *Intrabiotics*, 2006 U.S. Dist. LEXIS 56427, at *46-*49.  This *dictum*
    is irrelevant here because the Complaint is not grounded in fraud.

28

1   animal studies had specifically recognized significant liver toxicity issues arising in dogs treated

2   with lonidamine.  ¶70.  In light of these facts, the registration statements' claim that prior clinical

3   data "demonstrat[ed] tolerability" was misleading.  While no clinical study had noted occurrences of

4   liver toxicity at statistically significant levels in humans prior to Threshold's IPO, that possibility

5   had arisen and not yet been ruled out.

6             The fact that liver problems had not yet been found at statistically significant
              levels did not mean, however, that the drug was safe. Lonidamine had previously
7             been prescribed solely in one country, Italy, for the treatment of life-threatening
              conditions. There was no assurance that lonidamine would be safe when taken by
8             relatively healthy patients who were not suffering from cancer or related conditions
              that could mask adverse effects of long-term use of lonidamine, potentially altering
9             the risk-reward profile of the drug. Adding to this risk was the fact that the Bari
              Study was designed such that patients who already had elevated liver enzymes up to
10            2.5 times normal levels were eligible to participate, such that adverse liver effects
              during the short-term (28-day) study might go undetected if elevated liver enzymes
11            were wrongly attributed to pre-existing conditions rather than effect of the drug,
              particularly during the early stages of toxicity.
12
    ¶72.[21]  The need for disclosure of the liver toxicity risk was heightened by the registration
13
    statements' false claims that the Bari Study had been designed to ***determine*** whether the drug was
14
    safe and tolerable, when in fact the study had simply ***assumed*** lonidamine was safe based on
15
    previously reported, and inconclusive, clinical data collected prior to 1991 – 14 years before the Bari
16
    Study was conducted.  ¶¶ 68-69, 73.  Moreover, to the extent the Bari Study had ***any*** ability to detect
17
    liver toxicity or other safety issues, the Complaint alleges that the cancellation of the higher dose
18
    arm made it incapable of doing so – rendering Threshold's statements misleading.  *E.g.*, ¶65(f); *see*
19
    *also* ¶112 (liver toxicity issues arose in five days in high dose pharmacokinectic study).
20
              Defendants' contention that plaintiffs' claims amount to "quibbling over the interpretation of
21
    scientific data" provides no ground for dismissal.  *NPS Pharm.*, 2007 U.S. Dist. LEXIS 48713, at
22

23  _____

24  [21]    That analysts were misled by defendants' representations about lonidamine is demonstrated
    by the surprise noted by the Baird/U.S. Equity Research analyst upon discovering – after the clinical
25  trials were placed on hold by the FDA due to liver toxicity problems – the 1996 dog study and other
    clinical data showing variable and unpredictable pharmacokinetics associated with the drug.  ¶70.
26  That this analyst only conducted a "detailed look at older scientific literature" ***after*** those problems
    were reported is strong evidence of the extent to which defendants' repeated assurances regarding
27  the "demonstrated" safety profile of the drug lulled analysts – and the market as a whole – into a
    false sense of confidence about the safety of the drug.

28

1    *13-*14. Having gone to great lengths to tout the apparent safety of lonidamine based on its prior

2    use to treat cancer patients, defendants were not free to ignore that liver toxicity was a potential side

3    effect of the drug, even if it had been only rarely reported in clinical trials prior to 1991. *See, e.g., In

4    re Amylin Pharm., Sec. Litig.*, No. 01cv1455 BTM(NLS), 2002 U.S. Dist. LEXIS 19481, at *14

5    (S.D. Cal. Oct. 10, 2002) ("*Amylin I*") (recognizing that defendants were "under no obligation to

6    make statements" about the conduct of ongoing clinical trials or likelihood of approval, but having

7    made such statements were liable for failing to disclose risks associated with those trials), *amended

8    and vacated in part on other grounds by Amylin II*, 2003 U.S. Dist. LEXIS 7667.

9         **B.    Defendants Committed Fraud by Deliberately Concealing Known
              Liver Toxicity Problems After They Arose and Making Baseless
10             Claims About the Efficacy of TH-070 in the Ongoing Clinical Trials**

11        To successfully plead their claim under §10(b) of the Exchange Act and Rule 10b-5

12   promulgated thereunder, plaintiffs must allege: (1) a material misrepresentation or omission of fact;

13   (2) scienter; (3) a connection with the purchase or sale of a security; (4) transaction and loss

14   causation; and (5) economic loss. *Daou*, 411 F.3d at 1014. The required state of mind is one of

15   "deliberate or conscious recklessness." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 979

16   (9th Cir. 1999). Although the PSLRA requires these claims to be pled with particularity, it does not

17   alter the general rule that well-pled allegations in a complaint must be presumed to be true. *Tellabs*,

18   127 S. Ct. at 2509. Because falsity and scienter are generally inferred from the same set of facts,

19   "the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Vantive

20   Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002).

21        In *Tellabs*, the Supreme Court reminded lower courts to consider the complaint in its entirety

22   to determine "whether **all** of the facts alleged, taken collectively, give rise to a strong inference of

23   scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."

