MICHAEL L. CHARLSON (Bar No. 122125)
LAURENCE A. WEISS (Bar No. 164638)
ALEXANDER M.R. LYON (Bar No. 211274)
HELLER EHRMAN LLP
275 Middlefield Road
Menlo Park, California  94025-3506
Telephone: (650) 324-7000
Facsimile: (650) 324-0638
Michael.Charlson@hellerehrman.com
Laurence.Weiss@hellerehrman.com
Alexander.Lyon@hellerehrman.com

Attorneys for Defendants
THRESHOLD PHARMACEUTICALS, INC.,
HAROLD E. "BARRY" SELICK
and JANET I. SWEARSON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JERRY TWINDE, On Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> THRESHOLD PHARMACEUTICALS, INC., HAROLD E. "BARRY" SELICK and JANET I. SWEARSON <br><br> Defendants. | Case No.: 4:07-CV-04972-CW <br><br> CLASS ACTION <br><br> **REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| RAYNOLD L. GILBERT, On Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> THRESHOLD PHARMACEUTICALS, INC., HAROLD E. "BARRY" SELICK and JANET I. SWEARSON <br><br> Defendants. | Hearing Date: June 19, 2008 <br> Hearing Time: 2:00 p.m. <br> Place: Courtroom 2, 4th Floor <br> Judge: Hon. Claudia Wilken |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     PLAINTIFFS' REGISTRATION ACT CLAIMS ARE TIME-BARRED ......................... 2

III.    THE '33 ACT CLAIMS ALSO FAIL BECAUSE PLAINTIFFS DO NOT
        IDENTIFY A MATERIALLY FALSE STATEMENT IN EITHER
        REGISTRATION STATEMENT ................................................................................ 5

        A.      The Registration Statements Are Not Actionable Under The Bespeaks
                Caution Doctrine and the PSLRA Safe Harbor .............................................. 5

        B.      The Information Allegedly Omitted From The Registration
                Statements About The Bari Study Either Was In Fact Disclosed Or
                Was Immaterial ............................................................................................... 7

                1.      The Bari Study's Design ...................................................................... 7

                2.      The Bari Study's Publication ............................................................... 8

        C.      The Scientific Data Did Not Indicate A Material Risk Of Liver
                Toxicity ......................................................................................................... 10

IV.     PLAINTIFFS' SECTION 10(B) CLAIM SHOULD BE DISMISSED ........................... 12

        A.      Plaintiffs' Narrowed Fraud Claim Still Lacks The Required
                Particularity .................................................................................................. 12

                1.      Plaintiffs' Misquotation Of Dr. Selick's March 1, 2006
                        Conference Call Statement Does Not Adequately Plead Fraud ............. 13

                2.      The March 20, April 5, and May 10, 2006, Press Releases
                        Were Not Rendered Misleading By The Appearance Of SAEs
                        In Clinical Trials ................................................................................. 14

                3.      The May 11, 2006, Press Release and Conference Call Cannot
                        Support A Fraud Claim Either ............................................................. 16

        B.      Plaintiffs' Additional Scienter Allegations Do Not Salvage The Fraud
                Claim ............................................................................................................ 17

        C.      The Section 10(b) Claim Against Ms. Swearson Must Be Dismissed ................ 20

V.      CONCLUSION ................................................................................................... 20

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:07-CV-04972-CW

# TABLE OF AUTHORITIES

## Federal Cases

*Barbera v. WMC Mortgage Corp.,*
  2006 WL 167632 (N.D. Cal. 2006) ...................................................................................... 13

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) .............................................................................................. 4, 8, 12

*Car Carriers, Inc. v. Ford Motor Co.,*
  745 F.2d 1101 (7th Cir.1984) ............................................................................................. 13

*Cohen v. USEC, Inc.,*
  2003 U.S. App. LEXIS 14546 (4th Cir. 2003) .................................................................. 4

*Danis v. USN Commc'ns, Inc.,*
   73 F. Supp. 2d 923 (N.D. Ill. 1999) ................................................................................. 17

*Dura Pharm., Inc. v. Broudo,*
  544 U.S. 336 (2005) ........................................................................................................... 16

*Gargiulo v. Isolagen, Inc.,*
  527 F. Supp. 2d 384 (E.D. Pa. 2007) ............................................................................... 12

*Grossman v. Novell, Inc.,*
  120 F.3d 1112 (10th Cir. 1997) ........................................................................................ 15

*Harris v. IVAX Corp.,*
  182 F.3d 799 (11th Cir. 1999) ............................................................................................ 6

*Heywood v. Cell Therapeutics, Inc.,*
  2006 U.S. Dist. LEXIS 28684 (W.D. Wash. 2006) .................................................... 14, 16

*In re Alamosa Holdings, Inc. Sec. Litig.,*
  382 F. Supp. 2d 832 (N.D. Tex. 2005) ............................................................................... 4

*In re Amgen, Inc. Sec. Litig.,*
  2008 U.S. Dist. LEXIS 24611 (C.D. Cal. 2008) .............................................................. 15

*In re Amylin Pharm., Inc. Sec. Litig.,*
  2002 U.S. Dist. LEXIS 19481 (S.D. Cal. 2002) .............................................................. 12

*In re Amylin Pharm., Inc. Sec. Litig.,*
  2003 U.S. Dist. LEXIS 7667 (S.D. Cal. 2003) ............................................................... 6, 8

*In re Bayer AG Sec. Litig.,*
  2004 U.S. Dist. LEXIS 19593 (S.D.N.Y. 2004) .............................................................. 15

*In re Calpine Corp. Sec. Litig.,*
      288 F. Supp. 2d 1054 (N.D. Cal. 2003) ............................................................................ 19

*In re Convergent Techs. Sec. Litig.,*
      948 F.2d 507 (9th Cir. 1991) ............................................................................................. 8

*In re Eli Lilly & Co. Sec. Litig.,*
      2008 U.S. Dist. LEXIS 35162 (E.D.N.Y. 2008) ............................................................. 3, 4

*In re Entropin Sec. Litig.,*
      487 F. Supp. 2d 1141 (C.D. Cal. 2007) ...................................................................... 17, 18

*In re Gupta Corp. Sec. Litig.,*
      900 F. Supp. 1217 (N.D. Cal. 1994) ............................................................................... 20

*In re Harmonic Inc. Sec. Litig.,*
      163 F. Supp. 2d 1079 (N.D. Cal. 2001) ............................................................................ 9

*In re Infonet Services Corp. Sec. Litig.,*
      310 F. Supp. 2d 1080 (C.D. Cal. 2003) ............................................................................ 6

*In re Immune Response Sec. Litig.,*
      375 F. Supp. 2d 983 (S.D. Cal. 2005) ......................................................................... 8, 12

*In re Impax Labs., Inc., Sec. Litig.,*
      2007 U.S. Dist. LEXIS 52356 (N.D. Cal. 2007) ............................................................. 19

*In re JDS Uniphase Corp. Sec. Litig.,*
      2005 U.S. Dist. LEXIS 20831 (N.D. Cal. 2005) ............................................................... 5

*In re J.P. Morgan Chase Sec. Litig.,*
      363 F. Supp. 2d 595 (S.D.N.Y. 2005) ............................................................................. 18

*In re Merck & Co., Sec. Deriv. & ERISA Litig.,*
      483 F. Supp. 2d 407 (D.N.J. 2007) ................................................................................... 5

*In re Merrill Lynch & Co. Research Reports Sec. Litig.,*
      289 F. Supp. 2d 429 (S.D.N.Y. 2003) ............................................................................... 5

*In re Merrill Lynch & Co.,*
      272 F. Supp. 2d 243 (S.D.N.Y. 2003) ............................................................................... 9

*In re Netopia, Inc. Sec. Litig.,*
      2005 U.S. Dist. LEXIS 38823 (N.D. Cal. 2005) ............................................................. 20

*In re Petsmart, Inc. Sec. Litig.,*
      61 F. Supp. 2d 982 (D. Ariz. 1999) ................................................................................ 20

*In re Portal Software, Inc. Sec. Litig.,*
      2006 U.S. Dist. LEXIS 61589 (N.D. Cal. 2006) ............................................................... 5

*In re Regeneron Pharm. Sec. Litig.,*
    2005 U.S. Dist. LEXIS 1350 (S.D.N.Y. 2005) ...................................................... 6

*In re Silicon Graphics, Inc. Sec. Litig.,*
    183 F.3d 970 (9th Cir. 1999) ................................................................... 18, 19

*In re Stac Elect. Sec. Litig.,*
    89 F.3d 1399 (9th Cir. 1996) ...................................................................... 5

*In re Stratosphere Corp. Sec. Litig.,*
    1 F. Supp. 2d 1096 (D. Nev. 1998) ............................................................. 20

