# Exhibit A

1 of 1 DOCUMENT

**BRENT BERSON, individually and on behalf of all others similarly situated, Plaintiff, and FRANK WHITING, Plaintiff-Appellant, v. APPLIED SIGNAL TECHNOLOGY, INC.; GARY YANCEY; JAMES DOYLE, Defendants-Appellees.**

No. 06-15454

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

2008 U.S. App. LEXIS 11982

December 6, 2007, Argued and Submitted, San Francisco, California
June 5, 2008, Filed

**PRIOR HISTORY:** [*1]
Appeal from the United States District Court for the Northern District of California. D.C. No. CV-05-01027-SBA. Saundra B. Armstrong, District Judge, Presiding.
*In re Applied Signal Tech., Inc.*, 2006 U.S. Dist. LEXIS 24498 (N.D. Cal., Feb. 6, 2006)

**DISPOSITION:** REVERSED and REMANDED.

**COUNSEL:** Mark Kindall, Andrew M. Schatz and Jeffrey S. Nobel, Schatz & Nobel, P.C., Hartford, Connecticut; Alan R. Plutzik, Kathryn Scholfield, Bramson, Plutzik, Mahler & Birkhaeuser, LLP, Walnut Creek, California, for the plaintiff-appellant.

David Priebe, DLA Piper Rudnick Gray Cary US LLP, East Palo Alto, California; Shirli Fabbri Weiss, DLA Piper Rudnick Gray Cary US LLP, San Diego, California; and Kathryn E. Karcher, DLA Piper Rudnick Gray Cary US LLP, Seattle, Washington, for the defendants-appellees.

**JUDGES:** Before: Alex Kozinski, Chief Judge, Robert E. Cowen, * and Michael Daly Hawkins, Circuit Judges.

> \* The Honorable Robert E. Cowen, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

**OPINION BY:** KOZINSKI

**OPINION**

KOZINSKI, Chief Judge:

We consider whether plaintiffs adequately pled a claim of securities fraud--something that is much harder now than in days gone by.

**Facts**

Plaintiffs bought stock in Applied Signal Technology, Inc., during the six months before the company revealed that its revenue had fallen 25% [*2] from the preceding quarter. Immediately following this disclosure, the stock price dropped 16%. Plaintiffs sued the company and two of its officers under Securities Exchange Act § 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

Applied Signal's customers are almost all agencies of the federal government. Two civilian agencies together account for 80% of the company's revenue; military agencies account for most of the rest. According to plaintiffs, these government customers can, at any time and for any reason, order the company to stop working on existing contracts for up to 90 days. Compl. P 26; *see* 48 C.F.R. § 52.242-15(a) (model contract provision); *id.* § 42.1305(b)(1) (agencies "may" use this provision). The company only gets paid for work it actually performs, so when the government issues a "stop-work order," Applied Signal immediately ceases to earn money. And, because stopped work often is eventually cancelled altogether, a stop-work order signals a heightened risk that the company never *will* earn the money. *See* Compl. P 26; *48 C.F.R. § 52.242-15(a)* (after issuing a stop-work order, agencies may unilaterally modify or cancel the contract). According to plaintiffs, [*3] the precipitous drop in Applied Signal's revenue was caused by four stop-work orders the company received, which halted tens of millions of dollars of work it had contracted to do. Investors were surprised by the drop in revenue, plaintiffs claim, because Applied Signal continued to count the stopped work as part of its "backlog"--a term the company defines as the dollar value of the work it has contracted to do but hasn't yet performed. Plaintiffs claim that the company's backlog reports misled them

into believing that Applied Signal was likely to perform work that, in reality, had been halted and was likely to be lost forever.

The district court dismissed the complaint on several grounds and plaintiffs, naturally, appeal.

## Analysis

We first consider whether plaintiffs have pled with sufficient particularity the existence, content and effect of the stop-work orders. We then discuss whether defendants' alleged practice of counting stopped work as backlog was misleading, before weighing plaintiffs' allegations of scienter and loss causation. Finally, we ponder whether the backlog reports are immune from liability as "forward-looking" statements.

