United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JERRY TWINDE, on behalf of himself
and all others similarly situated,

     Plaintiff,

  v.

THRESHOLD PHARMECEUTICALS INC.,
HAROLD E. "BARRY" SELICK, and JANET
I. SWEARSON,

     Defendants.

_____/

No. C 07-4972 CW

CLASS ACTION

ORDER GRANTING
DEFENDANTS' MOTION
TO DISMISS AND
GRANTING PLAINTIFF
LEAVE TO AMEND

    Defendants Threshold Pharmeceuticals, Inc., Harold E. "Barry"
Selick and Janet I. Swearson have filed a motion to dismiss the
Consolidated Amended Class Action Complaint (CAC).  Lead Plaintiff
Michael Hentosh[1] opposes the motion.  The motion was heard on June
19, 2008.  Having considered all of the parties' papers and oral
argument on the motions, the Court grants Defendants' motion and
grants Lead Plaintiff leave to amend the complaint.

_____

    [1]In an order dated November 5, 2007, the Court granted Michael
Hentosh's unopposed motion to serve as Lead Plaintiff.

BACKGROUND[2]

Defendant Threshold Pharmaceuticals is a development-stage drug company that was founded in 2001.  Threshold's research focuses on a process it describes as "metabolic targeting," in which drugs target abnormal glucose metabolism to starve and kill off diseased cells while leaving healthy cells with normal glucose metabolism unharmed.  Defendant Selick is Threshold's Chief Executive Officer (CEO) and a member of its Board of Directors. Defendant Swearson was Threshold's Chief Financial Officer (CFO) during the class period.

Lead Plaintiff Michael Hentosh purports to represent a class of persons and entities who purchased Threshold's publicly traded common stock between February 4, 2005 and July 14, 2006, including those who purchased stock in or traceable to Threshold's February, 2005 initial public offering (IPO) or its October, 2005 follow-on offering.

Lead Plaintiff alleges that in the months leading up to its IPO, Threshold was in the process of developing three drugs, including TH-070, a drug intended to treat Benign Prostatic Hyperplasia (BPH).  BPH is disease common among middle-aged and older men that causes the prostate to enlarge.  This enlargement can partially or completely block the urethra, leading to a variety of urinary and bladder symptoms.  Lead Plaintiff characterizes BPH as "a common and relatively non-serious, though bothersome, side effect of aging that affects nearly all men by the time they reach

---

[2]  All facts are taken from Lead Plaintiff's CAC and are assumed to be true for purposes of these motions.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

70 years old." CAC ¶ 33. If left untreated, severe BPH can lead to kidney and bladder damage, bladder stones and incontinence.

The estimated market for a fast, safe and effective treatment for BPH is $1.6 billion. Lead Plaintiff alleges that, at the time of the IPO, one of Threshold's other two drugs in development, glufosfamide, was farther along in the development process, but that the market for that drug, which was intended to treat pancreatic cancer, was only $400 million. Therefore, Threshold elected to emphasize its progress with TH-070, despite the drug's early stage of development, in its efforts to convince investors to purchase shares through its IPO. TH-070 was a preparation of lonidamine, a drug that has never been approved for distribution in the United States and had, at the time Threshold began developing TH-070, been approved only in Italy and for treating seriously ill cancer patients.

Lead Plaintiff further alleges that when Threshold realized it would need public investors to support its clinical trials for TH-070 and glufosfamide, it

> planned a quick study of 60 patients in Bari, Italy treated with lonidamine. Before the Bari Study was complete, Threshold got the results it wanted [and] cancelled the second half of the study . . . .

CAC ¶ 4. As alleged, Threshold initiated the Bari Study in January, 2004. Later in 2004, after enrolling and observing a group of thirty patients who received a low dose of lonidamine, Threshold cancelled the second half of the study, in which another group of thirty patients was to receive a higher dose of lonidamine. The results of the Bari Study were available to

3

1  Defendants at the time of the IPO and, in the IPO documents,

2  Threshold predicted that it would "publish results of this trial in

3  the second quarter of 2005." Lyon Decl., Ex. A at 49.  Lead

4  Plaintiff alleges that Threshold misused the results of the

5  abbreviated Bari Study when it

6          told investors it had statistically significant
           results demonstrating that TH-070 worked better than
7          existing BPH treatments, including blockbuster drugs
           Flomax and Proscar.  Threshold also told investors
8          that TH-070 was well tolerated and safe, with no
           serious side effects.
9                Threshold repeatedly trumpeted the purportedly
           positive results of the Bari Study to the market,
10         permitting it to complete both its IPO and the Follow-
           on Offering and raising more than $100 million in
11         cash. . . .  Threshold used this money to fund phase 2
           and 3 clinical trials of TH-070 and glufosfamide, as
12         well as to pay generous salaries and bonuses and
           provide potentially lucrative stock options to its
13         senior management, including Selick and Swearson.

14  CAC ¶ 4-5.

15      Lead Plaintiff alleges that, through these communications,

16  Defendants misrepresented the likelihood that TH-070 would be

17  approved by the Food and Drug Administration (FDA) and failed to

18  disclose negative information already in their possession.  More

19  specifically, Lead Plaintiff alleges that Defendants negligently

20  published materially false and misleading information in the

21  prospectuses and registration statements related to the February,

22  2005 IPO and the October, 2005 follow-on offering when they

23  emphasized the positive results of the Bari Study with respect to

24  the safety of TH-070 and downplayed or failed to mention "specific

25  risks and uncertainties inherent in the design of that study."

26  Opposition at 8.

27      For example, Lead Plaintiff alleges that, in the February 3,

28                                    4

**United States District Court**
For the Northern District of California

2005 prospectus relating to the IPO, Defendants misleadingly stated

that the "primary objective" of the Bari Study was "to determine

the safety and tolerability of TH-070 in patients with BPH." CAC

¶ 63. However, Lead Plaintiff alleges that "the Bari Study was not

designed to demonstrate the safety and efficacy of TH-070. To the

contrary, the safety of TH-070 was assumed based on its prior use

in treating cancer patients in Europe, while trends in prior animal

and human studies indicating that the drug might cause abnormal

liver functions were overloaded [sic] or disregarded." Id. at ¶

65(f).

On May 19, 2005, after the IPO, but before the follow-on

offering, Threshold announced the publication of the results of the

Bari Study. In a press release issued that day, Threshold

summarized the results of the study and advised,

> Detailed results of the study will be published by
> MedReviews in the quarterly journal of Reviews in Urology
> available at the American Urology Association (AUA)
> annual meeting in San Antonio, Texas May 22-28, 2005.
> The information will also be available May 18th online at
> the MedReviews website http://www.medreviews.com.

