COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DENNIS J. HERMAN (220163)
SHIRLEY H. HUANG (206854)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)
dherman@csgrr.com
shuang@csgrr.com
dpfefferbaum@csgrr.com
    – and –
ELLEN GUSIKOFF STEWART (144892)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
elleng@csgrr.com

Lead Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| JERRY TWINDE, On Behalf of Himself and All Others Similarly Situated,<br><br>                       Plaintiff,<br><br>     vs.<br><br>THRESHOLD PHARMACEUTICALS, INC., et al.,<br><br>                     Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

No. 4:07-cv-04972-CW

<u>CLASS ACTION</u>

DECLARATION OF DENNIS J. HERMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS; AND AN AWARD OF ATTORNEYS' FEES AND EXPENSES

DATE: April 15, 2010
TIME: 2:00 p.m.
COURTROOM: The Honorable
                   Claudia Wilken

[Caption continued on following page.]

507833_1

| | | |
|---|---|---|
| 1 | RAYNOLD L. GILBERT, On Behalf of Himself and All Others Similarly Situated, ) | No. 4:07-cv-04971-CW |
| 2 | ) | <u>CLASS ACTION</u> |
| 3 | Plaintiff, ) | |
| 4 | vs. ) | |
| 5 | THRESHOLD PHARMACEUTICALS, INC., et al., ) | |
| 6 | Defendants. ) | |
| 7 | ) | |

# TABLE OF CONTENTS

Page

I.      PRELIMINARY STATEMENT ................................................................1

II.     FACTUAL SUMMARY OF PLAINTIFFS' CLAIMS................................7

        A.      Pre-Settlement Class Period Events........................................7

        B.      The Bari Study ................................................................9

        C.      Threshold's Initial Public Offering and Follow-On Offering................10

        D.      Threshold Announces Milestones in Clinical Trials on March 20, April 5 and May 10, 2006 ................................................11

        E.      Threshold Announces the Partial Clinical Hold Imposed by the FDA................12

III.    PROCEDURAL HISTORY................................................................13

        A.      Plaintiffs' Consolidated Amended Complaint ......................................13

        B.      Plaintiffs' Second Amended Consolidated Complaint and Defendants' Motion to Dismiss................................................15

        C.      Fact Discovery ................................................................16

                1.      Plaintiffs' Discovery Requests................................................16

                2.      Plaintiffs' Discovery Requests to Third Parties................................17

                3.      Defendants' Discovery Requests Propounded on Plaintiffs ................18

                4.      Plaintiffs' Investigators and Consultants ................................18

        D.      Protective Order................................................................19

IV.     THE STRENGTHS AND WEAKNESSES OF THE CASE ...........................19

V.      SETTLEMENT NEGOTIATIONS AND TERMS OF THE SETTLEMENT................22

VI.     THE SETTLEMENT IS IN THE BEST INTERESTS OF THE SETTLEMENT CLASS AND WARRANTS APPROVAL................................................23

VII.    THE PLAN OF ALLOCATION ................................................24

VIII.   LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE................................................28

        A.      Nature and Extent of Litigation ................................................28

        B.      The Requested Fee Is Reasonable................................................29

        C.      The Time Expended................................................................29

507833_1

DECL OF HERMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT & PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS - 4:07-cv-04972-CW

- i -

|   |   |   | Page |
|---|---|---|---|
| | D. | The Support of the Class Representatives | 29 |
| | E. | The Excellent Settlement Achieved | 29 |
| | F. | The Risk of Contingent Class Action Litigation | 29 |
| | G. | The Diligent Prosecution of This Case | 31 |
| | H. | The Complexity of This Action's Factual and Legal Questions | 31 |
| | I. | The Contingent Nature of the Case and the Financial Burden Carried by Lead Counsel | 31 |
| IX. | CONCLUSION | | 32 |

DECL OF HERMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT &
PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS - 4:07-cv-04972-CW

I, DENNIS J. HERMAN, declare as follows:

1.     I am a member of Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia" or "Lead Counsel"), Court appointed lead counsel for Plaintiffs in this action.[1]  I was actively involved in the prosecution of this action (hereinafter, the "Litigation"), am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my supervision of, and participation in, all material aspects of the Litigation.[2]

2.     I submit this Declaration in support of Plaintiffs' application, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for approval of (a) the Stipulation for a cash settlement on behalf of the Settlement Class of $10 million (the "Full Settlement Amount"); (b) the proposed Plan of Allocation of settlement proceeds; and (c) Lead Counsel's application for attorneys' fees and expenses.[3]

## I.     PRELIMINARY STATEMENT

3.     This case has been vigorously litigated from its commencement in July 2007 through its settlement in July 2009.  Plaintiffs filed two consolidated amended complaints, both of which were the subject of detailed motions to dismiss by defendants, which were extensively briefed and

---

[1]     The Lead Plaintiff in this action, Michael Hentosh ("Hentosh"), named plaintiff Christopher Lee ("Lee"), named plaintiff Electrical Workers Pension Fund Local 103 I.B.E.W. ("Local 103"), named plaintiff Jerry Twinde ("Twinde") and named plaintiff Raynold Gilbert ("Gilbert"), are collectively referred to herein as "Plaintiffs."

[2]     Unless otherwise defined herein, capitalized terms have the meaning ascribed to them in the Stipulation of Settlement dated October 30, 2009 (the "Stipulation"), filed on November 9, 2009.

[3]     For purposes of effectuating this settlement, references to the "Settlement Class" or "Settlement Class Member" are to the proposed class in this matter, defined as:

All Persons who received, purchased, or otherwise acquired Threshold securities during the period from and including February 4, 2005 and July 14, 2006, inclusive. Excluded from the Settlement Class are Defendants, any entity in which any Defendant has or had a controlling interest or that is a parent or subsidiary or is controlled by any Defendant, Defendants' officers and directors, including any person who was an officer or director during the Settlement Class Period, Defendants' affiliates, legal representatives, heirs, predecessors, successors or assigns, and members of Defendants' immediate families.  Also excluded from the Settlement Class are those Persons who timely and validly request exclusion from the Settlement Class pursuant to the Notice of Pendency and Proposed Settlement of Class Action.

argued to the Court. Significant factual discovery, including detailed review and analysis of documentary evidence created in connection with the clinical drug trials of Threshold Pharmaceuticals, Inc.'s ("Threshold" or the "Company") drug candidate "TH-070" that lies at the core of this Litigation, was completed prior to settlement. The settlement was not achieved until Plaintiffs, *inter alia*: (a) successfully opposed, in part, defendants' motion to dismiss the Consolidated Second Amended Class Action Complaint for Violation of the Federal Securities Laws ("SAC"); (b) reviewed and analyzed 80 boxes of documentary evidence containing thousands of pages of documents reflecting the conduct of the clinical trials, the existence of serious adverse effects ("SAEs") among trial participants, and the results of tests regarding the potential for liver toxicity or other side effects to be associated with TH-070; (c) conducted additional discovery from third parties, including the Food & Drug Administration ("FDA"); (d) consulted with experts in the fields of economic loss and damages, medicine, and FDA clinical trial and approval requirements; (e) prepared a detailed mediation brief and attended a full day mediation with a nationally-recognized mediator; and (f) assessed the risks of prevailing on their claims at trial and the Settlement Class's ability to collect on a final judgment, if obtained.

4.     The settlement of this Litigation was negotiated with the assistance and oversight of a respected mediator, Antonio Piazza, Esq., following a mediation held on July 15, 2009, in San Francisco, California. Plaintiffs and defendants prepared comprehensive mediation briefs, supported by evidentiary materials, and vigorously advanced and defended their positions at the mediation. While the parties did not reach a settlement at the mediation, Mr. Piazza, after careful and detailed consideration of the parties' briefs and the points made at the mediation, proposed to both sides that the case should settle for a cash payment of $10 million. Both sides ultimately accepted the mediator's proposal, and the material terms of the settlement were agreed to on July 31, 2009.

5.     This settlement is the result of hard-fought litigation and takes into consideration the significant risks specific to the case. It was negotiated by experienced counsel for Plaintiffs and defendants with a solid understanding of both the strengths and weaknesses of their respective positions.

507833_1

DECL OF HERMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT &
PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS- 4:07-cv-04972-CW                    - 2 -

6. Plaintiffs believe that this settlement represents an excellent result for the Settlement Class, especially under the circumstances of this case. Based upon the factual discovery, investigation, research, analysis, and motion practice conducted to date, Plaintiffs continued to believe that their case has significant merit, but also recognized there were significant risks and potential weaknesses which had to be carefully evaluated in determining what course (*i.e.*, whether to settle and on what terms, or to continue to litigate through summary judgment and a trial on the merits) was in the best interests of the Settlement Class. As set forth in further detail below, despite the fact that Plaintiffs' allegations and claims were supported by legal authority, expert opinion, and documentary evidence, the specific circumstances involved here presented many risks and uncertainties in Plaintiffs' ability to prevail if the case proceeded to summary judgment or trial, or to collect on any judgment that might be obtained. Chief among these uncertainties was the financial condition of Threshold, which was the subject of a going concern opinion by its auditors at the time of settlement, which created significant risks to the collectability of a judgment, given the limited insurance and other assets available to satisfy Plaintiffs' claims, particularly after protracted litigation.