24   *Tellabs*, 127 S. Ct. at 2509. While the Court must take into account plausible opposing inferences

25   arising from facts alleged, a complaint will survive "if a reasonable person would deem the inference

26   of scienter cogent and ***at least as compelling*** as any opposing inference one could draw from the

27

28

1    facts alleged." *Id.* at 2510.  Hence, after *Tellabs*, "a tie goes to the Plaintiff."[22]  *Commc'ns Workers*

2    *of Am. Plan for Employees' Pensions & Death Benefits v. CSK Auto Corp.*, No. CV06-1503-PHX-

3    DGC (Lead), 2007 U.S. Dist. LEXIS 72424, at *9 (D. Ariz. Sept. 27, 2007); *Sloman v. Presstek,*

4    *Inc.*, No. 06-cv-377-JD, 2007 U.S. Dist. LEXIS 69475, at *22 (D.N.H. Sept. 18, 2007); *Miss. Pub.*

5    *Employees' Retirement Sys. v. Boston Scientific Corp.*, No. 07-1794, 2008 U.S. App. LEXIS 8140, at

6    *35 (1st Cir. Apr. 16, 2008).

7         The Complaint here adequately pleads claims under the Exchange Act based upon false and

8    misleading statements on conference calls conducted, and press releases issued, between March 1,

9    2006 and May 11, 2006.  ¶¶84-116.   It was during this period of time, plaintiffs allege, that

10   defendants knew or were deliberately reckless to the undisclosed toxicity and efficacy problems with

11   TH-070, and made positive statements about the ongoing clinical trials that misled investors by

12   omitting this negative information.  Plaintiffs allege four sets of statements that misled investors in

13   this fashion:

14        •    On March 1, 2006, Selick told investors that TH-070 was a "home run" and that the
             Bari Study data had been "replicated" in the ongoing clinical trials.  ¶¶84-90.

15

16        •    On March 20 and April 5, 2006, Threshold announced the completion of enrollment
             in the ongoing clinical trials – a significant milestone on the road to FDA approval –
17           but failed to disclose that liver toxicity problems had arisen in those trials.  ¶¶91-99.

18        •    On May 10, 2006, after the liver toxicity issues had been reported to the FDA and
             just one day before the trials were placed on clinical hold, Threshold reiterated that
19           the TH-070 trials were on track with expectations, again without disclosing the liver
             toxicity issues.  ¶¶100-01.
20

21        •    On May 11, 2006, when Threshold announced that the clinical trials had been placed
             on hold by the FDA, its officers minimized that event, including by falsely reassuring
22           investors that "the FDA agrees" that a modified dosing schedule would permit the

23

24

25   [22]    Defendants' reliance on *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), is
     misplaced.  *Bell Atlantic* does **not** hold that "a complaint [that] alleges conduct that is **equally**
26   consistent with both culpability and innocence" must be dismissed. Motion at 8.  To the contrary,
     *Bell Atlantic* expressly *rejected "a prob*ability requirement at the pleading stage." *Bell Atlantic*, 127
27   S. Ct. at 1965.

28

1    trials to proceed, such that the clinical hold did not represent the end of the road for

2    TH-070.  ¶¶102-16.[23]

3          In seeking to dismiss the Exchange Act claims based on these statements, defendants

4    improperly deny that the statements were made, incorrectly claim that they had no duty to disclose

5    the negative liver tests while making positive statements about the drug, and simply ignore the false

6    assurances they provided to investors regarding the reasons for and impact of the clinical hold

7    imposed by the FDA on May 11, 2006.

8          1.    **Defendants' Denial that Selick Falsely Claimed TH-070 Was a
               "Home Run" Because Phase 2 Data Had Been "Replicated" in
9               the Clinical Trials Provides No Ground to Dismiss the
               Complaint**

10         Defendants contend that no liability can attach to the misleading statements alleged to have

11    been made on the March 1, 2006 conference call solely on the ground that Selick denies that he

12    made those statements, and claims to have been misquoted in the Complaint.  Motion at 19.  The

13    Complaint is based upon a transcript of that conference call that was circulated to investors

14    immediately after that call was concluded.  *See* Herman Decl. Ex. A.  That transcript quotes Selick

15    as saying exactly what the Complaint alleges he said. *Id.* at 1, 3; *cf.* ¶87.  Hence, at most, defendants

16    have suggested there may be a factual dispute over the contents of Selick's statement.  That is not an

17    issue that can be resolved on a motion to dismiss.  *E.g., Cahill*, 80 F.3d at 337-38.

18         Neither can the Court take judicial notice of defendants' purported version of the conference

19    call transcript to resolve this dispute. *See* Opp. to RJN at 1, 3-5.  The purported recording proffered

20    by defendants on a CD has not been properly authenticated, and, unlike the Bloomberg transcript

21    which was circulated to investors during the Class Period, the transcript proffered here was recently

22    prepared by defense counsel and never circulated to the market.  *See* Lyon Decl. Ex. H.  Accepting

23    the allegations of the Complaint as true, there can be no doubt that, if the jury credits the allegation

24    _____

25    [23]    Plaintiffs further allege that the false statements regarding the Bari Study contained in the
       registration statements and other press releases issued prior to March 1, 2006 remained uncorrected
26    and "alive" in the market as of that date.  ¶83; *see, e.g., Nathenson v. Zonagen, Inc.*, 267 F.3d 400,
       424 (5th Cir. 2001) (fact finder could determine that readers of press release reasonably understood
27    them as referring to matters described in previously issued but uncorrected press releases, such that
       misstatements were "in effect carried forward" to the later statements).