*In re Syntex Corp. Sec. Litig.,*
    95 F.3d 922 (9th Cir. 1996) ...................................................................... 11

*In re USEC Sec. Litig.,*
    190 F. Supp. 2d 808 (D. Md. 2002) ........................................................... 4, 5

*In re VeriFone Sec. Litig.,*
    11 F.3d 865 (9th Cir. 1993) ..................................................................... 7, 15

*In re Worlds of Wonder Sec. Litig.,*
    35 F.3d 1407 (9th Cir. 1994) .................................................................... 6, 9

*Intri-Plex Technologies, Inc. v. Crest Group, Inc.,*
    499 F.3d 1048 (9th Cir. 2007) ................................................................... 13

*Kaplan v. Rose,*
    49 F.3d 1363 (9th Cir. 1994) ................................................................ 5, 8, 10

*Kapps v. Torch Offshore, Inc.,*
    379 F.3d 207 (5th Cir. 2004) ...................................................................... 9

*Klein v. GNC, Inc.,*
    186 F.3d 338 (3rd Cir. 1999) ..................................................................... 10

*Lentell v. Merrill Lynch & Co.,*
    396 F.3d 161 (2d Cir. 2005) ....................................................................... 3

*Lipton v. Pathogenesis Corp.,*
    284 F.3d 1027 (9th Cir. 2002) .................................................................... 17

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,*
    547 U.S. 71 (2006) ............................................................................... 14

*Miller v. Nationwide Life Ins. Co.,*
    391 F.3d 698 (5th Cir. 2004) ...................................................................... 4

*Miller v. Thane Int'l, Inc.,*
    519 F.3d 879 (9th Cir. 2008) ..................................................................... 10

iv

*Mullis v. United States Bankr. Ct.*,
    828 F.2d 1385 (9th Cir. 1987) ........................................................................... 13

*Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*,
    515 F.2d 1200 (5th Cir. 1975) ........................................................................... 13

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West
    Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) ...................................................... 18

*Noble Asset Mgmt. v. Allos Therapeutics, Inc.*,
    2005 U.S. Dist. LEXIS 24452 (D. Col. 2005) ...................................................... 6

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ............................................................................. 8

*Rubke v. Capitol Bancorp Ltd.*,
    460 F. Supp. 2d 1124 (N.D. Cal. 2006) ............................................................... 9

*Steiner v. Hale*,
    868 F. Supp. 284 (S.D. Cal. 1993) .................................................................... 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S.Ct. 2499 (2007) ...................................................................................... 14

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ......................................................................................... 12

*Vess v. Ciba-Geigy Corp. U.S.A.*,
    317 F.3d 1097 (9th Cir. 2003) ............................................................................. 5

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) ................................................................................. 6

## Federal Statutes

15 U.S.C. § 77m ................................................................................................... 2

28 U.S.C. § 1658(b) .............................................................................................. 2

## Federal Regulations

21 C.F.R. § 202.1(e)(1) ....................................................................................... 12

21 C.F.R. § 312.21(c) ......................................................................................... 11

21 C.F.R. § 312.32 ............................................................................................. 15

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:07-CV-04972-CW

## I.    INTRODUCTION

Defendants' opening brief showed that the Complaint[1] should be dismissed for, among other reasons, failure to plead with the required particularity.  In response, Plaintiffs retreat from the Complaint's allegations of knowing misconduct dating from Threshold's IPO in an apparent attempt, ultimately unavailing, to invoke a relaxed pleading standard for some of their claims.  The incongruity between the Complaint's allegations and Plaintiffs' new theory is reason enough to require repleading.  But more significantly, Plaintiffs' recharacterization of their claims points up hopeless flaws that mandate dismissal of certain claims with prejudice.

Plaintiffs' new theory makes plain that the claims directed to the Registration Statements for Threshold's two stock offerings, which Plaintiffs now say arise only under the Securities Act of 1933 ("'33 Act"), are barred by the one-year statute of limitations:  under Plaintiffs' own allegations, many (if not all) of the facts about supposed flaws in the Bari Study and liver problems in prior studies of lonidamine that Plaintiffs say were omitted from the Registration Statements were disclosed to investors more than one year before Plaintiffs filed suit.  The claims are barred.

But even if the '33 Act claims were timely, Plaintiffs cannot overcome that the Registration Statements were replete with risk disclosures that accurately described Threshold as a risky bet on unproven technology and thereby bespoke caution (and with respect to the follow-on offering triggered the PSLRA safe-harbor) about the need for Threshold to conduct further clinical trials (including placebo-controlled tests) to determine the safety and efficacy *or not* of TH-070.  Plaintiffs' rhetoric does not and cannot contradict Defendants' showing that the information allegedly omitted was in fact disclosed, or was immaterial.

The rump Section 10(b) fraud claim – now limited to a handful of statements allegedly made in conference calls and press releases shortly before Threshold discontinued development of TH-070 – should also be dismissed.  *First*, Plaintiffs do not seriously dispute that their claim is based on misquotations.  Their contention that the Court must ignore their errors contradicts the PSLRA and recent Supreme Court authority.  *Second*, Plaintiffs cannot eschew the cases holding

---

[1]  Terms defined in Defendants' Motion to Dismiss ("Mot.") have the same meanings in this brief.  *See* Mot. at 4 n.2 (defining terms for exhibits).

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:07-CV-04972-CW

1   that adverse patient events are immaterial absent additional allegations – not present here – that the

2   events were sufficiently important to affect the drug's commercial prospects. *Third*, Plaintiffs fail

3   to allege with the required specificity that Defendants had any advance knowledge of the blinded

4   clinical trial data, and fail to present allegations supporting an inference of scienter, cogent and

5   compelling or otherwise.

6        Defendants' motion does not require the Court to resolve any dispute of fact. The

7   Complaint's allegations, along with materials the Court may consider in resolving this motion,

8   reveal that the Complaint is deficient as a matter of law and must be dismissed.

9   **II.    PLAINTIFFS' REGISTRATION ACT CLAIMS ARE TIME-BARRED**

10        As we discuss below, there were no material omissions or misstatements in the Registration

11   Statements covering either of Threshold's public offerings. But the Court need not reach those

12   issues because Plaintiffs' claims directed to the Registration Statements are untimely.

13        Plaintiffs now assert that they challenge Threshold's Registration Statements solely under

14   Sections 11 and 12 of the '33 Act. *See* Opp. at 1-2, 6. Taking Plaintiffs at their word, there can be

15   no doubt that the claims are time-barred. The limitations period applicable to '33 Act claims is one

16   year, 15 U.S.C. § 77m, not the two years applicable to '34 Act claims, 28 U.S.C. § 1658(b).[2] Under

17   Plaintiffs' allegations, the information they say was omitted from the Registration Statements was

18   disclosed more than a year before Plaintiffs sued. In particular, the Complaint alleges that:

19          • in June 2005, the Bari Study's principal investigator published an article disclosing
20            the very information about the Bari Study that Plaintiffs contend was omitted from
         the Registration Statements,[3] AC ¶¶ 65, 66, 78; and

21          • on May 11, 2006, Threshold "shocked investors" by announcing that the FDA had
22            placed a partial clinical hold on TH-070 trials due to liver toxicity problems and
         "admitted" that data existed showing what Plaintiffs say were liver toxicity "trends"
         in the prior literature on lonidamine, AC ¶¶ 71, 102.

23   As Plaintiffs' Complaint concedes that information purportedly demonstrating errors in the

24        ————————————

25      [2] Because the Complaint appears to allege a Section 10(b) fraud claim throughout the class
period, including with respect to the Registration Statements, Defendants' motion to dismiss
26   focused on the two-year period applicable to Section 10(b) claims. *See* Mot. at 12-13. Putting
aside the ambiguity within the Opposition on this point, Plaintiffs' claims based on the IPO
Registration Statement are time-barred even applying the two-year statute. *Id.*

27      [3] Although Plaintiffs allege that the Bari Study article was published in June 2005, AC ¶ 66,
28   it was actually published in May. *See* 5/19/05 P.R. Plaintiffs' error is irrelevant to the limitations
analysis, however, as the case was first filed on July 5, 2007 – more than two years after either date.

Registration Statements concerning the Bari Study and liver toxicity was disclosed more than a year before Plaintiffs filed their case, their '33 Act claims are time-barred. The defect cannot be cured.

Plaintiffs argue generally that their claims are not time-barred because Defendants' disclosures were insufficient "storm warnings" to trigger the running of the limitations period. Opp. at 14-15. Plaintiffs' reliance on the catch-phrase "storm warnings" in lieu of the actual legal standard is a subterfuge often criticized by courts. *E.g., In re Eli Lilly & Co. Sec. Litig.,* 2008 U.S. Dist. LEXIS 38823 (E.D.N.Y. 2008). According to the Second Circuit, the source of Plaintiffs' "storm warnings" language, the actual standard is as follows:

> Inquiry notice – often called "storm warnings" in the securities context – gives rise to a duty of inquiry when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded.

*Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 168 (2d Cir. 2005) (internal quotations omitted). Applying this standard, Threshold's May 2005 and May 2006 disclosures triggered the limitations period.

We begin with May 11, 2006. According to the allegations, the press release and investor call that day: (a) disclosed the facts about liver toxicity in prior studies that Plaintiffs say Defendants knew but omitted from the Registration Statements, and (b) caused a one-day stock price decline of more than 75%. AC ¶¶ 39, 71, 102-03. Among other things, Plaintiffs allege that Threshold's medical director, Alan Colowick, "conceded" that there had been prior studies showing liver toxicity. *Id.* ¶¶ 39, 71. These disclosures required investors to inquire into possible claims.

Plaintiffs contend that the May 11 disclosures were still misleading because Dr. Colowick tried to reassure investors on the call. *See* AC ¶¶ 103-07.[4] But under the storm warnings standard, the import of Dr. Colowick's "concession" and the 75% price decline is clear. *See* AC ¶¶ 71, 103. Plaintiffs cannot have matters both ways. If, as Plaintiffs allege, Defendants should have disclosed prior studies mentioning liver toxicity when they filed the Registration Statements, the May 11 disclosures made clear that such prior studies existed. *See* 5/11/06 Tr. Indeed, Plaintiffs allege that shortly after May 11 (but still more than a year pre-suit), analysts reviewed older scientific articles and noted mentions of liver problems. AC ¶ 70; *see also* Opp. at 20 n.21.

---

[4] We discuss in Part IV(A)(3) the reasons the May 11, 2006 disclosures are not actionable.

3

1    The same is true of the May 17, 2005, press release announcing publication of the Bari

2    Study.  Plaintiffs say the Bari Study article cannot have put investors on limitations-period notice

3    even though Threshold brought it to the market's attention with its press release.  Opp. at 15.  The

4    cases hold otherwise.  Inquiry notice can be triggered by "a wide variety of public documents and

5    other sources," including "any financial, legal, or other data."  *E.g., Eli Lilly*, 2008 U.S. Dist.

6    LEXIS 38823 at *31 (citing cases).  In fact, "[e]ven a single news article can provide sufficiently

7    strong omens to place a plaintiff on notice of the need for investigation."  *Id.* (citations omitted).

8        Plaintiffs' contrary assertion is, again, simply a wish to have it both ways.  On the one hand,

9    they say that the Registration Statements were deficient for not describing details of the Bari Study.

10   AC ¶¶ 64-65, 77-78.  Yet when Threshold itself alerted the markets shortly after its IPO to a new

11   article detailing the Study (discussing the same points the Complaint says were omitted), they claim

12   this was insufficient to alert investors to inquire – even though the publication led analysts to do

13   just that (and then publish reports reflecting the Bari Study details).  *See, e.g.,* Fortis.[5]  Under

14   myriad cases with facts analogous to those here, Plaintiffs' argument fails.  *E.g., In re Alamosa*

15   *Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 863-64  (N.D. Tex. 2005) (press release alleged to

16   be an "admission" of misrepresentations in prospectus triggered limitations period);  *Miller v.*

17   *Nationwide Life Ins. Co.,* 391 F.3d 698, 700 (5th Cir. 2004) (supplemental prospectus discussing

18   amendment of certain provisions put investors on notice of misstatements in initial prospectus); *In*

19   *re USEC Sec. Litig.*, 190 F. Supp. 2d 808, 818 (D. Md. 2002) (press release announcing

20   abandonment of technology development project made apparent "the falsity of the statement in the

21   prospectus that [the technology] would soon be deployed," triggering limitations period), *aff'd sub*

22   *nom. Cohen v. USEC, Inc.,* 2003 U.S. App. LEXIS 14546, **21-25 (4th Cir. 2003).[6]

23   _____

24       [5]  Plaintiffs say that the May 17, 2005 disclosure could have had no effect on the limitations
     period applicable to the October 2005 follow-on offering because it pre-dated the Registration

25   Statement.  *See* Opp. at 15 n.15.  Plaintiffs ignore the fraud-on-the-market nature of their case.  AC
     ¶ 121-22.  As we discuss below, the price of a security in an efficient market reflects *all*

26   information available to the market, *see, e.g., Basic Inc. v. Levinson,* 485 U.S. 224, 247 (1988)
     (emphasis added), meaning the Bari Study information published in May 2005 was reflected in

27   Threshold's stock price, and therefore in the follow-on offering price.  *See infra* Part III(B)(2).
     Plaintiffs also ignore the May 11, 2006 announcement that pre-dated their lawsuit by 14 months.

28       [6] Plaintiffs also argue that the Bari Study article did not trigger notice because it also
     included positive statements about the study.  Opp. at 15.  Plaintiffs' argument is mere assertion;

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:07-CV-04972-CW

1    The face of the Complaint reflects that Plaintiffs' '33 Act claims are time-barred. The

2   claims must be dismissed, with prejudice.  *USEC* at 817; *In re Merck & Co., Sec. Deriv. & ERISA*

3   *Litig.,* 483 F. Supp. 2d 407, 417 (D.N.J. 2007).

4   **III.    THE '33 ACT CLAIMS ALSO FAIL BECAUSE PLAINTIFFS DO NOT IDENTIFY
         A MATERIALLY FALSE STATEMENT IN EITHER REGISTRATION

5        STATEMENT[7]**

6        **A.    The Registration Statements Are Not Actionable Under The Bespeaks Caution
                Doctrine and the PSLRA Safe Harbor**

7        Stripped of rhetoric, the Opposition does nothing to undermine Defendants' basic point –

8   that the Registration Statement claims reduce to hindsight second-guessing of the Bari Study's

9   design and the lack of disclosure about a risk of liver toxicity.[8]  Neither omission supports a claim.

10        Nothing in Plaintiffs' 13 pages of argument about the Registration Statements, Opp. at 8-21,

11  _____

12  they do not identify what these supposedly soothing statements said and how they could negate the
    article's description of what the Bari Study was, and was not.  *See* Opp. at 13-15; AC ¶ 74; *see also*

13  *infra* Part III(B)(2) (placebo effect disclosures).  Moreover, positive language in a disclosure that
    includes information suggesting possible prior misrepresentations does not absolve a plaintiff of a

14  duty to inquire.  *See In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 289 F. Supp. 2d 429,
    433 (S.D.N.Y. 2003).  Finally, the claims still fail due to the May 11, 2006, disclosures.  *See USEC,*

15  190 F. Supp. 2d at 818 (notice that a registration statement is misleading in one respect is also
    notice of other possible misstatements).

16        [7]  Plaintiffs say their '33 Act claims are not subject to Rule 9(b) because the Complaint
    "disclaims" allegations of fraud for those claims.  Opp. at 7.  But application of Rule 9(b) depends

17  on the nature of the complaint's substantive allegations.  *See Vess v. Ciba-Geigy Corp. U.S.A.,* 317
    F.3d 1097, 1103-05 (9th Cir. 2003) (Rule 9(b) applies where all claims are based on a unified

18  course of fraudulent conduct).  As the Ninth Circuit has held, boilerplate disclaimers of fraud do not
    suffice to avoid Rule 9(b).  *E.g., In re Stac Elect. Sec. Litig.,* 89 F.3d 1399, 1405 n.2 (9th Cir.

19  1996).  Neither case that Plaintiffs cite says otherwise.  *See In re JDS Uniphase Corp. Sec. Litig.,*
    2005 U.S. Dist. LEXIS 20831 at *33-*34 (N.D. Cal. 2005) (disclaimer coupled with allegations

20  couched in language of "reasonableness"); *In re Portal Software, Inc. Sec. Litig.,* 2006 U.S. Dist.
    LEXIS 61589 at *7-*8, *12 (N.D. Cal. 2006) (disclaimer "borne out" by negligence allegations).

21  The Complaint's Section 10(b) claim incorporates all of the Complaint's earlier allegations,
    including those based on the Registration Statements.  AC ¶ 177.  The allegations reflect a unified

22  course of fraudulent conduct that purportedly began with Defendants' "quick" Bari Study to gin up
    a way to raise money from unsuspecting investors as private investment was "drying up."  *E.g.,* AC

23  ¶¶ 2-6.  As such, Rule 9(b) applies.  As Plaintiffs' Opposition does not seriously contest
    Defendants' Rule 9(b) motion as it pertains to the Registration Statements, all claims based on the

24  Registration Statements should be dismissed on this additional ground.

25        [8]  Plaintiffs try to disguise this essential point by fabricating allegations that were not in the
    Complaint.  For example, Plaintiffs say that Threshold's offering documents used the Bari Study to

26  compare TH-070 with two other drugs, Flomax and Proscar, supposedly claiming that TH-070
    "worked far better with fewer side effects" than either approved BPH treatment.  *See* Opp. at 4

27  (citing AC ¶¶ 56, 63 & 70); *see also* Opp. at 10-11.  This is just untrue, and none of the cited
    allegations (or any others) reflects any such comparison.  *See also* IPO R.S. at 47; 10/05 R.S. at 46.