### 1. *Fed. R. Civ. P. 9(b)* and the requirement [*4] of particularity

Defendants claim that plaintiffs haven't alleged sufficient facts to show that the company ever received three of the four stop-work orders, or that these orders halted any work that was later reported as backlog, and that plaintiffs therefore haven't pled with "particularity" the "reasons" why the backlog figures were misleading. *15 U.S.C. § 78u-4(b)(1)*; *Fed. R. Civ. P. 9(b)*.

But the complaint identifies four confidential witnesses who worked for Applied Signal and who allegedly will testify to the existence and effect of the stop-work orders. Defendants quibble that these witnesses weren't in a position to see the stop-work orders firsthand because they were "engineers or technical editors" rather than managers. But any number of company employees would be in a position to infer the issuance of stop-work orders, which would have had the very obvious effect of putting numerous employees out of work. It's entirely plausible that "engineers or technical editors" would know, or could reasonably deduce, that the company had suffered such setbacks. *See In re Daou Sys., Inc., 411 F.3d 1006, 1015-16 (9th Cir. 2005)* (complaint described confidential witnesses "with sufficient [*5] particularity to support the probability" that they knew about the fraud).

The complaint also alleges with particularity that defendants counted stopped work as backlog. Defendants admitted as much in two conference calls with analysts (transcripts of which were included in the company's SEC filings). *See* pp.6395-96 *infra*. And the complaint alleges that the stop-work orders were still in effect when defendants touted the company's backlog; defendants' arguments to the contrary simply misread the complaint.
[1] Defendants suggest that the stop-work orders may have expired (and work may have resumed) before they announced the backlog, and they speculate that two of the orders may have actually been "renewals" of an earlier order. But plaintiffs' confidential witnesses suggest otherwise, so these disputes must at least await discovery.

> 1   The complaint alleges that in January 2005, defendants' backlog figure included work that "probably would not be realized as a result of Stop-Work Order No. 1." Compl. P 34. That is just another way of saying that the order was still in effect. The complaint also alleges that the third stop-work order removed "customer funding" from a "major project" that [*6] was "abandoned" several months later. *Id.* P 43. Again, this is a more detailed and powerful way of making the same point. And the complaint alleges that the fourth stop-work order was received in December 2004. *Id.* P 35(c). Because the default duration of stop-work orders is 90 days, *see 48 C.F.R. § 52.242-15(a)*, this order was likely still in effect in January 2005. For the same reason, the second stop-work order, which was received in "late May or early June," Compl. P 30, was likely still in effect when defendants announced their backlog figure on August 25.

### 2. Ruminations on "misleading"

Defendants argue that, even if they did count stopped work as backlog, this couldn't have misled reasonable investors, who would have understood that this was just what defendants were doing. *See Brody v. Transitional Hospitals Corp., 280 F.3d 997, 1006 (9th Cir. 2002)* (a statement is misleading if it would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists"). Reasonable investors, defendants claim, would grasp that stopped work was included in backlog upon reading the following paragraph in the company's SEC filings:

> Our [*7] backlog . . . consists of anticipated revenues from the *uncompleted portions of existing contracts* . . . . Anticipated revenues included in backlog may be realized over a multi-year period. We include a contract in backlog when the contract is signed by us and by our customer. We believe the backlog figures are firm, subject only to the cancellation and modification provisions contained in our contracts. . . . Because of possible future changes in delivery schedules and cancellations of orders, backlog at any particular date is not necessarily representative of actual sales to be expected for any succeeding period, and actual sales for the

year may not meet or exceed the backlog represented. We may experience significant contract cancellations that were previously booked and included in backlog.

(Emphasis added.) According to defendants, reasonable investors would interpret the underlined phrase to mean that backlog includes stopped work: Because a stop-work order doesn't actually cancel the contract, the contract continues to "exist[ ]"; and because stopped work is perforce "uncompleted," it still counts as backlog, even though Applied Signal may never get to complete it.