Lyon Decl., Ex. C.

Lead Plaintiff alleges that, in 2005 and into 2006, after the

IPO and follow-on offering, Defendants "repeatedly trumpeted the

positive results of the Bari Study," including in press releases

dated March 20, 2006 and April 5, 2006 "announcing the completion

of enrollment and other milestones in ongoing phase 2 and 3 trials

of TH-070" as well as in a March 1, 2006 conference call and

related press release discussing Threshold's financial results for

the fourth quarter of 2005. Id. at 83. Lead Plaintiff alleges

that these press releases announced only the completion of enrollment in Threshold's clinical trials, but "did not warn investors of <u>any</u> potential issues with respect to the safety or the efficacy of TH-070." CAC ¶ 87.

Similarly, Lead Plaintiff alleges that its May 10, 2006 press release announcing Threhold's financial results for the first quarter of 2006 "were materially false and misleading to investors because the release failed to warn investors that liver problems had already arisen in the ongoing clinical trials of TH-070." CAC ¶ 101. Lead Plaintiff asserts that Defendants had a duty to disclose that six individuals in their clinical trials had demonstrated problems related to liver toxicity. Further, Lead Plaintiff alleges that, on May 10, 2006, Defendants must have known about these individuals because they reported these serious adverse events (SAEs) to the FDA on May 11, 2006. Lead Plaintiff alleges that by April, 2006, three of the six SAEs were being discussed within the Company. Moreover, Lead Plaintiff alleges that Threshold knew that it had not achieved its clinical milestones with respect to TH-070 as of May 10, and that Defendants knew that such milestones would not be reached.

On May 11, 2006, Threshold issued a press release announcing that its TH-070 trials had been placed on "partial clinical hold" by the FDA due to the abnormal liver test results reported by six patients in the trials. Lead Plaintiff alleges that this "sudden and unexpected news caused Threshold's stock to collapse, falling $10.56 or 75.4% in a single day." CAC ¶ 103. Nonetheless, Lead Plaintiff alleges that "the Company sought to stem further losses

6

by falsely reassuring the market that TH-070 was safe and effective, and that the Company already had plans to reinitiate clinical trials under a modified dosing regimen." Id. Moreover, Defendant Selick and Alan Colowick, Threshold's Chief Medical Officer (CMO), downplayed known trends of liver problems among dogs and people dosed with lonidamine. However, Lead Plaintiff asserts that these reassurances were false or misleading because "the liver toxicity problems with the drug were much more significant than revealed on that call" and "the drug did not work any better than a placebo in treating BPH." CAC ¶ 106.

Lead Plaintiff alleges that, as soon as the clinical trials were placed on hold, Threshold instructed every clinical site to stop administering TH-070 to patients in the study. Threshold gathered and analyzed the data collected by May 11, 2006 and, on July 17, 2006, the last day of the class period, announced that it planned to discontinue its development of TH-070 for BPH. The press release states that the decision was based on "the safety and efficacy results" of its trials. CAC ¶ 117. Threshold's stock fell $1.63, a 51.3% drop in value.

LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). On a motion under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. See Bell Atl. Corp. v. Twombly, __ U.S. __, 127 S. Ct. 1955, 1964 (2007).

7

**United States District Court**
For the Northern District of California

1    In considering whether the complaint is sufficient to state a

2    claim, the court will take all material allegations as true and

3    construe them in the light most favorable to the plaintiff.  NL

4    Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).

5    Although the court is generally confined to consideration of the

6    allegations in the pleadings, when the complaint is accompanied by

7    attached documents, such documents are deemed part of the complaint

8    and may be considered in evaluating the merits of a Rule 12(b)(6)

9    motion.  Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th

10   Cir. 1987).

11   When granting a motion to dismiss, the court is generally

12   required to grant the plaintiff leave to amend, even if no request

13   to amend the pleading was made, unless amendment would be futile.

14   Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911

15   F.2d 242, 246-47 (9th Cir. 1990).  In determining whether amendment

16   would be futile, the court examines whether the complaint could be

17   amended to cure the defect requiring dismissal "without

18   contradicting any of the allegations of [the] original complaint."

19   Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990).

20                                DISCUSSION

21   I.   Sections 11 and 12(2) of the Securities Act

22   Plaintiff brings allegations under §§ 11 and 12(2) of the

23   Securities Act for statements Defendants made in documents related

24   to the IPO and the follow-on offering.

25        Under § 11 of the Securities Act, anyone who buys a
         security pursuant to a false and misleading
26        registration statement may sue for damages.  Section 11
         states that any signer of the registration statement,
27        any partner or director of the issuer, any professional

28                                    8

**United States District Court**
For the Northern District of California

1

2

3

4

> involved in preparing or certifying the statement, and
> any underwriter of a registration statement may be
> liable "[i]n case any part of the registration
> statement, when such part became effective, contained
> an untrue statement of a material fact or omitted to
> state a material fact required to be stated therein or
> necessary to make the statements therein not
> misleading.

5

6

Kaplan v. Rose, 49 F.3d 1363, 1371 (9th Cir. 1994) (quoting 15

7

U.S.C. § 77k (1988)).  "The plaintiff in a § 11 claim must

8

demonstrate (1) that the registration statement contained an

9

omission or misrepresentation, and (2) that the omission or

10

misrepresentation was material, that is, it would have misled a

11

reasonable investor about the nature of his or her investment."

12

Id.  "No scienter is required for liability under § 11; defendants

13

will be liable for innocent or negligent material misstatements or

omissions."  Id.

14

15

     "Under § 12(2) of the Securities Act buyers have an express

16

cause of action for rescission against sellers who make material

17

misstatements or omissions 'by means of a prospectus.'"  Gustafson

18

v. Alloyd Co., Inc., 513 U.S. 561, 564 (1995) (quoting 15 U.S.C.