7. This action was originally brought against Threshold and certain of its officers on behalf of a class of persons who purchased Threshold securities between February 4, 2005 and July 14, 2006, for violations of §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "1933 Act") (15 U.S.C. §§77k, 77l(a)(2) and 77o) and §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).[4] The claims under the 1933 Act were dismissed with prejudice following submission of the SAC, as were the claims against one of the individual defendants (Swearson). In addition, the Court dismissed several statements alleged to be actionable under §10(b), leaving only two false statements remaining in the case, both of which were made in April

---

[4] The officer defendants (collectively, the "Individual Defendants") are: Chief Executive Officer ("CEO") Harold E. "Barry" Selick ("Selick") and Chief Financial Officer ("CFO") and Vice President, Finance and Administration, Janet I. Swearson ("Swearson").

507833_1

DECL OF HERMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT & PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS- 4:07-cv-04972-CW - 3 -

and May of 2006. As a result of these rulings, at the time of settlement this action was much narrower than it had been on the day it was commenced.

8. Plaintiffs alleged that Threshold, a small biotechnology company with no source of income and dwindling cash supply, made false and misleading statements about its drug candidate TH-070 for the treatment of benign prostatic hyperplasia ("BPH"). To assure investors that TH-070 was a viable candidate for the $1.6 billion BPH drug market, Threshold planned a small, two-armed study of 60 patients in Italy. Having achieved the purportedly positive results it was looking for with only the low-dose arm, Threshold cancelled the higher dose arm of the study and proceeded with its initial public offering. Plaintiffs alleged that Threshold's offering documents in connection with its 2005 initial public offering and a subsequent follow-on offering mislead investors by overstating the significance of the early clinical trials, failing to disclose fully the risks and limitations of that study, and omitting to disclose certain material risks to approval of the drug, including the risk of liver toxicity. Plaintiffs' claims related to these offering documents were brought solely under the 1933 Act. Plaintiffs alleged that following the offerings, defendants fraudulently mislead the market from March 1, 2006 through July 14, 2006 by making positive statements regarding ongoing clinical trials of TH-070 while failing to inform investors that liver toxicity issues had arisen which created significant new and previously undisclosed risks to the trials that were likely to delay or potentially prevent approval of the drug by the FDA. Plaintiffs brought these claims under the Exchange Act. While Plaintiffs alleged that false statements violative of the act were made on March 1, March 20, April 5, May 10 and July 17, 2006, following the Court orders described above, only the April 5 and May 10, 2006 statements remained in the case.

9. While Plaintiffs believe that they have a meritorious case, they also recognize that proceeding with this Litigation through class certification and summary judgment poses a number of real and substantial risks for the Settlement Class. In particular, defendants made clear that they would mount strong and vigorous defenses of each element of Plaintiffs' claims, including falsity, materiality, loss causation and scienter. While Plaintiffs believe there is significant documentary evidence supporting each element of their claims, no depositions had been taken at the time of settlement and Plaintiffs recognized that countervailing documentary or testimonial evidence might

be developed, or changes in the law might occur, which could result in dismissal of the remainder of this case at summary judgment, at trial, or on appeal. Even if Plaintiffs overcame these obstacles, the ultimate resolution of this case would not come for several years, or longer.

10.     Proceeding with this Litigation through trial poses a number of additional real and substantial risks for the Settlement Class, as discussed in more detail in §IV. For example, there is a substantial risk that Plaintiffs could not convince a jury that defendants' statements were false or misleading or that defendants' acted with the required state of mind – knowledge of falsity or deliberate recklessness with regard to the truth of their statements. A defendant's state of mind in a fraud case is often the most difficult element of proof, and one which is rarely supported by direct evidence such as an admission. There is also a substantial risk that, despite the use of expert testimony, Plaintiffs would not be able to prove loss causation at trial.

11.     Plaintiffs' burden at trial would require the testimony of experts in the fields of medicine, clinical drug trials and the FDA's drug approval process, loss causation and damages. Even with experts who are among the most respected in these fields, there could be no guarantee that Plaintiffs would prevail on liability and damages, as defendants would likewise hire equally competent experts to counter Plaintiffs' experts' theories. Indeed, the trial of this case could hinge on the testimony of experts, which presents a substantial risk of a party prevailing not on the merits but because of the jury's impression of one party's expert or experts.

12.     Even if Plaintiffs survived summary judgment and prevailed on any or all of their claims at trial and were awarded damages, there was a substantial risk that defendants would appeal any verdict or award. The appeals process could span years, during which time the Settlement Class would receive no recovery. Further, any appeal would also create the risk of reversal, in which case the Settlement Class would receive nothing after having prevailed on the claims at trial.

13.     Even if Plaintiffs obtained a final judgment against Threshold, the Company is in a precarious financial position and may be unable to pay any or all of a judgment. On March 13, 2009, Threshold announced that its auditor issued a going concern opinion. According to its Securities and Exchange Commission ("SEC") filings, as of June 30, 2009 (just prior to the mediation), the Company had assets of $13.2 million and more than $5 million of loss from

507833_1

DECL OF HERMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT & PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS- 4:07-cv-04972-CW                - 5 -

operations. While the Company carried $15 million in directors' and officers' liability insurance, proceeding with this Litigation to final judgment would likely extinguish these resources. Thus, even a final judgment in Plaintiffs' favor would not assure Settlement Class Members compensation for their losses.

14. These issues and others were considered by Plaintiffs and their counsel in deciding to settle the Litigation for $10 million. In reaching the determination to settle, Plaintiffs and their counsel have weighed the documentary evidence and legal authority supporting their allegations against the documents and legal authority that defendants believe undercut Plaintiffs' claims, as well as defendants' characterizations and interpretations of the evidence in this case.

15. On balance, considering all the circumstances and risks both sides faced at class certification, summary judgment and at trial, in addition to Plaintiffs' ability to collect on a final judgment, and the mediator's recommendation, Plaintiffs came to the conclusion that settlement on the terms agreed upon was in the best interests of the Settlement Class.

16. The settlement confers a substantial benefit on the Settlement Class and eliminates the significant costs of continued discovery, the significant risks of class certification, summary judgment, and trial, the outcome of which was far from certain. It is respectfully submitted that the settlement should be approved as fair, reasonable, and adequate; Lead Counsel should be awarded attorneys' fees of 25% of the Settlement Fund as well as their expenses of $163,743.23; and the Plan of Allocation should be approved.

17. Lead Counsel prosecuted this action on a wholly contingent basis for more than two years and advanced or incurred litigation expenses. By doing so, Lead Counsel have long borne the risk of an unfavorable result. They have not received any compensation for their substantial effort; nor have they been paid for their expenses. The vigorous nature of the Litigation, has resulted in expenses of $163,743.23 as well as the investment of 2,928.75 hours of attorney and other professional time.

18. The fee application for 25% of the Settlement Fund is fair both to the Settlement Class and Lead Counsel and warrants this Court's approval. This benchmark fee request is within the range of fees frequently awarded in these types of actions and is entirely justified in light of the

507833_1

DECL OF HERMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT &
PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS- 4:07-cv-04972-CW          - 6 -

substantial benefits conferred on the Settlement Class, the risks undertaken, the quality of representation, and the nature and extent of legal services performed.

19.     Lead Counsel also seek approval of expenses reasonably and necessarily incurred in prosecuting the Litigation. Lead Counsel have incurred expenses in the aggregate of $163,743.23. This amount includes (a) the fees and expenses of investigators, consultants, and experts whose services Lead Counsel required in the successful prosecution, analysis, and resolution of this case; (b) photocopying, imaging and printing thousands of pages of documents; (c) online factual and legal research; and (d) mediation fees and expenses. As illustrated by the discussion herein of Lead Counsel's efforts required to achieve this settlement, these expenses were reasonably and necessarily incurred to obtain this result.

20.     The following is a summary of the nature of the Settlement Class's claims, the principal events that occurred during the course of this Litigation, and the legal services provided by Lead Counsel.

## II.     FACTUAL SUMMARY OF PLAINTIFFS' CLAIMS

21.     This securities fraud class action was originally brought on behalf of a proposed class of investors who purchased Threshold's publicly traded securities between February 4, 2005 and July 14, 2006 (the "Settlement Class Period"), including those who purchased stock in or traceable to the Company's February 4, 2005 initial public offering ("IPO") or its October 12, 2005 follow-on offering ("Follow-on Offering"). ¶1.[5]

### A.     Pre-Settlement Class Period Events

22.     Threshold is a small biotechnology company headquartered in Redwood City, California. ¶¶24, 30. The Company focuses on the discovery , development, and commercialization of drugs based on a process it describes as "Metabolic Targeting" – an approach which targets the differences in metabolism between normal and certain diseased cells. ¶¶2, 24, 29. At the time of its IPO in February 2005, Threshold had three drug candidates: (i) TH-070 for treatment of BHP;

---

[5]     The allegations detailed herein as well as references to "¶___" are to the SAC, filed with the Court on September 19, 2008, unless otherwise indicated.