28

1   that Selick made this statement, Selick was acting with scienter.  As Threshold ultimately revealed,

2   none of the data from the ongoing clinical trials successfully replicated the Bari Study results.  ¶117.

3   *A fortiori*, Selick either had the data and knew his March 1, 2006 statements about the Bari Study

4   data being replicated were false, or Selick never saw the data in the first place, and was deliberately

5   reckless in claiming that the Bari Study had been replicated.[24]  ¶89.

6            **2.    Threshold Misled Investors by Making Positive**
                  **Announcements About the Clinical Trials Without Disclosing**
7                 **the Negative Liver Toxicity Problems that Had Arisen**

8            The Complaint alleges that the statements Threshold issued on March 20, April 5, and May

9   10, 2006, announcing the completion of milestones in the clinical trials and advising that the trials

10   remained on track were misleading because, by that time, defendants knew but failed to disclose that

11   liver toxicity issues had arisen in those trials.  ¶¶91-101.  Plaintiffs allege these statements were

12   misleading because they overstated positive news about the drug by concealing negative

13   information.  ¶95; *e.g., Xoma*, 74 F.3d at 959.  The statements were also misleading because they

14   assured investors that the clinical trials were on track when, as a result of the adverse toxicity

15   developments, it was likely that final clinical results would be delayed and additional trials would be

16   necessary.[25]  ¶¶96, 98; *e.g., Provenz*, 102 F.3d at 1489 ("There is a difference between knowing that

17   any product-in-development may run into a few snags, and knowing that a particular product has

18   already developed problems so significant as to require months of delay.").

19           Defendants' sole argument for dismissal of these allegations is to repeat their incorrect

20   assertion that they had no duty to disclose the adverse toxicity information until the Company had

21

---

22   [24]    Even if defendants ultimately establish that Selick's statement was qualified in the manner
    they suggest, that would not establish, as a matter of law, that the statement was not misleading to

23   investors in light of the prior misleading claims made about the Bari Study.  *See supra* §III.A.
    Calling a drug a "home run," even if only potentially so, is misleading when the speaker knows or is

24   deliberately reckless to, and does not disclose significant risks to overcome before it can be
    approved. *Amylin II*, 2003 U.S. Dist. LEXIS 7667, at *13 ("There is nothing unlawful about taking a

25   calculated risk.  However, if, as Plaintiffs allege, Defendants misled Plaintiffs about such risk by
    making assurances regarding the completeness of the data and the likelihood of FDA approval,

26   Defendants may be held liable.").

27   [25]    This risk was particularly material to investors at this time because, until the TH-070 clinical
    trials were released, there were no near term catalysts expected to move the stock price.  ¶91.

28

1    completed its investigation and determined "there was a known, scientifically established correlation

2    between liver toxicity findings and TH-070" because, until then, the information was "not material."

3    Motion at 18-19. Defendants are incorrect. *See supra* §III.A.1(b); *see, e.g., Amgen*, 2008 U.S. Dist.

4    LEXIS 24611, at *41 (even where interim analysis did not produce statistically significant results of

5    safety concerns it was required to be disclosed because, at the very least, it "indicated to Defendants

6    that they could not use the study results to respond to the FDA's inquiry"). Again, the question of

7    materiality is fact-specific and not proper for resolution on a motion to dismiss. *E.g., TSC Indus.*,

8    426 U.S. at 450; *Fecht*, 70 F.3d at 1080-81.

9        Defendants reliance on *Carter-Wallace* is misplaced because that case addressed the question

10   of when a multinational drug company with numerous products on the market has a duty to

11   announce SAEs associated with one of its approved drugs, not, as here, whether disclosure of SAEs

12   arising during ongoing clincial trials of a lead drug candidate by a start-up drug company with no

13   other drugs on the market is necessary to make statements regarding the ongoing conduct of those

14   trials not misleading. *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153 (2d Cir. 1988). Similarly,

15   *Oran v. Stafford*, 226 F.3d 275 (3rd Cir. 2000), arose in the context of the fen-phen litigation, and

16   involved general statements about an approved and actively marketed drug made by one of the

17   largest medical products companies, the American Home Products Corporation, rather than specific

18   representations about the conduct of ongoing clinical trials of an unapproved drug candidate made

19   by a small start-up company with no revenues. The questions of materiality are much different in

20   this case than they were in *Carter-Wallace* or *Oran*. It cannot be said, as a matter of law, that the

21   SAEs at issue in this case were so immaterial as to justify dismissal of this action as a matter of law.

22   *Fecht*, 70 F.3d at 1080-81; *see also In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546 (WHP), 2004 U.S.

23   Dist. LEXIS 19593, at *27 (S.D.N.Y. Sept. 30, 2004) ("The *Carter-Wallace* decisions do not hold

24   that adverse event reports are always immaterial. Indeed, the Second Circuit has instructed district

25   judges that materiality is a flexible, fact-based determination.").