28  As such, the discussion of inappropriate comparisons from *Kaplan v. Rose,* 49 F.3d 1363, 1371-72
    (9th Cir. 1994), *see* Opp. at 10-11, is inapposite.

1  challenges this fundamental truth: a person considering an investment in Threshold in 2005 could

2  not have read the Registration Statements, with their 18 pages of risk disclosures, without

3  understanding the highly speculative nature of the investment. Threshold made clear that its

4  Metabolic Targeting technology, along with TH-070 and its other drug candidates, were

5  "unproven;" the point of the stock offerings was to raise capital needed to *test* whether they would

6  work *or not*. Under any fair reading, the Registration Statements made this abundantly clear. Yes,

7  Threshold described the Bari Study and said it was promising (which it was). But they also made

8  clear that that Study was preliminary and open-label and would need to be supplemented with

9  additional clinical trials to prove safety and efficacy, the outcome of which was uncertain. IPO

10  R.S. at 3; 10/05 R.S. at 2, 47-48. Thus, the disclosures did precisely what the securities laws intend

11  – to advise investors through detailed, meaningful cautions that Threshold had nothing certain

12  before it but was instead a fledgling company experimenting to determine whether a promising idea

13  might be commercialized.[9] No reasonable investor could have been misled. *See* Mot. at 3-4, 11-

14  15; *see also, e.g., In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1420-21 (9th Cir.1994).

15      Plaintiffs' response to the actual disclosure record is circular: they essentially say that

16  Threshold could not have bespoken enough caution or included enough meaningful cautionary

17  language because, ultimately, something went badly. Once again, they point to purported

18  deficiencies in the design of the Bari Study and the fact that liver toxicity was later detected. *See*

19  Opp. at 16-21. But the law does not require an exact match between the risks disclosed and the

20  later outcome. *E.g., Harris v. IVAX Corp.,* 182 F.3d 799, 807 (11th Cir. 1999); *In re Infonet*

21  *Services Corp. Sec. Litig.,* 310 F. Supp. 2d 1080, 1091-92 (C.D. Cal. 2003).[10] And in any case,

22

23      [9] Plaintiffs assert that the bespeaks caution doctrine and safe-harbor are inapplicable
because they allege omissions on matters of historical fact. Opp. at 16. But Plaintiffs' claim is that
24  Defendants misled investors about TH-070's future *prospects. See, e.g.,* AC ¶ 64 (Defendants
failed to disclose "risks associated with TH-070" and that Bari Study results "were unreliable
25  indicators" of future success). *Noble Asset Mgmt. v. Allos Therapeutics, Inc.,* 2005 U.S. Dist.
LEXIS 24452 at *26 (D. Col. 2005) (prospects for FDA approval "forward-looking").

26      [10]  The cases Plaintiffs cite, Opp. at 17, do not suggest otherwise. Instead, they stand for
the unremarkable proposition that risk disclosures do not cure failures to disclose a specific, known
27  risk. *See In re Amylin Pharm., Inc. Sec. Litig.,* 2003 U.S. Dist. LEXIS 7667, at *21-22 (S.D. Cal.
2003) (*Amylin II); Warshaw v. Xoma Corp.,* 74 F.3d 955, 959 (9th Cir. 1996); *In re Regeneron*
28  *Pharm. Sec. Litig.,* 2005 U.S. Dist. LEXIS 1350, at *54-55 (S.D.N.Y. 2005).

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:07-CV-04972-CW

Plaintiffs' responses are simply more of the same insufficient claims they have asserted from the start.

### B.    The Information Allegedly Omitted From The Registration Statements About The Bari Study Either Was In Fact Disclosed Or Was Immaterial

In Defendants' motion, at 11-16, we showed that most of Plaintiffs' allegations about the Bari Study were demonstrably false (as the allegedly omitted facts were in fact in the Registration Statements) or amounted to impermissible criticism of the Study's (appropriately disclosed) design.

### 1.    The Bari Study's Design

Unable to counter that the basic points they claim were omitted were in fact disclosed, Plaintiffs change direction. The new response, belied by their pleading, is that they are not second-guessing the Bari Study's design, but complaining that the study had "no design at all." Opp. at 10.[11] Again eschewing their own allegations, Plaintiffs say they are *not* contending that the lack of a placebo arm to the study was concealed; their problem, they now say, is that no one explained the supposed particular importance of a placebo arm to a study of a prostate drug. *Id.*[12] The assertions serve only to point up how thin Plaintiffs' claims really are.[13]

---

[11] Plaintiffs' new contention is facially absurd. While the Bari Study may have had certain (disclosed) limitations *because* of its design, it clearly *had* a design. For example, no one has suggested that patients were given randomly sized doses of TH-070 whenever the mood struck the researchers. *See* IPO R.S. at 48-49 (explaining Bari Study design); 10/05 R.S. at 46-47; *see also* AC ¶¶ 51, 54-55. Plaintiffs' "no design" argument is just a hyperbolic disparagement the Study's design, which does not state a securities claim. Mot. at 12.

[12] The Opposition repeats, multiple times, that the Registration Statements did not disclose a supposed "well-document placebo effect" that threatened to render the Bari Study misleading (despite the conceded disclosure that the Study had no placebo arm). Opp. at 8, 10-11, 17. But the Complaint alleges no facts from which it could be inferred that such an effect had been established and was known by anyone, much less by Defendants, when the Registration Statements were issued. The Complaint points to three academic articles. *See* AC ¶ 67. None relates to TH-070 or lonidamine; and one actually belies Plaintiffs' argument by observing that numerous studies had found *no* significant placebo effect with BPH treatments. *See* Reply Declaration of Alexander Lyon Ex. O at 386; *see also id.* Ex. P at 146 & Ex. Q at 374. The articles simply do not constitute scientific data suggesting that "placebo risk was much greater" with respect to TH-070 than with other non-placebo controlled studies; and Plaintiffs' assertion to that effect, Opp. at 10, cannot defeat this motion. *In re VeriFone Sec. Litig.,* 11 F.3d 865, 868 (9th Cir. 1993) ("[c]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss").

[13] Perhaps recognizing this inadequacy, Plaintiffs ironically resort to mischaracterization in an effort to suggest that Defendants misled investors through – that's correct – mischaracterization. An example is Plaintiffs' new assertion that Defendants lied in the Registration Statement that "TH-070 kills prostate cells," supposedly because later clinical studies showed this to be untrue. *See* Opp. at 9-10. Plaintiffs overreach. First, what the Registration Statement actually said was "[b]y targeting the metabolism of glucose and other processes that are essential for prostate cell viability,

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:07-CV-04972-CW

1    Whatever spin Plaintiffs may try to place on the Complaint, their allegations are *post hoc*

2    second-guessing based on how TH-070's clinical trials eventually turned out.  Even if it might have

3    been a good idea to structure the Bari Study differently or to conduct some other type of study,

4    clinical judgments – good or bad – cannot support a securities claim.  *See* Mot. at 16 n.7.[14]

5    ## 2.    The Bari Study's Publication

6    If, as Plaintiffs allege, AC ¶ 66, the Bari Study's flaws were identified in the June 2005

7    article written by its principal investigators, it follows as a matter of law that the October 2005

8    Registration Statement's alleged failure to discuss those flaws was immaterial.  This mandates

9    dismissal of Bari Study claims related to the October 2005 follow-on offering.[15]

10    For an omission to be material, there must be a substantial likelihood that disclosure of the

11    fact would have been viewed by a reasonable investor as having significantly altered the "total mix"

12    of available information.  *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988).  Where a company's

13    stock is alleged to have traded on an "efficient market," as it is here, AC ¶¶ 121-22, this "total mix"

14    includes all relevant public information about the company, all of which is reflected in its stock

15    price.  *Basic* at 247.  Where information is already public, its omission from a company's later

16    disclosure is not material.  *See, e.g., In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir.

---

17    TH-070 kills prostate cells, reducing the size of the prostate, and therefore may provide an effective

18    treatment for symptomatic BPH."  10/05 R.S. at 2, 46; s*ee also* IPO R.S. at 47.  Even in isolation, the full statement cannot be read as an assurance that TH-070 would be an effective BPH treatment.