While this [*8] is a conceivable interpretation of this paragraph, it is hardly the only--or even the most plausible--one. It is just as likely that investors would interpret the underlined phrase as limited to work still in progress or work yet to be started on ongoing contracts. And, though the paragraph refers to customers' rights to "cancel[ ]" or "modif[y]" existing contracts, it says nothing about the right to simply stop work and thus immediately interrupt the company's revenue stream. The passage, moreover, speaks entirely of as-yet-unrealized risks and contingencies. Nothing alerts the reader that some of these risks may already have come to fruition, and that what the company refers to as backlog includes work that is substantially delayed and at serious risk of being cancelled altogether.

In ruling otherwise, the district court thought it significant that in a conference call with analysts, [2] one defendant hinted that stopped work counted as backlog. (As discussed above, *see* p.6393 *supra*, this conversation supports plaintiffs' allegation that Applied Signal did count stopped work as backlog.) The brief exchange went as follows:

> Q. [O]ne more question for you . . . please. Does the $ 143 million [*9] [of backlog] include--is that net of any potential debooking?
>
> A. That includes the $ 12 million that has not been debooked.
>
> Q. So it's not net of any potential debooking? Includes?
>
> A. That's right.

With the benefit of hindsight and some help from the briefs, [3] we can see how this exchange might be interpreted to communicate that defendants counted stopped work as backlog. The $ 12 million figure matches the amount of work halted by the first stop-work order (which the company had disclosed some three months earlier) and the company representative (who was one of the two individual defendants) admits that backlog still "[i]ncludes" this stopped work. But it's far from clear that a reasonable investor could have decoded this meaning at the time. Neither speaker made clear what $ 12 million was being referred to, nor said anything about stop-work orders, nor explained what the words "debook" and "potential debooking" mean. Absent undisputed evidence that these were terms of art that investors would have understood to refer to stop-work orders, we cannot find, as a matter of law, that defendants disclosed that backlog included a significant amount of work that had been halted by the company's [*10] customers.

> 2  The district court's memorandum cites two conference calls, but the second call occurred on the final day of the period in which plaintiffs bought stock, so this call cannot have had any effect on what a reasonable investor would have thought during that period.
> 3  Plaintiffs cite this conversation as proof that defendants counted stopped work as backlog. *See* p.6393 *supra*. Defendants mention the conversation in passing, *see* Appellees' Br. at 8 n.4, but do not rely on it to argue that their backlog statements weren't misleading, *see id.* at 33-37. We discuss the phone call here because the district court relied on it in finding that the backlog statements weren't misleading.

Defendants also argue that reasonable investors wouldn't have been misled because federal regulations warned them that Applied Signal's customers might issue stop-work orders. *See* 48 C.F.R. § 52.242-15(a) (agencies may contract for this authority); *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 609 (7th Cir. 1995) (investors are presumed to know the law under which companies operate). But learning that stop-work orders *might* be issued is quite different from knowing they were *in fact* issued. One indicates [*11] a risk, the other a certainty. It goes without saying that investors would treat the two differently.

None of this means that defendants had an affirmative duty to disclose the stop-work orders. *See Gallagher v. Abbott Labs., Inc.*, 269 F.3d 806, 808-09 (7th Cir. 2001) (the securities laws don't require firms to disclose all information). Had defendants released no backlog reports, their failure to mention the stop-work orders might not have misled anyone. But once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of. We cannot say, as a matter of law, that defendants fulfilled this duty.

### 3. Mental states and strong inferences

Plaintiffs must "state with particularity facts giving rise to a strong inference" that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors. *15 U.S.C. § 78u-4(b)(2)*; *In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 983 (9th Cir. 1999)*. Plaintiffs have done so by alleging that defendants Gary Yancey and James Doyle (Applied Signal's CEO and CFO) were aware that stop-work orders had halted [*12] significant amounts of work, yet counted the stopped work as backlog anyway.

As described above, plaintiffs allege the existence and effect of the stop-work orders with particularity. *See* pp.6392-93 *supra*. But plaintiffs allege no particular facts indicating that Yancey and Doyle actually knew about the stop-work orders.[4] Instead, plaintiffs *infer* that these high-level managers must have known about the orders because of their devastating effect on the corporation's revenue. We approved a similar inference in *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West, 320 F.3d 920 (9th Cir. 2003)*. In *America West*, as here, plaintiffs alleged no particular facts to show that certain defendants knew about maintenance problems at America West or about the government's investigation of those problems. In place of particularized allegations, plaintiffs relied on an inference based on defendants' position as outside directors on America West's board: The company's maintenance problems, and the government's investigation into them, were so important to the company that it was "absurd to suggest that the Board of Directors would not discuss" them. *Id. at 943 n.21*.