19

§ 77l(a)(2).  More specifically, "§ 12(2) establishes liability for

20

those persons who sell a security 'by means of a prospectus or oral

21

communication, which includes an untrue statement of material fact

22

or omits to state a material fact necessary in order to make the

23

statements, in light of the circumstances under which they were

24

made, not misleading."  In re Verifone Sec. Litiq., 11 F.3d 865,

25

868 (9th Cir. 1993).  Section 12(2) has been called "a strict

26

liability provision, in that the purchaser need not prove scienter,

27

fraud, or negligence on the part of the seller."  George F. Gabel,

28

9

**United States District Court**
For the Northern District of California

Jr., Annotation, Defense of Ignorance of Untruth or Omission in Civil Actions Under § 12(2) of Securities Act of 1933, 109 A.L.R. Fed. 444 (1992); <u>see also</u> <u>Casella v. Webb</u>, 883 F.2d 805, 809 (9th Cir. 1989).  "However, once the purchaser establishes a prima facie case under § 12(2), the seller of the security is provided with a statutory defense to liability if he establishes that he did not know, and in the exercise of reasonable care could not have known, of the misstatements or omissions."  109 A.L.R. 444; <u>see also</u> <u>Casella</u>, 883 F.2d at 809.

A.    Pleading Standard

Defendants argue that Lead Plaintiff's claims sound in fraud and are therefore subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standards.  <u>See</u> <u>Falkowski v. Imation Corp.</u>, 309 F.3d 1123, 1133 (9th Cir. 2002); <u>In re Stac Elec. Sec. Litig.</u>, 89 F.3d 1399, 1404-05 (9th Cir. 1996).  Lead Plaintiff counters that the §§ 11 and 12(2) claims expressly state that they are based on allegations of negligence.  Indeed, both claims specifically state that they are <u>not</u> based on allegations "that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent."  CAC ¶¶ 157, 165.  However, Lead Plaintiff's complaint clearly states that Defendants included in their Prospectuses and Registration Statements assertions

> that the drug showed "statistically significant improvements with no therapy related side effects," had "demonstrate[d] tolerability" in prior clinical trials, had demonstrated the ability to "kill[] prostate cells disproportionately" and worked better at increasing urine flow, reducing prostate size, and improving International Prostate Symptom Scores than either Flomax or Proscar.  In fact, as the Company later admitted, <u>TH-070 had no statistically</u>

United States District Court
For the Northern District of California

1  <u>significant benefit to BPH patients, worked no better</u>
2  <u>than a placebo, and caused significant serious side</u>
   <u>effects in the livers of patients taking the drug.</u>

3  CAC ¶ 6 (emphasis in original).

4      Such claims of factual misstatements cannot be construed as

5  allegations of negligent conduct in this context.  Reports in

6  prospectuses and registration statements of statistically

7  significant improvements in the absence of such results cannot be

8  deemed negligent.  Moreover, simple disclaimers "are unconvincing

9  where the gravamen of the complaint is plainly fraud and no effort

10  is made to show any other basis for the claims."  <u>In re Stac Elecs.</u>

11  <u>Sec. Litig.</u>, 89 F.3d 1399, 1405 n.2 (9th Cir. 1996).

12      Therefore, the Court finds that Lead Plaintiff's claims must

13  comply with Rule 9(b), which provides, "In all averments of fraud

14  or mistake, the circumstances constituting fraud or mistake shall

15  be stated with particularity."  Fed. R. Civ. P. 9(b).  The

16  allegations must be "specific enough to give defendants notice of

17  the particular misconduct which is alleged to constitute the fraud

18  charged so that they can defend against the charge and not just

19  deny that they have done anything wrong."  <u>Semegen v. Weidner</u>, 780

20  F.2d 727, 731 (9th Cir. 1985).  Statements of the time, place and

21  nature of the alleged fraudulent activities are sufficient, <u>Wool v.</u>

22  <u>Tandem Computers, Inc.</u>, 818 F.2d 1433, 1439 (9th Cir. 1987),

23  provided the plaintiff sets forth "what is false or misleading

24  about a statement, and why it is false."  <u>In re GlenFed, Inc., Sec.</u>

25  <u>Litig.</u>, 42 F.3d 1541, 1548 (9th Cir. 1994).  Scienter may be

26  averred generally, simply by saying that it existed.  <u>See id.</u> at

27  1547; <u>see</u> Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and

28                                11

other condition of mind of a person may be averred generally").  As to matters peculiarly within the opposing party's knowledge, pleadings based on information and belief may satisfy Rule 9(b) if they also state the facts on which the belief is founded.  <u>Wool</u>, 818 F.2d at 1439.

Nonetheless, as Lead Plaintiff argues, the complaint identifies with particularity the statements within the documents related to the IPO and follow-on offering that Lead Plaintiff alleges were misleading and why those statements were misleading. <u>See</u> CAC ¶¶ 64-74, 77-78.

B.   Bari Study

Lead Plaintiff alleges five general categories of misrepresentation regarding the Bari Study.  Defendants argue that they disclosed all of the relevant information Lead Plaintiff alleges they misrepresented or omitted.  Lead Plaintiff first alleges,

> Although the designers of the Bari Study had specifically warned that there was a "significant" possibility that the study results were "misleading," this warning was not included in the registration statement or prospectus for either the IPO or the Follow-on Offering.

Opposition at 8; CAC ¶ 65(d), 66-67, 78(e) 82.  Here, Lead Plaintiff is referring to the published report of the Bari Study, which warned,

> This is a "proof of concept study" in which, however, a placebo arm was not used.  The drawback in this design is the placebo effect that may elicit misleading results, if not properly corrected for, especially considering the small number of patients and the absence of a blind run-in period.

Lyon Decl., Ex. D at 532.  However, as Defendants point out, the

registration statements and prospectuses clearly stated that

the Bari Study was "open-label," meaning that no placebo was used.

Lyon Decl., Ex. A at 48 and Ex. G. at 46.  Moreover, the documents

disclosed that only thirty patients were enrolled in the study and

both sets of documents stated that further testing would be

necessary to determine the safety and efficacy of TH-070.  Id.

Next, Lead Plaintiff argues that the documents falsely stated

that "[t]he primary objective of [the Bari Study] is to determine

the safety or tolerability of TH-070."  Lyon Decl., Ex. A at 3.

Instead, Lead Plaintiff alleges, the Bari Study "assumed the safety

of the drug based on limited and undisclosed prior clinical trial

data."  Opposition at 8.  Nonetheless, even if Lead Plaintiff's

allegations are proven to be true, it is not clear how this

misrepresentation "would have misled a reasonable investor about

the nature of his or her investment."  Kaplan, 49 F.3d at 1371.  In

the same paragraph, the document states, "The safety and efficacy

of TH-070 for the treatment of symptomatic BPH will need to be

demonstrated in subsequent trials."  Lyon Decl., Ex. A at 3.