(ii) glufosfamide for the treatment of pancreatic cancer; and (iii) 2-deoxyglucose for the treatment of solid tumors. ¶30. While glufosfamide was the closest to regulatory approval by the FDA, it was TH-070 which was the most eagerly anticipated by the investment community because of its potential to compete in the $1.6 billion market for BPH drugs.

23. BPH is a bothersome condition that affects middle-aged and elderly men by restricting the flow of urine. ¶35. The prostate grows throughout a man's adult life causing partial or complete blockage of the urethra. This can lead to a variety of urinary and bladder symptoms, including difficulty urinating, urinary hesitancy and frequent urination, along with increased risk of urinary tract infections and urine retention. ¶¶35-37.[6] If left untreated, severe BPH can lead to kidney and bladder damage, bladder stones, and incontinence. BPH is extremely common; the NIH estimates that more than 50% of men over sixty and 90% of men over seventy suffer from symptoms of BPH. ¶41.

24. The active ingredient in TH-070 was an existing compound – lonidamine – which was approved for use in Italy in the mid-1980s as a treatment for prostate, brain, breast, and lung cancer. In June 2004, Threshold licensed worldwide rights to the use of lonidamine for treatment of BPH from Acraf S.p.a. ("Acraf"). As part of the terms of the agreement, Threshold obtained from Acraf reports of approximately 80 studies involving lonidamine for use in regulatory filings.

25. Threshold stated that lonidamine disrupted glycolysis in glandular prostate epithelial cells, the cells that overgrow in BPH. As a result, the Company claimed, the targeted cells would be unable to generate energy, thereby causing the prostate gland to shrink, relieving symptoms and effectively reversing the aging process of the prostate.

26. Threshold claimed that the safety and efficacy profiles of the existing BPH drugs created market opportunity for TH-070. ¶¶41-43. Threshold claimed that existing treatments for BPH, including Flomax®, Proscar® and Avodart®, had significant side effects, including decreased libido, impotence, and cardiovascular effects. Threshold claimed that TH-070 would compete with

_____

[6] These symptoms are collectively referred to as Lower Urinary Tract Symptoms ("LUTS").

these drugs because it was fast-acting with minimal side effects. Threshold further claimed that the lack of side effects would create new market opportunities for the drug, since many cases of BPH go untreated due to patient concerns with side effects.

27. At the time of the events underlying this action, Threshold had no marketable products and was experiencing escalating costs attributable to clinical trials. ¶¶44-48. By the end of 2004, Threshold had $28.6 million in cash on hand, it was spending at a rate of $2.1 million per month and expected to increase spending in 2005. ¶48. Threshold had exhausted private funding, having raised $50 million between its inception in 2001 and 2004. Plaintiffs alleged that this cash shortage prompted Threshold to conduct a limited, small scale study of TH-070 on foreign soil, hoping to achieve positive results it could leverage into a successful and much needed initial public offering to raise the capital it required to fund further clinical trials, as well as its ongoing operations. ¶51.

**B.  The Bari Study**

28. In January 2004, Threshold initiated a Phase 2 clinical trial at the University of Bari (Italy) (the "Bari Study") which was the first study of lonidamine as a treatment for BPH. ¶52. The study was open-label and contained no placebo arm. The Bari Study was originally designed to treat 60 patients, split into two groups of 30 patients each, with treatment lasting four weeks. In early 2004, 30 patients were recruited for the low-dose (150 mg/day) arm of the study, however four dropped out, leaving only 26 subjects in the low-dose arm.

29. Within six months, Threshold obtained purportedly positive results from the low-dose arm and cancelled the high-dose (450 mg/day) arm of the study. Even before the required six-month follow-up period for the 26 low dose patients was complete, Threshold announced that TH-070 had achieved statistically significant results after 28 days of dosing, including a purported 11.2% average decrease in prostate volume, a 17.8% decrease in PSA levels, a 7.3 average reduction in IPSS scores, a 3.2 ml/sec increase in maximum urine flow rate, and a 61% decline in post-void urine volume. At least one individual developed three-fold elevation in liver enzymes; nevertheless, Threshold claimed that TH-070 was "well tolerated" with no significant side effects. ¶66.

507833_1

DECL OF HERMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT & PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS- 4:07-cv-04972-CW      - 9 -

**C. Threshold's Initial Public Offering and Follow-On Offering**

30. Plaintiffs alleged violations of §§11, 12(a)(2) and 15 of the 1933 Act against all defendants for statements made in the Company's registration statements and prospectuses for its February 4, 2005 IPO and October 12, 2005 Follow-on Offering – which combined raised in excess of $100 million.[7] ¶¶62-84. Plaintiffs alleged that these offering documents contained false and misleading statements about the purpose and results of the Bari Study, the safety and efficacy of TH-070 and its ability to compete with existing drugs on the market. ¶64.

31. Plaintiffs alleged that the IPO Registration Statement and Prospectus failed to warn of specific heightened risk factors or disclose that the Bari Study results were unreliable indicators of the actual or potential success of TH-070. ¶¶65-76. In particular, Plaintiffs alleged that: (i) the Bari Study was designed merely to detect "a hint" of positive action of the drug, ***not*** to "determine the safety and tolerability of TH-070" or to evaluate the efficacy of the drug (¶¶33, 53, 70, 75); (ii) while Threshold achieved purportedly "statistically significant" results, these results could be entirely attributed to the unusually large placebo effect observed in BPH treatments (¶¶66(b)-(c), (e); 67-70); (iii) any comparisons to the clinical trials of Proscar®, Flomax®, and Avodart®, which were placebo-controlled studies, were misleading (¶¶66(f)); (iv) Threshold did not disclose that the designers of the Bari Study warned of the "significant" possibility that the study results could be "misleading" (¶¶66(d)-(e), 67-69); and (v) the representations that TH-070 kills prostate cells, reducing the size of the prostate and TH-070 was "well tolerated with no therapy-related side effects" were false. ¶66(h).

32. Plaintiffs alleged that the October 12, 2005 Registration Statement and Prospectus for the Follow-on Offering contained similarly misleading statements and omissions. The Company reiterated the positive statements about TH-070 found in the IPO offering documents. ¶¶78-79. While Threshold included more comprehensive efficacy results from the Bari Study, it made no

---

[7] While the Court's April 3, 2009 Order Granting in Part Defendants' Motion to Dismiss dismissed Plaintiffs' 1933 Act claims (without leave to amend), Plaintiffs believe that additional discovery would potentially have supported these allegations, such that Plaintiffs could have attempted to revive them before trial.

507833_1

DECL OF HERMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT &
PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS- 4:07-cv-04972-CW       - 10 -

additional disclosures regarding safety or efficacy risks. Plaintiffs alleged that the offering documents in connection with the Follow-on Offering were false and misleading for substantially the same reasons as detailed above regarding the IPO offering documents. ¶¶79-80(j).

**D.      Threshold Announces Milestones in Clinical Trials on March 20, April 5 and May 10, 2006**

33.     Plaintiffs allege violations of §§10(b) and 20(a) of the Exchange Act, against defendants Threshold and Selick, for making materially false and misleading statements about ongoing clinical trials while failing to disclose liver toxicity issues that had arisen during those trials. Having successfully raised millions of dollars in the public market, Threshold commenced two clinical trials of TH-070, a Phase 2 U.S. trial and a Phase 3 European trial, announced on June 27 and August 8, 2005, respectively. ¶¶9, 89. The Company did not provide guidance as to when the trials would be complete, promising only to alert investors when the trials were fully enrolled, which – given the dosing schedule – would occur approximately four months before the trials were completed. ¶89.

34.     By March 2006, investors were eagerly anticipating an announcement that Threshold had completed enrollment in the ongoing clinical trials, because this would mean that the expected near-term catalyst to Threshold's stock price – the release of data from those trials – was near at hand. As many analysts had previously reported, prior to the time the clinical results were released there was little new information that was expected to be released that would move the stock price. Many analysts had lowered their ratings to "hold" or similar, suggesting that investors should wait until clinical data was closer to being released before putting money into the stock. ¶88.

35.     On March 20, 2006, Threshold announced that it had completed enrollment in the Phase 2 TH-070 trial. The Company stated that it would have results from both trials available around the beginning of 4Q06 (*i.e.*, by October 2006). On April 5, 2006, Threshold announced that the Phase 3 trial had completed enrollment and reiterated that it would have results from that and the Phase 2 trial by the beginning of 4Q06. Once again, the Company repeated the positive results of the Bari Study without revealing any of the specific risks to efficacy or safety concealed by that study, or warning of any current concerns with the efficacy or toxicity of the drug.