26       Moreover, *Carter Wallace* analyzed allegations that the company's financial statements were

27   misleading – not, as here, allegations that statements regarding ongoing clinical trials were rendered

28   misleading by the failure to disclose SAEs impacting those trials. 150 F.3d at 157. Although

1   *Carter-Wallace* also arose from statements about the drug's safety profile contained in a 16-page

2   medical journal advertisement, the District Court found those allegations misleading but inactionable

3   because they were not made "in connection with" the purchase or sale of a security.  150 F.3d at 155.

4   After the Second Circuit reversed, the District Court again dismissed those allegations, but on

5   grounds of scienter, not materiality or falsity.  *See In re Carter-Wallace Sec. Litig.*, 220 F.3d 36, 41

6   (2d Cir. 2000).   That holding does not aid defendants because their Motion is based on the

7   contention that the negative clinical results were "not material" – not that the statements were not

8   misleading or made with scienter.  *See* Motion at 18-19.

9          Defendants' only scienter-based argument is relegated (again) to a footnote at the end of their

10  Motion, wherein they suggest that they did not know of the SAEs in "early April," as the Complaint

11  alleges.   Motion at 24 n.16.   Given that the Complaint alleges, based on the Company's own

12  admissions, that the SAEs were "reported to the FDA on April 10, 2006," defendants' argument that

13  the Complaint is based on "insinuation" rather than fact must be rejected.  ¶¶10, 99.  Given further

14  that, as defendants admit in their brief, the Company needed time to investigate these incidents

15  *before* reporting them to the FDA, defendants certainly were aware of them by the time of the April

16  5, 2006 press release, and most likely were aware of them on March 20, 2006 as well.[26]  ¶97; *see*

17  *also* ¶¶84, 109-12.  This inference is strengthened by the fact that Threshold characterized its action

18  in reporting the incidents to the FDA as "voluntary" because they arose in the European, rather than

19  U.S., arm of the clinical trial.   ¶¶97, 99.   Threshold plainly would have fully investigated the

20  incidents *before* risking disruption to the clinical trials by voluntarily alerting the FDA.  ¶¶97, 99.

21         Further support for a strong inference of scienter is found in the report of a market analyst

22  following the clinical hold announcement, which stated that Threshold's management had revealed

23  that liver toxicity issues had "occurred ***within five days at extremely high doses in a recent***

---

[26]    *See, e.g., In re Oak Tech. Sec. Litig.*, No. 96-20552 SW, 1997 U.S. Dist. LEXIS 18503, at *8
(N.D. Cal. Aug. 1, 1997) ("plaintiff may explain why a statement is false or misleading by merely
pointing to facts that were later revealed which, due to their nature, were necessarily in existence at
the time the statement was made"); *Boston Scientific*, 2008 U.S. App. LEXIS 8140 at *31, *37, *41
(proximity in time between false statements and disclosure, and existence of contemporaneous
internal investigation, collectively support scienter).

1   *pharmacokinetic study*." ¶112. That Threshold had commenced that study by March 1, 2006 is

2   strong evidence that, by March 6, 2006, at least, it had data in hand showing that liver toxicity was

3   an issue of concern with the drug. ¶¶84, 114.

4         In light of these allegations, defendants' repetitious suggestion that scienter is negated by

5   Threshold's actions in spending millions of dollars to pursue the clinical trials, and the FDA's

6   agreement to let them do so, is meritless. *See, e.g., Amylin I*, 2002 U.S. Dist. LEXIS 19481, at *12-

7   *13 (rejecting argument that allegations regarding sufficiency of clinical trials "make no rational

8   sense" because defendants would not have pursued clinical trials for three years, and the FDA would

9   not have approved the trials, if defendants knew or had reason to believe concealed risks would lead

10  to non-approval).

11        Also meritless is defendants' attack (again, relegated to a footnote) on the competency of

12  confidential witness no. 6 ("CW6") because s/he was an administrative assistant who was "in no

13  position to have personal knowledge about the SAEs." Motion at 24 n.16. In so contending,

14  defendants ignore that CW6 worked in Threshold's clinical department, ¶27(f), and learned about

15  the SAEs from a clinical research associate in the same department who would have had personal

16  knowledge of the events. ¶111. Defendants also ignore that CW6's allegations are corroborated by

17  two other witnesses, CW1 and CW4, one of whom revealed that – as Colowick later admitted – by

18  April 10, 2006, Threshold had access to clinical trial data as a result of initial investigation into the

19  incidents. ¶¶109-11. These allegations are sufficient to credit the information provided by these

20  witnesses at this stage. *Daou*, 411 F.3d at 1015-16.

21        The Court should cast great skepticism on defendants' suggestions that Threshold's

22  management was unaware that liver toxicity issues had arisen in the trials. As the Complaint

23  explains: "In a small company like Threshold, it is reasonable to infer that if an administrative

24  assistant in the clinical department [*i.e,* CW6] knew about the SAEs affecting Threshold's most

25  significant ongoing drug trial by April 2006, so, too, did higher-ranking employees, including Selick,

26  Swearson and Colowick." ¶111; *e.g., No. 84 Employer-Teamster Joint Council Pension Trust Fund*

27  *v. America West Holding Corp.*, 320 F.3d 920, 943 (9th Cir. 2003); *Nathenson v. Zonagen, Inc.*, 267

28  F.3d 400, 425-26 (5th Cir. 2001); *see also Amylin I*, 2002 U.S. Dist. LEXIS 19481, at *21-*22

1    ("[b]ecause SYMLIN was Amylin's primary drug candidate and Amylin is a small biotech company,

2    defendants Cook and Greene are properly charged with knowledge of the misstatements"); *In re*

3    *Impax Labs.*, No. C 04-04802 JW, 2007 U.S. Dist. LEXIS 52356, at *30 (N.D. Cal. July 18, 2007)

4    (in a "small company with low revenues and few high-ranking members of management" it may be

5    inferred that defendants were aware revenues were improperly being recognized on sale of its most

6    important product).