19    Second, the clinical trial data that 17 months later led Threshold to discontinue its TH-070 program did *not* show the original statement to be false.  What the data showed was that "the Phase 3 trial

20    did not achieve a statistically significant difference in IPSS between TH-070 and placebo."  *See* 7/17/06 P.R.  ("IPSS" or "International Prostate Symptom Score" is a self-administered

21    questionnaire used to assess lower urinary tract symptoms.  IPO R.S. at 48; AC ¶ 36.)  The failure of TH-070 to achieve its hoped-for clinical targets does not mean that the Registration Statements

22    were false or that TH-070 did not kill prostate cells.  *Cf. Kaplan,* 49 F.3d at 1373 (defendants' later statement did not suggest their registration statement was false).

23    [14]  Plaintiffs rely on *Amylin II* and *In re Immune Response Sec. Litig.*  Opp. at 11.  But facts

24    critical in those cases are absent here.  In *Amylin II*, the defendant company affirmatively told investors that its clinical trial results met FDA approval requirements while failing to disclose that

25    the FDA *had already raised concerns* about the trials' sufficiency.  2003 U.S. Dist. LEXIS 7667 at *22-*23  And in *Immune Response,* 375 F. Supp. 2d 983, 1010 (S.D. Cal. 2005), the defendants

26    allegedly touted promising results from a preliminary clinical trial while failing to disclose negative results they *had already received* from a much larger trial.  As similar facts are not alleged here,

27    these cases serve only to highlight what is missing from the Complaint:  allegations of contemporaneous known *facts* that contradicted or undermined the Bari Study's findings.

28    [15]  As noted, the June 2005 publication of the Bari Study article is also relevant to the IPO Registration Statement claims because it triggered the limitations period.  *See supra* Part II.

8

1  1991) (dismissing claims where analyst reports and articles, including one published before the

2  prospectus, left "no doubt" the market was aware that demand for the company's product would not

3  increase as it had been and that there was a risk of obsolescence for older technology) (summary

4  judgment), *superseded by statute on other grounds as stated in In re Harmonic Inc. Sec. Litig.,* 163

5  F. Supp. 2d 1079 (N.D. Cal. 2001); *Rubke v. Capitol Bancorp Ltd.*, 460 F. Supp. 2d 1124, 1140,

6  1146 (N.D. Cal. 2006) (already-public information about a prior share exchange); *In re Merrill*

7  *Lynch & Co.*, 272 F. Supp. 2d 243, 249-50 (S.D.N.Y. 2003) (already public that defendant provided

8  investment banking services to companies in the fund's portfolio).

9         These principles are fatal to claims based on the Bari Study.  The Complaint alleges that in

10  June 2005, four months before the follow-on offering, the Bari Study's principal investigator

11  published an article in which he "warned that the Bari Study was a 'proof of concept' study" and

12  stated that "'[t]he drawback in this design is the placebo effect that may elicit misleading results, if

13  not properly corrected for, especially considering the small number of patients and the absence of a

14  blind run-in period.'"  AC ¶ 66.  This is precisely what Plaintiffs say should have been in the

15  October 2005 Registration Statement.  AC ¶ 78.  But because the article was public, Threshold's

16  stock price reflected all information in the article.  And it was reflected in the price for the stock

17  Threshold sold in its October 12, 2005, offering because Threshold priced that stock at the previous

18  day's market close.  *Compare* AC ¶ 75 ($10.46 follow-on offering price) *with* Lyon Reply Dec. Ex.

19  R ($10.46 10/11/05 closing price).  As a matter of law, then, any supposed omission from the

20  Registration Statement of information from the Bari Study article was immaterial.

21         Plaintiffs try to escape this conclusion by asserting that materiality is assessed differently for

22  '33 Act claims than for '34 Act claims, and that materiality with respect to a Registration Statement

23  is determined solely with reference to the document.  Opp. at 11-12 nn.11 & 12.  But the law is

24  clear that the materiality concept "applies equally to both statutory provisions."  *Worlds of Wonder,*

25  35 F.3d at 1415 n.3.  As noted, many courts have dismissed '33 Act claims on grounds that publicly

26  available information outside the prospectus rendered alleged omissions immaterial.  *See also*

27  *Kapps v. Torch Offshore, Inc.,* 379 F.3d 207, 216 (5th Cir. 2004) (total mix includes information

28  "that is and has been in the readily available general public domain and facts known or reasonably

9

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:07-CV-04972-CW

1  available to the shareholders"); *Klein v. GNC, Inc.*, 186 F.3d 338, 342-43 (3rd Cir. 1999) ('33 Act

2  materiality determination takes into account availability of the information in the public domain).[16]

3  ## C.    The Scientific Data Did Not Indicate A Material Risk Of Liver Toxicity

4  The Registration Statements warned that TH-070 could cause as-yet unknown side effects

5  that could affect FDA approval and specifically called out the side effects that had been identified

6  over the decades that lonidamine had been in use in Europe as a cancer therapy.  10/05 R.S. at 9;

7  IPO R.S. at 10.  Plaintiffs say these disclosures were insufficient, however, because they did not

8  discuss liver toxicity "trends" allegedly documented in scientific literature relating to lonidamine.

9  Opp. at 18-21.  But as with their "well documented placebo effect," the "liver toxicity trends" are a

10  rhetorical illusion.  The facts alleged do not come close to showing a "trend;" indeed, they only

11  confirm that liver toxicity was *not* a known material risk to TH-070's development at the time.

12  Plaintiffs point to five paragraphs of the Complaint as support for their "trend."  Opp. at 18.

13  Three of these allege that Defendants "admitted" to evidence of liver toxicity when Dr. Colowick

14  stated on May 11, 2006, "[t]here are studies in which numerically, in some studies, the liver toxicity

15  was higher numerically."  *See* AC ¶¶ 33, 38 & 39.  The other two cite a 1996 study of lonidamine's

16  effect on dogs which, Plaintiffs say, "found significant liver malfunction occurred at high

17  intravenous doses and suspicious lesions, and unpredictable toxicity occurred even after oral

18  dosing."  *See* ¶¶ 70-71.  Nothing about these allegations supports an inference that liver toxicity

19  was recognized as a material risk, or should have been.  Indeed, Plaintiffs' allegations concede that:

20  - the liver toxicity referenced by Dr. Colowick was "anecdotal," AC ¶ 39,

21  - the dog study was one of at least 80 studies relating to lonidamine, AC ¶ 38, and

22  - none of those 80 studies showed a statistically significant incidence of liver toxicity in humans, AC ¶ 72.

23

24  [16]  Neither case Plaintiffs cite, *see* Opp. at 12, holds otherwise.  In *Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008), the Court declined to hold that minor wording changes among drafts

25  of registration statements filed with the SEC put the market on notice of a significant change in a
proposed merger.  *Id.* at 882-84, 887.  And in *Kaplan v. Rose,* the court held actionable a failure to

26  disclose results of a clinical trial where the issuer's statements in a prospectus about the clinical
study included an express claim that the issuer's product's performance compared favorably with

27  those of competitors.  49 F.3d at 1374.  In both cases, the omitted information was otherwise
unknown to investors.  Neither case supports the notion that information in an article, the

28  publication of which is highlighted in a company press release and then discussed by analysts in
independent reports they issued, is not part of the "total mix" of information.  *See* Mot. at 12 n.5.

Plaintiffs also do not dispute that lonidamine had received regulatory approval in Italy, AC ¶ 38;

the FDA approved human clinical trials of TH-070 in the United States, 10/05 R.S. at 47; and other

animal studies cited in the Registration Statements showed lonidamine to be well tolerated, IPO

R.S. at 3, 47.  These undisputed facts cannot support an inference that liver toxicity represented an

important threat to TH-070's prospects, at least based on the information at the time.  *See In re*

*Syntex Corp. Sec. Litig.,* 95 F.3d 922, 926 (9th Cir. 1996) ("unwarranted inferences are insufficient

to defeat a motion to dismiss for failure to state a claim.") (internal citations omitted).[17]

    Unable to meet the actual materiality standard, Plaintiffs again try lowering their bar.  Even

if the scientific evidence was slight, they argue, data lacking statistical significance is not *per se*

immaterial, and Defendants had to disclose even slightly negative data because they had "gone to

great lengths to tout the apparent safety of lonidamine based on its prior use to treat cancer patients"

and had made "false claims that the Bari Study had been designed to ***determine*** whether the drug

was safe and tolerable...."  Opp. at 18-21, 25-26 (original emphasis).  Again the arguments fail.

    Plaintiffs say that Threshold "touted" lonidamine's safety based on its prior use in cancer

patients; but they do not (a) dispute that lonidamine was *in fact* used this way for many years, (b)

challenge the accuracy of any statements Threshold made about that use, or (c) point to anything in

the Registration Statements suggesting that the prior use meant TH-070 would prove a safe and

effective BPH treatment.  To the contrary, Plaintiffs *admit* that Defendants never claimed the Bari

Study showed TH-070 to be safe and effective, Opp. at 9-10; and that the Registration Statements

specifically warned that further studies were needed to *determine* safety and efficacy, *id. at* 17.[18]

---

[17] At one point, Plaintiffs allege that Defendants should have been alerted to the risk of liver toxicity by the fact that one patient in the Bari Study developed a possible sign of liver malfunction. AC ¶¶ 65(f)-(g).  But if, as Plaintiffs allege, AC ¶¶ 65(f)-(g), 72, the Bari Study's population included liver-challenged patients, it is hard to see why one would attribute significance to this fact.