> 4  It's undisputed [*13] that defendants knew about the first stop-work order by September 9, 2004 at the latest--that's the day they disclosed the order in a filing with the SEC. They also referred to it, rather obliquely, in a conference call with investors three months later. *See* p.6395-96 *supra*. The relevant question is whether defendants knew about this order on August 24, 2004, when they announced their backlog to investors in a conference call without disclosing the order.

Plaintiffs' inference here is far stronger than the one we approved in *America West*. Defendants in *America West* were outside directors who did no more for the company than attend board meetings and serve on a board committee. *Id. at 943*. Here, by contrast, Yancey and Doyle were directly responsible for Applied Signal's day-to-day operations, *see* Compl. PP 8-10, 13, so it is hard to believe that they would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work.[5] If plaintiffs in *America West* could rely on an inference that outside directors were aware of maintenance problems over which they had no direct management responsibility, then plaintiffs here are entitled to rely on a [*14] similar inference as to the four stop-work orders.

> 5  The first stop-work order halted between $ 10 and $ 15 million of work on the company's largest contract with one of its most important customers. Compl. P 29. The size of the contract and the prominence of the client raise a strong inference that defendants would be aware of this order. And defendants clearly did know about it later, when they disclosed it in an SEC filing. That disclosure occurred just two weeks after defendants' allegedly misleading backlog statement, and the "temporal proximity" of the misleading statement and the subsequent disclosure "bolster[s]" the inference that defendants knew about the order when they made the statement. *Ronconi v. Larkin, 253 F.3d 423, 437 (9th Cir. 2001)*.
>
> The second stop-work order halted $ 8 million of work. Compl. P 30(b). According to a confidential witness, the order followed a "series" of client meetings where "management" tried unsuccessfully to "negotiate away" certain contract requirements. *Id*. Those alleged meetings raise a strong inference that defendants were aware of this client's dissatisfaction and thus also aware of the stop-work order that resulted from it.
>
> A different confidential [*15] witness will allegedly testify that the third stop-work order caused the company to reassign "50-75 employees," with the result that one of the company's facilities became a "ghost town." *Id*. P 43. The magnitude of this reallocation of personnel raises a strong inference that defendants were aware of it, and thus also aware of the stop-work order that caused it.
>
> The fourth stop-work order came from a difficult client, an agency that required Applied Signal to "complete massive volumes of paperwork" to meet the agency's reporting requirements. *Id*. P 35(c). Applied Signal was "unable to comply" with the agency's demands and, apparently as a result, the head of the project was "demoted." *Id*. Such difficulties make it highly likely that defendants were aware of this customer's problems; this customer in particular would be on defendants' radar screen because it had previously canceled other large contracts with Applied Signal. *Id*.

Defendants argue that *America West* conflicts with our later decision in *In re Read-Rite Corp., 335 F.3d 843 (9th Cir. 2003)*, where we said:

Plaintiffs also rely upon *Epstein v. Itron, Inc.*, in which a district court held, "facts critical to a business's core operations [*16] or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers." . . . . *Epstein*, however, predates *Silicon Graphics*, which clarified the requirement that a plaintiff must plead with particularity . . . .

. . . .

Plaintiffs may have established a "reasonable inference" that, based upon their job duties at Read-Rite, [defendant officers] "would be aware of the falsity of some or all of the statements" regarding the [company's] products. The existence of a "reasonable inference," however, does not satisfy the PSLRA's requirement that Plaintiffs allege particular facts . . . .