Lead Plaintiff further contends that the documents improperly

compared the results of the Bari Study to the results of Proscar

and Flomax clinical trials because those trials "were placebo-

controlled studies in which an unusually strong placebo effect had

been recognized."  Opposition at 8.  However, Lead Plaintiff does

not indicate where such a comparison occurred.  The only references

in the IPO documents to Proscar and Flomax state that (1) the Bari

Study measured "specific variables that have been used in clinical

trials of currently marketed BPH drugs to support their FDA

**United States District Court**
For the Northern District of California

approval," Lyon Decl., Ex. A at 3; (2) Threshold was "using Metabolic Targeting to develop a new class of drugs for BPH that may offer an improvement over current treatments," id. at 44; and (3) a general discussion of the revenues generated by Proscar and Flomax and the ways in which the drugs work, id. at 47, 56.  None of these statements purport to compare the results of the Bari Study to the clinical trials for Proscar or Flomax.

At the hearing, Lead Plaintiff argued that the follow-on documents were misleading because they compared the results of Flomax trials to the results of the Bari Study.  However, when asked to identify where such a comparison was located, Lead Plaintiff identified two separate sections of the follow-on registration statement.  The first section, titled "Current Therapies for BPH," states,

> In clinical studies of Flomax for the treatment of BPH symptoms, the average increase in urine flow was approximately 1.8 mL/sec. after four weeks of treatment. . . .  In clinical studies of Avodart the average increase in urine flow was approximately 1.6mL/sec. and the average decrease in prostate size was approximately 8% after four weeks of treatment.

Lyon Decl., Ex. G at 46.  Two sections later, under the heading "Prior Clinical Trials," the document describes the results of the Bari Study.  First, it discloses the design of the Bari Study, stating that the phase 2 "trial was an open-label, two-arm study designed to enroll a total of 60 patients in two 30-patient dosing schedules of TH-070, 150 mg once a day and 150 mg three times a day" and explains the decision not to enroll the second, high-dose group of patients.  Id.  The document goes on to state that, within those parameters, the study observed a statistically significant

14

decrease of 11.2% in prostate size and an average increase in flow rate of 3.2mL/sec.[3]  Id. at 47.  In addition to the implicit differences between the clinical study results for a drug that has already been approved by the FDA and the results of an open-label phase 2 trial with thirty patients for a drug that has not yet been approved, the document disclosed that Threshold had begun two additional "randomized, placebo controlled, double blinded clinical studies."  Id.  The document's description of the Bari Study, together with its description of Threshold's ongoing trials, was sufficient to indicate that the results of the Bari Study were not directly comparable to the results of the clinical studies of other BPH drugs already on the market.

     Lead Plaintiff next argues that the "representation that 'TH-070 kills prostate cells, reducing the size of the prostate' was false because TH-070 works no better than a placebo in reducing the size of the prostate."  Opposition at 9 (quoting Lyon Decl., Ex. A at 47).  However, the sentence Lead Plaintiff quotes in part states in full, "By inhibiting glycolysis, TH-070 kills prostate cells, reducing the size of the prostate, and therefore may provide an effective treatment for symptomatic BPH."  Lyon Decl., Ex. A at 47.  This complete statement again reiterates that the testing on TH-070 was not complete and might not show that the drug was more effective than a placebo.

     Finally, Lead Plaintiff asserts that it was misleading to

_____

     [3]The IPO documents contain the same information under the headings "BPH Market Opportunity" and "Ongoing Clinical Program." Lyon Decl., Ex. A at 47-48.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  claim that the results of the Bari Study were a "'statistically

2  significant' indicator of the safety or efficacy of TH-070 as a

3  treatment for BPH" because of the small sample size, the lack of

4  placebo control and other shortcomings of the study.  First,

5  Defendants did not claim that the Bari Study results were a

6  statistically significant indicator of TH-070's safety.  The IPO

7  document states only, "We observed statistically significant

8  improvements in all variables measured by day 28."  Lyon Decl., Ex.

9  A at 3.  The only other instance in which the documents addressed

10  the concept of statistical significance with respect to TH-070 was

11  in their later disclosure of the numerical results of the study.

12  See id. at 48.  However, both of the statements regarding

13  statistical significance were prefaced by disclosures of each of

14  the shortcomings Lead Plaintiff alleges made the statements

15  misleading.

16      The Court finds that Lead Plaintiff has failed to allege any

17  material omission or misleading statement in the IPO and follow-on

18  offering documents regarding the Bari Study.[4]

19  ————————————————————

20      [4]The Court finds inapposite Defendants' argument that because
   the publication of the results of the Bari Study disclosed the
21  information Lead Plaintiff alleges to have been omitted, it put
   Lead Plaintiff on notice of his claims, therefore making his claims
22  untimely.  "[I]nvestors are not generally required to look beyond a
   given document to discover what is true and what is not."  Miller
23  v. Thane, 519 F.3d 879, 887 (9th Cir. 2008) (citing multiple
   cases).  Taking all of Plaintiff's allegations as true, a dispute
24  remains whether the May, 2005 publication of the results of the
   Bari Study was sufficient to put investors on notice of their
25  claims.  Similarly, the question of whether the May, 2006
   disclosure of the partial hold on the clinical trials put investors
26  on notice of the allegedly misleading statements in the IPO and
   follow-on offering documents cannot be resolved at this stage.
27      Moreover, the challenged statements in the IPO and follow-on
   offering documents are not forward-looking and therefore are not

28                                      16

1              2.    Liver Toxicity

2         Lead Plaintiff also alleges that Defendants were obliged to

3    report that liver toxicity was a potential side effect of TH-070

4    because they had "gone to great lengths to tout the apparent safety

5    of lonidamine based on its prior use to treat cancer patients."

6    Opposition at 21.  Lead Plaintiff presents evidence that Defendants

7    were aware of various studies in which there was anecdotal evidence

8    of liver toxicity in cancer patients taking lonidamine and a study

9    in dogs that "found significant liver malfunction occurred at high

10   intravenous doses and suspicious lesions[] and unpredictable

11   toxicity occurred even after oral dosing."  CAC ¶ 70.  Defendants

12   concede that they were aware of these studies at the time of the

13   IPO and the follow-on offering but argue that the studies cited did

14   not indicate that liver toxicity was a "known material risk to TH-

15   070's development."  Reply at 10.