36. These announcements released pent up demand for Threshold's common stock. Between the time of the IPO and March 17, 2006, NASDAQ had reported an average daily trading volume of 137,659 shares of Threshold's stock. From March 20, 2006 until the end of the Settlement Class Period, the average reported daily trading volume more than tripled, to 470,299 shares. In the seven trading days following the April 5, 2006 announcement, Threshold's average reported daily trading volume spiked to 818,414 shares.

37. Plaintiffs alleged that the March 20 and April 5, 2006 statements were either knowingly false and/or misleading when made or made with deliberate recklessness as to their truth because defendants had knowledge of liver toxicity issues that threatened to delay or prevent FDA approval of TH-070. In the weeks prior to the alleged false statements, two venture capital firms with close ties to Threshold sold large portions of their investments at tremendous profit – facts that Plaintiffs alleged provided circumstantial evidence of scienter. ¶¶138-152.

38. On May 10, 2006, Threshold announced its results for 1Q06, which ended March 31, 2006. The press release again trumpeted the completion of enrollment in the Phase 2 and Phase 3 trials as significant highlights of the quarter, and again claimed that the anticipated results from those trials would be reported within approximately five months – *i.e.*, by the beginning of 4Q06. ¶106. Plaintiffs alleged that the statements in the May 10, 2006 press release were materially false and misleading for the reasons listed in paragraph 80 of the SAC, and because additional incidents of toxicity had arisen by the time that statement was made.

**E. Threshold Announces the Partial Clinical Hold Imposed by the FDA**

39. On May 11, 2006, just a day after making positive statements about the clinical trials, Threshold shocked investors, announcing that the TH-070 program had been placed on "Partial Clinical Hold" by the FDA due to abnormal liver test results reported in six patients in the ongoing Phase 2 and Phase 3 trials. Threshold advised all clinical sites to immediately stop dosing clinical subjects. This sudden and unexpected news caused Threshold's stock to collapse, falling $10.56 or 75.4% in a single day.

40. On July 17, 2006, Threshold disclosed that TH-070 did not work any better than a placebo at treating BPH and that the clinical program would be cancelled. Defendants admitted that

1  there were many more adverse events than had been disclosed on May 11, 2006 - 16 subjects across

2  all the studies had elevated liver enzymes (two on placebo) of which 6 were classified as SAEs.  On

3  the news that Threshold would not capture any part of the $1.6 billion market for BPH treatment, the

4  Company's stock price fell $1.63, an additional loss of 51.3% in value, on a trading volume of 12.9

5  million shares.

6  **III.    PROCEDURAL HISTORY**

7        **A.    Plaintiffs' Consolidated Amended Complaint**

8        41.    On July 5, 2007, Jerry Twinde filed an action, No. 07-cv-06227-JSR, against

9  Threshold in the United States District Court for the Southern District of New York.  A similar

10  action was filed in that court on July 18, 2007 by Raynold L. Gilbert, No. 07-cv-06490-JSR.  On

11  August 13, 2007, the Honorable Jed S. Rakoff, United States District Judge, Southern District of

12  New York, consolidated the actions.  On September 27, 2007, the cases were transferred on

13  defendants' motion to the United States District Court for the Northern District of California and

14  opened as separate cases.[8]  On October 2, 2007, the cases were related and assigned to this Court.

15  The Court granted Hentosh's unopposed motion to serve as Lead Plaintiff and of his selection of

16  Coughlin Stoia as Lead Counsel on November 5, 2007.

17        42.    On January 15, 2008, Plaintiffs filed their Consolidated Amended Class Action

18  Complaint ("CAC"), alleging claims arising under §§11, 12(a)(2) and 15 of the 1933 Act (15 U.S.C.

19  §§77k, 77l(a)(2) and 77o) and §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and

20  78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).  All discovery

21  in the matter was stayed pursuant to the Private Securities Litigation Reform Act of 1995

22  ("PSLRA").

23        43.    On March 7, 2008, defendants moved to dismiss the CAC on the grounds that

24  Plaintiffs could not adequately plead falsity, materiality, or scienter.  Defendants argued that all

25  relevant details of the Bari Study were disclosed and that they did not claim the study proved TH-

---

27  [8]    *Twinde* is now Case No. 07-cv-04972-CW; *Gilbert* is now Case No. 07-cv-04971-CW.

1   070's safety or efficacy.  Regardless, defendants maintained their risk disclosures in their SEC

2   filings immunized them from liability.  Defendants claimed they were under no duty to inform

3   investors of SAEs unless and until such negative events become statistically significant.  Plaintiffs

4   filed their opposition on April 21, 2008.  Defendants replied on June 2, 2008.  The Court heard oral

5   argument on June 19, 2008.

6       44.     The parties engaged in supplemental briefing regarding two audio recordings of

7   Threshold investor conference calls.  Defendants submitted audio recordings of two investor

8   conference calls (and transcripts recently prepared therefrom) which contradicted the *Bloomberg* and

9   *Thomson Financial* transcripts which Plaintiffs quoted in the CAC.  Plaintiffs countered that defense

10  counsel could not authenticate these recordings.  In response, on June 23, 2008 defendants filed the

11  declaration of Denise T. Powell, Senior Director of Corporate Communications at Threshold in an

12  attempt to authenticate the audio recordings.  On July 8, 2008 Plaintiffs filed a response stating their

13  non-opposition to Powell's declaration (despite its inadequacies) and sought a lifting of the PSLRA

14  discovery stay for the limited purpose of resolving this factual issue.

15      45.     On July 11, 2008, the Court granted defendants' motion to dismiss the CAC without

16  prejudice.  The Court held Plaintiffs failed to allege any material omission or misleading statement

17  regarding the Bari Study or liver toxicity in the Company's Registration Statements or Prospectuses

18  for the IPO and Follow-on Offering.[9]  The Court rejected defendants' argument that only statistically

19  significant adverse events can be material and found that defendants had made materially false and

20  misleading statements in the April 5 and May 10, 2006 press releases.  However, the Court found

21  that Plaintiffs failed to allege that defendants' statements were made with the requisite mental state.

22  The Court lifted the PSLRA discovery stay to allow Plaintiffs to subpoena additional audio

23  recordings from *Bloomberg* and *Thomson Financial*.  Plaintiffs thereafter served such discovery, but

24  were unsuccessful in obtaining any additional audio recordings of the calls.

25

26  _____

27  [9]      The Court held that Plaintiffs' 1933 Act claims sounded in fraud and thus were subject to a
    heightened pleading standard.

28

## B. Plaintiffs' Second Amended Consolidated Complaint and Defendants' Motion to Dismiss

46. On September 19, 2008, Plaintiffs filed the SAC adding detail regarding defendants' knowledge of liver toxicity problems which arose during the clinical trials, the undisclosed placebo effect specific to BPH trials and why defendants' statements regarding the Bari Study were false and misleading. Defendants moved to dismiss the SAC on November 14, 2008, again on the grounds of falsity, materiality, and scienter. Plaintiffs filed their opposition on December 22, 2008. Defendants replied on January 22, 2009. The Court heard oral argument on February 5, 2009.

47. On April 3, 2009, the Court granted in part and denied in part defendants' motion to dismiss. The Court held that Plaintiffs' amendments to the §§11 and 12(a)(2) claims were insufficient and dismissed these claims without leave to amend. The Court upheld Plaintiffs' §10(b) claims against Threshold and Selick with regard to the April 5 and May 10, 2006 statements on the basis that Plaintiffs sufficiently alleged that defendants acted with scienter in trumpeting positive developments in the ongoing clinical trials without discussing liver toxicity issues which had arisen in those trials. Because Plaintiffs successfully alleged an underlying violation of the Exchange Act, the Court also denied defendants' motion to dismiss the §20(a) claim against Selick and Threshold.

48. On April 22, 2009, following a case management conference ("CMC") held on April 21, 2009, the Court established a case management schedule with completion of both fact and expert discovery by July 16, 2010, dispositive motions to be heard on May 6, 2010, and set trial – expected to last 10 days – for September 13, 2010. At the case management conference, defendants had urged the Court to order an early settlement conference due to Threshold's precarious financial condition. The Court agreed that it would be beneficial to explore settlement at an early stage, and encouraged the parties to do so prior to the October 1, 2009 deadline set for a hearing on class certification.

49. In the weeks following the CMC, the parties conferred on several occasions to agree on a mediator and schedule a mediation in this action, ultimately agreeing to participate in a mediation with Antonio Piazza, Esq., on July 15, 2009. During those discussions, the parties also agreed upon a framework for accelerated discovery of core documentary evidence regarding the clinical trials and other facts, transactions, and circumstances giving rise to Plaintiffs' allegations. In

507833_1

DECL OF HERMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT & PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS- 4:07-cv-04972-CW

- 15 -

particular, defendants agreed to produce all of the hard copy clinical trial documents in Threshold's possession on an expedited basis, so that Lead Counsel could review and copy selected documents sufficiently in advance of the mediation to permit them to further analyze the risks and rewards of continued litigation.