7    Considering these allegations holistically, as the Supreme Court requires, lends strong

8    support for an inference that, in the absence of any disclosure of the liver toxicity problems or any

9    past warning that such problems might arise, defendants were deliberately reckless in issuing the

10   subsequent statements that mislead investors about the progress of the clinical trials and the

11   prospects for FDA approval. *Tellabs*, 127 S. Ct. at 2509, 2511.

### 3. When the FDA Hold Was Announced, Defendants Made Baseless Claims About the Continued Prospects for TH-070

13   Defendants largely ignore plaintiffs' claims that the positive statements they made about TH-

14   070's prospects, even after the FDA placed the trial on clinical hold, were misleading.  ¶¶102-16.

15   Indeed, the only argument defendants make for dismissal of this claim is to contend that, like Selick

16   two months earlier, Threshold's medical director, Colowick, was "misquoted" in the transcript of the

17   May 11, 2006 conference call with investors.   Motion at 20.  Again, the Thomson StreetEvents

18   transcript circulated to investors during the Class Period substantiates the statements attributed to

19   Colowick in the Complaint. *See* Herman Decl. Ex. B at 7; *cf.* ¶105. Hence, once again, defendants'

20   argument raises, at most, a factual dispute that cannot be resolved on the pleadings. *E.g., NPS*

21   *Pharm.*, 2007 U.S. Dist. LEXIS 48713, at *10; *supra* §III.B.1; *see* Opp. to RJN at 1, 3-5.

22   Moreover, defendants are incorrect that plaintiffs rely solely upon the purported misquotation

23   of Colowick to contend that Threshold misleadingly downplayed the significance of the liver toxicity

24   issues during the May 11, 2006 conference call.  Motion at 20.  To the contrary, the Complaint

25   specifically alleges that, in addition to Colowick's claim that the Company was not in agreement

26   with the FDA's decision to place the trials on clinical hold, defendants made numerous other

27   statements designed to mislead investors into believing that TH-070 still had promise despite the

28

1  regulatory action.  ¶¶103-07.  Hence, even if the jury were to credit defendants' belated correction of

2  Colowick's statement, that finding would not result in denial of plaintiffs' claim, nor does it justify

3  dismissal on the pleadings.

4        For example, the press release announcing the clinical hold advised investors that the

5  Company expected, subject to the FDA's agreement, to continue clinical trials with an "intermittent

6  dosing" regimen.  ¶103.  Colowick reassured investors during a conference call held the same day

7  that continuation of the trial was likely, suggesting that the FDA had imposed the clinical hold

8  simply "as a regulatory policy" and that, based on discussions with the agency, the Company had "a

9  reasonable sense of" its concerns:

10        [T]he issues are primarily related around determining what is a safe both dose and
          duration of the drug to move forward.  We believe ***and I think the FDA agrees*** that

11        the plan would look something like a shorter-duration certainly than has been used in
          the current European study.

12  ¶104.  These statements misled investors by suggesting that the concerns with TH-070's liver

13  toxicity and the FDA's action in response were not as great as they might otherwise seem, and that

14  even the FDA was on board with a plan that would allow the clinical trials to continue.[27]  ¶106.  The

15  statements were also misleading in that they failed to identify the full extent of the toxicity problems,

16  and made no mention of the lack of any data showing the efficacy of the drug.  ¶¶107-08.

17        Defendants do not claim that these statements were not misleading, nor do they contend that

18  they were not made with scienter.  Even if defendants had raised such an argument, it would have

19  had to be rejected because the Complaint adequately explains why these statements were false

20  (¶¶106-07), and provides detailed allegations giving rise to a strong inference that defendants either

21  knew or were deliberately reckless to the fact that the statements were misleading when made.

22  ¶¶108-16.  Hence, there is no ground on which to dismiss plaintiffs' claims.  *E.g., Immune Response*,

23  375 F. Supp. 2d at 1020-21; *Amylin II*, 2003 U.S. Dist. LEXIS 7667, at *8.

24

25  _____

26  [27]    The misleading nature of these statements was enhanced by Colowick's efforts to downplay
        the significance of the SAEs that had led to the hospitalization of clinical trial patients, by suggesting

27      that one of the patients was an alcoholic and – in the passage disputed by defendants – that
        Threshold didn't agree with the decision to classify the incidents as SAEs.  ¶105.