[18] These concessions render curious Plaintiffs' contention, Opp at 10, that the Registration Statements were misleading in saying that the Bari Study's "primary objective" was to show the safety and efficacy of TH-070.  First, the Registration Statements said the primary objective was "to determine the safety and *tolerability* of TH-070 in patients with BPH."  IPO R.S. at 3 (emphasis added); AC ¶ 63.  Second, Threshold described the Bari Study as a "Phase 2 trial."  As such, investors knew it could not resolve the safety and efficacy questions.  *See* 21 C.F.R. § 312.21(c) (mandating *Phase 3* studies for this purpose).  Threshold also specifically warned that further trials were needed to prove safety and efficacy.  *See* Mot. at 13.  With these facts and Plaintiffs' concession that Defendants never held out the Bari Study as proof that TH-070 *was* safe and effective, Opp. at 9-10, it is unclear what about the "primary objective" phrase was misleading.

11

1  Nothing about Threshold's supposed "touting" of lonidamine's actual safety record in dozens of

2  studies over years of use supports some duty to disclose otherwise immaterial information.

3      None of Plaintiffs' cases supports their suggestion that they can state '33 Act claims based

4  on the omission of clinical data that they *admit* was anecdotal and not statistically significant.

5  *Compare In re Immune Response Sec. Litig.,* 375 F. Supp. 2d 983, 1021 (S.D. Cal. 2005) (negative

6  efficacy data *was* statistically significant); *Gargiulo v. Isolagen, Inc.,* 527 F. Supp. 2d 384, 391

7  (E.D. Pa. 2007) (omission concerned design of a cellular therapy technology, not clinical data).

8  Indeed, the *Amylin* cases, on which Plaintiffs rely, highlight what is lacking from the Complaint.

9  The court there relied on alleged "facts showing that *Amylin* knew that some correlation existed

10 between [the drug] and [the side effect]."  *In re Amylin Pharm., Inc. Sec. Litig.,* 2002 U.S. Dist.

11 LEXIS 19481 (S.D. Cal. 2002) (*Amylin I*) at *17-*19.  There are no analogous allegations here.

12     The absence of legal support for Plaintiffs' argument is not surprising.  If drug companies

13 could be subjected to securities liability for failing to discuss every risk that might in theory arise in

14 developing a new drug, including risks explored and rejected in extensive prior literature, the

15 resulting disclosures would "bury the shareholders in an avalanche of trivial information."  *Basic,*

16 485 U.S. at 231 (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 448-49 (1976)).  Such a

17 rule would undermine the purpose of the securities laws' disclosure requirements, nonsensically

18 burdening investors with determining which risks are important and which are not.[19]

19 **IV.    PLAINTIFFS' SECTION 10(B) CLAIM SHOULD BE DISMISSED**

20     **A.    Plaintiffs' Narrowed Fraud Claim Still Lacks The Required Particularity**

21     In the opening brief, Defendants showed that the theory of fraud alleged in the Complaint

22 fails to satisfy Rule 9(b) or the PSLRA.  Mot. at 21-24.  In response, Plaintiffs retreat and now posit

23 a much more limited fraud claim – that in five statements during the short period March 1 to May

24 11, 2006 (all more than a year *after* the IPO), Defendants allegedly misled investors by failing to

25

26     [19]  It is worth pausing to note that, while liver toxicity led to the clinical trial hold in May
    2006, it was the efficacy results, learned only when Threshold unblinded the Phase 2 trial data
27  during the hold period, that resulted in the decision to discontinue TH-070 development.  *See*
    7/17/06 P.R.  Many drugs receive FDA approval, and are successfully marketed, despite risk of
28  liver-related side effects, as anyone who has seen television advertisements for prescription drugs
    knows.  *See* 21 C.F.R. § 202.1(e)(1) (requiring disclosure of side effects in drug advertising).

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:07-CV-04972-CW

reveal supposed "problems that had already arisen" in Threshold's ongoing Phase 2 and 3 clinical trials. Opp. at 2. This truncated theory cannot be squared with the Complaint's sweeping fraud allegations and so must be rejected. *Barbera v. WMC Mortgage Corp.*, 2006 WL 167632, at *2 (N.D. Cal. 2006) (*citing Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984)) ("axiomatic" that complaint cannot be amended by briefs opposing a motion to dismiss).

Taking Plaintiffs at their word, however, their narrowed fraud claim is still not pled with the required particularity, and they still fail to plead facts supporting a cogent and compelling inference of scienter. Plaintiffs' claim still relies principally on misquotations of Threshold employees, unfounded inferences about Dr. Selick's supposed advance knowledge of blinded clinical trial results, and "serious adverse event" ("SAE") reports that Plaintiffs do not allege to have had any statistical significance prior to the time Threshold disclosed them.

### 1. Plaintiffs' Misquotation Of Dr. Selick's March 1, 2006 Conference Call Statement Does Not Adequately Plead Fraud

Plaintiffs now assert that Defendants' first fraudulent act was a statement Dr. Selick allegedly made during Threshold's March 1, 2006, investor conference call. Opp. at 22-24; *see also* AC ¶¶ 87-89. Any supposed fraud claim based on this alleged statement fails for two reasons.

*First*, the Complaint misquotes Dr. Selick. Plaintiffs do not seriously dispute that, as shown in Defendants' opening papers, Mot. at 19-20; Lyon Dec. Ex. H at 2:50-3:08, 9:44-9:55, Dr. Selick never said what they allege. Instead, Plaintiffs argue that the Court must ignore the actual recording of the call, and allow Plaintiffs to proceed based upon an obvious error. *See* Opp. at 23-24. This is not the law. Even on a motion to dismiss, the Court need not accept as true allegations that contradict judicially noticeable facts. *E.g., Intri-Plex Technologies, Inc. v. Crest Group, Inc.,* 499 F.3d 1048, 1052 (9th Cir. 2007); *Mullis v. United States Bankr. Ct.,* 828 F.2d 1385, 1388 (9th Cir. 1987). The Court may also consider documents whose contents are alleged in a complaint or on which the complaint relies. Mot. at 3 n.1 (citing cases). Where such materials reveal that a defendant's actual statement differs from what is alleged, the actual statement prevails. *See Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank,* 515 F.2d 1200, 1206-07 (5th Cir. 1975). Indeed, it defies logic to believe that, despite the high pleading standards established by Congress in

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:07-CV-04972-CW

the PSLRA and by courts in cases such as *Tellabs* and *Silicon Graphics,* a plaintiff could proceed with one of these onerous suits merely by alleging statements that demonstrably were never made. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007) (PSLRA's purpose is "to curb frivolous, lawyer-driven litigation"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 81-82 (2006) (Congress wished to deter meritless suits).[20]

*Second*, even were the Court required to accept the erroneous allegation about what Dr. Selick said, the claim would still fail because the Complaint alleges no particular facts about what Dr. Selick supposedly knew about the then-ongoing clinical trials that would have made the alleged statement false. Plaintiffs acknowledge that those clinical trials were placebo-controlled and blinded, AC ¶¶ 76, 87 – facts at odds with the idea that the data were available. Not surprisingly, then, Plaintiffs fail to allege with particularity any adverse clinical data that had even arisen by March 1, let alone that was known to Dr. Selick. As such, Plaintiffs' "*a fortiori*" assertion, Opp. at 24; *see also* AC ¶ 89, that Dr. Selick had advance knowledge of the clinical trial data (or was reckless in not knowing it) is insufficient. For example, in *Cell Therapeutics*, the Court dismissed allegations that a CEO "must have learned" adverse facts about ongoing clinical trials about which he was alleged to have made misleading positive statements because plaintiffs failed to allege when the CEO reviewed Case Report Forms from the trials, how many were examined and in what context. *Heywood v. Cell Therapeutics,* 2006 U.S. Dist. LEXIS 28684 at *17 (W.D. Wash. 2006); *see also Steiner v. Hale,* 868 F. Supp. 284, 287 (S.D. Cal. 1993) (equivocal speculation that defendant *may* have known facts contrary to his statement insufficient); s*ee* Mot. at 23.