*Id. at 848-49* (citations omitted). Defendants misread *Read-Rite*. In that case, plaintiffs hadn't even alleged that defendants' optimistic statements were false or misleading when made. (Plaintiffs tried to show that these statements were inconsistent with defendants' later admissions, but on close inspection, it turned out that there wasn't any inconsistency at all--and therefore no support for the proposition that the earlier optimistic statements were false. *See id. at 847-48*.) So plaintiffs in *Read-Rite* were drawing a different inference from the [*17] kind at issue here and in *America West*. The *Read-Rite* plaintiffs were trying to show that defendants ought to have discovered as-yet-unalleged facts that would have convinced defendants that their optimism was unfounded. We held that this was an inference too far: Where defendants make cheerful predictions that do not come to pass, plaintiffs may not argue, based only on defendants' prominent positions in the company, that they ought to have known better. Instead, the PSLRA requires "particular allegations which strongly imply Defendant[s'] *contemporaneous* knowledge that the statement was false when made." *Id. at 847*.

Here, unlike *Read-Rite*, plaintiffs alleged particular facts (the stop-work orders) that support the inference that the backlog statements were misleading when made. These facts were prominent enough that it would be "absurd to suggest" that top management was unaware of them. *America West, 320 F.3d at 943 n.21*.

**4. Particular causes of loss**

Plaintiffs must allege that defendants' misleading backlog statements caused them a "later economic loss." *Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 343, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*; *see 15 U.S.C. § 78u-4(b)(4)* (at trial, plaintiff must prove that defendant [*18] "caused the loss").

The parties dispute the standard for pleading loss causation. Plaintiffs claim that *Rule 8(a)(2)* applies, and that they need only provide a "short and plain statement" of their loss causation theory. *Fed. R. Civ. P. 8(a)(2)*. Defendants argue that plaintiffs must satisfy *Rule 9(b)*, which requires them to "state with particularity the circumstances constituting fraud." *Fed. R. Civ. P. 9(b)*. We have not yet answered this question; nor has the Supreme Court. *Broudo, 544 U.S. at 346* (assuming, but not deciding, that *Rule 8* governs the pleading of loss causation).

We need not decide the question here. Assuming--without deciding--that *Rule 9(b)* governs, such that plaintiffs bringing a *10b-5* securities fraud claim must plead the element of loss causation with particularity, plaintiffs have done so here by alleging particular facts indicating that "but for the circumstances that the fraud concealed"--namely, the fact that much of Applied Signal's backlog had been halted by stop-work orders--"[plaintiffs'] investment . . . would not have lost its value." *Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 648-49 (7th Cir. 1997)*. The complaint describes the stop-work orders [*19] in detail, explains that the orders halted a significant amount of work, alleges that the reduced workload caused revenue to fall by 25%, and claims that this revenue reduction caused the stock price to drop by 16%. It's true, as defendants point out, that plaintiffs haven't alleged precisely which parts of which contracts three of the stop-work orders affected. But the complaint describes the orders in sufficient detail to give defendants ample notice of plaintiffs' loss causation theory, and to give us some assurance that the theory has a basis in fact. *See* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1297 (3d ed. 2004) (one reason for *Rule 9(b)*'s heightened pleading standard is to prevent baseless claims). *Rule 9(b)* requires no more. *See Daou, 411 F.3d at 1025-26* (where defendants overstated the firm's revenues, and where stock prices dropped immediately after defendants revealed the firm's "true financial condition," plaintiffs adequately pled loss causation) (citing *Broudo*).

**5. Backlog doesn't look forward**

Defendants argue that the PSLRA bars liability for their statements about backlog because those statements were "forward-looking." *15 U.S.C. § 78u-5(c)*. [*20] But, as Applied Signal uses the term, "backlog" isn't a "projection" of earnings or a "statement" about "future economic performance." *Id. § 78u-5(i)(1)*. Applied Sig-

nal's backlog is, instead, a snapshot of how much work the company has under contract right now, and descriptions of the present aren't forward-looking. *See America West, 320 F.3d at 936-37* (defendant's statements weren't forward-looking because they described the "present effects" of a settlement agreement). Backlog is much like accounts receivable: It represents Applied Signal's contractual entitlement to perform certain work, just like accounts receivable represents the company's contractual entitlement to be paid for work already performed. *See In re Complete Mgmt. Inc. Sec. Litig., 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001)* (accounts receivable is not forward-looking).

**REVERSED and REMANDED.**