16        Moreover, Defendants argue that both the IPO and the follow-on

17   offering documents disclosed that Threshold's "drug candidates may

18   have undesirable side effects that prevent their regulatory

19   approval or limit their use if approved."  Lyon Decl., Ex. A at 10

20   and Ex. G at 9.  With respect to TH-070, the IPO documents stated,

21           TH-070, which we are developing to treat patients with
             BPH, has been investigated as a male contraceptive and
22           is known to cause reversible effects on fertility in
             animals.  In human clinical trials at doses
23           significantly higher than the dose of TH-070 we
             contemplate investigating for BPH, muscle and
24           testicular pain have been observed.  These side effects

25   ─────────────────────

26   protected under the PSLRA's safe harbor or the bespeaks caution
     doctrine.  See 15 U.S.C. § 78u-5(c)(A)(I) ("forward-looking
27   statements"); In re Worlds of Wonder Sec. Litig., 35 F.3d 1407,
     1413 (9th Cir. 1994) (same).

28                                17

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1
2
3
4

> or others that could be identified in the course of our clinical trials or that may otherwise be associated with our product candidates may outweigh the benefits of our product candidates and prevent regulatory approval or limit their market acceptance if they are approved.

Id., Ex. A at 10.  In the follow-on offering documents, Threshold

provided additional detail, stating that BPH had been investigated

as a male contraceptive "because of its effects on spermatogenesis,

fertility and shrinkage of testes in animals.  As a consequence,

these may be significant side effects that may or may not be

reversible in patients treated with TH-070 for BPH."  Id. Ex. G at

9.  Again, Threshold warned that other side effects could exist.

Id.

     Defendants argue that these disclosures, together with the

lack of statistically significant evidence linking lonidamine to

liver toxicity in humans, establish that Threshold did not fail to

disclose any material information regarding TH-070.  Indeed,

evidence that falls short of statistical significance only

demonstrates that there is a chance that a drug is unsafe.  See In

re Carter-Wallace Inc. Sec. Litiq., 150 F.3d 153 (2d Cir. 1988)

(Carter-Wallace I); In re Carter-Wallace Sec. Litiq., 220 F.3d 36

(2d Cir. 2000) (Carter-Wallace II).  If, as Lead Plaintiff alleges,

Defendants were required to disclose the non-statistically

significant anecdotal evidence of liver toxicity in the human

subjects of the already published studies, they would also be

required to disclose any other non-statistically significant

evidence of potential side effects.  As Defendants note, with a

drug under development, such disclosures likely would not aid

18

investors in their evaluation of the total mix of information available to them.  Such "a minimal standard might bring an overabundance of information within its [the public's] reach, and lead management simply to bury the shareholders in an avalanche of trivial information -- a result that is hardly conducive to informed decision making."  Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988) (internal quotation marks omitted); see also SEC v. Todd, 2006 US Dist. LEXIS 41182, *12 (S.D. Cal.) ("An excess of disclosure can have the same net effect as a dearth of it -- the shareholder misses the relevant information.").

The Court finds that Lead Plaintiff has failed to allege any misstatements or omissions regarding liver toxicity in the IPO or follow-on offering documents.

Because Lead Plaintiff has not alleged any material misstatement or omission in the IPO or follow-on offering documents, the Court grants Defendants' motion to dismiss Lead Plaintiff's claims under §§ 11 and 12(2) of the Securities Act. The Court will grant Lead Plaintiff leave to amend.

II.  Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b); see also 17 C.F.R. § 240.10b-5 (Rule 10b-5).  To state a claim under § 10(b), a plaintiff must allege: "(1) a misrepresentation or omission of material fact, (2) reliance, (3) scienter, and (4) resulting

19

United States District Court
For the Northern District of California

damages."  <u>Paracor Fin., Inc. v. Gen. Elec. Capital Corp.</u>, 96 F.3d 1151, 1157 (9th Cir. 1996); <u>see also</u> <u>McCormick v. Fund Am. Cos.</u>, 26 F.3d 869, 875 (9th Cir. 1994).

Some forms of recklessness are sufficient to satisfy the element of scienter in a § 10(b) action.  <u>See</u> <u>Nelson v. Serwold</u>, 576 F.2d 1332, 1337 (9th Cir. 1978).  Within the context of § 10(b) claims, the Ninth Circuit defines "recklessness" as

> a highly unreasonable omission [or misrepresentation], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

<u>Hollinger v. Titan Capital Corp.</u>, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc) (quoting <u>Sundstrand Corp. v. Sun Chem. Corp.</u>, 553 F.2d 1033, 1045 (7th Cir. 1977)).  As explained by the Ninth Circuit in <u>In re Silicon Graphics Inc. Securities Litigation</u>, 183 F.3d 970 (9th Cir. 1999), recklessness, as defined by <u>Hollinger</u>, is a form of intentional conduct, not merely an extreme form of negligence.  <u>See</u> <u>Silicon Graphics</u>, 183 F.3d at 976-77.  Thus, although § 10(b) claims can be based on reckless conduct, the recklessness must "reflect[] some degree of intentional or conscious misconduct."  <u>See</u> <u>id.</u> at 977.  The <u>Silicon Graphics</u> court refers to this subspecies of recklessness as "deliberate recklessness."  <u>See</u> <u>id.</u> at 977.

As stated above, Lead Plaintiff must plead any allegations of fraud with particularity, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure.  <u>In re GlenFed, Inc. Sec. Litig.</u>, 42 F.3d 1541, 1543 (9th Cir. 1994) (en banc).  Pursuant to the requirements

20

of the Private Securities Litigation Reform Act of 1995 (PSLRA), Pub. L. No. 104-67, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

Further, pursuant to the requirements of the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  The PSLRA thus requires that a plaintiff plead with particularity "facts giving rise to a strong inference that the defendant acted with," at a minimum, deliberate recklessness.  See 15 U.S.C. § 78u-4(b)(2); Silicon Graphics, 183 F.3d at 977.  Facts that establish a motive and opportunity, or circumstantial evidence of "simple recklessness," are not sufficient to create a strong inference of deliberate recklessness. See 183 F.3d at 979.  In order to satisfy the heightened pleading requirement of the PSLRA for scienter, plaintiffs "must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent."  Id.

A.   Misrepresentation or Omission of a Material Fact

Thus, to state a claim pursuant to § 10(b) of the Exchange Act, Lead Plaintiff must allege, among other things, a misrepresentation or omission of a material fact.  Lead Plaintiff claims that four sets of statements made in conference calls conducted and press releases issued between March 1, 2006 and May

21

11, 2006 misled investors by making positive statements about the ongoing clinical trials and omitting negative information about toxicity and efficacy problems.  The Court addresses each set of statements in turn.