50. On May 4, 2009, defendants filed an answer to the SAC in which they denied Plaintiffs' substantive allegations. Also, on May 4, 2009, both parties served their Initial Disclosures pursuant to Federal Rule of Civil Procedure 26. Plaintiffs' disclosures included over three dozen former Threshold employees and approximately a dozen third-party individuals and entities that were likely to have discoverable information relevant to Plaintiffs' claims or defenses.

## C. Fact Discovery

### 1. Plaintiffs' Discovery Requests

51. On May 20, 2009, Plaintiffs served their First Set of Requests for Production of Documents to Defendants, containing 49 requests. Plaintiffs' requests sought documents regarding all aspects of their claims, including: (i) drafts and final versions of all press releases, SEC filings and other public statements; (ii) documents and correspondence related to the Company's new drug application; (iii) data regarding animal and clinical studies of lonidamine; (iv) all documents related to SAEs or other abnormal events connected to lonidamine; (v) all data or correspondence regarding liver toxicity; and (vi) information regarding Three Arch Partners and Sofinnova Ventures and any ongoing relationships with the Company. Defendants served their objections to Plaintiffs' requests on June 22, 2009. Defendants objected to the majority of Plaintiffs' requests, but indicated they would produce documents subject to their objections. On May 20, 2009, Plaintiffs also served their First Interrogatory to Defendants, seeking information regarding all abnormal liver function tests, including the date, type of test, numerical result and any regulatory entity to which the result was reported. Defendants served their response and objections to the interrogatory on June 22, 2009, and amended their responses on June 26, 2009. The parties subsequently met and conferred regarding defendants' responses, which Plaintiffs believed were incomplete. Defendants did not supplement their interrogatory responses prior to the mediation, but produced additional documents prior to the mediation reflecting the information Plaintiffs believed was missing from the interrogatory response.

507833_1

DECL OF HERMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT & PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS- 4:07-cv-04972-CW          - 16 -

52. Subsequent to serving discovery, the parties met and conferred over several telephonic conferences regarding the timing and scope of Plaintiffs' discovery requests. Ultimately, with the production of additional information from the FDA, the parties were able to resolve many of their disputes through Threshold's early pre-mediation production, and to defer others until after the mediation.

53. On June 4, 2009, defendants produced approximately 6,000 pages of communications between Threshold and the FDA concerning the Company's IND application for TH-070. Defendants also made approximately 80 boxes of documents related to defendants' clinical trials available for inspection by counsel for Plaintiffs, which were reviewed by a team of lawyers and others who selected approximately 187,000 pages for copying and additional analysis prior to the mediation. From June 16-23, 2009, defendants produced approximately 130,000 pages of documents from the boxes inspected by Lead Counsel on June 4, 2009. Defendants produced an additional 50,000 documents on June 26, 2009. Lead Counsel and document reviewers under their direct supervision spent hundreds of hours reviewing and analyzing these documents for information which supported, or undermined, Plaintiffs' claims.

### 2. Plaintiffs' Discovery Requests to Third Parties

54. On May 11, 2009, Plaintiffs served a document subpoena on the FDA. The FDA served its objections to the subpoena on May 22, 2009. Counsel for Plaintiffs and counsel for the FDA held a telephonic meet and confer on May 27, 2009, at which time the FDA advised Plaintiffs that it required a protective order to facilitate the expedited release of documents. Counsel for Plaintiffs, defendants, and the FDA communicated throughout June 2009, ultimately agreeing that the FDA would provide all responsive documents to Threshold pursuant to an Authorization for the Release of Trade Secrets and Confidential Commercial Information (the "Authorization"), and, after review, defendants would authorize the FDA to produce them to Plaintiffs together with a log of any withheld documents.

55. On June 23, 2009, after a series of telephonic meet and confer sessions, the FDA produced the documents which defendants obtained from the FDA pursuant to the Authorization.

507833_1

DECL OF HERMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT & PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS- 4:07-cv-04972-CW      - 17 -

1    Additional documents were provided on July 8, 2009, following additional correspondence and

2    discussions with the FDA and defendants.

3        56.    On May 12, 2009, Plaintiffs served document subpoenas on Sofinnova Ventures, its

4    Managing Director, Michael F. Powell, Three Arch Partners and its partner Wilfred E. Jaeger, M.D.

5    These subpoenas sought documents relating to the relationships and communications between these

6    entities and Threshold, including documents relating to their respective sales of Threshold stock

7    during the Settlement Class Period.  The third parties served their objections and responses to these

8    subpoenas on May 27, 2009, refusing to produce any documents but indicating that the third parties

9    were willing to meet and confer to narrow the scope of requests.

10                **3.    Defendants' Discovery Requests Propounded on Plaintiffs**

11       57.    On May 4, 2009, defendants propounded defendants' First Set of Requests for

12   Production and Defendants First Set of Interrogatories on Plaintiffs Hentosh and Local 103.  After

13   consultation with lead plaintiff Hentosh and named plaintiff Local 103, counsel for Plaintiffs served

14   responses and objections to the interrogatories and document requests on June 8, 2009.  In June

15   2009, counsel for Plaintiffs engaged in several meet and confer sessions with counsel for defendants

16   regarding Plaintiffs' responses and objections.  On June 8, 2009, Local 103 produced responsive

17   documents to defendants.

18                **4.    Plaintiffs' Investigators and Consultants**

19       58.    Plaintiffs retained the services of investigators L.R. Hodges & Associates, Ltd. to

20   locate and contact former Threshold employees.  Courts require plaintiffs to plead fraud with great

21   detail to satisfy the heightened pleading standard of the PSLRA.  Direct first-hand accounts of

22   former employees are essential to plaintiffs' ability to overcome a motion to dismiss a securities

23   fraud claim.  During the pre-filing and the process of amending the complaints, counsel for Plaintiffs

24   were in regular contact with the investigators, including providing strategy and guidance on the

25   investigation and any follow-up matters.  The investigation was crucial to the development of the

26   case as Lead Counsel were able to rely on information obtained from some of the witnesses in

27   pleading a complaint that satisfied the PLSRA pleading standard which the Court upheld. ¶28(a)-(f).

28

59.     Plaintiffs also utilized the services of two consulting experts during the course of the litigation.  One of these individuals was a Stanford-trained physician and medical researcher, who assisted Lead Counsel in researching and understanding issues relating to lonidamine, BPH, and the clinical trials conducted by Threshold.  The second was a former FDA official with over 20 years experience in reviewing new drug applications, who assisted Lead Counsel in drafting discovery requests to defendants and the FDA, and in reviewing and analyzing the import of various documents obtained from the defendants, the FDA, and other sources.

### D.     Protective Order

60.     Throughout May 2009, the parties spent substantial time negotiating the terms of a proposed protective order that would govern the confidential treatment of evidence produced in this case.  One of the contested issues was whether Threshold documents would require the highest level of protection of "Highly Confidential – Attorneys Eyes Only" confidential designation.  Another contested issue was the list of who could access information produced in this case as confidential or highly confidential.  The parties exchanged multiple drafts of a proposed order and held multiple telephonic meet and confers concerning certain disputed language.  After an extensive negotiation on the terms, the parties filed a Stipulated Proposed Protective Order on June 3, 2009 and the Court signed the Order on June 10, 2009.

## IV.     THE STRENGTHS AND WEAKNESSES OF THE CASE

61.     Based on publicly available documents, discovery received from defendants, their own investigation and their consultation with experts, Plaintiffs believed that there would be substantial evidence available to support their claims.  They also realized, however, that they faced considerable risks and defenses as the case proceeded.  Some of the most serious risks are discussed in the following paragraphs.  Plaintiffs carefully considered these risks during the months leading up to the settlement and during their settlement discussions with defendants.

62.     As an initial matter, prevailing on their claims required Plaintiffs to successfully certify a class and overcome defendants' anticipated motion for summary judgment.  Summary judgment posed a number of real and substantial risks for the Settlement Class, including falsity,

materiality or scienter. Of course, even if Plaintiffs received a favorable ruling on summary judgment, defendants could appeal or seek reconsideration of such a ruling.

63. Were Plaintiffs to proceed to trial, there was a substantial risk that a jury would not find defendants' statements materially misleading. On April 5, 2006, the defendants reported the completion of enrollment in the Phase 3 trial but did not disclose that at least one SAE had arisen in clinical trials. Plaintiffs alleged that this SAE, in combination with past clinical data which indicated potential liver toxicity, was sufficient to make defendants' statement materially misleading because liver toxicity issues would likely delay or prevent FDA approval. In response, defendants would likely present evidence that on April 5, 2006, and even on May 10, 2006, there was insufficient evidence to indicate to them that liver toxicity issues would delay or prevent FDA approval. Defendants indicated they would present the jury with extensive evidence of clinical testing conducted over nearly 30 years which they contend showed no statistically significant incidences of liver toxicity. Defendants would likely also point to the use of lonidamine in Europe for almost 20 years for multiple indications as evidence of its safety. Finally, defendants would argue that they could draw no conclusions from six, let alone one or zero, SAEs in their clinical trials and that they were still analyzing the relevant data at the time of the statements. There was a significant risk that the jury could find this evidence to be sufficient to overcome Plaintiffs' allegations that the April 5 and May 10, 2006 statements were materially misleading and made with scienter at the time they were issued. While Plaintiffs intended to present countervailing evidence supporting their allegations to the jury, and would also present highly trained expert witnesses with experience in the pharmaceutical industry and the FDA drug approval process to testify, there is no guarantee that a jury would find in Plaintiffs' favor on these issues.