28

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS -
**4:07-cv-04972-CW**                                                                      - 29 -

1
2

      **C.**    **Defendants' Exorbitant Bonuses and Rich Compensation Packages, Together with Stock Sales by Related Parties, Lends Additional Support for a Strong Inference of Scienter**

3           As set forth above, plaintiffs have sufficiently alleged, with respect to their claims under the

4  Exchange Act, that defendants were deliberately reckless to the misleading nature of the statements

5  they made about the conduct of the clinical trials and the prospects for FDA approval of, and risks

6  associated with, TH-070.  In addition, the Complaint strengthens these inferences of scienter by

7  demonstrating that each of the defendants had a strong motive and opportunity to mislead the market

8  about the progress of the TH-070 trials.  ¶¶115, 129-49.  These allegations, when considered

9  collectively with the other allegations in the Complaint, further support the required "strong

10  inference" of scienter by making it at least as likely as not that defendants deliberately and recklessly

11  disregarded that their statements would mislead investors at the time they made them.  *Tellabs*, 127

12  S. Ct. at 2509-11.

13           The fact that Threshold was a small start-up drug company without any approved product to

14  sell, and that TH-070 was both its lead product candidate and the drug of most interest to investors,

15  provided defendants with a motive to present the market with overly optimistic statements about the

16  drug's potential.  *E.g., Amylin I*, 2002 U.S. Dist. LEXIS 19481, at *21-*22.  The fact that Threshold

17  was running out of money prior to its IPO also provided defendants with an incentive to overlook the

18  shortcomings of the Bari Study and downplay potential safety concerns with the drug.  ¶4, 43-48;

19  *Gargiulo*, 527 F. Supp. 2d at 390.

20           Defendants' desire to assist Threshold's early stage non-public venture capital investors to

21  obtain a return on their investment, together with the fact that they were precluded from doing so by

22  a 180-day "lock up" agreement, provided a further motive for defendants to keep Threshold's stock

23  price inflated through April 2006.  ¶¶131, 138; *e.g., In re Entropin, Inc., Sec. Litig.*, 487 F. Supp. 2d

24  1141, 1153-54 (C.D. Cal. 2007); *see also Danis v. USN Commc'ns Inc.*, 73 F. Supp. 2d 923, 941

25  (N.D. Ill. 1999) (desire to preserve credibility with venture capitalists who had been brought in to

26  invest in start up company provided motive for fraud that could be considered in light of other

27  factors to help give rise to strong inference of scienter).  Like most venture capitalists, Threshold's

28  early investors had representatives on the Company's board of directors and exerted strong control

1    over its operations.  ¶¶130, 132, 138-39.  Moreover, here, the Complaint alleges that Threshold had

2    stronger than normal ties, both personal and professional, to its venture capital investors.  ¶¶130-33,

3    138-39.

4           Threshold founder George Tidmarsh was a member of Three Arch Partners ("Three Arch"), a

5    venture capital firm that suspiciously dumped one million of its shares on the market for $14.5

6    million on March 2, 2006, just two days after Selick primed the market to expect a "home run" from

7    TH-070.  ¶¶9, 138-43.  By the end of the month, Tidmarsh had resigned from Threshold "to pursue

8    other interests."[28]  ¶9.  Meanwhile, Sofinnova Ventures, Inc.'s ("Sofinnova") representative on

9    Threshold's board, Board President Michael F. Powell, is the brother of Denise Powell, who was

10   Threshold's investor relations representative and senior director of corporate communications, a

11   position that by its nature put her in contact with material non-public information about the

12   Company.  ¶90.  In addition, Selick himself was a "venture partner" of Sofinnova and had received

13   $236,083 in compensation in 2003 and 2004 alone as a result of its activities in investing in

14   companies like Threshold.[29]  ¶¶24, 133.  Like Three Arch, Sofinnova sold 2.5 million shares for

15

16   [28]    While plaintiffs do not contend that Tidmarsh's resignation alone gives rise to a strong

17   inference of scienter, defendants are incorrect that these allegations are entitled to no weight
     whatsoever.  Even the cases on which defendants rely recognize that the resignation of high-ranking

18   officers may "add one more piece to the scienter puzzle" particularly where they are "proximate in
     time" to the disclosures of negative information to the market.  *Impax Labs.*, 2007 U.S. Dist. LEXIS

19   52352, at *26-*29.

20   [29]    Defendants' attempts to contradict the allegations regarding Selick's interest in Sofinnova is
     misplaced and incorrect.  Defendants do not dispute that Selick was a venture partner and had a

21   significant financial interest in Sofinnova, from which he had received, and expected to continue
     receiving, substantial compensation.  ¶133.  Defendants seek instead to improperly contradict that

22   allegation by interjecting factual disputes over the nature of Selick's interest in Sofinnova.  Motion
     at 22.  Regardless of the exact nature of Selick's interest, the fact remains that Selick had strong

23   economic ties to Sofinnova and a financial interest in Sofinnova's continued success, which lends
     additional support to the inferences of scienter in this case.  This would be true whether Selick's

24   interest was tied to Sofinnova's investment in Threshold, as the Complaint alleges, or was tied to
     another company in which Sofinnova had invested, as defendants' imply.  While Selick's interest in

25   Sofinnova, alone, may not give rise to a strong inference, it certainly advances it.  Tellingly,
     defendants do not explain the precise nature of Selick's interest in Sofinnova, nor would it be

26   appropriate for them to do so at this stage.  Instead, defendants chide plaintiffs for not being able to
     more specifically describe Selick's interest based upon the circumspect descriptions provided in