### 2. The March 20, April 5, and May 10, 2006, Press Releases Were Not Rendered Misleading By The Appearance Of SAEs In Clinical Trials

Plaintiffs contend that three Threshold press releases – on March 20, April 5, and May 10,

---

[20] Contrary to Plaintiffs' suggestion, Opp. at 23, Defendants do not ask the Court to resolve a fact question about which competing transcript is more accurate – although it bears noting that the transcript Plaintiffs rely upon states that it "may not be 100 percent accurate," may contain "inaccuracies" and was provided "solely for [] personal, non-commercial use." Herman Dec. Ex. A at 6-7. Rather, Defendants urge the Court to listen to the recording of what Dr. Selick actually said, and evaluate whether Plaintiffs' allegation survives as a matter of law. Nor do Defendants rely on the documents submitted with their motion for the truth of what they assert. Instead, they are offered only to show what was actually said to the market, a purpose for which the documents are judicially noticeable. *See* Reply in Support of Defendants' Request for Judicial Notice.

14

1  2006 – announcing milestones in the clinical trials were misleading because by then, Defendants

2  supposedly knew but did not disclose liver toxicity issues that had arisen.  Opp. at 24.  Beyond the

3  unsupported assertion that Dr. Selick or others at Threshold somehow had early access to blinded

4  clinical trial data, *see supra* Part IV(A)(1), this claim depends on allegations that Defendants should

5  have disclosed that it had received reports of SAEs related to abnormal liver enzymes.  AC ¶¶ 95-

6  97, 100-01; Opp. at 22, 24, 26.  The SAE allegations cannot support a claim.

7      First, Plaintiffs offer no effective response to the many cases holding that negative clinical

8  information such as an SAE is immaterial as a matter of law absent something more – an allegation,

9  absent here, that the adverse data was statistically significant and sufficient to threaten the drug's

10 commercial prospects.  *See* Mot. at 17-19.  All Plaintiffs do is to observe generally that materiality

11 is fact-specific.  Opp. at 25.  But courts routinely resolve materiality as a matter of law on motions

12 to dismiss where (as here) the allegations are insufficient to suggest materiality.  *E.g., VeriFone,* 11

13 F.3d at 870; *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1118 (10th Cir. 1997).  Plaintiffs do not

14 dispute that, under FDA rules, myriad events constitute SAEs despite having nothing to do with the

15 study drug, much less its safety, efficacy or prospects for commercial success.  Mot. at 18 (*citing* 21

16 C.F.R. § 312.32).[21]  Nor do Plaintiffs dispute that their argument effectively implies the novel – and

17 unsalutary – rule that any SAE be disclosed as soon as it arises.  Not surprisingly, Plaintiffs point to

18 no case in which the report of SAEs, without more, suffices to state a claim.[22]

19     In any case, the SAE allegations cannot support fraud claims based on the March 20 and

20 April 5 press releases as they *pre-date* the first report of an SAE alleged in the Complaint.  AC ¶¶

21 97-99.  Plaintiffs assert that Defendants "would have" investigated before reporting an SAE to the

22 _____

23 [21]  Plaintiffs also attempt to distinguish the *Oran* and *Carter-Wallace* cases cited by
   Defendants, Mot. at  18-19, on grounds that the cases involved *already-approved* drugs rather than

24 a drug candidate.  *See* Opp. at 18, 25-26.  The attempt is unavailing because Plaintiffs do not
   explain why the distinction matters, and there is no apparent reason why it would.

25 [22]  Plaintiffs' reliance on *In re Bayer AG Sec. Litig.*, 2004 U.S. Dist. LEXIS 19593

26 (S.D.N.Y. 2004), is misplaced.  In *Bayer,* plaintiffs alleged that the company was inundated with
   adverse event reports and that company scientists had reached consensus that the data "put[] the
   brand at risk"  *Id.* at * 11-13, 33.  Plaintiffs here allege nothing like this.  Nor does *In re Amgen,*

27 *Inc. Sec. Litig.,* 2008 U.S. Dist. LEXIS 24611 (C.D. Cal. 2008), support Plaintiffs.  That case
   involved the duty to disclose the cessation of a clinical study that defendants had asserted would

28 allow them to address safety concerns raised by the FDA.  *Id.* at *39-40.  Again, no such facts are
   alleged here; and it is undisputed that the Defendants promptly disclosed the partial clinical hold.

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:07-CV-04972-CW

FDA and so "most likely" were aware of it prior to April 10, 2006.  Opp. at 26.  But this is speculation, not fact.  Likewise, CW6's supposed assertion that Threshold knew of the SAEs "by April 2006," AC ¶¶ 97, 99, lacks any specifics.  *Cell Therapeutics,* 2006 U.S. Dist. LEXIS 28684, at *18 (rejecting such "generalized and speculative" assertions about what others knew and when).

### 3.    The May 11, 2006, Press Release and Conference Call Cannot Support A Fraud Claim Either

Plaintiffs also argue that Threshold's May 11, 2006, press release and conference call were misleading because Defendants allegedly did not reveal the supposed "full extent" of liver toxicity problems, gave the impression that TH-070 clinical trials could continue, and did not mention clinical data showing a lack of efficacy.  *See* Opp. at 28-29.  Again, this claim fails.

As with their March 1 claim, Plaintiffs' May 11 claim is based on a clear misquotation of what Dr. Colowick said on the call.  *See* Mot. at 20; Lyon Dec. Ex. L at 16:12-16:57.[23]

Plaintiffs also again fail to identify specific data known to Defendants *on May 11* suggesting liver toxicity beyond what Threshold disclosed.[24]  Nor do Plaintiffs offer facts suggesting that on May 11, Defendants did not expect to be able to resolve the FDA's partial clinical hold and resume clinical trials of TH-070.  Ultimately, Plaintiffs' challenge to the May 11 statements reduces to the fraud-by-hindsight concept that Defendants "must have" had additional negative data on May 11 because *two months later* the Company decided to end the program.  This is plainly insufficient.[25]

----

[23] Plaintiffs again rely on an erroneous third-party transcript that itself cautions "there may be material errors, omissions or inaccuracies in the reporting of the substance of the conference call[]."  Herman Dec. Ex. B at 11.  Again, Plaintiffs do not dispute that their transcript is inconsistent with the audio recording; they just urge the Court to ignore it.  Opp. at 28.  Again, the Court need not, and should not, do so.  *See supra* Part IV(A)(1).

[24] Plaintiffs quote Threshold's July 17, 2006, press release indicating that by that time 16 patients with elevated liver enzymes had been identified, six being classified as SAEs.  AC ¶ 107. But nothing in this statement suggests these patients had all been identified by May 11.  *See id.*

[25] To the extent Plaintiffs assert that the challenged statements in March, April and May 2006 were misleading because they failed to disclose alleged flaws in the Bari Study, those claims are barred by the truth-on-the-market doctrine.  *See* Mot. at 11-13.  Plaintiffs say there is a fact question as to whether the Study was communicated to the market with sufficient intensity and whether the Study could be understood by investors.  Opp. at 12-13.  Plaintiffs' fraud-on-the-market allegations, AC ¶¶ 121-22, also foreclose this argument.  *See also* Part III(B)(2).  Similarly, Plaintiffs cannot plead loss causation with respect to the Bari Study.  Nothing disclosed on May 11, 2006, or on July 17, 2006, provided any new details about the Bari Study and thus as a matter of law the alleged stock price reaction on those days had nothing to do with the Bari Study.  *See generally Dura Pharm., Inc. v. Broudo,* 544 U.S. 336 (2005).

16

1    Finally, Plaintiffs' allegations once again fail to explain, in a cogent and compelling way or

2    otherwise, why Defendants would have withheld material adverse information about TH-070 on

3    May 11 despite supposedly knowing that such information was certain to be revealed soon

4    thereafter, but doing nothing to profit from the nondisclosure.  The claim is irrational.

5         **B.        Plaintiffs' Additional Scienter Allegations Do Not Salvage The Fraud Claim**

6         Plaintiffs' scattershot "additional" scienter allegations underscore their inability to raise a

7    cogent and compelling inference of scienter as to the Defendants.  Most of their allegations pertain

8    to entities – Threshold's investors and a former chairman – who are not defendants, and the chain

9    of reasoning employed to link them to Defendants is tortured at best.  The few arguments about the

10   Defendants either are so generic that courts routinely reject them as inadequate, or are contradicted

11   by the Complaint.  In short, the "additional" allegations, which Plaintiffs concede are insufficient

12   by themselves to plead scienter under the PSLRA, *see* Opp. at 30-33, remain insufficient when

13   considered collectively.  *Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1036-38 (9th Cir. 2002)

14   (unsuspicious stock sales and generic motives did not support inference of scienter).