        1.   TH-070 is a "Home Run"

Lead Plaintiff first asserts, "On March 1, 2006, Selick told investors that TH-070 was a 'home run' and that the Bari Study data had been 'replicated' in the ongoing clinical trials."  Opposition at 22, citing CAC ¶ 84-90.  However, Defendants have submitted an audio recording of the conference call, which makes clear that the complaint misquotes Selick.  Lead Plaintiff alleges that Selick stated, "The ongoing studies replicate what we've already demonstrated in our single center Phase II study and TH-070 lonidamine is going to be truly a home run for patients."  CAC ¶ 87.  In fact, Selick stated, "_If_ the ongoing studies replicate what we've already demonstrated in our single center Phase II study, _then_ TH-070 _in my opinion_ is going to be truly a home run for patients."  Lyon Decl., Ex. H at 9:35.  Lead Plaintiff does not dispute that this is what the recording actually states.  Rather he relies on a transcript of the call prepared by a third party and posted on the internet.  However, that transcript expressly concedes that it "may not be 100 percent accurate and may contain misspellings and other inaccuracies."  Herman Decl., Ex. A at 6.  The Court finds that it is appropriate to take judicial notice of the audio recording of the conference call and that there is no

United States District Court
For the Northern District of California

1  reasonable dispute that Defendants' version is correct.[5]

2      In the alternative, Lead Plaintiff argues that, even if

3  Defendants' version of Selick's statement is correct, "[c]alling a

4  drug a 'home run,' even if only potentially so, is misleading when

5  the speaker knows or is deliberately reckless to, and does not

6  disclose significant risks to overcome before it can be approved."

7  Opposition at 24, n.24.  However, this theory is belied by Selick's

8  qualification that _in his opinion_ the drug would be a home run _if_

9  the studies could replicate the earlier results.  Such a statement

10  of opinion cannot form the basis for a fraud claim.

11      Therefore, the Court grants Defendants' motion to dismiss with

12  respect to this challenged statement.

13          2.    March 20 and April 5, 2006 Announcement of
                  Completion of Enrollment in Ongoing Clinical Trials
14                and May 10, 2006 Announcement that TH-070 Trials
                  were On Track
15

16  Lead Plaintiff next alleges, "On March 20 and April 5, 2006,

17  Threshold announced the completion of enrollment in the ongoing

18  clinical trials – a significant milestone on the road to FDA

19  approval – but failed to disclose that liver toxicity problems had

20  arisen in those trials."  Opposition at 22, citing CAC ¶¶ 91-99.

21  Similarly, Lead Plaintiff alleges, "On May 10, 2006, after the

22  liver toxicity issues had been reported to the FDA and just one day

23      [5]Lead Plaintiff has filed a motion to lift the PSLRA discovery
    stay to allow him to seek limited discovery with respect to the
24  audio recordings of the two conference calls at issue.  The Court
    GRANTS the motion (Docket No. 44).  Lead Plaintiff may seek
25  production of any audio recordings maintained by the third parties
    that created the transcripts upon which Lead Plaintiff relies.  If
26  Lead Plaintiff obtains evidence that the audio recordings produced
    by Defendants are not accurate, he may seek appropriate relief from
27  the Court.

28                                  23

United States District Court
For the Northern District of California

before the trials were placed on clinical hold, Threshold reiterated that the TH-070 trials were on track with expectations, again without disclosing the liver toxicity issues." Opposition at 22, citing CAC ¶ 100-01.[6] In particular, Lead Plaintiff alleges that Defendants

> announced seemingly positive news about the ongoing clinical trials of TH-070 without revealing the hidden risks to approval of the drug – i.e., that the drug was prone to causing liver toxicity in patients.

CAC ¶ 95.

Defendants counter that any information they possessed with respect to liver toxicity at the time of the March 20, April 5 and May 10 press releases was not material. In particular, Defendants argue that any allegations based on the reporting of SAEs fail as a matter of law because, absent statistical significance, SAEs do not establish that a drug is unsafe. See Carter-Wallace I, 150 F.3d at 157; Carter-Wallace II, 220 F.3d at 40-41. This is because SAEs

---

[6]In his complaint, Lead Plaintiff also alleges that the March 20, April 5 and May 10 statements were misleading because they failed to disclose that TH-070 "did not work any better than a placebo in treating BPH" and "reiterat[ed] the positive results of the Bari Study without revealing either the limitations of that study or any results of the ongoing clinical trials revealing toxicity issues and lack of efficacy of the drug." CAC ¶ 95 (emphasis in original). However, in his opposition, Lead Plaintiff appears to abandon allegations based on the efficacy of TH-070 and Defendants' continued reliance on the Bari Study. See Opposition at 24-28 (asserting that these documents were misleading because they "failed to disclose that liver toxicity issues had arisen in those trials"). Even if Lead Plaintiff has not abandoned these bases for his claims, the Court finds that they must be dismissed. The ongoing clinical trials were blinded, placebo-controlled studies. Until the studies were completed, Defendants could not have evaluated the efficacy of TH-070 in comparison to a placebo. Lead Plaintiff has not alleged any facts to support a finding that Defendants had access to the unblinded results of those studies. Moreover, as discussed above, Defendants had earlier disclosed the limitations of the Bari Study.

24

are broadly defined and may be caused by preexisting conditions or other factors aside from the drug being tested.  See 21 C.F.R. § 312.32.

While it is true that only statistically significant test results are conclusive, non-statistically significant SAEs together with other evidence are sometimes considered material.  For example, in In re Bayer AG Sec. Litig., 2004 U.S. Dist. LEXIS 19593, *28 (S.D.N.Y.), a court in the Southern District of New York found that several SAEs, together with evidence that the defendant's executives had met to discuss the SAEs and concluded that "the potential dangers were 'putting the brand at risk,'" were sufficient to require the defendant to disclose those SAEs.