64. There was also a substantial risk that Plaintiffs would not be able to prove scienter at trial. A defendant's state of mind in a fraud case is often the most difficult element of proof and one which is rarely supported by direct evidence such as an admission. Thus, it was quite possible that Plaintiffs would depose all defendants and those with knowledge about the case and yet adduce insufficient evidence to satisfy their burden of proof at trial. Plaintiffs would likely argue that defendants' awareness of SAEs in the ongoing clinical trials was sufficient to demonstrate scienter,

1  while defendants would likely counter that to show scienter, Plaintiffs must show that a consensus

2  had emerged at the Company that TH-070 would be delayed or not approved. At trial, a mere

3  finding of negligence would be fatal to Plaintiffs' claims.

4       65.     To meet their burden at trial, Plaintiffs planned to present the testimony of multiple

5  expert witnesses on clinical trials, the FDA approval process, loss causation, and damages. Even

6  with experts who are among the most respected in these fields, there could be no guarantee that

7  Plaintiffs would prevail on liability and damages, as defendants would likewise hire equally

8  competent experts to counter Plaintiffs' experts' theories. Indeed, the trial of this case may hinge as

9  much on the testimony of experts as on fact witnesses, which always presents a substantial risk of a

10 party prevailing not because of the merits but because of a jury's impression of one party's expert or

11 experts.

12      66.     Even if Plaintiffs prevailed on liability on any or all of their claims and were awarded

13 all of their damages, there was the significant risk that defendants would appeal the verdict and

14 award. The appeals process would likely span several years, during which time the Settlement Class

15 would receive no distribution on any damage award. In addition, an appeal of any verdict would

16 carry with it the risk of reversal, in which case the Settlement Class would receive no distribution

17 despite having prevailed on the claims at trial.

18      67.     Finally, and most significantly, even if Plaintiffs did obtain a final judgment against

19 the defendants, collecting on this judgment may prove difficult if not impossible. Threshold is in a

20 precarious financial state. The Company's auditors have issued a going concern letter and the

21 Company's public filings prior to the mediation indicated assets of $13.2 million in cash (as of

22 June 30, 2009). Threshold's most recent balance sheet list just $8.5 million in cash, virtually no

23 revenue and its stock is trading at just $1.84 per share. Plaintiffs were aware that taking this case

24 through trial and any possible appeal would likely exhaust defendants' remaining insurance policies,

25 potentially bankrupt the Company, and leave Settlement Class Members with a judgment but no

26 means to collect on it.

27

28

68. In summary, Plaintiffs faced many procedural hurdles as well as merit-based and practical risks in this matter, all of which were carefully considered by Lead Counsel in making the determination to settle on the agreed terms.

## V. SETTLEMENT NEGOTIATIONS AND TERMS OF THE SETTLEMENT

69. The parties agreed to participate in a mediation on July 15, 2009 before Antonio Piazza, Esq. Plaintiffs spent substantial time preparing a comprehensive mediation statement including reviewing all available documents prior to the mediation. The mediator spent considerable time conferring with Plaintiffs and defendants both separately and in joint sessions. The parties were adamant about their respective positions at the mediation. At the conclusion of the mediation, Mr. Piazza issued a "Mediator's Proposal" that the case settle for a cash payment of $10 million and gave the parties approximately one week to accept or reject the proposal. At the request of the mediator, this deadline was extended twice before the parties each accepted the proposal.

70. Defendants and/or their insurers will pay $10 million cash to the Settlement Class, consisting of all persons who purchased or otherwise acquired the securities of Threshold during the period February 4, 2005 through July 14, 2006. Excluded from the Settlement Class are defendants, any entity in which any defendant has or had a controlling interest or that is a parent or subsidiary or is controlled by any defendant, defendants' officers and directors, including any person who was an officer or director during the Settlement Class Period, defendants' affiliates, legal representatives, heirs, predecessors, successors or assigns, and members of defendants' immediate families. Also excluded from the Settlement Class are those Persons who timely and validly request exclusion from the Settlement Class pursuant to the Notice of Pendency and Proposed Settlement of Class Action.

71. On December 1, 2009, the Court granted preliminary approval of the settlement as well as the form and manner of notice of the settlement to the Settlement Class.

72. Darren Robbins and I led the settlement negotiations for the Plaintiffs. We have years of experience in the prosecution and resolution of complex class actions. Michael Charlson led the defense team for defendants. Defense counsel's credentials in the defending class actions are similarly unquestionable.

507833_1

DECL OF HERMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT &
PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS- 4:07-cv-04972-CW          - 22 -

73.     Lead Counsel are actively engaged in complex civil litigation, particularly the litigation of securities class actions.  We believe that our reputation as attorneys who will zealously carry a meritorious case through the trial and appellate levels, as well as our aggressive litigation of this case, put us in a strong position in settlement negotiations with defendants and their insurance carriers.

74.     The Stipulation resulted from vigorous arm's-length negotiations.  In the estimation of Lead Counsel, the compromise embodied in the Stipulation with defendants represents a successful resolution of a complex and risky class action.

75.     Upon approval of the Stipulation by the Court and entry of a judgment that becomes a final judgment, and upon satisfaction of the other conditions to the settlement, the Settlement Fund will pay for certain administrative expenses, including the cost of providing notice to the Settlement Class; the cost of publishing newspaper notice; payment of taxes assessed against the Settlement Fund; costs associated with the processing of claims submitted; and will pay Lead Counsel's fees and expenses.  The balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to the Plan of Allocation to Settlement Class Members who submit valid, timely Proof of Claim forms.

## VI.    THE SETTLEMENT IS IN THE BEST INTERESTS OF THE SETTLEMENT CLASS AND WARRANTS APPROVAL

76.     Plaintiffs believe they could have prevailed on the merits of the case.  Defendants were just as adamant that Plaintiffs would fail.  There was a very real risk, as discussed in detail above, that Plaintiffs would not prevail on their motion for class certification or at the summary judgment stage.  Had Plaintiffs' case successfully reached a trial, Plaintiffs faced the risk that a jury would not be convinced that defendants' statements were false or misleading, that defendants acted with the requisite scienter or the Plaintiffs sufficiently demonstrated loss causation.  There was also the risk that even if Plaintiffs prevailed at trial, defendants would appeal, which would take years to resolve and bore the risk of reversal.  Finally, because of the precarious financial position of the Company, collecting a final judgment against Threshold was not assured.

507833_1

DECL OF HERMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT & PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS- 4:07-cv-04972-CW        - 23 -

1    77.    Having considered the foregoing, and evaluating defendants' likely defenses at trial, it

2  is the informed judgment of Plaintiffs and their counsel, based upon all proceedings to date and their

3  extensive experience in litigating shareholder class actions, that the proposed settlement of this

4  matter before the Court is fair, reasonable, and adequate, and in the best interests of the Settlement

5  Class.

6  **VII.    THE PLAN OF ALLOCATION**

7    78.    Under the proposed Plan of Allocation, a Settlement Class Member's claim will be

8  calculated as follows:

9    The allocation below is based on the following price declines as well as the
    statutory PSLRA 90-day look-back amount of $2.10:

10    **CUSIP: 885807206**

11    <u>**Section 11 Claims for the February 2005 Initial Public Offering**</u>[10]

12  Initial Public Offering Price:                          $7.00 per share
13  Closing Price on the date the lawsuit was filed:[11]    $1.24

14

15    1.    For shares of Threshold acquired *pursuant to, and traceable to, the*
    *Company's offering prospectus dated February 3, 2005,* and

16    a)    sold prior to July 5, 2007, the claim per share is the lesser of: (i) the
17  purchase price per share less the sales price per share, or (ii) $7.00 less the sales price
    per share.

18    b)    retained at the end of July 4, 2007, or sold on or after July 5, 2007, the
19  claim per share is the lesser of: (i) the purchase price per share less the sales price per
    share, or (ii) $7.00 less $1.24.

20    <u>**Section 11 Claims for the October 2005 Secondary Public Offering**</u>

21  Secondary Public Offering Price:                        $10.46 per share
22  Closing Price on the date the lawsuit was filed:        $ 1.24 per share

23    1.    For shares of Threshold acquired *pursuant to, and traceable to, the*
    *Company's offering prospectus dated October 11, 2005,* and

24

25

---

26  [10]    The combined recovery for the Section 11 claims related to the February and October 2005
    public offerings shall be limited to 5% of the Net Settlement Fund.

27  [11]    First class action complaint with Section 11 claims filed on July 5, 2007.