27   Threshold's SEC filings.  Motion at 22.  Defendants' reliance on the absence of a Form 3 or Form 4
     filing by Selick provides no support for their Motion, for it asks the Court to conclude, without even

28   knowing the nature of his interest, that (i) Selick was not required to make such filings, and (ii) the

1   $36.5 million, representing 75% of its holdings, on March 16, 2006, just weeks after Selick had

2   reassured the market with his "home run" comment. ¶134. The amount and timing of the sales by

3   Three Arch and Sofinnova, along with the strong ties between these entities and Threshold insiders,

4   lend additional support for an inference of scienter. ¶¶134-36, 140-43; *see, e.g., Nursing Home*

5   *Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (sale of less than 7%

6   of holdings for significant amount of money just one month before release of adverse earnings report

7   supported scienter); *Silicon Graphics*, 183 F.3d at 1001 (insider sales of 43.6% and 75.3%

8   suspicious).

9       That both Three Arch's and Sofinnova's sales came on a single day, rather than being spread

10  out over a period of time to avoid price declines caused by the volume of stock they were selling and

11  maximize the price received for the shares, lends further support for the inference that they were

12  acting on the basis of inside information to sell their shares as rapidly as possible. ¶¶134, 136, 140,

13  142. In fact, Sofinnova's sale triggered a 4% decline in Threshold's stock price, demonstrating the

14  economic irrationality of a one-day sale. ¶134. That these entities did not sell *all* their shares is of

15  no moment, as the timing of their sales was suspicious (coming after the "home run" comment and

16  the adverse pharmacokinetic study, and just weeks before adverse liver incidents were revealed to

17  the FDA), and both the amount of the proceeds and the percentage of their holdings sold was

18  significant. *E.g., Oracle*, 380 F.3d at 1232.

19      Finally, the rich compensation packages bestowed on Selick and Swearson demonstrate that

20  there were significant rewards available to Threshold's management, without them having to resort

21  to insider stock sales that might call attention to the fact that there were problems in the clinical

22  trials. Following the success of the IPO on the backs of the quickly-conducted Bari Study, Selick

23  and Swearson received bonuses of $374,614 and $141,375, respectively, out of the proceeds of that

24  offering, and another $120,000 and $98,500 out of the proceeds of the Follow-on Offering. ¶¶144-

25  45. Their anticipation of even richer rewards from the appearance of success in later clinical trials

26

27  only financial interests that are required to be disclosed on Forms 3 or Forms 4 can provide a motive
    for fraud.

28

1    provided them with a strong motivation to keep investor confidence in TH-070 afloat for as long as

2    possible. *See Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 664 (8th Cir. 2001)

3    (potential for increased compensation "is an important part of the overall picture of scienter").

4    Defendants' efforts to "negate" the inferences of scienter flowing from the foregoing allegations

5    based on the purported absence of insider stock sales is meritless. *E.g., America West*, 320 F.3d at

6    944; *Entropin*, 487 F. Supp. 2d at 1153-54. Neither does the fact that Threshold spent the IPO

7    proceeds on the clinical trials for TH-070 negate an inference of scienter. *Hanon v. Dataproducts*

8    *Corp.*, 976 F.2d 497, 507 (9th Cir. 1992); *Amylin I*, 2002 U.S. Dist. LEXIS 19481, at *12-*13. By

9    the time plaintiffs allege that defendants were acting with scienter – *i.e.*, March 1, 2006 – the clinical

10   trials were well underway and the money had already been spent. The expenditure of funds in the

11   past hardly can be used to negate defendants' present knowledge that the trials had not gone as well

12   as hoped – or that investors were being misled when Threshold provided positive updates on the

13   trials ***without*** disclosing the problems that had erupted.[30]

14
15       **D.    The Individual Defendants "Made" the Misleading Statements Giving
              Rise to Plaintiffs' Claims**

16       Defendants Selick and Swearson incorrectly contend that they cannot be held liable under

17   §10(b) of the Exchange Act by reference to the "group pleading" doctrine to establish that they

18   "made" the statements at issue herein. Motion at 20. Defendants do not dispute that Selick and

19   Swearson are properly named as defendants under the Securities Act claims arising from the

20   misleading statements in the prospectuses and registration statements they signed for the two public

21   offerings during the Class Period, as described above.

22       Defendants are wrong that the group pleading doctrine did not survive passage of the

23   PSLRA. *In re PETsMART, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 997 (D. Ariz. 1999); *In re*

24
---

25   [30]    Defendants' reliance on *In re Worlds of Wonder Sec. Litig.* is therefore misplaced, because
     the majority of the spending in that case continued ***after*** the problems allegedly became known

26   whereas here the spending occurred beforehand. *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407,
     1425 (9th Cir. 1994). Defendants' reliance on *Oppenheim Pramerica Asset Mgmt. S.a.r.l. v. Encysive*

27   *Pharm.*, No. H-06-3022, 2007 U.S. Dist. LEXIS 69121 (S.D. Tex. Sept. 18, 2007), is misplaced for
     the same reason.

28

1    *Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1108 (D. Nev. 1998).  Plaintiffs may use the

2    group pleading doctrine to impose liability upon Selick and Swearson for statements made on

3    conference calls in which they participated, in press releases they were responsible for preparing or

4    approving, or in SEC filings which they personally signed – whether or not they were the ones who

5    communicated the misleading information to the market.  *Wool v. Tandem Computers, Inc.*, 818 F.