15        Plaintiffs argue that Defendants were motivated to commit fraud because, as a start-up

16   company Threshold needed to protect its investors.  Opp. at 30.  But courts will not infer fraud from

17   "routine business objectives" – those held by any company.  *Lipton* at 1038.  Plaintiffs suggest –

18   but did not plead –  that Defendants were particularly motivated to keep Threshold's venture

19   investors happy, citing two cases.  Opp. at 30; *see* AC ¶¶ 131-39.  However, in one of the cases, *In

20   re Entropin Sec. Litig.,* 487 F. Supp. 2d 1141, 1153-54 (C.D. Cal. 2007), this argument does not

21   appear at all.  In the other, *Danis v. USN Commc'ns, Inc.,* 73 F. Supp. 2d 923, 940-41 (N.D. Ill.

22   1999), the court found the alleged motive relevant only because – unlike here – the complaint

23   alleged the defendant's receipt of a specific report detailing the company's problems.  Here,

24   Plaintiffs offer nothing to support the counterintuitive supposition that Threshold's officers and

25   directors including Defendants Dr. Selick and Ms. Swearson risked stratospheric liability so that

26   they could benefit two (but no other) investors while allowing their own substantial holdings in

27   Threshold to lose 89% of their value without selling a single share.  Opp. at 30-33; AC ¶ 12; 10/05

28   R.S. at 81.  Far from cogent and compelling, Plaintiffs' supposition is economically irrational and

implausible.  *See In re J.P. Morgan Chase Sec. Litig.,* 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005).[26]

Plaintiffs propose that Defendants had an incentive to commit fraud because "Threshold was running out of money prior to its IPO."  Opp. at 30.  But this could not have influenced Defendants *in March 2006,* after the Company had already raised $100 million in two offerings the prior year, AC ¶¶ 61, 75, that the Opposition now says were not fraudulent, Opp. at 1-2.

Plaintiffs point to stock sales by two (of several) of Threshold's venture investors, Sofinnova and Three Arch.  They say the sales show that Defendants knew the TH-070 trials were proceeding poorly.  Opp. at 30-31.  First, the sales were disclosed, AC ¶¶ 134, 140, so if there were some adverse inference to be drawn from them, investors had the information.  Second, while "unusual" or "suspicious" stock sales by corporate *insiders* can evidence scienter, *In re Silicon Graphics, Inc., Sec. Litig.,* 183 F.3d 970, 986 (9th Cir. 1999), Plaintiffs cite no authority that sales by outside investors serves the same purpose.  Opp. at 31-32.  Plaintiffs go on at length about the "strong ties" between Sofinnova and Three Arch and Threshold officers and directors.  But as noted, *see supra* Part IV(A), Plaintiffs alleged no specific negative information about the TH-070 trials known to Threshold's officers and directors, much less conveyed by them to outside investors by the time of the investors' sales.  *Cf. Silicon Graphics,* 183 F.3d at 987-88 (defendant's stock sales did not support scienter where he made none of the challenged statements and had no day-to-day contact with operations or company officers).

Even if these were insider sales, the sales as alleged do not support an inference of scienter under the factors prescribed by the Ninth Circuit.  *Id.* at 986 (amount, percentage and timing of sales, and whether sales are consistent with prior trading history).  Plaintiffs propose that Three Arch's sale of 29% of its holdings can be suspicious, citing *Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1232 (9th Cir. 2004), and *Silicon Graphics,* 183 F.3d at 1001.  But *Oracle* concluded that the CEO's stock sale was suspicious in light of *his trading history,* a

---

[26] Plaintiffs argue that the lack of stock sales by Dr. Selick and Ms. Swearson do not negate an inference of scienter, citing *Entropin,* 487 F. Supp. 2d 1141, and *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920 (9th Cir. 2003). Opp. at 33.  The citations prove nothing.  In *America West,* 320 F.3d at 939, the individual defendants *were* alleged to have *sold* 88-100% of their holdings.  And in *Entropin,* 487 F. Supp. 2d at 1153-54, it was undisputed that defendants were unable to sell because of a lock-up agreement in place until after the stock plummeted.  There are no such allegations here.

1    factor Plaintiffs never address. And the portion of *Silicon Graphics* Plaintiffs cite is in the separate

2    opinion of Judge Browning. 183 F.3d at 991. The court's opinion held the sales *not* probative of

3    scienter for other reasons, including the lack of access to inside information. *Id.* at 987-88.

4         Plaintiffs no longer contend that Dr. Tidmarsh's March 2006 resignation from the Board of

5    Directors was unexpected, but they still suggest that it supports scienter. Opp. at 31 n.28. But Dr.

6    Tidmarsh is not a defendant, nor is he alleged to have had any role in the TH-070 program. It is

7    thus unreasonable to infer a connection between his resignation and the trials because, as stated in

8    the case Plaintiffs cite, "plaintiffs have not alleged facts clearly tying the two together." *In re*

9    *Impax Labs., Inc., Sec. Litig.,* 2007 U.S. Dist. LEXIS 52356, at *27-*28 (N.D. Cal. 2007)

10   (defendant CEO's resignation did *not* support scienter; defendant CFO's resignation was "minimal,

11   non-dispositive" evidence of scienter when considered with other alleged conduct). The more – or

12   rather only – plausible inference to be drawn from Dr. Tidmarsh's March 2006 resignation as

13   Chairman is that he was completing a process he started eight months earlier (prior to the time that

14   Plaintiffs now say there was any fraud) when, citing exactly the same desire to pursue other

15   interests, he resigned as President. *See* Lyon Dec. Ex. E.

16        Finally, Plaintiffs argue that Dr. Selick and Ms. Swearson were motivated to defraud by

17   their "anticipation of even richer rewards from the appearance of success in later clinical trials."

18   Opp. 30, 32-33. But the "motive" to earn more, which is so generic that it applies to anyone at any

19   company, is not probative of scienter. *In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1087

20   (N.D. Cal. 2003). Moreover, the Complaint contradicts the argument. It alleges that a drastic

21   *reduction* in Dr. Selick's and Ms. Swearson's compensation showed that by March 2006

22   Defendants "knew there was a substantial doubt about whether [TH-070] would be safe or

23   efficacious." AC ¶¶ 145-47. Obviously, Dr. Selick and Ms. Swearson could not have known the

24   end was near *and* expected increased compensation as a result of later clinical trials.[27]

---

25        [27] As noted in the motion to dismiss, Threshold's use of the funds raised in the offerings to
26   pursue clinical trials of TH-070 most plausibly reflects Defendants' good faith efforts to develop
     the product. Mot. at 21-22. Plaintiffs now argue that investment in clinical research does not
27   negate scienter under their new fraud theory because by March 1, 2006, "the money had already
     been spent." Opp. at 33. The Complaint alleges just the opposite. AC ¶ 84 (on March 1, 2006,
28   Threshold announced it would conduct three additional studies of TH-070 during 2006); AC ¶ 92
     (Threshold continued to enroll patients in TH-070 trials in March and April 2006).

### C.    The Section 10(b) Claim Against Ms. Swearson Must Be Dismissed

Plaintiffs do not dispute that Ms. Swearson made none of the challenged statements, or that the only statement she is alleged to have made – responding to a question during a conference call regarding an increase in R&D costs – was true.  AC ¶ 86.  Still, Plaintiffs attempt to justify their claim against Ms. Swearson under the group pleading doctrine.  Opp. at 34.  The effort fails.

First, "group pleading" did not survive the PSLRA.  Mot. at 20-21.  Plaintiffs contend that it does, citing two cases, *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1098 (D. Nev. 1998), and *In re Petsmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 997-98 (D. Ariz. 1999).  *Petsmart* did not reach the group pleading survival question in holding the allegations there insufficient.  61 F. Supp. 2d at 997-98.  *Stratosphere* does apply group pleading post-PSLRA; however, given its lack of analysis of the issue and more recent, persuasive authority, *see* Mot. at 20-21, Defendants submit that it is wrong on the point.  *In re Netopia, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 38823 at *17 (N.D. Cal. 2005) ("better view" is that the PSLRA precludes reliance on group pleading).

Second, the Complaint alleges no facts suggesting that Ms. Swearson helped craft statements about the progress of TH-070 clinical trials or was privy to clinical data related to them.  Accordingly, she does not fall within the "group" even if the doctrine survives.  *See* Mot. at 21 n.12.  Plaintiffs' observation that Ms. Swearson as CFO spoke with investors about the *costs* of clinical trials, Opp. at 34, does not place her in the "group."  Finally, "group pleading" never did apply to oral statements made by others – such as the misquoted March 1, 2006 statement attributed to Dr. Selick.  *E.g., In re Gupta Corp. Sec. Litig.,* 900 F. Supp. 1217, 1240 (N.D. Cal. 1994).

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs' Complaint must be dismissed.

Dated: June 2, 2008                           HELLER EHRMAN LLP

                                              By /s/
                                                    Michael L. Charlson

                                              Attorneys for Defendants
                                              THRESHOLD PHARMACEUTICALS, INC., HAROLD
                                              E. "BARRY" SELICK, and JANET I. SWEARSON

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:07-CV-04972-CW