However, Lead Plaintiff does not allege additional information sufficient to establish that potential liver toxicity issues had to be disclosed at the time of the March 20, 2006 press release. Indeed, Lead Plaintiff does not even allege that Defendants had identified any SAEs at the time of the March 20, 2006 press release.  The only allegation of Defendants' knowledge of potential liver toxicity issues prior to March 20 is based on Lead Plaintiff's erroneous quotation of Selick's statement in the March 1, 2006 conference call.  See FAC ¶ 97.  Even accepting Lead Plaintiff's version, that statement does not establish that Defendants had identified any liver toxicity issues at the time of the March 20, 2008 press release.  Otherwise, Lead Plaintiff alleges only that "[i]t is certain that defendants knew about these issues at the time of the April 5, 2006 announcement."  Id. Without more, the later investigation and reporting of SAEs to the

25

FDA are not sufficient to establish that, at the time of the March 20 press release, Defendants were under a duty to disclose any incidents of liver toxicity. Defendants also note that, because the test in which the SAEs occurred was a blinded, placebo-controlled study, it would not have been possible for Defendants to know whether any incidents of liver toxicity were caused by TH-070. Lead Plaintiff asserts that Defendants somehow had the unblinded results but don't allege any facts to support this. Therefore, the Court dismisses Lead Plaintiff's claims based on the March 20 press release.

Although his allegations regarding the March 20 press release are deficient, Lead Plaintiff has alleged additional information sufficient to support a finding that the SAEs should have been disclosed in the April 5 and May 10 announcements. In particular, Lead Plaintiff has alleged that, on April 10, Threshold reported to the FDA that a patient in its European study "had developed elevated levels of the liver transamine ALT that were <u>thirty times higher</u> than normal." CAC ¶ 99. Lead Plaintiff alleges,

> At the very least, the toxicity issues that had arisen with the drug alerted defendants that clinical trials were likely to be delayed or that additional clinical trials would have to be conducted, such that the final results from the clinical trials would not come as quickly after completion of enrollment or be as meaningful as the market expected.

CAC ¶ 98. Moreover, Lead Plaintiff alleges that Defendants likely knew about the incident of liver toxicity for some time and had conducted considerable investigation to determine that the toxicity was significant, because they elected to report the incident to the FDA even though the European study was not within the FDA's

26

United States District Court
For the Northern District of California

jurisdiction.  Based on Defendants' decision to report the patient's condition on April 10, it is reasonable to infer that five days earlier, at the time of the April 5 press release, Defendants knew of and had a duty to disclose potential liver toxicity problems.

There is an even stronger inference that Defendants were obliged to disclose potential liver toxicity issues by the time Threshold released its May 10, 2006 quarterly report.  Not only had Defendants reported the European patient's elevated liver enzymes, but they were undoubtedly aware of the severity of the SAEs that, one day later, led the FDA to place a partial hold on the clinical trials.  Therefore, the Court finds that Lead Plaintiff has adequately alleged material misstatements in the April 10, 2006 press release and May 10, 2006 quarterly report based on Defendants' failure to disclose evidence of liver toxicity in the ongoing clinical trials.

> 3.   May 11, 2006 Announcement that Trials were Placed on Hold

Finally, Lead Plaintiff alleges, "On May 11, 2006, when Threshold announced that the clinical trials had been placed on hold by the FDA, its officers minimized the event, including by falsely reassuring investors that 'the FDA agrees' that a modified dosing schedule would permit the trials to proceed such that the clinical hold did not represent the end of the road for TH-070." Opposition at 22-23, citing CAC ¶¶ 102-16.  The announcement was made in a press release and a conference call held later the same day.  Lead Plaintiff alleges that this "sudden and unexpected news

27

United States District Court
For the Northern District of California

caused Threshold's stock to collapse, falling $10.56 or 75.4% in a single day." CAC ¶ 103.

Although the disclosure of the FDA hold led to a dramatic decrease in Threshold's stock price, Lead Plaintiff alleges that Defendants prevented a greater decrease by making additional misleading statements "suggesting that the concerns with TH-070's liver toxicity and the FDA's action in response were not as great as they might otherwise seem, and that even the FDA was on board with a plan that would allow the clinical trials to continue." Opposition at 29. Lead Plaintiff also faults Defendants for seeking "to reassure the market that the FDA action did not mean the end of TH-070." CAC ¶ 104.

However, Lead Plaintiff's allegations that Defendants stated that "the FDA agrees" and that "the FDA was on board" appear to be based on Colowick's statement during the conference call that Defendants had discussed the meaning of the partial clinical hold with the FDA. Colowick went on to state,

> [W]e have not received the formal letter from the FDA. However, we think we have a reasonable sense of what those issues are and the issues are primarily related around determining what is a safe both dose and duration of the drug to move forward. We believe <u>and I think the FDA agrees</u> that the plan would look something like a shorter-duration certainly than has been used in the current European study.

CAC ¶ 104 (emphasis added). In other words, Colowick presented his perception of the FDA's position and did not, as Lead Plaintiff asserts, represent that the FDA actually agreed with Defendants' assessment of the situation. Moreover, Lead Plaintiff has not sufficiently alleged that the FDA hold actually did end the

**United States District Court**
For the Northern District of California

viability of TH-070 as a marketable drug.  Indeed, as Lead

Plaintiff alleges, Defendants continued one of the trials that was

already underway at the time of the hold and only later decided not

to pursue TH-070 when the results of the clinical trials

demonstrated that TH-070 was not effective.

Finally, Lead Plaintiff argues that Colowick "downplay[ed] the

significance of the SAEs that had led to the hospitalization of

clinical trial patients, by suggesting that one of the patients was

an alcoholic and . . . that Threshold didn't agree with the

decision to classify the incidents as SAEs."  Opposition at 29

n.27.  However, Colowick's report that one of the patients had "a

history of recent increased alcohol consumption" was made in

response to an analyst's question regarding the medical history of

the patients identified as having SAEs.  Moreover, Defendants have

submitted an audio recording of the conference call which clearly

indicates that Colowick stated,

> I think the magnitude of the elevation of the liver
> enzymes, even in the absence of significant clinical
> symptoms, were concerning enough to the investigators
> that they classified these as SAEs, and we, quite
> frankly, were in agreement with that.

Lyon Decl. Ex. L at 16:41-16:57 (emphasis added).[7]

The Court finds that Lead Plaintiff has failed to allege that

Defendants made any materially false or misleading statements in

their May 11, 2006 announcement of the FDA hold on Threshold's

clinical trials.

---

[7]As discussed above, the Court takes judicial notice of the
recordings of the March 1 and May 11, 2006 conference calls.