28

DECL OF HERMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT &
    PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS- 4:07-cv-04972-CW                    - 24 -

a) sold prior to July 5, 2007, the claim per share is the lesser of: (i) the purchase price per share less the sales price per share, or (ii) $10.46 less the sales price per share.

b) retained at the end of July 4, 2007, or sold on or after July 5, 2007, the claim per share is the lesser of: (i) the purchase price per share less the sales price per share, or (ii) $10.46 less $1.24.

### Section 10(b) Claims for Common Stock

Class Period: February 4, 2005 through July 14, 2006

The allocation below is based on the following price declines as well as the statutory PSLRA 90-day look-back amount of $2.10:

May 12, 2006 Price Decline:    $10.56
July 17, 2006 Price Decline:    $ 1.63

1. For shares of Threshold common stock **purchased or acquired, on or between February 4, 2005 and March 19, 2006**, the claim per share shall be zero.

2. For shares of Threshold common stock **purchased or acquired, on or between March 20, 2006 and April 4, 2006**, the claim per share shall be as follows (the combined claims for this sub-period shall be limited to 10% of the Net Settlement Fund):

a) If sold prior to May 12, 2006, the claim per share is zero.

b) If sold on May 12, 2006 through July 14, 2006, the claim per share shall be the lesser of: (i) $10.56 (May 12, 2006 Price Decline), or (ii) the difference between the purchase price and the selling price.

c) If retained at the end of July 14, 2006, and sold before October 16, 2006, the claim per share shall be the lesser of: (i) $12.19 (May 12, 2006 and July 17, 2006 Price Declines), or (ii) the difference between the purchase price and the selling price, or (iii) the difference between the purchase price per share and the average closing price per share up to the date of sale as set forth in the table below.

d) If retained or sold on or after October 15, 2006, the claim per share shall be the lesser of: (i) $12.19 (May 12, 2006 and July 17, 2006 Price Declines), or (ii) the difference between the purchase price per share and $2.10 per share.

3. For shares of Threshold common stock **purchased or acquired, on or between April 5, 2006 through May 11, 2006**, the claim per share shall be as follows (the combined claims for this sub-period shall be limited to 70% of the Net Settlement Fund):

a) If sold prior to May 12, 2006, the claim per share is zero.

b) If sold on May 12, 2006 through July 14, 2006, the claim per share shall be the lesser of: (i) $10.56 (May 12, 2006 Price Decline), or (ii) the difference between the purchase price and the selling price;

c) If retained at the end of July 14, 2006 and sold before October 15, 2006, the claim per share shall be the lesser of: (i) $12.19 (May 12, 2006 and July 17,

Price Declines), or (ii) the difference between the purchase price and the selling price, or (iii) the difference between the purchase price per share and the average closing price per share up to the date of sale as set forth in the table below.

d) If retained or sold on or after October 15, 2006, the claim per share shall be the lesser of: (i) $12.19 (May 12, 2006 and July 17, 2006 Price Declines), or (ii) the difference between the purchase price per share and $2.10 per share.

4. For shares of Threshold common stock *purchased or acquired, on May 12, 2006 through July 14, 2006*, the claim per share shall be as follows (the combined claims for this sub-period shall be limited to 15% of the Net Settlement Fund):

a) If sold prior to July 15, 2006, the claim per share is zero.

b) If retained at the end of July 14, 2006 and sold before October 15, 2006, the claim per share shall be the lesser of: (i) $1.63 (July 17, 2006 Price Decline), or (ii) the difference between the purchase price and the selling price, or (iii) the difference between the purchase price per share and the average closing price per share up to the date of sale as set forth in the table below.

d) If retained or sold, on or after October 15, 2006, the claim per share shall be the lesser of: (i) $1.63 (July 17, 2006 Price Decline), or (ii) the difference between the purchase price per share and $2.10 per share.

| Date | Closing Price | Average Closing Price |
|------|---------------|-----------------------|
| 15-Jul-06 | N/A | $1.55 |
| 16-Jul-06 | N/A | $1.55 |
| 17-Jul-06 | $1.55 | $1.55 |
| 18-Jul-06 | $1.54 | $1.55 |
| 19-Jul-06 | $1.52 | $1.54 |
| 20-Jul-06 | $1.51 | $1.53 |
| 21-Jul-06 | $1.49 | $1.52 |
| 24-Jul-06 | $1.45 | $1.51 |
| 25-Jul-06 | $1.52 | $1.51 |
| 26-Jul-06 | $1.56 | $1.52 |
| 27-Jul-06 | $1.57 | $1.52 |
| 28-Jul-06 | $1.54 | $1.53 |
| 31-Jul-06 | $1.62 | $1.53 |
| 1-Aug-06 | $1.61 | $1.54 |
| 2-Aug-06 | $1.60 | $1.54 |
| 3-Aug-06 | $1.62 | $1.55 |
| 4-Aug-06 | $1.62 | $1.55 |
| 7-Aug-06 | $1.61 | $1.56 |
| 8-Aug-06 | $1.58 | $1.56 |
| 9-Aug-06 | $1.59 | $1.56 |
| 10-Aug-06 | $1.55 | $1.56 |
| 11-Aug-06 | $1.56 | $1.56 |
| 14-Aug-06 | $1.53 | $1.56 |
| 15-Aug-06 | $1.52 | $1.56 |
| 16-Aug-06 | $1.55 | $1.56 |
| 17-Aug-06 | $1.59 | $1.56 |

| Date | Closing Price | Average Closing Price |
|------|---------------|------------------------|
| 18-Aug-06 | $1.92 | $1.57 |
| 21-Aug-06 | $1.98 | $1.59 |
| 22-Aug-06 | $2.00 | $1.60 |
| 23-Aug-06 | $1.95 | $1.62 |
| 24-Aug-06 | $1.89 | $1.63 |
| 25-Aug-06 | $1.93 | $1.64 |
| 28-Aug-06 | $1.86 | $1.64 |
| 29-Aug-06 | $1.95 | $1.65 |
| 30-Aug-06 | $2.07 | $1.67 |
| 31-Aug-06 | $2.07 | $1.68 |
| 1-Sep-06 | $2.00 | $1.69 |
| 5-Sep-06 | $2.29 | $1.70 |
| 6-Sep-06 | $2.24 | $1.72 |
| 7-Sep-06 | $2.15 | $1.73 |
| 8-Sep-06 | $2.24 | $1.74 |
| 11-Sep-06 | $2.14 | $1.75 |
| 12-Sep-06 | $2.30 | $1.77 |
| 13-Sep-06 | $2.20 | $1.78 |
| 14-Sep-06 | $2.70 | $1.80 |
| 15-Sep-06 | $2.78 | $1.82 |
| 18-Sep-06 | $2.67 | $1.84 |
| 19-Sep-06 | $2.59 | $1.85 |
| 20-Sep-06 | $2.55 | $1.87 |
| 21-Sep-06 | $2.45 | $1.88 |
| 22-Sep-06 | $2.43 | $1.89 |
| 25-Sep-06 | $2.37 | $1.90 |
| 26-Sep-06 | $2.42 | $1.91 |
| 27-Sep-06 | $2.50 | $1.92 |
| 28-Sep-06 | $2.82 | $1.94 |
| 29-Sep-06 | $2.57 | $1.95 |
| 2-Oct-06 | $2.61 | $1.96 |
| 3-Oct-06 | $2.55 | $1.97 |
| 4-Oct-06 | $2.68 | $1.99 |
| 5-Oct-06 | $2.89 | $2.00 |
| 6-Oct-06 | $2.89 | $2.02 |
| 9-Oct-06 | $2.94 | $2.03 |
| 10-Oct-06 | $3.03 | $2.05 |
| 11-Oct-06 | $2.99 | $2.06 |
| 12-Oct-06 | $3.04 | $2.08 |
| 13-Oct-06 | $3.20 | $2.10 |
| 14-Oct-06 | N/A | $2.10 |
| 15-Oct-06 | N/A | $2.10 |

The date of purchase or sale is the "contract" or "trade" date as distinguished from the "settlement" date.

For Settlement Class Members who held Threshold securities at the beginning of the Settlement Class Period, or who received or made multiple purchases, acquisitions or sales during the Settlement Class Period, the first-in, first-

out ("FIFO") method will be applied to such holdings, receipts, purchases, acquisitions and sales for purposes of calculating a claim. Under the FIFO method, sales of securities during the Settlement Class Period will be matched, in chronological order, first against securities held at the beginning of the Settlement Class Period. The remaining sales of securities during the Settlement Class Period will then be matched, in chronological order, against securities received, purchased or acquired during the Settlement Class Period.

A Settlement Class Member will be eligible to receive a distribution from the Net Settlement Fund only if a Settlement Class Member had a net loss. All gains and losses (as calculated under the above plan) will be combined and thereafter netted against each other. In addition, no distribution will be made unless the amount of the check is at least $10.00.

## VIII. LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

79. The requested fee of 25% of the Settlement Fund is fair and reasonable, is consistent with percentages routinely awarded by courts, and is amply justified by numerous specific facts and circumstances in this case.