6    2d 1433, 1440 (9th Cir. 1987); *In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 595 (9th Cir. 1995).

7            Defendants' Motion appears to be based principally on an argument relegated to a footnote,

8    wherein they suggest that Swearson (though not Selick) should be relieved of liability because she

9    was the CFO and the Complaint does not allege Threshold published false or misleading financial

10   statements.  Motion at 21 n.12.  However, the Complaint alleges that Swearson was responsible for

11   and communicated to investors regarding the costs of the clinical trials, which is suggestive of her

12   involvement to some extent in those activities, as would be expected in a small, start-up

13   pharmaceutical company with only two significant products in the regulatory pipeline.  ¶¶2, 29, 86-

14   7.  To the extent Selick and Swearson complain because some of the misleading statements were

15   made by Colowick (Threshold's medical director) during Company-sponsored conference calls with

16   analysts (*e.g.*, ¶¶104-05), they are wrong that the securities laws permitted them to stand idly by

17   while investors were being misled.  *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d

18   527, 543 (S.D. Ohio 2000); *see also Pegasus Holdings v. Veterinary Ctrs. of Am., Inc.*, 38 F. Supp.

19   2d 1158, 1165 (C.D. Cal. 1998) ("non-speaking defendants may be held liable on a 'group pleading'

20   theory").

21           **E.    Defendants Concede that They Are Control Persons Within the
                     Meaning of §15 of the Securities Act and §20(a) of the Exchange Act**
22

23           Both the Securities Act and the Exchange Act provide for liability to be imposed against

24   those who exert control over the primary violators of those Acts, and therefore had the power to stop

25   those violations from occurring before investors could be misled or injured.  15 U.S.C. §§77*o*, 78*o*;

26   *e.g., Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990); *Howard v. Everex Sys.,*

27   *Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  The Complaint alleges that each of the defendants had

28   but failed to exercise the power to prevent the alleged securities law violations.  ¶¶175-76, 183-84.

1   The sole ground defendants raise for dismissing these claims is the purported lack of a primary

2   violation.  Motion at 24.  Hence, defendants admit that the control person claims are otherwise

3   properly pled.  Because defendants' motion to dismiss the primary violations must be denied as

4   described above, defendants' motion to dismiss the control person claims must be denied as well.

5   **IV.    CONCLUSION**

6          For the reasons set forth above, defendants' motion to dismiss should be denied in its

7   entirety.  To the extent the Court concludes otherwise in any respect, plaintiffs respectfully request

8   an opportunity to amend the Complaint.  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048,

9   1051 (9th Cir. 2003) (leave to amend should be liberally granted, particularly in securities cases);

10  *Daou*, 411 F.3d at 1013 ("Dismissal without leave to amend is improper unless it is clear, upon *de*

11  *novo* review, that the complaint could not be saved by any amendment.").

12  DATED:  April 21, 2008                       Respectfully requested,

13                                               COUGHLIN STOIA GELLER
                                                   RUDMAN & ROBBINS LLP
14                                               DENNIS J. HERMAN
                                                 DANIEL J. PFEFFERBAUM
15

16
                                                        s/ Dennis J. Herman
17                                                     DENNIS. J. HERMAN

18                                               100 Pine Street, Suite 2600
                                                 San Francisco, CA  94111
19                                               Telephone:  415/288-4545
                                                 415/288-4534 (fax)
20
                                                 Lead Counsel for Plaintiffs
21

22  T:\CasesSF\Threshold\BRF00050524.doc

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2       I hereby certify that on April 21, 2008, I electronically filed the foregoing with the Clerk of

3 the Court using the CM/ECF system which will send notification of such filing to the e-mail

4 addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5 mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6 participants indicated on the attached Manual Notice List.

7       I certify under penalty of perjury under the laws of the United States of America that the

8 foregoing is true and correct.  Executed on April 21, 2008.

9

10                              s/ Dennis J. Herman
                             DENNIS J. HERMAN

11

12                             COUGHLIN STOIA GELLER
                                  RUDMAN & ROBBINS LLP

13                             100 Pine Street, 26th Floor
                             San Francisco, CA  94111

14                             Telephone:  415/288-4545
                             415/288-4534 (fax)

15

16                             E-mail:Dennish@csgrr.com

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 4:07-cv-04972-CW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Kevin Anthony Burke**
  kburke@hewm.com

- **Michael L. Charlson**
  michael.charlson@hellerehrman.com,larissa.soboleva@hellerehrman.com,jennifer.cygnor@hellerehrman.com,su

- **Marc S. Henzel**
  mhenzel182@aol.com

- **Dennis J. Herman**
  dennish@csgrr.com,jdecena@csgrr.com,moniquew@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Alexander M.R. Lyon**
  alexander.lyon@hellerehrman.com,yfs@hellerehrman.com

- **Daniel Jacob Pfefferbaum**
  DPfefferbaum@csgrr.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Samuel H. Rudman**
  srudman@csgrr.com

- **Evan J. Smith**
  esmith@brodsky-smith.com

- **Laurence Andrew Weiss**
  lweiss@hewm.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Mary K. Blasy
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
```