**United States District Court**
For the Northern District of California

1    B.    Requisite Mental State

2        As discussed above, to state a claim pursuant to § 10(b) of

3    the Exchange Act, Lead Plaintiff must also allege that Defendants

4    acted with "deliberate recklessness." Silicon Graphics, 183 F.3d

5    at 977. The PSLRA requires that these allegations be plead with

6    particularity. 15 U.S.C. § 78u-4(b)(2). The parties dispute

7    whether, assuming Lead Plaintiff can allege false or misleading

8    statements, he has adequately plead that Defendants acted with the

9    requisite intent.

10        Lead Plaintiff claims that Defendants "were deliberately

11   reckless to the misleading nature of the statements," Opposition at

12   30, and that the following allegations support a finding that

13   Defendants acted with the requisite state of mind: (1) Threshold

14   was a small company without any approved products to sell and TH-

15   070 was its lead product candidate; (2) Defendants had a "desire to

16   assist Threshold's early stage non-public venture capital investors

17   to obtain a return on their investments, together with the fact

18   that they were precluded from doing so by a 180-day 'lock-up'

19   agreement, provided a further motive for defendants to keep

20   Threshold's stock price inflated through April 2006," Opposition at

21   30; and (3) although neither of the Individual Defendants sold any

22   stock during the class period, they were awarded "rich compensation

23   packages" demonstrating that "there were significant rewards

24   available to Threshold's management, without them having to resort

25   to insider stock sales that might call attention to the fact that

26   there were problems in the clinical trials," Opposition at 32.

27        As Defendants note, each of these three sets of allegations

28                                    30

**United States District Court**
For the Northern District of California

can be characterized as "routine business objectives, [which] without more, cannot normally be alleged to be motivations for fraud." Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1038 (9th Cir. 2002). Indeed, if such allegations were sufficient, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." Id. (quoting Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995)).

Lead Plaintiff also points to the stock sales by two of Threshold's initial investors, Sofinnova and Three Arch. Lead Plaintiff alleges that these large stock sales constitute evidence of scienter because Threshold founder George Tidmarsh was a member of Three Arch and Selick was a "venture partner" of Soffinova. Lead Plaintiff alleges that Three Arch sold one million shares on March 2, 2006 and that Tidmarsh resigned from Threshold's board of directors within that month. However, as Defendants point out, Three Arch's sale of one million shares constituted only twenty-nine percent of its holdings. It retained 2.44 million shares. Moreover, Sofinnova's March 16, 2006 sale of 2.5 million shares, representing seventy-five percent of its investment in Threshold, is not itself evidence of deliberate recklessness. Although Selick invested money in Sofinnova, there are no allegations that he shared material or inside information with Sofinnova prior to the March 16 sale.

The Court finds that, even to the extent Lead Plaintiff has successfully alleged false or misleading statements of material facts, his § 10(b) claim fails for failure to allege sufficient

1    facts to support a finding of deliberate recklessness.

2        C.    Defendant Swearson

3        Finally, Defendants argue that Lead Plaintiff's § 10(b) claim

4    against Swearson must be dismissed because she did not make any of

5    the challenged statements.  Lead Plaintiff argues that Swearson can

6    be held liable for all statements made in the challenged press

7    releases and conference calls under the group pleading doctrine.

8    However, assuming the group pleading doctrine is a viable legal

9    theory, it is not entirely clear that Swearson, as the CFO, was

10   involved in decisions regarding which clinical trial results should

11   be released or the meaning of those results.  Indeed, Lead

12   Plaintiff's response itself demonstrates this weakness in applying

13   the group pleading doctrine to Swearson.  Lead Plaintiff asserts

14   that "Swearson was responsible for and communicated to investors

15   regarding the costs of clinical trials, which is suggestive of her

16   involvement to some extent in those activities, as would be

17   expected in a small, start-up pharmaceutical company . . ."

18   Opposition at 34.

19       The Court finds that Lead Plaintiff fails to plead facts

20   either to demonstrate that his claims against Swearson fall within

21   the group pleading doctrine or to state a claim against Swearson as

22   an active participant in a fraudulent scheme.

23       Because the CAC's allegations do not sufficiently allege that

24   Defendants acted with the requisite intent and, in some instances,

25   fail to allege a misstatement or omission of material fact, the

26   Court grants Defendants' motions to dismiss Lead Plaintiff's claims

27   pursuant to § 10(b) of the Exchange Act.  However, the Court will

28                                  32

grant Lead Plaintiff leave to amend these claims.

III. Section 20(a) of the Exchange Act and § 15 of the Securities Act

Both the Exchange Act and the Securities Act provide for joint and several liability for every person who, directly or indirectly, controls any person found liable under other provisions of the Acts.  15 U.S.C. § 78t(a) ("Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person."); 15 U.S.C. § 77o ("Every person who, by or through stock ownership, agency, or otherwise or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under [§ 11 of the Securities Act or § 12 of the Securities Act] shall also be liable jointly and severally with and to the same extent as such controlled person."). These control person liability provisions are "given the same interpretation." Durham v. Kelly, 810 F.2d 1500, 1503 (9th Cir. 1987).  In both instances, "[t]o establish that someone is a 'controlling person' the complainant must show that there was a relationship between the controlling and controlled person and that actual power or influence was exerted over the alleged controlled person." Id. at 1503-04.  Further, to succeed on such a claim, the complainant must first show that the controlled person violated either the Exchange Act or the Securities Act. See Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).

United States District Court
For the Northern District of California

33

**United States District Court**
For the Northern District of California

Defendants Selick and Swearson move to dismiss the claims brought against them pursuant to § 15 of the Securities Act and § 20 of the Exchange Act on the sole basis that Lead Plaintiff has not sufficiently plead an underlying primary violation.  <u>See</u> <u>Lipton</u>, 284 F.3d at 1035 n.15.  Because the Court agrees with Defendants that Lead Plaintiff has not sufficiently plead an underlying violation of the Securities Act or the Exchange Act, the Court grants Defendants Selick and Swearson's motions to dismiss the § 20 claims and § 15 claims and grants leave to amend.

CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss (Docket No. 24).  The Court grants Lead Plaintiff leave to amend.  Lead Plaintiff may file an amended complaint within forty-five days of the date of this order.  A further case management conference will be held on October 16, 2008.  If Defendants file a motion to dismiss the amended complaint, they shall notice it for that date.

The Court GRANTS Lead Plaintiff's motion to lift the PSLRA discovery stay for the limited purpose discussed above (Docket No. 44).

IT IS SO ORDERED.

Dated:  7-11-08                          _____

                                         CLAUDIA WILKEN
                                         United States District Judge

34