### A. Nature and Extent of Litigation

80. The prosecution of this action required Lead Counsel and their paraprofessionals to perform 2,928.75 hours of work and incur $163,743.23 in expenses.

81. This case was vigorously litigated and settled only after Lead Counsel had, *inter alia*: (a) conducted an extensive investigation during each pleading stage; (b) successfully opposed defendants' motion to dismiss the SAC; (c) conducted merits discovery, including reviewing and analyzing over 187,000 pages of documents produced by defendants and third parties; (d) consulted with experts, (e) prepared for and attended a mediation session; and (f) assessed the risks of prevailing on their claims at trial. These efforts and others on the part of Lead Counsel are described in detail throughout this Declaration.

82. For our extensive efforts on behalf of the Settlement Class, Lead Counsel are applying for compensation from the Settlement Fund on a percentage basis. The percentage method is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the class in achieving the maximum recovery in the shortest amount of time required under the circumstances.

507833_1

DECL OF HERMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT & PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS- 4:07-cv-04972-CW          - 28 -

**B.     The Requested Fee Is Reasonable**

83.     Lead Counsel request a fee of 25% of the Settlement Fund.  As set forth in the accompanying memorandum in support of Lead Counsel's application for an award of attorneys' fees and expenses, numerous courts have applied the percentage-of-recovery method in awarding fees.  The percentage sought is merited in this case in light of the effort required and the results obtained.

**C.     The Time Expended**

84.     Lead Counsel expended a total of 2,928.75 hours in attorney and paraprofessional time in litigating this case and obtaining the settlement.  The resulting lodestar is $1,366,283.75.

**D.     The Support of the Class Representatives**

85.     Plaintiffs actively monitored the Litigation and consulted with counsel during the course of settlement negotiations.  Both lead plaintiff Hentosh and named plaintiff Local 103 spent considerable time and effort fulfilling their duties and responsibilities in this case, including reviewing briefs, answering discovery requests, and consulting with counsel concerning the merits of this Litigation.  Both Hentosh and Local 103 support Lead Counsel's requested fee.

**E.     The Excellent Settlement Achieved**

86.     The $10 million cash settlement was achieved as a result of extensive and creative prosecutorial and investigative efforts, and contentious and complicated motions practice and settlement negotiations, as detailed herein.  As a result of this settlement, hundreds of Settlement Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of a settlement.

**F.     The Risk of Contingent Class Action Litigation**

87.     This Declaration and the motion in support of the proposed settlement and the fee application describe the substantial risks of this Litigation.  Those same difficulties also constituted risks that counsel might never be paid for their efforts.

88.     There are numerous cases where class counsel in contingent fee cases such as this, after expenditures of thousands of hours and significant out-of-pocket expenditures, have received no compensation whatsoever.  Class counsel who litigate cases in good faith and receive no fees

507833_1

DECL OF HERMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT & PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS- 4:07-cv-04972-CW                                    - 29 -

whatsoever are often the most diligent members of the plaintiffs' bar. The fact that defendants and their counsel know that the leading members of the plaintiffs' bar are actually able to, and will, go to trial even in high-risk cases gives rise to meaningful settlements in actions such as this. The losses suffered by class counsel in other actions where insubstantial settlement offers are rejected, and class counsel ultimately receives little or no fee, should not be ignored. Lead Counsel knows from personal experience that despite the most vigorous and competent of efforts, attorneys' success in contingent litigation, such as this, is never assured.

89. Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result, and that such a result would be realized only after a lengthy and difficult effort.

90. Lawsuits such as this are exceedingly expensive to litigate successfully. Those unfamiliar with the efforts required to litigate class actions often focus on the aggregate fees awarded but ignore the fact that those fees are used to fund enormous overhead expenses incurred during the course of many years of litigation, are taxed by federal, state, and local authorities, used to fund the massive expenses of other contingent cases prosecuted by plaintiffs' counsel and to pay the monthly salaries of the firms' attorneys and staff, and when reduced to a bottom line, are far less imposing to each individual firm involved than the gross fee awarded appears.

91. As discussed in greater detail above, this case was fraught with significant risk factors concerning liability. Plaintiffs' success was by no means assured. Defendants disputed whether Plaintiffs could even establish liability and would likely contend, as the case proceeded to expert discovery, that even if liability existed, the amount of damages was substantially lower than Plaintiffs alleged. Were this settlement not achieved, and even if Plaintiffs prevailed at trial, Plaintiffs faced potentially years of costly and risky appellate litigation against defendants, with ultimate success far from certain. It is also possible that a jury could have found no liability or no damages. Collection on any judgment remained speculative because of the Company's precarious financial position. Lead Counsel are entitled to 25% of the Settlement Fund because of the risk factors involved in this case.

**G.  The Diligent Prosecution of This Case**

92.  A 25% fee is also warranted in light of the extensive efforts on the part of Lead Counsel, as outlined above, that were required to produce this settlement.  Lead Counsel and their paraprofessionals spent 2,928.75 hours of time on the case, *inter alia*, conducting discovery, reviewing and analyzing documents, consulting with experts, drafting complaints and comprehensive memoranda of law concerning the motions to dismiss, making court appearances, and engaging in settlement discussions.

**H.  The Complexity of This Action's Factual and Legal Questions**

93.  Courts have recognized that the novelty and difficulty of the issues in a case are significant factors to be considered in making a fee award.  As demonstrated by the discussion above of the contested issues in the Litigation, this case involved difficult issues of fact and law regarding the falsity, materiality, defendants' states of mind, and loss causation.

**I.  The Contingent Nature of the Case and the Financial Burden Carried by Lead Counsel**

94.  A determination of a fair fee must include consideration of the contingent nature of the fee, the financial burden carried by plaintiffs' counsel, and the difficulties that were overcome in obtaining the settlement.

95.  This action was prosecuted by Lead Counsel on an "at-risk" contingent fee basis.  Lead Counsel committed 2,928.75 hours of attorney and paraprofessional time and incurred $163,743.23 in expenses in the prosecution of the Litigation, and fully assumed the risk of an unsuccessful result.  Thus, Lead Counsel should be fairly compensated for their efforts.  Lead Counsel have received no compensation for their services during the course of this Litigation and have incurred very significant expenses in litigating for the benefit of the Settlement Class.  Any fee award or expense reimbursement to Lead Counsel has always been at risk and completely contingent on the result achieved.

96.  Lead Counsel's efforts were performed on a wholly-contingent basis, despite significant risk and in the face of determined opposition with no governmental assistance.  Under these circumstances, it necessarily follows that we are justly entitled to the award of a reasonable

percentage fee based on the benefit conferred and the common fund obtained. Under all of the circumstances present here, a benchmark 25% fee plus expenses is fair and reasonable.

## IX. CONCLUSION

97. For all of the foregoing reasons, Lead Counsel respectfully request the Court to approve the settlement and Plan of Allocation of settlement proceeds and to approve the fee and expense application and award Lead Counsel 25% of the Settlement Fund plus $163,743.23 in expenses, plus the interest earned on both amounts at the same rate and for the same period as that earned on the Settlement Fund until paid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 10th day of March, 2010, at San Francisco, California.

_____

DENNIS J. HERMAN

507833_1

DECL OF HERMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT & PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS- 4:07-cv-04972-CW

- 32 -

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I further certify that I caused this document to be forwarded to the following Designated Internet Site at: http://securities.stanford.edu.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 11, 2010.

*s/ Ellen Gusikoff Stewart*
ELLEN GUSIKOFF STEWART

COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)
E-mail:elleng@csgrr.com

# Mailing Information for a Case 4:07-cv-04972-CW

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Mary K. Blasy**
  mblasy@scott-scott.com,efile@scott-scott.com

- **Kevin Anthony Burke**
  kburke@hewm.com

- **Michael L. Charlson**
  mlcharlson@hhlaw.com,dmsalvi@hhlaw.com,lasoboleva@hhlaw.com,mdewers@hhlaw.com,mjclouse@hhlaw.com,kwong@

- **Marc S. Henzel**
  mhenzel182@aol.com

- **Dennis J. Herman**
  dennish@csgrr.com,jdecena@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Shirley H. Huang**
  shirleyh@csgrr.com

- **J. Christopher Mitchell**
  jcmitchell@hhlaw.com,lasoboleva@hhlaw.com

- **Daniel Jacob Pfefferbaum**
  DPfefferbaum@csgrr.com,e_file_sf@csgrr.com,gfreemon@csgrr.com,e_file_sd@csgrr.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Samuel H. Rudman**
  srudman@csgrr.com

- **Evan J. Smith**
  esmith@brodsky-smith.com

- **Ellen Anne Stewart Gusikoff**
  elleng@csgrr.com

- **Laurence Andrew Weiss**
  laweiss@hhlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

Manual List
*Twinde v. Threshold Pharmaceuticals, Inc., et al.*
No. 4:07-cv-04972-CW


D. Seamus Kaskela
BARROWAY TOPAZ KESSLER
 MELTZER & CHECK, LLP
280 Kind of Prussia Road
Radnor, PA  19087